UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO.:  5:11-CR-229-F-8

UNITED STATES OF AMERICA          .
                                  .
        v.                        .
                                  .      November 17, 2011
DAVID LEWIS                       .      Wilmington, NC
                                  .
              DEFENDANT           .
. . . . . . . . . . . . . . . . .

                        TRIAL
        BEFORE THE HONORABLE JAMES C. FOX
    SENIOR UNITED STATES DISTRICT JUDGE AND A JURY

APPEARANCES:


For the Government:     JENNIFER WELLS,
                        ASSISTANT UNITED STATES ATTORNEY
                        310 NEW BERN AVENUE
                        SUITE 800, FEDERAL BUILDING
                        RALEIGH, NORTH CAROLINA 27601-1461




For the Defendant:      MARK D. STEWART, ESQUIRE
                        BURCH LAW OFFICE
                        311 SOUTH EVANS STREET
                        GREENVILLE, NC 27858




Court Reporter:         STACY SCHWINN, CCR, CVR
                        P.O. BOX 1611
                        WILMINGTON, NC 28402
                        (910) 431-4502

Proceedings recorded by stenomask, transcript produced from
dictation.

# T A B L E   O F   C O N T E N T S

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| STEPHANIE SMITH | | |
| | | |
| BY MS. WELLS | DIRECT (CONTINUED) | 453 |
| BY MR. STEWART | CROSS | 467 |
| BY MS. WELLS | REDIRECT | 474 |
| BY MR. STEWART | RECROSS | 477 |
| | | |
| JEREMY CREECH | | |
| | | |
| BY MS. WELLS | DIRECT | 477 |
| BY MR. STEWART | CROSS | 504 |
| | | |
| GENARD PATRICK | | |
| | | |
| BY MS. WELLS | DIRECT | 513 |
| | | |
| KELLY PAGE | | |
| | | |
| BY MS. WELLS | DIRECT | 538 |
| BY MR. STEWART | CROSS | 601 |
| | | |
| JONATHAN LEE THOMPSON | | |
| | | |
| BY MR. STEWART | DIRECT | 622 |
| | | |
| CATHY LEWIS | | |
| | | |
| BY MR. STEWART | DIRECT | 628 |
| BY MS. WELLS | CROSS | 650 |
| BY MR. STEWART | REDIRECT | 657 |
| | | |
| DAVID LEWIS | | |
| | | |
| BY MR. STEWART | DIRECT | 660 |
| BY MS. WELLS | CROSS | 734 |

EXHIBITS

| GOVERNMENT'S | DESCRIPTION | PAGE - ADMITTED |
|---|---|---|
| 72 | PHOTO - BLUE BACKPACK | 463 |
| 150 & 150A | PHOTO - TERESA MORGAN WITH AND WITHOUT NAME | 464 |
| 151 & 151A | PHOTO - WADE TURNAGE WITH AND WITHOUT NAME | 465 |
| 152 & 152A | PHOTO - SHANNON GRIMES WITH AND WITHOUT NAME | 466 |
| 63 | PHOTO - TWO-DOOR CHEVY PICKUP TRUCK | 493 |

November 17, 2011

T A B L E   O F   C O N T E N T S   C O N T I N U E D

EXHIBITS
GOVERNMENT'S                DESCRIPTION              PAGE - ADMITTED

| GOVERNMENT'S | DESCRIPTION | PAGE - ADMITTED |
|---|---|---|
| 64-67 | PHOTOS - INTERIOR OF TRUCK, PURSE AND BAG, BATTERIES AND METH | 494 |
| 68 | PHOTO - BLACK CONTAINER, CLEAR PLASTIC BAG AND  METH | 497 |
| 69 | PHOTO - ENERGIZER DOUBLE A LITHIUM BATTERY | 497 |
| 70 | PHOTO - FIVE NEEDLES, BLACKBERRY CELL PHONE WITH PINK COVER | 499 |
| 71 | PHOTO - REAR BED OF PICKUP TRUCK | 499 |
| 154 | 3 ENERGIZER LITHIUM BATTERIES | 501 |
| 155 | WALGREENS RECEIPT | 501 |
| 156 | MISCELLANEOUS PAPERWORK AND SMALL BROWN PURSE | 502 |
| 157 | YELLOW MOTOROLA CELL PHONE | 503 |
| 158 | BLACKBERRY CELL PHONE WITH PINK COVER | 504 |
| 73 | PHOTO - ITEMS LOCATED IN SEARCH AND PLACED ON BED OF TRUCK | 520 |
| 77-79 | PHOTOS - 4 DIFFERENT KINDS OF DRAIN OPENER | 521 |
| 74 | PHOTO - PLASTIC BOTTLE, WHITE SUBSTANCE AND TUBING | 523 |
| 75 | PHOTO - PLASTIC CONTAINER, WHITE RESIDUE | 525 |
| 80 | PHOTO - PLASTIC BAG, WHITE PELLET MATERIAL | 527 |
| 76 | PHOTO - INSIDE BOOK BAG | 528 |
| 153 | LAB REPORT | 535 |
| 159 | PHOTO - BOTTLE AND TUBING | 537 |
| 149 | SUMMARY | 559 |
| 130 | PSEUDOEPHEDRINE LOG 2/6/10 | 566 |
| 145 | WALMART PSEUDOEPHEDRINE SALES - DAVID LEWIS | 572 |
| 146 | WALGREENS PSEUDOEPHEDRINE LOGS - DAVID LEWIS | 572 |
| 147 | NPLX PRINTOUT - ALL OF DAVID LEWIS'S PURCHASES AT CVS, RITEAID AND KMART | 573 |
| 124 | TARGET PSEUDOEPHEDRINE LOG - DAVID LEWIS | 574 |
| 120 | HARRIS TEETER PSEUDOEPHEDRINE LOGS - DAVID LEWIS | 575 |
| 121-122 | HARRIS TEETER PRINTOUTS OF PSEUDOEPHEDRINE PURCHASES - DAVID LEWIS | 576 |
| 148 | CHART OF ALL MR. LEWIS'S PSEUDOEPHEDRINE PURCHASES | 577 |
| 129 | WALGREENS PSEUDOEPHEDRINE LOG - 11/1/09 | 585 |
| 126 | WALGREENS PSEUDOEPHEDRINE LOG - 5/17/11 | 585 |
| 127 | WALGREENS PSEUDOEPHEDRINE LOG - 5/30/11 | 586 |
| 118 | STIPULATION | 618 |
| 119 | STIPULATION | 619 |
| 160 | LAB REPORT | 619 |
| 161 | LAB REPORT | 619 |

November 17, 2011

1          P R O C E E D I N G S          9:02 A.M.

2          (DEFENDANT PRESENT.)

3          (OUT OF THE PRESENCE OF THE JURY AND ALTERNATES.)

4          THE COURT:  GOOD MORNING, EVERYONE.  PLEASE BE

5 SEATED.  PLEASE BE SEATED.  LET'S SEE.  BRING THEM IN.

6          I'M SORRY, YOU WANT TO BRING UP SOMETHING, MS.

7 WELLS?

8          MS. WELLS:  I DO, YOUR HONOR.  YOUR HONOR, THIS

9 MORNING WHEN I PULLED INTO THE PARKING LOT ACROSS THE STREET,

10 THE $5 PARK RITE PARKING LOT, AND AS I GOT OUT OF MY VEHICLE

11 -- I JUST WANT TO BRING TO THE COURT'S ATTENTION, ONE OF THE

12 JURORS APPROACHED ME.  I CAN'T TELL YOU WHICH JUROR NUMBER IT

13 IS.  QUITE FRANKLY, WHEN HE FIRST APPROACHED ME, I DIDN'T

14 RECOGNIZE HIM AS ONE OF OUR JURORS.  HE'S WEARING A PURPLE

15 SHIRT.  HE ASKED ME -- I'M NOT DRIVING MY OWN VEHICLE THIS

16 WEEK, I'M DRIVING MY MOTHER'S CAR, AND IT HAS A SOUTH CAROLINA

17 FLAG ON THE FRONT OF THE CAR.  HE ASKED ME WHERE I WAS FROM IN

18 SOUTH CAROLINA, AND I TOLD HIM THAT I WAS FROM UPSTATE SOUTH

19 CAROLINA.  THEN I REALIZED HE WAS STANDING WITH TWO OTHER

20 JURORS AND AT THAT POINT HE ASKED ME ANOTHER QUESTION AND I

21 ENDED OUR CONVERSATION.  I DIDN'T SAY I CAN'T TALK TO YOU, I

22 DIDN'T DO ANYTHING LIKE THAT.  I JUST WALKED AWAY AND PUT MY

23 MONEY IN THE PARK RITE.  AND BY THAT TIME HE HAD WALKED ACROSS

24 THE STREET.

25          BUT I DID WANT TO BRING IT TO THE COURT'S ATTENTION.

1 I'VE INFORMED DEFENSE COUNSEL ABOUT IT.  I THINK IT WAS

2 INNOCUOUS, BUT THE COURT MAY WANT TO INSTRUCT THE JURY ON THAT

3 WE CAN'T HAVE CONTACT WITH THEM.  IF YOU WOULD TELL THEM THAT,

4 YOU KNOW, US NOT SPEAKING TO THEM -- BECAUSE I DID SORT OF

5 ABRUPTLY ONCE I REALIZED THAT --

6　　　　　　THE COURT:  I'LL EXPLAIN IT.

7　　　　　　MS. WELLS:  TELL THEM THAT IT'S NOT ANYTHING

8 PERSONAL, JUST THAT WE CAN'T HAVE CONTACT WITH THEM DURING THE

9 TRIAL.

10　　　　　　THE COURT:  YES, I WILL.  I'LL TAKE CARE OF IT.

11　　　　　　MS. WELLS:  THANK YOU VERY MUCH, YOUR HONOR.

12　　　　　　THE COURT:  ANYTHING ELSE, COUNSEL?  MR. STEWART?

13　　　　　　MR. STEWART:  NOTHING FROM ME, YOUR HONOR.

14　　　　　　THE COURT:  ALL RIGHT.  READY TO START?

15　　　　　　MS. WELLS:  THE GOVERNMENT'S READY, YOUR HONOR.

16　　　　　　THE COURT:  ALL RIGHT.

17　　　　　　(IN THE PRESENCE OF THE JURY AND ALTERNATES.)

18　　　　　　THE COURT:  GOOD MORNING, MEMBERS OF THE JURY.

19　　　　　　JURORS:  GOOD MORNING.

20　　　　　　THE COURT:  MS. SMITH, YOU'RE STILL UNDER OATH.  THE

21 WITNESS, I BELIEVE, IS WITH YOU, MS. WELLS.

22　　　　　　MS. WELLS:  THANK YOU VERY MUCH, YOUR HONOR.

23　　**STEPHANIE SMITH, GOVERNMENT WITNESS, PREVIOUSLY SWORN**

24　　**D I R E C T   E X A M I N A T I O N   C O N T I N U E D**

25　　　　　　　　　　　　　　　　　　9:04 A.M.

November 17, 2011

1 BY MS. WELLS:

2 Q.   MS. SMITH, YESTERDAY BEFORE WE BROKE FOR THE DAY WE WERE

3 TALKING ABOUT YOU TRAVELING WITH THE DEFENDANT TO JOHNSTON

4 COUNTY TO TERESA MORGAN'S HOUSE.  DO YOU KNOW -- I MEAN

5 TERESA'S HOUSE.  DO YOU KNOW HER LAST NAME?  I'M SORRY.

6 A.   YEAH, IT IS TERESA MORGAN.

7 Q.   OKAY.  AND YOU HAD TESTIFIED THAT YOU HAD BEEN AT ANOTHER

8 HOUSE AND THAT A PERSON BY THE NAME OF BERNIE MACK HAD DRIVEN

9 YOU TO 42 TO MEET UP WITH THE DEFENDANT, MR. LEWIS.  DO YOU

10 RECALL THAT?

11 A.   YES, MA'AM.

12 Q.   OKAY.  AND AT THAT TIME WHEN YOU GOT IN THE VEHICLE WITH

13 MR. LEWIS, YOU HAD SEVERAL BAGS WITH YOU?

14 A.   YES, MA'AM.

15 Q.   AND WHAT WERE THE BAGS THAT YOU HAD WITH YOU?

16 A.   I HAD A BAG WITH SOME OF MY CLOTHES IN THEM, MY

17 POCKETBOOK, AND A BAG WITH SOME OF MY DAUGHTER'S STUFF, AND

18 THE BAG WITH THE PRECURSORS.

19 Q.   OKAY.  AND AT THE TIME YOU PUT THAT -- THE BAG WITH THE

20 PRECURSORS, WHAT KIND OF BAG WAS THAT, IF YOU RECALL?

21 A.   IT WAS A BLUE BACKSACK.

22 Q.   OKAY.  AND THAT BACKPACK I BELIEVE YOU TESTIFIED

23 YESTERDAY YOU HAD GOTTEN BECAUSE YOU ALL NEEDED TO CLEAN OUT

24 THE HOUSE --

25 A.   YES.

1 Q.   -- WHERE YOU ALL HAD BEEN COOKING METHAMPHETAMINE, IS

2 THAT CORRECT?

3 A.   YES, MA'AM.

4 Q.   AND THAT BACKPACK CONTAINED ITEMS TO PRODUCE

5 METHAMPHETAMINE?

6 A.   YES, MA'AM.

7 Q.   AND DID YOU KNOW THAT AT THE TIME THAT YOU PUT IT IN THE

8 BACK OF MR. LEWIS'S TRUCK?

9 A.   YES, MA'AM.

10 Q.   NOW, DID YOU HAVE ANY CONVERSATION WITH MR. LEWIS ABOUT

11 WHAT WAS IN THE BACKPACK?

12 A.   WHEN WE WERE AT WADE TURNAGE'S HOUSE.

13 Q.   OKAY.  AND WHAT WAS THAT?

14 A.   I TOLD HIM THAT I NEEDED SOME PILLS, TO SEE IF WADE COULD

15 GET US SOME PILLS, BECAUSE I HAD ABOUT EVERYTHING ELSE I

16 NEEDED IN MY BACKSACK.

17 Q.   OKAY.  AND WHAT WAS MR. LEWIS'S RESPONSE?

18 A.   HE WENT INSIDE TO TALK TO WADE.

19 Q.   OKAY.  AND WHAT WAS THE -- ARE YOU AWARE OF WHAT THE

20 CONVERSATION THEY HAD WAS?

21 A.   NO, MA'AM.

22 Q.   ALL RIGHT.  NOW, WERE YOU ABLE TO GET PILLS FROM MR.

23 TURNAGE?

24 A.   NO, MA'AM.

25 Q.   AND WHILE YOU'RE AT MR. TURNAGE'S HOUSE YOU TESTIFIED

1 YESTERDAY YOU RECEIVED PHONE CALLS FROM MS. MORGAN, TERESA

2 MORGAN, IS THAT CORRECT?

3 A.   YES, MA'AM.  UH-HUH.

4 Q.   AND YOU DECIDED TO GO TO HER RESIDENCE IN JOHNSTON

5 COUNTY?

6 A.   YES, MA'AM.

7 Q.   WAS MR. LEWIS AWARE OF WHY YOU WERE GOING TO HER

8 RESIDENCE IN JOHNSTON COUNTY?

9 A.   YES, MA'AM.

10 Q.   AND WHAT WAS THE PURPOSE FOR THAT TRIP?

11 A.   TO PICK UP TWO BOXES OF PSEUDOEPHEDRINE.

12 Q.   AND WHEN YOU GOT THAT PSEUDOEPHEDRINE, WHAT WERE YOU ALL

13 GOING TO DO WITH IT?

14 A.   I WAS EITHER GOING TO TAKE IT BACK TO THE SHOP AND TRADE

15 IT WITH AARON OR FIGURE OUT A WAY TO GET SOME DRY ICE SO THAT

16 I COULD COOK IT UP.

17 Q.   OKAY.  NOW, ON YOUR WAY TO MS. MORGAN'S HOUSE DID YOU ALL

18 MAKE ANY STOPS?

19 A.   AT THE GAS STATION FOR CIGARETTES.

20 Q.   AND WHILE YOU WERE AT THE GAS STATION DID ANYTHING -- DID

21 A TRANSACTION OCCUR BETWEEN YOU AND MR. LEWIS?

22 A.   YES, MA'AM.

23 Q.   AND WHAT WAS THAT?

24 A.   HE TOOK THE GRAM OF DOPE OUT OF HIS POCKET --

25 METHAMPHETAMINE OUT OF HIS POCKET AND ASKED ME TO HOLD IT

1 BECAUSE IT WAS MELTING.

2 Q.    AND IS THAT UNCOMMON FOR METHAMPHETAMINE TO MELT --

3 A.    NO.

4 Q.    -- WHEN IT'S CLOSE -- WHEN IT'S WARM?

5 A.    HOT OUTSIDE, YEAH.

6 Q.    AND AFTER YOU DID THAT, YOU WENT TO MS. MORGAN'S

7 RESIDENCE, IS THAT CORRECT?

8 A.    YES, MA'AM.

9 Q.    OKAY.  HAD YOU BEEN THERE BEFORE?

10 A.    YES, MA'AM.

11 Q.    AND WHY HAD YOU BEEN THERE PREVIOUSLY?

12 A.    PICKING UP PILLS.

13 Q.    WHAT HAPPENED WHEN YOU GOT TO THE TRAILER WHERE SHE

14 LIVES?

15 A.    I WALKED IN AND THE DETECTIVES WERE SITTING IN HER LIVING

16 ROOM AND HER KITCHEN.

17 Q.    DID YOU WALK IN BY YOURSELF?

18 A.    NO, MA'AM.

19 Q.    WHO WALKED IN WITH YOU?

20 A.    DAVID LEWIS.

21 Q.    AND WHEN YOU ALL PULLED UP -- AGAIN, HE WAS AWARE YOU ALL

22 WERE GOING THERE TO PICK UP PSEUDOEPHEDRINE PILLS, CORRECT?

23 A.    YES, MA'AM.

24 Q.    YOU SAID YOU ALL WALKED IN AND DETECTIVES ARE WHERE?

25 A.    THEY'RE IN HER KITCHEN AND HER LIVING ROOM.

1 Q.   OKAY.  DID YOU RECOGNIZE ANY OF THE DETECTIVES?

2 A.   YES, MA'AM.

3 Q.   AND WHO WAS THAT?

4 A.   MILLIE AND JAY CREECH.

5 Q.   AND YOU RECOGNIZED THEM WHY?

6 A.   BECAUSE THEY HAD PREVIOUSLY -- FROM MY PREVIOUS -- WHERE

7 I GOT CHARGED BEFORE FOR THE METH LAB, THEY WERE THERE THEN.

8 Q.   FROM THE ONE IN KENLY IN JANUARY, CORRECT?

9 A.   YES, MA'AM.

10 Q.   NOW, AT THAT TIME, DID YOU HAVE ANY CONVERSATION WITH MS.

11 MORGAN OR WITH MR. CREECH WHILE YOU'RE IN THAT TRAILER?

12 A.   NO.

13 Q.   YOU DON'T RECALL ANYTHING?

14 A.   I TALKED TO CREECH, YEAH.

15 Q.   OKAY.

16 A.   BECAUSE, I MEAN, HE HAD A WARRANT FOR MY ARREST FROM THE

17 PREVIOUS COURT DATE THAT I MISSED THE FOLLOWING MONDAY BEFORE.

18 Q.   OKAY.  AND THEY TRANSPORTED YOU TO JOHNSTON COUNTY?

19 A.   YES, MA'AM.

20 Q.   AT THAT POINT ARE YOU -- WHAT IS YOUR MIND -- WHAT ARE

21 YOU THINKING ABOUT THE ITEMS IN THIS BAG?  ARE YOU GOING TO

22 TRY TO STICK MR. LEWIS WITH THEM?

23 A.   NO.

24 Q.   WHY NOT?

25 A.   BECAUSE IT WAS MY -- THEY WERE MY ITEMS, I PUT THEM IN

1  THE TRUCK.

2  Q.   OKAY.

3  A.   I FIGURED THAT I WOULD GET IN LESS TROUBLE.  I WAS

4  ALREADY IN TROUBLE, YOU KNOW.  HE'S ON PAROLE AND I WAS

5  ALREADY IN TROUBLE SO I TRIED TO TELL THEM THEY WERE MINE AND

6  IT WAS MINE, BUT HE DID KNOW ABOUT THEM IN THE TRUCK.

7  Q.   NOW, I WANT TO GO BACK AND ASK YOU ONE THING.  THE METH

8  THAT MR. LEWIS GAVE YOU WHEN YOU ALL WERE AT THE GAS STATION

9  BUYING THE CIGARETTES, WHAT DID YOU DO WITH IT?

10  A.   I STUCK IT IN A LITTLE BLACK PHOTO CONTAINER AND PUT IT

11  IN MY PURSE IN A LITTLE SIDE POCKET WITH SOME FILTERS THAT I

12  HAD IN THERE.

13  Q.   OKAY.  YOU WENT TO THE SHERIFF'S OFFICE WITH JAY CREECH,

14  IS THAT CORRECT?

15  A.   UH-HUH.

16  Q.   AND YOU WERE INTERVIEWED?

17  A.   YES, MA'AM.

18  Q.   WERE YOU HIGH AT THE TIME OF YOUR INTERVIEW?

19  A.   YES, MA'AM.

20  Q.   HOW RECENTLY HAD YOU ALL DONE METHAMPHETAMINE?

21  A.   WHEN WE WERE AT WADE TURNAGE'S, I SWALLOWED .3 GRAMS.

22  Q.   OKAY.  WHEN YOU SAY YOU SWALLOWED IT, WHAT DOES -- HOW DO

23  YOU DO THAT?

24  A.   I JUST SWALLOW IT AND CHASE IT WITH DRINK.

25  Q.   OKAY.  THAT INTERVIEW WAS SOMEWHAT LENGTHY, IS THAT FAIR

1  TO SAY?

2  A.   YES, MA'AM.

3  Q.   AND DURING THE COURSE OF THAT INTERVIEW, DID YOU MAKE

4  SOME STATEMENTS TO MR. CREECH THAT WEREN'T COMPLETELY ACCURATE

5  ABOUT --

6  A.   YES, MA'AM.

7  Q.   -- YOUR RELATIONSHIP DRUG-WISE WITH MR. LEWIS?

8  A.   YES, MA'AM.

9  Q.   YOU TOLD HIM THAT YOU HADN'T COOKED AT THE SHOP?

10  A.   YES, MA'AM.

11  Q.   IS THAT TRUE?

12  A.   NO, THAT'S NOT TRUE.

13  Q.   AND YOU TOLD HIM THAT YOU HADN'T SOLD ANY METH AT THAT

14  SHOP, IS THAT CORRECT?

15  A.   YES, THAT'S WHAT I TOLD HIM, BUT IT'S NOT TRUE.

16  Q.   OKAY.  AND YOU SAID THAT YOU'D NEVER SEEN ANY

17  METHAMPHETAMINE MADE OR ANYTHING -- OR ANY METHAMPHETAMINE

18  SOLD BY ANYBODY ELSE AT THAT SHOP?

19  A.   YES, MA'AM.

20  Q.   AND THAT --

21  A.   THAT'S NOT TRUE.

22  Q.   OKAY.  AND YOU DIDN'T -- YOU ALSO TALKED TO MR. CREECH

23  ABOUT WADE TURNAGE, BUT YOU DIDN'T MENTION HIS NAME?

24  A.   RIGHT.

25  Q.   TRUE?

1  A.    (WITNESS NODS HEAD.)

2  Q.    AND WHY WAS THAT?

3  A.    BECAUSE I DIDN'T WANT HIM TO GET IN TROUBLE.

4  Q.    OKAY.  NOW, LATER ON IN YOUR INTERVIEW YOU GOT SOME OF

5  THOSE THINGS STRAIGHT, IS THAT RIGHT?

6  A.    YES, MA'AM.

7  Q.    OKAY.  BUT THERE ARE POINTS IN THAT INTERVIEW WHERE YOU

8  INITIALLY DENIED SOME OF THE THINGS WITH MR. LEWIS, IS THAT

9  CORRECT?

10 A.    YES, MA'AM.

11 Q.    OKAY.  MS. SMITH, DURING THE TIME FRAME THAT YOU WERE

12 WITH MR. LEWIS AND WORKING FOR HIM, DID YOU LOOK UP TO HIM AS

13 A CHRISTIAN OR A SPIRITUAL ADVISOR FOR YOURSELF?

14 A.    NO, NOT FOR MYSELF.  NO.  HUH-UH.

15 Q.    OKAY.  DID HE EVER TALK TO YOU ABOUT CHURCH OR THE

16 IMPORTANCE THAT YOU NEEDED TO GET TO CHURCH AND GET RIGHT WITH

17 GOD?

18 A.    NO, MA'AM.  WE WENT TO CHURCH ONE TIME WITH HIS WIFE.

19 Q.    AND WHAT DO YOU ALL CALL HER (SIC) WIFE?

20 A.    MISS CATHY.

21 Q.    MISS CATHY.

22 A.    YES, MA'AM.

23 Q.    AND YOU USED METHAMPHETAMINE NUMEROUS TIMES WITH MR.

24 LEWIS, IS THAT RIGHT?

25 A.    OH, YES, MA'AM.

1  Q.   AND HOW DID HE INGEST METHAMPHETAMINE?

2  A.   HE SNORTED IT.  HE'S ALSO SMOKED IT AND HE'S EATEN

3  FILTERS.

4  Q.   OKAY.  NOW, YOU SAID HE'S EATEN FILTERS.  THAT'S

5  DIFFERENT FROM EATING JUST ACTUAL METHAMPHETAMINE?

6  A.   YEAH.

7  Q.   WHAT IS -- WHY WOULD YOU EAT -- NUMBER ONE, LET'S START,

8  WHEN YOU SAY HE'S EATING A FILTER, WHAT IS A FILTER?

9  A.   IT'S WHERE YOU STRAIN YOUR METHAMPHETAMINE WHEN YOU'RE

10 DONE COOKING IT.  IT'S IN FUEL, YOU STRAIN THE FUEL OUT OF IT.

11 SO, WHEN YOU DUMP THE METH OFF OF IT, THERE'S STILL A WHOLE

12 LOT OF RESIDUE OF METH ON THE FILTER, A COFFEE FILTER.

13 Q.   A COFFEE FILTER?

14 A.   UH-HUH.

15 Q.   AND HE'S EATEN THE FILTER?

16 A.   YES.

17 Q.   IS THAT UNCOMMON?

18 A.   NO.

19 Q.   OKAY.  YOU SAID YOU HAD FILTERS IN YOUR PURSE AS A MATTER

20 OF FACT, CORRECT?

21 A.   UH-HUH.  YOU CAN STICK THEM IN YOUR DRINK OR YOU CAN CHEW

22 ON THEM AND IT GETS THE METH OUT OF THEM.

23 Q.   OKAY.

24        (PAUSE.)

25        MS. WELLS:  ONE MOMENT, PLEASE, YOUR HONOR.

1          THE COURT:  CERTAINLY.

2          MS. WELLS:  THANK YOU VERY MUCH.

3          (PAUSE.)

4 BY MS. WELLS:

5 Q.    NOW, MS. SMITH, YOU TESTIFIED YESTERDAY THAT MR. LEWIS

6 PURCHASED PSEUDOEPHEDRINE PILLS FOR YOU, IS THAT CORRECT?

7 A.    YES, MA'AM.

8 Q.    DID YOU EVER GO WITH HIM WHEN HE PURCHASED PILLS?

9 A.    YES, MA'AM, ONE TIME.

10 Q.    AND WHEN WAS THAT?

11 A.    WE WERE IN ZEBULON AT RITE AID.  WE WENT TO ZEBULON TO

12 CASH A CHECK.

13 Q.    OKAY.  YOU WERE IN ZEBULON CASHING A CHECK --

14 A.    YES, MA'AM.

15 Q.    -- FROM WHERE?

16 A.    A CUSTOMER.

17 Q.    OKAY.

18 A.    THEIR BANK WAS IN ZEBULON.

19 Q.    ALL RIGHT.  SO, YOU WENT THERE TO CASH A CHECK AND YOU

20 WENT TO A PHARMACY?

21 A.    RITE AID.

22 Q.    OKAY.  DID YOU GO IN WITH HIM?

23 A.    NO, HE WENT IN FIRST AND THEN I WENT IN.

24 Q.    OKAY.  AND HE PURCHASED WHAT?

25 A.    A BOX OF 20 120'S.  GENERIC 20 120'S.

1 Q.   AND PROVIDED THOSE TO WHOM?

2 A.   ME.

3 Q.   ALL RIGHT.

4          MS. WELLS:  MAY I APPROACH THE WITNESS, YOUR HONOR?

5          THE COURT:  YES, MA'AM.

6          MS. WELLS:  THANK YOU.

7 BY MS. WELLS:

8 Q.   MS. SMITH, I'M GOING TO SHOW YOU WHAT'S BEEN MARKED FOR

9 IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT 72.  DO YOU

10 RECOGNIZE THAT?

11 A.   YES, MA'AM.

12 Q.   AND THAT IS THAT?

13 A.   THAT'S THE BLUE BACKPACK WITH THE PRECURSOR CHEMICALS IN

14 IT.

15             (GOVERNMENT EXHIBIT NUMBER 72

16              WAS IDENTIFIED FOR THE RECORD.)

17 Q.   AND IS THAT IN THE SAME OR SUBSTANTIALLY THE SAME

18 CONDITION AS WHEN YOU HAD IT ON JUNE 30TH OF 2011?

19 A.   YES, MA'AM.

20          MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

21 EXHIBIT 72 AT THIS TIME.

22          THE COURT:  IT'S ADMITTED.

23          MS. WELLS:  THANK YOU VERY MUCH.

24             (GOVERNMENT EXHIBIT NUMBER 72 WAS

25              OFFERED AND ADMITTED INTO EVIDENCE.)

1  BY MS. WELLS:

2  Q.   NOW, MS. SMITH, I'M GOING TO SHOW YOU WHAT'S BEEN MARKED

3  FOR IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT 150A.  DO

4  YOU RECOGNIZE THE PERSON IN THAT PHOTO?

5  A.   YES, MA'AM.

6  Q.   AND WHO IS THAT?

7  A.   TERESA MORGAN.

8                    (GOVERNMENT EXHIBIT NUMBER 150A

9                    WAS IDENTIFIED FOR THE RECORD.)

10 Q.   OKAY.  SHOWING YOU NOW GOVERNMENT'S EXHIBIT 150.  IS THAT

11 THE SAME PHOTO?

12 A.   YES, MA'AM.

13 Q.   WHAT'S THE DIFFERENCE BETWEEN THESE TWO?

14 A.   HER NAME IS AT THE BOTTOM OF THE PHOTO.

15                    (GOVERNMENT EXHIBIT NUMBER 150

16                    WAS IDENTIFIED FOR THE RECORD.)

17          MS. WELLS:  YOUR HONOR, I'D OFFER 150 AND 150A AT

18 THIS TIME.

19          THE COURT:  THEY'RE BOTH ADMITTED.

20                    (GOVERNMENT EXHIBIT NUMBER 150 AND 150A

21                    WERE OFFERED AND ADMITTED INTO EVIDENCE.)

22 BY MS. WELLS:

23 Q.   OKAY.  SHOWING YOU NOW WHAT'S BEEN MARKED FOR

24 IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT 151A.  DO YOU

25 RECOGNIZE THE PERSON IN THAT PHOTO?

1  A.   YES, MA'AM.

2  Q.   AND WHO IS THAT?

3  A.   WADE TURNAGE.

4                (GOVERNMENT EXHIBIT NUMBER 151A

5                WAS IDENTIFIED FOR THE RECORD.)

6  Q.   OKAY.  SHOWING YOU NOW WHAT'S BEEN MARKED FOR

7  IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT 151.  IS THAT

8  THE SAME PHOTO?

9  A.   YES, MA'AM.

10  Q.   AND WHAT'S THE DIFFERENCE?

11  A.   HIS NAME IS AT THE BOTTOM OF THIS PHOTO.

12                (GOVERNMENT EXHIBIT NUMBER 151

13                WAS IDENTIFIED FOR THE RECORD.)

14  Q.   THANK YOU VERY MUCH.

15           MS. WELLS:  I WOULD OFFER GOVERNMENT'S EXHIBIT 151

16  AND 151A AT THIS TIME.

17           THE COURT:  THEY'RE ADMITTED.

18                (GOVERNMENT EXHIBIT NUMBER 151 AND 151A

19                WERE OFFERED AND ADMITTED INTO EVIDENCE.)

20           MS. WELLS:  THANK YOU VERY MUCH.

21  BY MS. WELLS:

22  Q.   SHOWING YOU WHAT'S BEEN MARKED FOR IDENTIFICATION

23  PURPOSES AS GOVERNMENT'S EXHIBIT 152A.  DO YOU RECOGNIZE THAT

24  PERSON?

25  A.   YES, MA'AM.

1  Q.   AND WHO IS THAT?

2  A.   SHANNON GRIMES.

3                  (GOVERNMENT EXHIBIT NUMBER 152A

4                  WAS IDENTIFIED FOR THE RECORD.)

5  Q.   SHOWING YOU NOW WHAT'S BEEN MARKED FOR IDENTIFICATION

6  PURPOSES AS GOVERNMENT'S EXHIBIT 152.  DO YOU RECOGNIZE -- IS

7  THAT THE SAME PHOTO?

8  A.   YES, MA'AM.

9  Q.   AND WHAT'S THE DIFFERENCE?

10  A.   HIS NAME IS AT THE BOTTOM OF THE PHOTO.

11                  (GOVERNMENT EXHIBIT NUMBER 152

12                  WAS IDENTIFIED FOR THE RECORD.)

13           MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S 152

14  AND 152A.

15           THE COURT:  THEY'RE ADMITTED.

16                  (GOVERNMENT EXHIBIT NUMBER 152 AND 152A

17                  WERE OFFERED AND ADMITTED INTO EVIDENCE.)

18  BY MS. WELLS:

19  Q.   YOU WERE AT THE LEWIS'S RESIDENCE ON A FAIRLY REGULAR

20  BASIS FOR AN EXTENDED PERIOD OF TIME, IS THAT FAIR TO SAY?

21  A.   YES, MA'AM.

22  Q.   DID YOU HAVE ANY CONVERSATIONS -- OR ARE YOU AWARE

23  WHETHER OR NOT MISS CATHY WAS AWARE OF MR. LEWIS'S ISSUES --

24  HIS ADDICTION?

25  A.   OH, YEAH, SHE WAS BECAUSE WE USED TO GET IN TROUBLE.  SHE

1  USED TO COME DOWN THERE AND FUSS AT HIM AND HE'D TAKE HER

2  OUTSIDE AND WE COULD SEE THEM ON THE CAMERA ARGUING ABOUT IT.

3  Q.   WAS SHE AWARE THAT YOU HAD AN ADDICTION ISSUE?

4  A.   YES, MA'AM.

5  Q.   SHE WAS?

6  A.   SHE WAS AWARE THAT WE ALL DID.

7  Q.   AND WHEN YOU SAY WE ALL, WHO DO YOU MEAN?

8  A.   ME, VAL AND AARON, BRIAN, DOG, ANDY.  ALL OF US DID.

9  Q.   OKAY.

10        MS. WELLS:  ONE MOMENT, PLEASE, YOUR HONOR.

11        (PAUSE.)

12        MS. WELLS:  YOUR HONOR, I HAVE NO FURTHER QUESTIONS

13  FOR MS. SMITH AT THIS TIME.

14        THE COURT:  CROSS.

15            C R O S S - E X A M I N A T I O N    9:18 A.M.

16  BY MR. STEWART:

17  Q.   NOW, MS. SMITH, YOU WOULD ADMIT THAT YOU LIED TO LAW

18  ENFORCEMENT PREVIOUSLY?

19  A.   YES, SIR.

20  Q.   WHY DID YOU LIE TO LAW ENFORCEMENT?

21  A.   I DON'T KNOW.  I WAS HIGH.

22  Q.   YOU DON'T KNOW WHY YOU LIED?

23  A.   NO, I DON'T.  I DIDN'T WANT HIM TO GET IN TROUBLE.  IT

24  WAS MY STUFF IN THE BACK OF THE TRUCK, I DIDN'T WANT HIM TO

25  GET IN TROUBLE FOR IT.

1 Q.   WHAT DID YOU THINK WOULD GET HIM IN TROUBLE?

2 A.   IT BEING IN HIS TRUCK THAT HE WAS DRIVING.  HE WAS WITH

3 ME WHEN -- I'VE BEEN BUSTED PREVIOUSLY, I KNOW HOW OTHER

4 PEOPLE GET INVOLVED IN YOUR CRIME.

5 Q.   YOU'VE BEEN BUSTED BY JAY AND MILLIE BEFORE?

6 A.   YES, MA'AM -- YES, SIR.

7 Q.   NOW, WHAT DID YOU SAY JAY ARRESTED YOU FOR WHEN HE SHOWED

8 UP AT TERESA'S HOUSE?

9 A.   FOR A WARRANT THAT I HAD OUT FOR MY ARREST FOR FAILURE TO

10 GO TO COURT.

11 Q.   IT WAS FOR A FELONY PROBATION VIOLATION, WASN'T IT?

12 A.   YES, SIR.

13 Q.   WAS THAT THE VIOLATION, NOT GOING TO COURT, OR WAS THERE

14 ANOTHER VIOLATION?

15 A.   THERE WAS ANOTHER VIOLATION.

16 Q.   YOU DIDN'T TELL US ABOUT THAT ON THE STAND, DID YOU?

17 A.   NO, SIR.

18 Q.   ARE YOU LYING NOW?

19 A.   NO, SIR.

20 Q.   HOW DO YOU KNOW -- HOW DO WE KNOW YOU'RE NOT LYING NOW?

21        MS. WELLS:  I'M GOING TO OBJECT TO THAT, YOUR HONOR.

22        THE COURT:  SUSTAINED.

23 BY MR. STEWART:

24 Q.   LET ME GO BACK TO WHAT YOU SAID MAYBE TO JAY.  WERE YOU

25 TRYING TO KEEP DAVID OUT OF TROUBLE COMPLETELY?

1 A.   I WAS TRYING TO TELL JAY THAT IT WAS MINE.  HE'S ON

2 PAROLE, I DIDN'T WANT HIM TO GET IN TROUBLE.  I KNEW I WAS IN

3 TROUBLE ALREADY BECAUSE I HAD A VIOLATING PROBATION AND I

4 MISSED COURT.

5 Q.   DO YOU RECALL ANYTIME IN THE INTERVIEW WHERE DETECTIVE

6 CREECH WOULD ASK YOU IF DOG OR DAVID GOT HIS METH FROM YOU?

7 A.   YES, SIR.

8 Q.   DO YOU RECALL SAYING, NO, I GET MY METH FROM DOG?

9 A.   YEAH.

10 Q.   DON'T YOU THINK THAT WOULD HAVE GOTTEN HIM IN TROUBLE?

11 A.   I WASN'T HIGH ANYMORE TOWARDS THE END OF THE INTERVIEW.

12 IF YOU LOOK AT THE INTERVIEW, AT THE BEGINNING I WAS LYING,

13 BUT WHEN YOU NOTICE THE LONGER I SAT THERE THE MORE TRUTHFUL I

14 GOT BECAUSE I WASN'T HIGH ANYMORE.

15 Q.   ABOUT WHAT TIME DID YOU START TELLING THE TRUTH?

16 A.   WHEN I GOT SOBER.  WHEN I GOT ARRESTED AND GOT -- WHEN I

17 GOT INTO PRISON AND THEY QUESTIONED ME OVER AND OVER AND OVER

18 AGAIN.  I HAD THE SAME STATEMENTS EVERY TIME THEY QUESTIONED

19 ME BECAUSE I WAS SOBER.

20 Q.   WELL, WOULD YOU AGREE THROUGHOUT YOUR INTERVIEWS YOU'VE

21 BEEN A LITTLE INCONSISTENT?

22 A.   THE FIRST INTERVIEW WHEN I WAS HIGH, YES.  THAT'S IT.

23 Q.   DURING THE FIRST INTERVIEW, HOW MANY HOURS OR MINUTES IN

24 TO IT DID YOU SOBER UP AND BECOME TRUTHFUL?

25 A.   I DON'T KNOW, SIR.

1 Q.   BUT YOU KNOW TOWARDS THE END WHEN YOU SAID I GOT MY METH

2 FROM DOG, YOU WERE BEING TRUTHFUL AT THAT POINT?

3 A.   YES, SIR.

4 Q.   AT THAT POINT DID YOU NO LONGER CARE WHETHER HE GOT IN

5 TROUBLE?

6 A.   I WAS JUST -- I WAS GIVING UP AND I WAS READY TO TELL THE

7 TRUTH.  I SAT THERE FOR HOURS BEING QUESTIONED.

8 Q.   DID YOU LIE BECAUSE YOU WERE HIGH OR DID YOU LIE BECAUSE

9 YOU WERE TRYING TO PROTECT DAVID?

10 A.   I WAS TRYING TO PROTECT DAVID.

11 Q.   SO, WHAT DID BEING HIGH HAVE TO DO WITH IT?

12 A.   I WAS STILL HIGH.

13 Q.   WHAT --

14 A.   IT'S EASIER TO PUT SOMETHING ON YOURSELF WHEN YOU'RE

15 HIGH.  IT'S EASIER TO TAKE THE BLAME WHEN YOU'RE HIGH.

16 Q.   BUT DO YOU KNOW WHAT YOU'RE SAYING WHEN YOU'RE HIGH?

17 A.   YEAH.  I KNEW I WAS LYING.  I WASN'T TOTALLY INCOHERENT

18 THAT I DIDN'T KNOW WHAT WAS GOING ON.  I KNEW I WAS LYING.

19 Q.   BUT TOWARDS THE END --

20 A.   AND JAY CREECH DID TOO.  THAT'S WHY HE REPEATEDLY ASKED

21 ME THE QUESTIONS OVER AND OVER AGAIN TO SEE IF I'D CHANGE MY

22 STORY.

23 Q.   SO, I'M TRYING TO CLARIFY WHEN YOU STARTED TELLING THE

24 TRUTH.  YOU'RE A LITTLE UNCLEAR AS TO THAT?

25 A.   NO, I'M NOT.  HE ASKED ME ABOUT DAVID LEWIS IN THE

1 BEGINNING OF THE INTERVIEW AND I LIED.

2 Q.   BUT TOWARDS THE END WHEN YOU SAID I GOT MY METH FROM

3 DOG --

4 A.   YES.

5 Q.   -- YOU WERE TELLING THE TRUTH?

6 A.   I HAVE GOT METH FROM DOG.

7 Q.   ABOUT TELLING THE TRUTH, YOU WERE TELLING THE TRUTH AT

8 THAT POINT, IS THAT CORRECT?

9 A.   YES, SIR.

10 Q.   ABOUT A MINUTE PRIOR TO THAT STATEMENT WERE YOU STILL

11 HIGH AND LYING?

12 A.   I WAS HIGH THE WHOLE -- THE WHOLE INTERVIEW.

13 Q.   YOU SAID --

14 A.   YOU CAN'T TAKE THE METH OUT OF MY SYSTEM.

15 Q.   WELL, YOU SAID JUST A MINUTE AGO YOU WERE NO LONGER HIGH

16 TOWARDS THE END OF THE INTERVIEW AND STARTED TELLING THE

17 TRUTH, IS THAT CORRECT?

18 A.   I WASN'T AS HIGH AS I WAS WHEN I STARTED.  I HAD JUST

19 INGESTED .3 OF METHAMPHETAMINE BEFORE WE LEFT WADE TURNAGE'S

20 HOUSE.

21 Q.   DID YOU WEIGH IT BEFORE YOU INGESTED IT?

22 A.   NO, SIR.

23 Q.   WELL, HOW DID YOU KNOW IT WAS .3?

24 A.   BECAUSE I HAVE BEEN AROUND DOPE FOR TEN YEARS, YOU CAN

25 LOOK AT IT AND TELL HOW MUCH -- HOW MUCH IT WEIGHS.

1 Q.   HOW MANY TIMES DID YOU SEE DUSTIN BOYKIN AT THE CORVETTE

2 SHOP?

3 A.   ONE TIME.

4 Q.   ARE YOU SURE ABOUT THAT?

5 A.   YES, I'M SURE.

6 Q.   WHAT WAS THE DATE ON THAT?

7 A.   I HAVE NO IDEA.

8 Q.   DID YOU DO ANY METH THAT DAY?

9 A.   YES, SIR.

10 Q.   HOW MUCH?

11 A.   I DON'T KNOW.  EVERYBODY WAS PASSING AROUND A BOAT AND

12 SMOKING IT, YOU DON'T KNOW HOW MUCH YOU'RE DOING.  I DIDN'T

13 LOAD THE BOAT AND I DIDN'T COUNT HOW MANY PUFFS SOMEBODY

14 PULLED OFF OF IT BEFORE THEY PASSED IT TO ME.

15 Q.   NOW, YOU SAID EARLIER OR YESTERDAY ACTUALLY THAT DAVID

16 LEWIS CALLED YOU?

17 A.   YES, SIR.

18 Q.   YOU CALLED HIM, DIDN'T YOU?

19 A.   WHEN?

20 Q.   ON JUNE 30TH.

21 A.   NO, SIR.

22 Q.   YOU DID NOT CALL HIM?

23 A.   NO, SIR, I WAS IN A BARN GETTING HIGH AND HE CALLED.

24 Q.   WHAT TIME DID HE CALL?

25 A.   I'M NOT SURE.

1  Q.   HOW MUCH METH DID YOU DO AT THE BARN?

2  A.   I DO METH EVERY DAY, I DON'T KNOW.  I WAS EATING FILTERS

3  THAT DAY.

4  Q.   RIGHT.  WELL, YOU KNEW YOU DID .3 GRAMS AT WADE TURNAGE'S

5  HOUSE A FEW HOURS AFTER THAT.

6  A.   BECAUSE IT WAS PHYSICALLY ONE PIECE OF DOPE THAT'S SAT

7  DOWN ON THE TABLE THAT I COULD LOOK AT.  WHEN YOU HAVE A

8  FILTER AND IT HAS DOPE RESIDUE ON IT, YOU CANNOT EYEBALL THAT

9  AND SEE HOW MUCH DOPE IS IN THERE.

10  Q.   WERE YOU HIGH AT WADE TURNAGE'S HOUSE?

11  A.   YES.  SO WAS DAVID LEWIS.

12  Q.   WHERE DID DAVID LEWIS DO METH PRIOR TO GOING TO WADE'S

13  HOUSE?

14  A.   I DON'T KNOW.  HE PICKED ME UP AND HE EAT ONE OF MY

15  FILTERS ON THE WAY THERE IN HIS -- IN HIS -- YOU CAN LOOK IN

16  THE TRUCK, THERE'S A CUP IN THERE THAT'S GOT A PIECE OF FILTER

17  IN IT THAT HE DRANK WITH HIS LIQUOR ON THE WAY THERE.  AND

18  WHEN WE GOT THERE, WE SNORTED LINES AT WADE TURNAGE'S HOUSE

19  BECAUSE I DON'T SNORT DOPE.

20  Q.   DID YOU TELL YOUR PROBATION OFFICER YOU WERE DOING METH?

21  A.   NO, SIR, THAT WOULD BE STUPID.

22  Q.   SO, YOU LIED TO YOUR PROBATION OFFICER?

23  A.   YES, I DID.

24  Q.   SO, YOU HAVE A PATTERN OF LYING?

25  A.   ANY CRIMINAL DOES, BUT I ALSO HAVE A PATTERN OF TELLING

1 THE TRUTH WHEN I GOT SOBER.

2 Q.   YOUR TESTIMONY HERE WILL HELP YOU OUT, WON'T IT?

3 A.   I'M NOT SURE --

4 Q.   DO YOU BELIEVE IT WILL HELP YOU OUT?

5 A.   IT MIGHT HELP ME OUT, YES.

6 Q.   DO YOU HOPE IT WILL HELP YOU OUT?

7 A.   I HOPE IT WILL, BUT THAT'S NOT WHY I'M TELLING THE TRUTH.

8 WHY WOULD I INCRIMINATE MYSELF AND LIE ON SOMEBODY ELSE?  WHY

9 WOULD --

10 Q.   THAT'S WHAT YOU DID DURING THIS INTERVIEW, ISN'T IT?

11 A.   YES, I DID.

12 Q.   I HAVE NO --

13 A.   I WAS HIGH.

14 Q.   -- FURTHER QUESTIONS, MS. SMITH.

15 A.   GOOD.

16          R E D I R E C T   E X A M I N A T I O N  9:26 A.M.

17 BY MS. WELLS:

18 Q.   MS. SMITH, AT THE TIME THAT YOU WERE INTERVIEWED BY JAY

19 CREECH, HAD YOU EVER HAD ANY CONTACT WITH THE FEDERAL JUSTICE

20 SYSTEM?

21 A.   NO, MA'AM.

22 Q.   YOU HAD HAD -- YOU HAD BEEN ARRESTED IN JANUARY OF

23 2011 --

24 A.   UH-HUH.

25 Q.   -- AND BEEN RELEASED FROM JAIL IN APRIL, CORRECT?

1 A.   YES, MA'AM.

2 Q.   OKAY.  WHEN YOU WERE -- DURING THAT TIME FRAME, DID

3 ANYONE APPROACH YOU WITH A PLEA AGREEMENT?

4 A.   NO.

5 Q.   DID ANYBODY ASK YOU TO COOPERATE?

6 A.   NO, MA'AM.

7 Q.   AND WHEN YOU WERE RELEASED, YOU WENT RIGHT BACK TO WHAT

8 YOU WERE DOING BEFORE, CORRECT?

9 A.   YES, MA'AM.

10 Q.   NOW, WHEN YOU WERE ARRESTED AND INTERVIEWED BY MR.

11 CREECH, YOU TESTIFIED PREVIOUSLY YOU WERE HIGH, IS THAT

12 CORRECT?

13 A.   YES, MA'AM.

14 Q.   HAD MR. CREECH TALKED TO YOU ABOUT THE POSSIBILITY OF

15 FEDERAL PROSECUTION DURING YOUR INTERVIEW?

16 A.   HE DID THAT, YES, HE DID.  HE SAID THE FEDS COULD LOOK

17 INTO THIS.

18 Q.   OKAY.  AT THAT TIME DID THAT MEAN ANYTHING TO YOU?

19 A.   IT DID, BUT I DIDN'T THINK THEY'D LOOK INTO IT BECAUSE,

20 YOU KNOW, I MEAN WE'RE NOT -- NEITHER ONE OF US WERE REALLY

21 BIG, YOU KNOW, DRUG DEALERS IN THE COMMUNITY AND I DIDN'T

22 THINK THAT THEY'D LOOK INTO MY CASE, YOU KNOW.

23 Q.   DID HE TALK TO YOU ABOUT SIGNING A PLEA AGREEMENT?

24 A.   A PLEA AGREEMENT?

25 Q.   UH-HUH.

1  A.   NO.

2  Q.   WHEN DID YOU SIGN -- WHEN DID YOU SIGN A PLEA AGREEMENT?

3  A.   WHEN I GOT PICKED UP BY THE FEDS IN SEPTEMBER AND MY

4  LAWYER SENT ME THE PLEA AGREEMENT IN THE MAIL SHORTLY AFTER, A

5  COUPLE WEEKS AFTER.

6  Q.   AND AT THE TIME YOU SIGNED IT YOU WERE WITH YOUR

7  ATTORNEY, CORRECT?

8  A.   NO, MA'AM.

9  Q.   NO?

10  A.   NO.

11  Q.   BUT YOU TALKED TO HIM ABOUT IT, CORRECT?

12  A.   YES, MA'AM.

13  Q.   AND HE WENT THROUGH ALL OF THE ITEMS IN THAT PLEA

14  AGREEMENT WITH YOU, CORRECT?

15  A.   YES, MA'AM.

16  Q.   YOU UNDERSTOOD THEM?

17  A.   YES, MA'AM.

18  Q.   OKAY.  AND PRIOR TO THAT -- PRIOR TO SIGNING THAT PLEA

19  AGREEMENT, YOU DIDN'T HAVE ANY INTERVIEWS WITH ANY OTHER

20  GOVERNMENT AGENTS, IS THAT CORRECT?

21  A.   THAT'S CORRECT.

22  Q.   OTHER THAN THE STATE -- THE LOCAL AGENTS WITH THE COUNTY

23  THAT YOU HAD TALKED TO?

24  A.   YES, MA'AM.  I'M NOT TESTIFYING TO GET TIME OFF IN MY

25  CASE.  I'M TESTIFYING BECAUSE IT'S IN MY PLEA AGREEMENT.  IF I

 1 DON'T AGREE WITH IT AND I DON'T DO LIKE I'M SUPPOSED TO, MY

 2 PLEA AGREEMENT GETS CANCELED.  IT'S NO GOOD ANYMORE.

 3          MS. WELLS:  YOUR HONOR, I HAVE NO FURTHER QUESTIONS.

 4          THE COURT:  RECROSS.

 5          MR. STEWART:  JUST ONE, YOUR HONOR.

 6           R E C R O S S - E X A M I N A T I O N  9:28 A.M.

 7 BY MR. STEWART:

 8 Q.  SO, MS. SMITH, YOU'RE SAYING YOU LIED WHEN IT COULD NOT

 9 HELP YOU, BUT NOW THAT IT CAN HELP YOU YOU'RE TELLING THE

10 TRUTH?

11 A.  NO, NOW THAT I'M SOBER I'M TELLING THE TRUTH.  IT'S TIME

12 TO MAN UP AND TAKE YOUR RESPONSIBILITY TO WHAT YOU'VE DONE AND

13 I'VE DONE IT.

14          MR. STEWART:  THANK YOU, MS. SMITH.

15          THE COURT:  YOU MAY STEP DOWN.  THANK YOU.  NEXT

16 WITNESS?

17          MS. WELLS:  THANK YOU, YOUR HONOR.  THE GOVERNMENT

18 CALLS JAY CREECH TO THE STAND, PLEASE.

19      **JEREMY ALBERT CREECH, GOVERNMENT WITNESS, SWORN**

20          **D I R E C T   E X A M I N A T I O N**   9:29 A.M.

21 BY MS. WELLS:

22 Q.  INVESTIGATOR CREECH, WHERE ARE YOU EMPLOYED?

23 A.  JOHNSTON COUNTY SHERIFF'S OFFICE.

24 Q.  AND HOW LONG HAVE YOU BEEN WITH THE JOHNSTON COUNTY

25 SHERIFF'S OFFICE?

1  A.   SINCE DECEMBER OF 2007.

2  Q.   OKAY.  AND PRIOR TO COMING ON WITH THE JOHNSTON COUNTY

3  SHERIFF'S OFFICE, DO YOU HAVE ANY PREVIOUS LAW ENFORCEMENT

4  EXPERIENCE?

5  A.   YES, MA'AM.  I WAS CURRENTLY EMPLOYED ONE YEAR WITH THE

6  WILSON COUNTY SHERIFF'S OFFICE BEFORE THAT.

7  Q.   WHAT'S YOUR CURRENT ASSIGNMENT?

8  A.   CURRENT ASSIGNMENT IS DETECTIVE IN THE NARCOTICS DIVISION

9  OF THE SHERIFF'S OFFICE.

10 Q.   AND HOW LONG HAVE YOU BEEN IN THE NARCOTICS DIVISION?

11 A.   SINCE MARCH OF 2009.

12 Q.   I'M GOING TO DIRECT YOUR ATTENTION NOW TO JUNE OF 2011.

13 DURING THAT TIME WERE YOU ALL CONDUCTING AN INVESTIGATION INTO

14 METHAMPHETAMINE AND PSEUDOEPHEDRINE PURCHASES?

15 A.   YES, WE WERE.

16 Q.   AND DID PART OF YOUR INVESTIGATION LEAD YOU TO TERESA AND

17 JERRY MORGAN?

18 A.   YES, IT DID.

19 Q.   HOW DID YOU GET TO TERESA MORGAN?

20 A.   WE WERE TARGETING SPECIFIC METHAMPHETAMINE COOKS IN THE

21 JOHNSTON COUNTY AREA USING A SOFTWARE THAT WE'RE ASSIGNED TO,

22 WHICH WAS METH CHECK AT THE TIME.  TERESA WAS EXCEEDING THE

23 PSEUDO LIMIT MORE THAN ANYONE ELSE IN JOHNSTON COUNTY AT THAT

24 TIME.

25 Q.   OKAY.  YOU SAID SHE'S EXCEEDING THE PSEUDO LIMIT.  WHEN

1  YOU SAY PSEUDO, IS THAT SHORT FOR PSEUDOEPHEDRINE?

2  A.   YES, IT IS.

3  Q.   OKAY.  AND YOU SAID THAT SHE'S EXCEEDING THE PSEUDO

4  LIMIT.  WHAT IS THE PSEUDO LIMIT?

5  A.   BY STATE LAW, NORTH CAROLINA STATE LAW, SHE WAS EXCEEDING

6  MORE THAN -- PURCHASING MORE THAN 9.0 GRAMS OF PSEUDOEPHEDRINE

7  WITHIN A 30 DAY PERIOD AND ALSO PURCHASING MORE THAN 3.6 GRAMS

8  IN A 24-HOUR PERIOD.

9  Q.   AND BASED ON USING THE DATABASE THAT YOU WERE USING, THAT

10 WAS CAPTURING INFORMATION FROM PHARMACIES, IS THAT CORRECT?

11 A.   YES, IT IS.

12 Q.   AND THAT'S HOW YOU WERE ABLE TO MAKE THAT DETERMINATION?

13 A.   YES, IT WAS.

14 Q.   AND BASED ON THE INFORMATION THAT YOU APPLIED AT THAT

15 POINT BY METH CHECK, DID YOU SEEK WARRANTS FOR HER ARREST?

16 A.   I DID, ONE FELONY WARRANT AND ONE MISDEMEANOR WARRANT FOR

17 HER ARREST.

18 Q.   AND ONCE YOU HAD THOSE WARRANTS, DID YOU GO AND ATTEMPT

19 TO SERVE THEM?

20 A.   YES, WE DID.

21 Q.   YOU WERE LOOKING TO ARREST HER, WERE YOU HOPING TO GET

22 ANYTHING ELSE OUT OF IT?

23 A.   YES, WE WERE.

24 Q.   WHAT WAS THAT?

25 A.   WE WERE HOPING THAT ONCE WE PLACED HER UNDER ARREST THAT

1 SHE WOULD COOPERATE WITH US AND ORDER UP METHAMPHETAMINE OR

2 ANY OTHER NARCOTIC FROM KNOWN DRUG DEALERS IN THE JOHNSTON

3 COUNTY AREA.

4 Q.    AND YOU WENT TO HER RESIDENCE?

5 A.    YES, MA'AM.

6 Q.    WHERE IS THAT?

7 A.    133 MELVIN COURT, IT'S IN SMITHFIELD, NORTH CAROLINA,

8 WHICH IS -- IT HAS A SMITHFIELD ADDRESS, BUT IT'S IN THE

9 COUNTY.

10 Q.    I'M GOING TO SHOW YOU, AND YOU MAY NEED TO LEARN FORWARD,

11 BUT I'M GOING TO SHOW YOU GOVERNMENT'S EXHIBIT 150.  IS THAT

12 MS. MORGAN?

13          MS. WELLS:  MAY HE HAVE PERMISSION TO --

14          THE COURT:  YES, MA'AM.

15          MS. WELLS:  THANK YOU VERY MUCH.

16          THE WITNESS:  YES, IT IS.

17              (GOVERNMENT EXHIBIT NUMBER 150

18              WAS IDENTIFIED FOR THE RECORD.)

19 BY MS. WELLS:

20 Q.    AND THAT'S THE PERSON THAT YOU APPROACHED, CORRECT?

21 A.    YES, MA'AM.

22 Q.    AND WHAT WAS THE DATE ON THIS?

23 A.    THURSDAY, JUNE 30TH OF 2011.

24 Q.    WHAT HAPPENED WHEN YOU APPROACHED MS. MORGAN?

25 A.    SHE INVITED US IN HER HOME.  WE TOLD HER -- WE ASKED HER

1  COULD WE ASK QUESTIONS ABOUT THE INVESTIGATION AND SHE AGREED.

2  INVITED DETECTIVE LANGDON AND MYSELF INTO HER HOUSE WITH HER

3  HUSBAND, JERRY MORGAN, AND WE BEGAN SPEAKING TO HER ABOUT THE

4  WARRANTS AND THE INVESTIGATION.

5  Q.    OKAY.  AND DID YOU ASK HER IF SHE WOULD COOPERATE?

6  A.    WE DID.

7  Q.    AND DID SHE AGREE TO DO THAT?

8  A.    SHE DID.

9  Q.    AND DID YOU ASK HER ABOUT PEOPLE THAT SHE COULD POSSIBLY

10 PURCHASE METHAMPHETAMINE FROM?

11 A.    I DID.

12 Q.    AND WHO DID SHE TELL YOU THAT SHE MIGHT BE ABLE TO DO

13 THAT WITH?

14 A.    SHE STATED STEPHANIE SMITH AND JEFF PAUL.

15 Q.    AND WERE YOU FAMILIAR WITH EITHER OF THOSE PEOPLE?

16 A.    I WAS.

17 Q.    AND WHO WERE YOU FAMILIAR WITH?

18 A.    I'M FAMILIAR WITH BOTH SUBJECTS.  STEPHANIE SMITH DUE TO

19 HAVING ARRESTED -- I ARRESTED HER EARLIER THAT YEAR IN JANUARY

20 FOR MANUFACTURING METH.  AND JEFF PAUL WHO'S A KNOWN CRIMINAL

21 IN JOHNSTON COUNTY WHO WAS ACTUALLY INCARCERATED AT THAT TIME.

22 Q.    OKAY.  DID SHE MENTION ANYONE ELSE?

23 A.    SHE MENTIONED ALSO MICHAEL BATTEN.

24 Q.    AND WERE YOU FAMILIAR WITH MR. BATTEN?

25 A.    YES, I WAS.

1 Q.   AND WHY WERE YOU FAMILIAR WITH MR. BATTEN?

2 A.   WE HAD PREVIOUSLY DONE SEARCH WARRANTS AT HIS RESIDENCE

3 AND HIS BARN IN THE SAME YEAR, 2011 AND '10, FOR MANUFACTURING

4 METH AND POSSESSION OF METHAMPHETAMINE.

5 Q.   OKAY.  AND AT THAT POINT, DID YOU DETERMINE YOU WERE

6 GOING TO PLACE RECORDED -- EXCUSE ME -- AT THAT POINT, DID YOU

7 DETERMINE YOU WERE GOING TO PLACE PHONE CALLS TO ANYONE?

8 A.   YES, I WAS.

9 Q.   AND WHO DID YOU DETERMINE YOU ALL SHOULD MAKE A PHONE

10 CALL TO?

11 A.   TO STEPHANIE SMITH.

12 Q.   OKAY.  HOW DID YOU GET MS. SMITH'S NUMBER?

13 A.   TERESA HAD IT PREVIOUSLY STORED IN HER CELL PHONE.

14 Q.   ALL RIGHT.  AND DID SHE PLACE A PHONE CALL TO MS. SMITH

15 FOR YOU?

16 A.   SHE DID.

17 Q.   AND WAS SHE ABLE TO GET IN TOUCH WITH HER IMMEDIATELY?

18 A.   NO, MA'AM.  SHE TRIED CALLING HER TWICE AND LEFT TWO

19 VOICE MAILS ON STEPHANIE'S CELL PHONE.

20 Q.   OKAY.  AND THEN AFTER THAT DID YOU EVER -- DID YOU ALL

21 HAVE CONTACT WITH MS. SMITH?

22 A.   YES, MA'AM.

23 Q.   ALL RIGHT.  AND HOW DID THAT OCCUR?

24 A.   AFTER TWO ATTEMPTS TO CALL HER ON HER CELL PHONE AND

25 LEAVE VOICE MAILS FROM TERESA, STEPHANIE SMITH CONTACTED

1 TERESA BY CELL PHONE SHORTLY THEREAFTER.

2 Q.   AND DID YOU -- ARE YOU ABLE TO LISTEN TO THIS PHONE CALL?

3 A.   I WAS.

4 Q.   AND DID YOU RECOGNIZE MS. SMITH'S VOICE?

5 A.   I DID.

6 Q.   AND WHY IS THAT?

7 A.   FROM PREVIOUS HAVING CONTACT WITH HER EARLIER THAT YEAR

8 BASED ON ARRESTING HER AT THE HOTEL AND FOR WARRANTS.

9 Q.   OKAY.  AND WERE YOU ABLE TO HEAR -- YOU'RE ABLE TO HEAR

10 THIS CONVERSATION?

11 A.   YES, MA'AM.

12 Q.   AND WHAT DID THEY DISCUSS?

13 A.   THEY DISCUSSED -- AT FIRST I ASKED TERESA TO ORDER UP

14 FROM STEPHANIE ONE GRAM OF METHAMPHETAMINE.  SHE SAID THAT IT

15 WAS NOT COMMON FOR HER TO PURCHASE METH FROM --

16 METHAMPHETAMINE FROM STEPHANIE DUE TO SHE COULD PURCHASE TWO

17 BOXES OF ONE BOX OF PSEUDOEPHEDRINE IN EXCHANGE FOR A HALF A

18 GRAM OF METH PER BOX.  SHE SAID IT WAS COMMON FOR HER TO TRADE

19 TWO BOXES FOR ONE GRAM.

20 Q.   AND IS THAT THE DEAL THAT YOU ALL ATTEMPTED TO SET UP

21 WITH MS. SMITH?

22 A.   IT IS.

23 Q.   AND DID SHE AGREE TO COME TO THE RESIDENCE?

24 A.   SHE DID.

25 Q.   AND WHAT WERE THE ARRANGEMENTS THAT TERESA MORGAN AND

1 STEPHANIE SMITH MADE?

2 A.   THE ARRANGEMENT WAS TO -- FOR STEPHANIE TO COME TO

3 TERESA'S HOUSE AT 133 MELVIN COURT TO PICK UP TWO BOXES OF

4 PSEUDOEPHEDRINE.  SHE STATED THAT IT WOULD TAKE HER

5 APPROXIMATELY THREE HOURS TO GO COOK METH -- METHAMPHETAMINE

6 WITH THE TWO BOXES OF PSEUDOEPHEDRINE AND THEN LATER SHE WOULD

7 RETURN TO TERESA'S HOUSE AT 133 MELVIN COURT TO PROVIDE ONE

8 GRAM OF METHAMPHETAMINE FOR THE BOXES.

9 Q.   OKAY.  AND DID MS. SMITH, IN FACT, ARRIVE AT TERESA

10 MORGAN'S RESIDENCE?

11 A.   SHE DID.

12 Q.   WHERE WERE YOU AT THAT TIME?

13 A.   AT THE TIME OF STEPHANIE'S SMITH ARRIVAL, I WAS IN THE

14 KITCHEN AREA AT THE WINDOW SO I COULD SEE THE DRIVEWAY.

15 Q.   AND WERE THERE OTHER AGENTS THERE WITH YOU?

16 A.   YES, MA'AM.

17 Q.   AND WHO ELSE WAS IN THE RESIDENCE?

18 A.   DETECTIVE RODNEY LANGDON WAS ALSO INSIDE THE RESIDENCE

19 WITH ME.

20 Q.   AND YOU HAD OTHER AGENTS IN THE AREA, IS THAT CORRECT?

21 A.   YES, MA'AM.

22 Q.   NOW, WHEN MS. SMITH ARRIVED, DID SHE ARRIVE ALONE?

23 A.   NO, MA'AM.

24 Q.   AND DID YOU SEE HER -- WERE YOU ACTUALLY ABLE TO VIEW HER

25 ARRIVAL?

1  A.   YES, MA'AM.

2  Q.   WHO DID SHE COME WITH?

3  A.   SHE ARRIVED IN A BLACK CHEVY TWO-DOOR TRUCK WITH AN OLDER

4  WHITE MALE.

5  Q.   OKAY.  AND AT THAT POINT, DID YOU RECOGNIZE THAT MALE?

6  A.   I DID NOT.

7  Q.   WHO'S DRIVING THE VEHICLE?

8  A.   LATER IDENTIFIED AS DAVID GERALD LEWIS WAS THE DRIVER OF

9  THE VEHICLE.

10 Q.   AND MS. SMITH IS IN THE PASSENGER SEAT?

11 A.   YES, MA'AM.

12 Q.   AT THAT POINT CAN YOU SEE ANYTHING IN THE BED OF THE

13 TRUCK?

14 A.   NO, MA'AM, NOT AT THAT TIME.

15 Q.   WHAT HAPPENED AFTER THEY GOT OUT OF THE VEHICLE?

16 A.   THEY EXITED THE VEHICLE AND ENTERED THE RESIDENCE THROUGH

17 THE FRONT DOOR.  STEPHANIE SMITH ENTERED FIRST AND THE OLDER

18 WHITE MALE WHO WAS MR. LEWIS ENTERED SECOND AFTER STEPHANIE.

19 Q.   AND AFTER THEY ENTERED THE RESIDENCE WHAT HAPPENED?

20 A.   THEY ENTERED THE RESIDENCE AND I STEPPED OUT FROM THE

21 KITCHEN AREA INTO THE LIVING ROOM.  I IDENTIFIED MYSELF TO

22 STEPHANIE AS JAY CREECH WITH THE SHERIFF'S OFFICE.  SHE

23 RECOGNIZED ME FROM PRIOR CONTACT EARLIER THAT YEAR.  I PLACED

24 HER UNDER ARREST FOR AN OUTSTANDING WARRANT FOR PROBATION

25 VIOLATION AT THAT TIME.

1 Q.   NOW, AFTER YOU PLACE HER UNDER ARREST, DO ONE OF YOU ALL

2 RECEIVE CONSENT TO SEARCH THE VEHICLE?

3 A.   WE DO.

4 Q.   OKAY.  AND DO YOU GO TO SEARCH THAT VEHICLE?

5 A.   WE DO.

6 Q.   AND THAT IS THE BLACK TRUCK, IS THAT CORRECT?

7 A.   THAT'S CORRECT.

8 Q.   AND YOU RECEIVED THE CONSENT TO SEARCH FROM THE DEFENDANT

9 IN THIS CASE, MR. LEWIS, IS THAT RIGHT?

10 A.   YES, MA'AM.

11 Q.   AND THAT WAS ACTUALLY INVESTIGATOR LANGDON WHO RECEIVED

12 THAT CONSENT?

13 A.   IT WAS.

14 Q.   AND AT THAT POINT ARE THERE OTHER AGENTS ARRIVING ON THE

15 SCENE?

16 A.   THERE IS.

17 Q.   OKAY.  DID SOMEONE STAY WITH MS. SMITH AND MS. MORGAN?

18 A.   YES, DETECTIVE GOUSMAN CAME INSIDE THE RESIDENCE AND

19 STOOD WITH MS. SMITH.

20 Q.   AND WHO WAS -- WHO GOES TO THE VEHICLE?

21 A.   DETECTIVE LANGDON AND MYSELF APPROACHED THE VEHICLE.

22 Q.   AND AS YOU APPROACH THE VEHICLE ARE YOU NOTIFIED OF ANY

23 CONCERN WITH ANY ITEMS IN THE VEHICLE?

24 A.   YES, WE WERE.

25 Q.   OKAY.  AND WHAT IS -- WHO IDENTIFIES IT AND WHAT'S THE

1 CONCERN?

2 A.   DETECTIVE BAILEY, WHO'S ASSIGNED WITH US IN THE NARCOTICS

3 DIVISION, ADVISED DETECTIVE LANGDON AND MYSELF THAT THERE WAS

4 A BLUE BACK PACK IN THE BED OF THE TRUCK THAT WAS OPEN.  IT

5 WAS UNZIPPED APPROXIMATELY EIGHT TO TEN INCHES.  SHE SAID THAT

6 SHE COULD SEE INSIDE THE BLUE BACK PACK PLASTIC TUBING AND A

7 DRANO CAN.

8 Q.   DID YOU APPROACH THE VEHICLE AT THAT TIME?

9 A.   I DID.

10 Q.   BASED ON BEING A NARCOTICS INVESTIGATOR IN JOHNSTON

11 COUNTY, DID THE ITEMS THAT SHE LISTED TO YOU HAVE ANY

12 SIGNIFICANCE?

13 A.   YES.

14 Q.   AND WHAT WAS THAT SIGNIFICANCE?

15 A.   THE PLASTIC TUBING AND DRANO IS COMMONLY LOCATED IN

16 METHAMPHETAMINE LABS THAT I'M FAMILIAR WITH IN JOHNSTON

17 COUNTY.

18 Q.   YOU APPROACHED THE VEHICLE, ARE YOU ABLE TO SEE THE SAME

19 THING THAT INVESTIGATOR BAILEY NOTIFIED YOU OF?

20 A.   I WAS.

21 Q.   AND ONCE YOU DID THAT AND IDENTIFIED THOSE ITEMS, WHAT

22 STEPS DO YOU TAKE NEXT?

23 A.   NEXT WE UNZIP THE BLUE BACK PACK TO SEE IF THERE WAS ANY

24 OTHER ITEMS INSIDE THE BACK PACK.  MR. LEWIS WAS STANDING ON

25 THE DRIVER'S SIDE OF THE TRUCK WITH US.

1 Q.   OKAY.  AND WHEN YOU UNZIP THE BACK PACK, DO YOU FIND ANY

2 ADDITIONAL COMPONENTS FOR METHAMPHETAMINE PRODUCTION INSIDE

3 THAT BACK PACK?

4 A.   YES, WE DO.

5 Q.   AND WHAT WERE THOSE ITEMS?

6 A.   ONE OF THEM WAS A CLEAR PLASTIC BOTTLE WITH A WHITE

7 UNKNOWN SUBSTANCE AT THE TIME WITH A PLASTIC TUBING ATTACHED

8 TO THE TOP WITH A DOOR STOPPER COMING FROM IT.  IT'S COMMONLY

9 SEEN AT METHAMPHETAMINE LABS ALSO.  A STRAINER.  I BELIEVE

10 SOME COFFEE FILTERS, A SPATULA, STIRRING SPOONS, AND I BELIEVE

11 A PLASTIC PITCHER.

12 Q.   AT THAT POINT, DID YOU PLACE MR. LEWIS UNDER ARREST?

13 A.   WE DID.

14 Q.   AND DID YOU MAKE ANY PHONE CALLS TO ANY OTHER LAW

15 ENFORCEMENT OFFICERS?

16 A.   I DID.

17 Q.   AND WHAT PHONE CALLS DID YOU MAKE?

18 A.   I PLACED A PHONE CALL TO NORTH CAROLINA SBI SPECIAL AGENT

19 KELLY PAGE, WHO IS OUR CONTACT PERSON WITH THE SBI ANYTIME WE

20 LOCATE COMPONENTS TO CONSIST OF A METHAMPHETAMINE LAB.

21 Q.   AND YOU AND SPECIAL AGENT PAGE HAVE CONVERSATION ABOUT

22 WHAT TO DO WITH THESE COMPONENTS, IS THAT CORRECT?

23 A.   WE DID.

24 Q.   AND AT THE END OF THAT CONVERSATION, WHAT IS THE

25 DETERMINATION THAT YOU ALL MAKE?

1 A.   DETERMINATION DUE TO THE TIME OF DAY AND THE RESOURCES

2 NOT AVAILABLE AT THAT TIME FOR A SEARCH WARRANT TO SEIZE THE

3 -- DESTROY THE METHAMPHETAMINE COMPONENTS, WE AGREED TO SEIZE

4 THE TRUCK OVERNIGHT AND RETURN TO IT THE NEXT MORNING TO APPLY

5 FOR A SEARCH WARRANT.

6 Q.   AND WHERE DO YOU TAKE THIS TRUCK?

7 A.   WE HAD IT TOWED TO A SECURE FACILITY THAT THE JOHNSTON

8 COUNTY SHERIFF'S OFFICE USES, THE ALMS, LOCATED AT 20 FLEET

9 SERVICES DRIVE IN SMITHFIELD, NORTH CAROLINA.

10 Q.   AND WHAT TYPE OF FACILITY IS THAT?

11 A.   IT'S A SECURE FACILITY WITH A TALL CHAIN LINK FENCE WITH

12 BARBED WIRE AROUND THE TOP.  IT ALSO HAS AN ELECTRONIC SLIDING

13 GATE WITH AN ACCESS KEY CODE THAT ONLY JOHNSTON COUNTY

14 DEPUTIES HAVE ACCESS TO.

15 Q.   NOW, WHAT DID YOU DO WITH THE BACK PACK?

16 A.   PLACED THE BACK PACK INSIDE THE CAB OF THE TRUCK DUE TO

17 WEATHER CONCERNS AND OTHER CONDITIONS.

18 Q.   AND DID YOU MAKE ANY -- DID YOU ATTEMPT TO SEAL THE

19 VEHICLE?

20 A.   WE DID.

21 Q.   AND WHAT DID YOU DO TO DO THAT?

22 A.   WE PLACED EVIDENCE TAPE THAT'S ASSIGNED TO US ON THE DOOR

23 PANELS OF THE TRUCK.  WE LOCKED IT AND PLACED OUR INITIALS ON

24 THE TAPE TO MAKE SURE THAT THE SEAL WAS NOT BROKEN.

25 Q.   AND AT THAT POINT DO YOU GO BACK AND CONDUCT AN INTERVIEW

1 WITH MS. SMITH?

2 A.    THAT IS CORRECT.

3 Q.    AND THAT INTERVIEW TOOK APPROXIMATELY HOW MANY HOURS?

4 A.    APPROXIMATELY TWO AND A HALF HOURS, I BELIEVE.

5 Q.    OKAY.  NOW, YOU ALSO SEEK A SEARCH WARRANT AND A

6 DESTRUCTION ORDER?

7 A.    THAT'S CORRECT.

8 Q.    AND YOU GET THAT FROM A NORTH CAROLINA SUPERIOR COURT

9 JUDGE?

10 A.    YES, MA'AM.

11 Q.    THE NEXT DAY DO YOU ALL GO BACK TO THIS TRUCK?

12 A.    WE DO.

13 Q.    AND WHO'S PRESENT?

14 A.    SBI SPECIAL AGENT KELLY PAGE, SBI CHEMIST -- FORENSIC

15 CHEMIST PATRICK, CAPTAIN FISH OF THE NARCOTICS DIVISION AND

16 MYSELF.

17 Q.    AND CAPTAIN FISH IS OBVIOUSLY YOUR BOSS, RIGHT?

18 A.    CORRECT.

19 Q.    WHEN YOU GET ON THE SCENE WITH THE TRUCK, WHAT DO YOU DO?

20 A.    I INSPECT THE EVIDENCE TAPE THAT'S ON THE DOOR PANELS TO

21 MAKE SURE THAT THE INTEGRITY OF THE VEHICLE WAS KEPT AND THERE

22 WAS NO INTRUSION OF THE VEHICLE, TO MAKE SURE IT WAS SEALED.

23 Q.    AND WHAT WAS THE -- WHAT WAS YOUR -- THE RESULT OF

24 LOOKING AT THE SEALING OF THE VEHICLE?

25 A.    THE TAPE WAS IN THE SAME CONDITION AS I LEFT IT THE NIGHT

1 BEFORE.

2 Q.   OKAY.  THEN WHAT YOU DO?

3 A.   I TOOK MY POCKET KNIFE AND CUT THE TAPE, EXECUTED THE

4 SEARCH WARRANT ON THE VEHICLE.

5 Q.   AND WHEN YOU EXECUTED THE SEARCH WARRANT ON THE VEHICLE,

6 DID YOU -- WHAT PART OF THE VEHICLE DID YOU SEARCH?

7 A.   THE INTERIOR CAB OF THE TRUCK.

8 Q.   AND DID YOU -- WHAT, IF ANYTHING, DID YOU LOCATE?

9 A.   LOCATED APPROXIMATELY FIVE NEEDLES, A SMALL CLEAR PLASTIC

10 BAG WITH SUSPECTED METHAMPHETAMINE INSIDE, AND THREE LITHIUM

11 BATTERIES, A WALLET, AND TWO CELL PHONES.

12 Q.   ONCE YOU LOCATED THOSE ITEMS -- ARE OTHER AGENTS OR

13 INVESTIGATORS SEARCHING OTHER PARTS OF THE VEHICLE?

14 A.   YES, THEY WERE.

15 Q.   AND WHO WAS SEARCHING WHAT?

16 A.   DETECTIVE LANGDON WAS SEARCHING THE DRIVER'S SIDE OF THE

17 VEHICLE IN THE CAB AND MYSELF WAS SEARCHING THE PASSENGER AREA

18 OF THE VEHICLE.

19 Q.   OKAY.  AND THEN THE AGENTS WITH THE SBI ARE SEARCHING THE

20 BACK PACK?

21 A.   THAT'S CORRECT.

22 Q.   AND ONCE THE SEARCH IS COMPLETE WHAT DO YOU DO?

23 A.   ONCE THE SEARCH IS COMPLETE THE EVIDENCE WAS SEALED IN

24 EVIDENCE BAGS.  THE METHAMPHETAMINE AND THE COMPONENTS INSIDE

25 OF THE BACK PACK WERE TURNED OVER TO SBI CHEMIST PATRICK SO

1 THAT HE CAN CONCLUDE HIS INVESTIGATION.

2 Q.    AND THEN DO YOU WAIT FOR ANYONE?

3 A.    YES, I WAITED FOR THE LCI GROUP WHO IS A HAZ-MAT CLEAN UP

4 CREW THAT WAS CONTACTED BY CAPTAIN FISH TO COME AND COLLECT

5 THE REST OF THE MATERIALS THAT PATRICK -- SBI CHEMIST PATRICK

6 DID NOT COMPLETE.

7          MS. WELLS:  MAY I APPROACH, YOUR HONOR?

8          THE COURT:  YES, MA'AM.

9 BY MS. WELLS:

10 Q.    INVESTIGATOR CREECH, I'M GOING TO SHOW YOU WHAT'S BEEN

11 MARKED FOR IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT 63.

12 DO YOU RECOGNIZE THAT?

13 A.    I DO.

14 Q.    AND WHAT IS GOVERNMENT'S EXHIBIT 63?

15 A.    IT IS THE TWO-DOOR CHEVY PICKUP TRUCK THAT MR. LEWIS AND

16 MS. SMITH ARRIVED ON THAT DAY.

17               (GOVERNMENT EXHIBIT NUMBER 63

18               WAS IDENTIFIED FOR THE RECORD.)

19 Q.    OKAY.  AND IS THAT A FAIR AND ACCURATE DEPICTION OF THE

20 TRUCK AS IT APPEARED TO YOU ON JUNE THE 30TH, AND INTO THE

21 NEXT DAY?

22 A.    IT IS.

23          MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

24 EXHIBIT 63 AT THIS TIME.

25          THE COURT:  IT'S ADMITTED.

1    MS. WELLS:  THANK YOU VERY MUCH.

2         (GOVERNMENT EXHIBIT NUMBER 63 WAS

3         OFFERED AND ADMITTED INTO EVIDENCE.)

4  BY MS. WELLS:

5  Q.   I'M NOW GOING TO SHOW YOU A SERIES OF PHOTOS, WHAT'S BEEN

6  MARKED FOR IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT 64,

7  65, 66 AND 67.  IF YOU'LL TAKE A LOOK AT THOSE PHOTOS AND TELL

8  ME IF YOU RECOGNIZE THEM.

9  A.   I DO RECOGNIZE THEM.

10 Q.   OKAY.  AND WHAT DO THOSE PHOTOS SHOW?

11 A.   THE INTERIOR OF THE CAB OF THE TRUCK, THE PURSE AND BAG

12 THAT WE SEARCHED AND LOCATED SOME -- THE BATTERIES AND THE

13 METHAMPHETAMINE.

14         (GOVERNMENT EXHIBIT NUMBER 64, 65, 66

15         AND 67 WERE IDENTIFIED FOR THE RECORD.)

16 Q.   OKAY.  AND ARE THOSE A FAIR AND ACCURATE DEPICTION OF THE

17 EVIDENCE THAT YOU SEIZED AS YOU COLLECTED IT ON JUNE --

18 ACTUALLY, IT'S NOT JUNE THE 30TH, WHEN YOU COLLECT THIS

19 EVIDENCE, ISN'T THAT RIGHT?

20 A.   THAT'S CORRECT.

21 Q.   IT'S THE NEXT DAY?

22 A.   JULY 1ST.

23 Q.   JULY 1ST.  AND IS THAT A FAIR AND ACCURATE DEPICTION OF

24 HOW YOU COLLECTED THE EVIDENCE ON JULY 1ST?

25 A.   YES, MA'AM.

1              MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S 64,

2  65, 66 AND 67 AT THIS TIME.

3              THE COURT:  THEY'RE ADMITTED.

4              MS. WELLS:  THANK YOU.

5                   (GOVERNMENT EXHIBIT NUMBER 64, 65, 66 AND

6                   67 WERE OFFERED AND ADMITTED INTO EVIDENCE.)

7  BY MS. WELLS:

8  Q.   I'M GOING TO SHOW YOU FIRST --

9              MS. WELLS:  MAY HE HAVE PERMISSION TO STEP DOWN,

10  YOUR HONOR?

11             THE COURT:  YES, MA'AM.

12             MS. WELLS:  THANK YOU VERY MUCH.

13  BY MS. WELLS:

14  Q.   AND, INVESTIGATOR CREECH, IF YOU WANT TO STAND THERE,

15  I'LL STAND OVER HERE SO WE'RE NOT BLOCKING ANYBODY'S VIEW.

16             MS. WELLS:  CAN THE MEMBERS OF THE JURY SEE?

17             JURORS:  (NOD HEADS.)

18  BY MS. WELLS:

19  Q.   SHOWING YOU NOW GOVERNMENT'S EXHIBIT -- WE'RE LOOKING AT

20  63.  CAN YOU SHOW WHERE THE TAPE IS ON THE VEHICLE ON 63?

21  A.   THE EVIDENCE TAPE --

22  Q.   OKAY.  AND I'M SORRY --

23             COURT REPORTER:  I'M SORRY.  WAIT.  MS. WELLS, I

24  DIDN'T HEAR HIS ANSWER.

25             MS. WELLS:  I'M SORRY.

1 BY MS. WELLS:

2 Q.   OKAY.  CAN YOU ANSWER AGAIN?

3 A.   THE EVIDENCE TAPE IS HERE ON THE DOOR PANEL.

4 Q.   AND INDICATING THE DOOR PANEL ON THE TRUCK, THERE'S WHAT

5 APPEARS TO BE GRAY ON GOVERNMENT'S EXHIBIT 63 FOR THE RECORD.

6 AND IS THAT TAPE ON THE OPPOSITE DOOR PANEL AS WELL?

7 A.   IT IS.

8 Q.   OKAY.  I'M GOING TO NOW SHOW YOU -- INVESTIGATOR CREECH,

9 YOU CAN STAND ALL THE WAY OVER HERE SO YOU DON'T HAVE TO STAND

10 IN THE MIDDLE OF THE PICTURE IF YOU'D LIKE.

11        SHOWING YOU NOW GOVERNMENT'S EXHIBIT 64.  YOU SAID

12 THIS IS THE PASSENGER SIDE OF THE INTERIOR OF THE VEHICLE?

13 A.   YES, IT IS.

14 Q.   OKAY.  AND HOW MANY -- APPROXIMATELY HOW MANY BAGS WERE

15 IN THE VEHICLE, IF YOU RECALL?

16 A.   APPROXIMATELY THREE OR FOUR.

17 Q.   OKAY.  AND HAD YOU BEEN DIRECTED TO A PARTICULAR BAG IN

18 THE VEHICLE BY MS. SMITH?

19 A.   YES, I WAS.

20 Q.   AND WHICH BAG WAS THAT?

21 A.   THE BAG THAT MS. SMITH DIRECTED ME TO DURING THE

22 INTERVIEW WAS THIS BAG IN THE PASSENGER SEAT.

23 Q.   OKAY.  AND WHAT SPECIFIC DID SHE TELL YOU ABOUT HIS BAG?

24 A.   SHE STATED THAT IF YOU GO INTO THE SIDE POCKET OF THAT

25 BAG, PARTICULAR BAG, THAT THERE WOULD BE A BLACK SEALED

1 CONTAINER LIKE AN OLD FILM CONTAINER THAT WOULD HAVE

2 METHAMPHETAMINE INSIDE OF IT.

3 Q.   OKAY.  SHOWING YOU NOW GOVERNMENT'S EXHIBIT 67.  DID YOU,

4 IN FACT, DO THAT?

5 A.   I DID.

6 Q.   OKAY.  SHOWING YOU GOVERNMENT'S 67, IS THAT THE POCKET?

7 A.   YES, MA'AM.

8 Q.   AND IN THAT PHOTO CAN YOU SEE THE BLACK CONTAINER?

9 A.   YES, MA'AM.

10 Q.   AND THEN THAT'S AN ENLARGEMENT THAT WE'RE LOOKING AT ON

11 THE SCENE RIGHT NOW, IS THAT CORRECT?

12 A.   THAT'S CORRECT.

13 Q.   NOW, DID YOU ALSO FIND ANY OTHER ITEMS THAT INDICATED TO

14 YOU PRODUCTION OF METHAMPHETAMINE IN THIS BAG?

15 A.   WE DID.

16 Q.   AND WHAT WAS THAT?

17 A.   THREE LITHIUM BATTERIES DOUBLE A.

18 Q.   OKAY.  I'M GOING TO SHOW YOU GOVERNMENT'S EXHIBIT 66.

19 THOSE ARE TWO OF THOSE BATTERIES, IS THAT RIGHT?

20 A.   THAT'S CORRECT.

21 Q.   OKAY.  AND THERE'S A -- WE'RE GOING TO GET TO A PICTURE

22 OF THE THIRD.  OKAY, YOU CAN RETAKE THE STAND.

23        NOW, YOU SAID MS. SMITH HAD DIRECTED YOU TO THE

24 POCKET OF THE BAG, DID YOU REMOVE THAT BLACK CONTAINER?

25 A.   I DID.

1 Q.   SHOWING YOU NOW GOVERNMENT'S EXHIBIT 68 AND 69.  I SHOW

2 YOU THOSE.  DO YOU RECOGNIZE THOSE TWO PHOTOS?

3 A.   I DO.

4 Q.   WHAT IS GOVERNMENT'S 68?

5 A.   IT'S A BLACK CONTAINER CONTAINING A CLEAR PLASTIC BAG

6 WITH SUSPECTED METHAMPHETAMINE INSIDE OF IT.

7                 (GOVERNMENT EXHIBIT NUMBER 68

8                 WAS IDENTIFIED FOR THE RECORD.)

9 Q.   OKAY.  AND WHAT'S 69?

10 A.   A ENERGIZER DOUBLE A LITHIUM BATTERY.

11                 (GOVERNMENT EXHIBIT NUMBER 69

12                 WAS IDENTIFIED FOR THE RECORD.)

13 Q.   OKAY.  AND THAT WAS ALSO LOCATED INSIDE THAT SAME

14 POCKETBOOK THAT WE WERE SPEAKING OF PREVIOUSLY?

15 A.   YES, MA'AM.

16 Q.   OKAY.

17           MS. WELLS:  YOUR HONOR, I'D OFFER --

18 BY MS. WELLS:

19 Q.   AND THOSE ARE IN THE SAME OR SUBSTANTIALLY THE SAME

20 CONDITION AS WHEN YOU SEIZED THEM ON JULY THE 1ST OF 2011?

21 A.   THAT'S CORRECT.

22           MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

23 EXHIBIT 68 AND 69 AT THIS TIME.

24           THE COURT:  ADMITTED.

25                 (GOVERNMENT EXHIBITS NUMBER 68 AND 69

1          WERE OFFERED AND ADMITTED INTO EVIDENCE.)

2          MS. WELLS:  THANK YOU VERY MUCH.  IF WE CAN SEE

3  GOVERNMENT'S EXHIBIT 68.  THAT'S A PICTURE.

4  BY MS. WELLS:

5  Q.   SO, GOVERNMENT'S EXHIBIT 68, YOU'VE OPENED THIS

6  CONTAINER?

7  A.   YES, MA'AM.

8  Q.   OKAY.  AND THAT'S WHAT YOU BELIEVED AT THAT TIME TO BE

9  METHAMPHETAMINE INSIDE OF IT?

10  A.   THAT'S CORRECT.

11  Q.   ALL RIGHT.  I'M NOW GOING TO SHOW YOU GOVERNMENT'S

12  EXHIBIT 70 AND 71, AND ASK IF YOU RECOGNIZE THOSE?

13  A.   I DO RECOGNIZE THEM.

14  Q.   OKAY.  AND WHAT'S GOVERNMENT'S EXHIBIT 70?

15  A.   IT IS FIVE NEEDLES AND A BLACKBERRY CELL PHONE WITH A

16  PINK COVER.

17                  (GOVERNMENT EXHIBIT NUMBER 70

18                  WAS IDENTIFIED FOR THE RECORD.)

19  Q.   OKAY.  AND WHAT'S GOVERNMENT'S EXHIBIT 71?

20  A.   IT IS THE REAR BED OF THE PICKUP TRUCK WITH THE TAILGATE

21  DOWN WITH A BLUE BACK PACK THAT WE DISCOVERED AT THE TIME.

22                  (GOVERNMENT EXHIBIT NUMBER 71

23                  WAS IDENTIFIED FOR THE RECORD.)

24  Q.   OKAY.  AND ARE THOSE FAIR AND ACCURATE DEPICTIONS -- OR

25  THESE PICTURES SHOW THIS IN THE SAME OR SUBSTANTIALLY THE SAME

1 CONDITION AS WHEN YOU SEIZED THE ITEMS ON JULY THE 1ST OF

2 2011?

3 A.   IT DOES.

4 Q.   OKAY.

5        MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

6 EXHIBIT 70 AND 71 AT THIS TIME.

7           THE COURT:  ADMITTED.

8              (GOVERNMENT EXHIBITS NUMBER 70 AND 71

9              WERE OFFERED AND ADMITTED INTO EVIDENCE.)

10 BY MS. WELLS:

11 Q.   WHAT WAS THE SIGNIFICANCE TO YOU OF THE PRESENCE OF THE

12 NEEDLES?

13 A.   THE NEEDLES ARE A COMMON SIGN OF A NARCOTIC USER, WHETHER

14 IT BE METHAMPHETAMINE, CRACK COCAINE OR OTHER NARCOTICS.

15 Q.   OKAY.  AND I'M NOW GOING TO SHOW YOU WHAT'S ALREADY BEEN

16 ADMITTED INTO EVIDENCE AS GOVERNMENT'S EXHIBIT 72, AND IF WE

17 CAN SEE THAT ON THE SCREEN.  IS THAT THE BACK PACK THAT YOU

18 LOCATED IN THE BACK OF THE VEHICLE?

19 A.   IT IS.

20 Q.   THAT WAS ON JUNE THE 30TH, IS THAT CORRECT?

21 A.   THAT'S CORRECT.

22 Q.   AND AT THIS POINT YOU'VE REMOVED IT FROM THE INTERIOR OF

23 THE VEHICLE AND PLACED IT BACK IN THE BACK OF THE TRUCK, IS

24 THAT RIGHT?

25 A.   YES, MA'AM.

1 Q.   OKAY.  AND AT THIS POINT IS THE BACK -- THE BACK PACK IS

2 SEARCHED?  THIS IS PRIOR TO THE SEARCH?

3 A.   THAT'S CORRECT.

4 Q.   ALL RIGHT.  NOW, YOU SEIZED -- I'M GOING TO SHOW YOU WHAT

5 I'M MARKING AS GOVERNMENT'S EXHIBIT 154 FOR IDENTIFICATION

6 PURPOSES.  DO YOU RECOGNIZE GOVERNMENT'S EXHIBIT 154, YOUR

7 ITEM NUMBER ONE?

8 A.   I DO.

9 Q.   AND WHAT IS GOVERNMENT'S EXHIBIT -- WHAT'S BEEN MARKED

10 FOR IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT 154?

11 A.   IT IS THREE ENERGIZER LITHIUM BATTERIES.

12                 (GOVERNMENT EXHIBIT NUMBER 154

13                 WAS IDENTIFIED FOR THE RECORD.)

14 Q.   AND WHERE DID THESE BATTERIES COME FROM?

15 A.   FROM INSIDE THE BAG IN THE INTERIOR OF THE TRUCK.

16 Q.   OKAY.  ARE THEY IN THE SAME OR SUBSTANTIALLY THE SAME

17 CONDITION AS WHEN YOU SEIZED THEM?

18 A.   YES, MA'AM.

19 Q.   OKAY.  AND ARE YOU ABLE TO RECOGNIZE THOSE BY YOUR

20 INITIALS AND DATE ON THIS?

21 A.   IT IS.

22 Q.   OKAY.

23         MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

24 EXHIBIT 154 AT THIS TIME.

25         THE COURT:  ADMITTED.

1                    (GOVERNMENT EXHIBIT NUMBER 154 WAS

2                        OFFERED AND ADMITTED INTO EVIDENCE.)

3  BY MS. WELLS:

4  Q.   I'M NOW GOING TO MARK WHAT IS YOUR ITEM NUMBER TWO FOR

5  IDENTIFICATION PURPOSES AS GOVERNMENT'S 155, AND ASK IF YOU

6  RECOGNIZE THAT?

7  A.   I DO.

8  Q.   AND WHAT IS GOVERNMENT'S EXHIBIT 155?

9  A.   IT IS A WALGREENS RECEIPT THAT WAS SEIZED FROM INSIDE THE

10 INTERIOR OF THE TRUCK.

11                   (GOVERNMENT EXHIBIT NUMBER 155

12                       WAS IDENTIFIED FOR THE RECORD.)

13 Q.   OKAY.  AND ARE THOSE YOUR INITIALS AND DATE ON THE TOP OF

14 THAT EVIDENCE?

15 A.   IT IS.

16 Q.   OKAY.  AND IS THAT IN THE SAME OR SUBSTANTIALLY THE SAME

17 CONDITION AS WHEN YOU SEIZED IT?

18 A.   YES, MA'AM.

19 Q.   OKAY.

20         MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

21 EXHIBIT 155 AT THIS TIME.

22         THE COURT:  IT'S ADMITTED.

23                   (GOVERNMENT EXHIBIT NUMBER 155 WAS

24                       OFFERED AND ADMITTED INTO EVIDENCE.)

25 BY MS. WELLS:

1 Q.   I'M NOW GOING TO SHOW YOU WHAT'S BEEN MARKED FOR

2 IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT 156.  WHAT IS

3 THIS ITEM?

4 A.   IT'S MISCELLANEOUS PAPERWORK AND A SMALL BROWN PURSE THAT

5 WAS SEIZED FROM INSIDE THE TRUCK.

6                    (GOVERNMENT EXHIBIT NUMBER 156

7                    WAS IDENTIFIED FOR THE RECORD.)

8 Q.   OKAY.  AND WHERE DID THAT BAG COME FROM?

9 A.   THE PURSE CAME FROM INSIDE THE BROWN BAG THAT WAS INSIDE

10 THE TRUCK.

11 Q.   OKAY.  AND IS THAT ITEM IN THE SAME OR SUBSTANTIALLY THE

12 SAME CONDITION AS WHEN YOU SEIZED IT?

13 A.   YES, IT IS.

14 Q.   OKAY.

15         MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

16 EXHIBIT 156 AT THIS TIME.

17         THE COURT:  IT'S ADMITTED.

18                    (GOVERNMENT EXHIBIT NUMBER 156 WAS

19                    OFFERED AND ADMITTED INTO EVIDENCE.)

20 BY MS. WELLS:

21 Q.   I'M NOW GOING TO SHOW YOU WHAT'S BEEN MARKED FOR

22 IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT 157.  DO YOU

23 RECOGNIZE THAT?

24 A.   I DO.

25 Q.   OKAY.  AND WHAT IS THIS?

1  A.   IT'S A YELLOW MOTOROLA CELL PHONE THAT WAS SEIZED FROM

2  INSIDE THE INTERIOR OF THE TRUCK.

3                    (GOVERNMENT EXHIBIT NUMBER 157

4                    WAS IDENTIFIED FOR THE RECORD.)

5  Q.   OKAY.  AND IS THAT PHONE IN THE SAME OR SUBSTANTIALLY THE

6  SAME CONDITION AS WHEN YOU SEIZED IT?

7  A.   IT IS.

8  Q.   OKAY.

9         MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

10 EXHIBIT 157.

11              THE COURT:  IT'S ADMITTED.

12                    (GOVERNMENT EXHIBIT NUMBER 157 WAS

13                    OFFERED AND ADMITTED INTO EVIDENCE.)

14 BY MS. WELLS:

15 Q.   I'M NOW GOING TO SHOW YOU WHAT'S BEEN MARKED FOR

16 IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT 158.  WHAT IS

17 GOVERNMENT'S EXHIBIT 158?

18 A.   IT'S A BLACKBERRY CELL PHONE WITH A PINK COVER THAT WAS

19 SEIZED FROM INSIDE THE INTERIOR OF THE TRUCK ALSO.

20                    (GOVERNMENT EXHIBIT NUMBER 158

21                    WAS IDENTIFIED FOR THE RECORD.)

22 Q.   OKAY.  AND IS THAT PHONE IN THE SAME OR SUBSTANTIALLY THE

23 SAME CONDITION AS WHEN YOU SEIZED IT?

24 A.   IT IS.

25         MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

1  EXHIBIT 158 AT THIS TIME.

2          THE COURT:  ADMITTED.

3                  (GOVERNMENT EXHIBIT NUMBER 158 WAS

4                  OFFERED AND ADMITTED INTO EVIDENCE.)

5          MS. WELLS:  THANK YOU.

6          (PAUSE.)

7          MS. WELLS:  ONE MOMENT, PLEASE, YOUR HONOR.

8          THE COURT:  YES, MA'AM.

9          (PAUSE.)

10         MS. WELLS:  ONE MOMENT, PLEASE.

11         (PAUSE.)

12         MS. WELLS:  YOUR HONOR, I HAVE NO FURTHER QUESTIONS

13 FOR AGENT CREECH AT THIS TIME.

14         THE COURT:  CROSS?

15         MR. STEWART:  YES, YOUR HONOR.  THANK YOU.

16         **C R O S S - E X A M I N A T I O N**  9:57 A.M.

17 BY MR. STEWART:

18 Q.  MR. CREECH, IS IT FAIR TO SAY THAT YOU'VE BEEN IN LAW

19 ENFORCEMENT SINCE ABOUT 2007?

20 A.  2006.

21 Q.  2006?

22 A.  YES, SIR.

23 Q.  SO, ROUGHLY FIVE, MAYBE SIX YEARS THUS FAR?

24 A.  THAT'S CORRECT.

25 Q.  HAVE YOU EVER BEEN ON WHAT WOULD BE CALLED ROUTINE

1 PATROL?

2 A.   I HAVE.

3 Q.   LIKE TRAFFIC VIOLATIONS?

4 A.   YES, SIR.

5 Q.   DID YOU EVER WRITE ANY TRAFFIC VIOLATIONS FOR DWI OR

6 DRIVING WHILE IMPAIRED?

7 A.   I HAVE.

8 Q.   DID YOU RECEIVE ANY TRAINING ON WHAT TO LOOK FOR IN

9 IMPAIRED DRIVERS?

10 A.   YES, SIR.

11        MS. WELLS:  YOUR HONOR, I'M GOING TO OBJECT TO THIS

12 LINE OF QUESTIONING.  I'M NOT REAL SURE HOW IT'S RELEVANT.

13        THE COURT:  OVERRULED.

14        MS. WELLS:  THANK YOU.

15 BY MR. STEWART:

16 Q.   ON JUNE THE 30TH, WHEN YOU CAME INTO CONTACT WITH MR.

17 LEWIS, WAS HE IMPAIRED?

18 A.   NOT TO MY KNOWLEDGE.

19 Q.   DID YOU SMELL ANY ODOR OF ALCOHOL ON HIS BREATH?

20 A.   NOT AT THAT TIME.

21 Q.   WERE HIS EYES RED OR GLASSY?

22 A.   NOT THAT I RECALL.

23 Q.   HAVE YOU EVER SEEN ANYONE HIGH ON METHAMPHETAMINE?

24 A.   I HAVE.

25 Q.   IS THERE A CHANGE IN THEIR PHYSICAL APPEARANCE WHEN

1 THEY'RE HIGH ON METH?

2 A.   SOMETIMES THERE IS, SOMETIMES THERE'S NOT.

3 Q.   DID YOU KNOW ON JUNE THE 30TH, THAT STEPHANIE SMITH WAS

4 HIGH ON METH WHEN YOU FIRST CAME INTO CONTACT WITH HER?

5 A.   NO, I DID NOT.

6 Q.   DID SHE ADMIT TO YOU AT ANY POINT SHE WAS HIGH ON METH?

7 A.   NOT THAT DAY.

8 Q.   HOW LONG DID YOU INTERVIEW HER THAT DAY?

9 A.   APPROXIMATELY TWO AND A HALF HOURS.

10 Q.   DID YOU KNOW SHE WAS LYING TO YOU MOST OF THAT TIME?

11 A.   NO, I DID NOT.

12 Q.   DID YOU FIND ANY MEASURABLE AMOUNT OF METHAMPHETAMINE IN

13 THE BLACK TRUCK?

14 A.   YES, I DID.

15 Q.   HOW MUCH DID YOU FIND?

16 A.   APPROXIMATELY ONE GRAM.

17 Q.   AND WHERE DID YOU FIND IT?

18 A.   INSIDE OF A BLACK OLD FILM CONTAINER THAT WAS INSIDE THE

19 LIGHT TAN PURSE.

20 Q.   WHEN YOU FIRST -- NOW, I'M GOING TO TAKE YOU BACK TO

21 TERESA, IF I MAY.  WHEN YOU FIRST APPROACHED TERESA, DID YOU

22 ASK HER TO TRY TO PURCHASE METHAMPHETAMINE?

23 A.   I DID.

24 Q.   AND SHE CALLED STEPHANIE SMITH?

25 A.   THAT'S CORRECT.

1  Q.   SHE DIDN'T CALL DAVID LEWIS?

2  A.   NO, SIR.

3  Q.   AND STEPHANIE SMITH CAME OVER AND SAID THAT SHE COULD

4  COOK SOME METHAMPHETAMINE, IS THAT CORRECT?

5  A.   THAT'S WHAT SHE STATED ON THE CELL PHONE AT THE TIME.

6  Q.   BUT SHE HAD METHAMPHETAMINE ON HER, DID SHE NOT?

7  A.   IT WAS INSIDE THE PURSE INSIDE THE TRUCK.

8  Q.   NOW, AT SOME POINT STEPHANIE TOLD YOU THAT SHE HAD NO

9  KNOWLEDGE OF WHAT WAS IN THE BACK PACKS, IS THAT CORRECT?

10  A.   NOT THAT I RECALL.

11  Q.   DID SHE TELL YOU THAT A GIRL NAMED BRITTANY HAD THROWN

12  ALL OF THE STUFF IN THE BACK PACK BECAUSE SHE WAS IN A HURRY?

13  A.   NO, SIR.

14  Q.   DID STEPHANIE EVER SAY THAT SHE PUT THE STUFF IN THE BACK

15  PACK?

16  A.   NO, SIR.

17  Q.   DID YOU -- WERE YOU EVER TOLD HOW THIS METH LAB GOT

18  INSIDE THE BACK PACK IN THE BACK OF THE TRUCK?

19  A.   AT THE TIME OF THE ARREST, NO, SIR.

20  Q.   DURING THE ARREST AND SUBSEQUENT SEARCH OF THE BLACK

21  PICKUP TRUCK, DID ANYONE SUGGEST YOU TAKE FINGERPRINTS OF THE

22  ITEMS?

23  A.   NO, SIR.

24  Q.   SO, NO FINGERPRINTS WERE EVER TAKEN OF ANY OF THE ITEMS

25  YOU FOUND IN ANY OF THE BACK PACKS?

1  A.    NO, SIR.

2  Q.    MR. CREECH, YOU TESTIFIED EARLIER THAT YOU FOUND SEVERAL

3  NEEDLES, FIVE NEEDLES, INSIDE THE TRUCK, IS THAT CORRECT?

4  A.    THAT'S CORRECT.

5  Q.    WHERE WERE THE NEEDLES INSIDE THE TRUCK?

6  A.    I BELIEVE THEY WERE INSIDE THE TAN BAG.

7  Q.    AND THE BATTERIES THAT YOU FOUND THAT ARE NOW IN

8  EVIDENCE, THEY WERE ALSO INSIDE THE BAG?

9  A.    THAT'S CORRECT.

10  Q.    SO, ALL THE PARAPHERNALIA THAT YOU FOUND WERE INSIDE

11  BAGS, IS THAT CORRECT?

12  A.    THAT'S CORRECT.

13  Q.    AND THEY WERE EITHER ON THE PASSENGER SIDE OR IN THE BED

14  OF THE TRUCK, IS THAT CORRECT?

15  A.    THAT'S CORRECT.

16  Q.    DID STEPHANIE SMITH EVER ADMIT TO YOU OF PUTTING ANY OF

17  THESE BAGS IN THE TRUCK?

18  A.    YES.

19  Q.    DID SHE EVER CLAIM OWNERSHIP OF ANY OR ALL OF THESE BAGS?

20  A.    SHE CLAIMED OWNERSHIP OF THE BAGS THAT WERE INSIDE THE

21  CAB OF THE TRUCK.

22  Q.    SHE DID NOT CLAIM OWNERSHIP OF THE BAG IN THE BACK?

23  A.    NO, SIR.

24  Q.    DID SHE EVER TELL YOU WHOSE BAG THAT WAS OR WHERE IT CAME

25  FROM?

1 A.   YES, SIR.

2 Q.   WHO DID SHE SAY IT WAS?

3 A.   SHE SAID THAT SHE WENT TO A RESIDENCE ON FIRE HILL ROAD,

4 WHICH IS INSIDE JOHNSTON COUNTY, AND THAT THE BAG WAS TOSSED

5 INTO THE BED OF THE TRUCK.

6 Q.   DID SHE SAY BERNIE MACK TOSSED IT IN THE BED OF THE

7 TRUCK?

8 A.   NO, SIR.

9 Q.   DID SHE SAY WHO TOSSED IT IN THE BED OF THE TRUCK?

10 A.   I DO NOT RECALL.

11 Q.   SHE DIDN'T SAY THAT DAVID LEWIS PUT IT IN THE BED OF THE

12 TRUCK, DID SHE?

13 A.   NO, SIR.

14 Q.   AND, MR. CREECH, HAVE YOU HAD THE OCCASION TO REVIEW --

15 REVIEW THE SEVERAL HOUR LONG INTERVIEW YOU HAD WITH MS. SMITH?

16 A.   I HAVE.

17 Q.   YOU HAVE?

18 A.   YES.

19 Q.   DO YOU RECALL IN THE INTERVIEW HER SAYING THAT THERE WAS

20 NO METH SOLD, COOKED OR USED AT THE CORVETTE SHOP?

21 A.   I DO.

22 Q.   DO YOU RECALL HER TELLING YOU THAT AARON SIMMONS, WHEN HE

23 WAS AT THE SHOP, HE WOULD WORK AND NOT SELL OR DO METH?

24 A.   WITHOUT ACCURATE KNOWLEDGE, I'D HAVE TO LOOK BACK AT THE

25 INTERVIEW.  IT WAS SO LONG.

1 Q.   I UNDERSTAND.  IT WAS A LONG INTERVIEW.

2 A.   YES, IT WAS.

3 Q.   DO YOU RECALL ANY TIME IN THE INTERVIEW, MR. CREECH,

4 WHERE YOU BELIEVED THAT STEPHANIE CHANGED HER STORY AS TO WHAT

5 WAS GOING ON ON JUNE THE 30TH?

6 A.   INSIDE THE INTERVIEW?

7 Q.   YES, SIR.

8 A.   I BELIEVE THERE WAS AN OCCASION.

9 Q.   DO YOU THINK PART OF WHAT SHE TOLD YOU WAS A LIE AND PART

10 OF IT WAS THE TRUTH?

11          MS. WELLS:  I'M GOING TO OBJECT TO HIS -- I MEAN, HE

12 TOOK IT DOWN.  I THINK HIS OPINION AS --

13          THE COURT:  THAT'S CORRECT.  LET ME SEE COUNSEL JUST

14 FOR A MINUTE.

15          (BENCH CONFERENCE ON THE RECORD.)

16          MR. STEWART:  YES, SIR.

17          THE COURT:  IT IS IMPROPER TO EXPRESS AN OPINION OF

18 SOMEBODY LYING.

19          MR. STEWART:  YES, SIR.  YES, SIR.

20          THE COURT:  THANK YOU.

21          MR. STEWART:  THANK YOU, JUDGE.

22          (BENCH CONFERENCE CONCLUDED.)

23          MR. STEWART:  I HAVE NO FURTHER QUESTIONS, YOUR

24 HONOR.  THANK YOU, MR. CREECH.

25          THE WITNESS:  THANK YOU.

1          THE COURT:  ANY REDIRECT?

2          MS. WELLS:  NO, SIR.

3          THE COURT:  I'M SORRY?

4          MS. WELLS:  THERE'S NO REDIRECT, YOUR HONOR.

5          THE COURT:  YOU MAY STEP DOWN.  CALL YOUR NEXT

6  WITNESS.

7          MS. WELLS:  YOUR HONOR, MAY WE APPROACH BRIEFLY?

8          THE COURT:  YES, MA'AM.

9          (BENCH CONFERENCE ON THE RECORD.)

10          MS. WELLS:  WOULD IT BE POSSIBLE FOR US TO GO AHEAD

11  AND TAKE OUR MORNING BREAK?  I KNOW IT'S A LITTLE, BUT I -- OR

12  COULD I JUST HAVE TWO MINUTES TO RUN TO THE LADIES ROOM?  THAT

13  WOULD BE -- EITHER WAY, WHICHEVER THE COURT PREFERS.

14          THE COURT:  I'LL TAKE A SHORT BREAK AT THIS TIME,

15  BUT IT WILL BE SHORT.

16          MS. WELLS:  THAT'S FINE.  THAT'S FINE.

17          THE COURT:  THANK YOU VERY MUCH.

18          MS. WELLS:  THANK YOU.

19          (BENCH CONFERENCE CONCLUDED.)

20          MR. STEWART:  MEMBERS OF THE JURY, WE'RE GOING TO

21  TAKE A VERY SHORT RECESS AT THIS TIME.  WE'LL START BACK AT

22  AROUND TEN PAST 10:00.

23          I WANT TO TELL YOU THAT IF YOU SEE COUNSEL IN THE

24  COURTHOUSE AND THEY DON'T APPEAR EAGER TO TALK TO YOU IT'S

25  BECAUSE THEY KNOW THEY'RE NOT SUPPOSED TO TALK TO ANY MEMBER

1  OF THE JURY.  SO, DON'T FEEL LIKE THEY'RE BEING RUDE.  THEY'RE

2  JUST KNOW THAT THEY'RE NOT SUPPOSED TO HAVE CONVERSATIONS WITH

3  THE JURY.

4          STEP OUT TO THE JURY ROOM.  WE'LL CALL YOU BACK IN

5  JUST A FEW MINUTES.

6              (OUT OF THE PRESENCE OF THE JURY AND ALTERNATES.)

7              THE COURT:  OKAY.  WE'LL TAKE A RECESS UNTIL 10:10.

8              MS. WELLS:  YOUR HONOR, MAY INVESTIGATOR CREECH BE

9  RELEASED?

10             THE COURT:  ANY OBJECTION?

11             MR. STEWART:  NO OBJECTION, YOUR HONOR.

12             THE COURT:  YES, MA'AM, HE CAN.

13             MS. WELLS:  THANK YOU VERY MUCH.

14             (RECESS FROM 10:06 A.M., UNTIL 10:13 A.M.)

15             (DEFENDANT PRESENT.)

16             THE COURT:  ALL RIGHT.  PLEASE BE SEATED EVERYONE.

17 WE'LL CONTINUE.  SEE IF THE JURY IS READY.

18             LAW CLERK:  ARE YOU READY FOR THEM?

19             THE COURT:  YES, MA'AM.  WHO IS YOUR NEXT WITNESS,

20 MS. WELLS?

21             MS. WELLS:  I'M SORRY, YOUR HONOR?

22             THE COURT:  WHO IS YOUR NEXT WITNESS?

23             MS. WELLS:  GENARD PATRICK WITH THE STATE BUREAU OF

24 INVESTIGATION CRIME LAB.

25             (IN THE PRESENCE OF THE JURY AND ALTERNATES.)

1            THE COURT:  IF YOU'LL CALL YOUR NEXT WITNESS, MS.

2 WELLS.

3            MS. WELLS:  THANK YOU VERY MUCH, YOUR HONOR.  THE

4 GOVERNMENT WILL CALL GENARD PATRICK.

5            **GENARD PATRICK, GOVERNMENT WITNESS, SWORN**

6            **D I R E C T   E X A M I N A T I O N**   10:15 A.M.

7 BY MS. WELLS:

8 Q.   SPECIAL AGENT PATRICK, WHERE ARE YOU EMPLOYED?

9 A.   NORTH CAROLINA STATE CRIME LABORATORY.

10 Q.   OKAY.  AND WHAT IS YOUR CURRENT ASSIGNMENT?

11 A.   I'M ASSIGNED TO THE -- I'M ASSIGNED AS A FORENSIC

12 SCIENTIST IN THE DRUG CHEMISTRY SECTION OF THE NORTH CAROLINA

13 STATE CRIME LABORATORY.

14 Q.   AND HOW LONG HAVE YOU BEEN EMPLOYED THERE?

15 A.   SINCE APRIL OF 2007.

16 Q.   CAN YOU TELL THE MEMBERS OF THE JURY A LITTLE BIT ABOUT

17 YOUR EDUCATION?

18 A.   I HAVE A BACHELOR'S OF SCIENCE IN FORENSIC SCIENCE FROM

19 VIRGINIA COMMONWEALTH UNIVERSITY.  I GRADUATED IN DECEMBER OF

20 2005.

21 Q.   AND AFTER THAT, DID YOU RECEIVE ADDITIONAL TRAINING OR --

22 AS TO YOUR JOB AS A FORENSIC SCIENTIST?

23 A.   AFTER GRADUATING IN 2005, I WORKED AS A FORENSIC

24 SPECIALIST WITH HAMPTON POLICE DIVISION IN HAMPTON, VIRGINIA,

25 WHICH IS ESSENTIALLY A CRIME SCENE INVESTIGATOR.  I WORKED

1 THERE FROM DECEMBER OF 2005 TO APRIL OF 2006.

2 Q.   AND AFTER THAT, WHAT DID YOU DO?

3 A.   AFTER THAT, IN APRIL OF --- I'M SORRY, I WORKED AS A

4 CRIME SCENE SPECIALIST FROM DECEMBER 2005 TO APRIL OF 2007.

5 AND IN 2007, I JOINED THE NORTH CAROLINA STATE CRIME

6 LABORATORY.

7 Q.   OKAY.  AND IN DOING THAT, YOU'VE ATTENDED BASIC LAW

8 ENFORCEMENT TRAINING?

9 A.   THAT IS CORRECT.

10 Q.   AND YOU ALSO ATTENDED THE SPECIAL AGENT ACADEMY WITH THE

11 STATE BUREAU OF INVESTIGATION?

12 A.   YES.

13 Q.   OKAY.  AND AFTER DOING THOSE DID YOU RECEIVE IN-HOUSE

14 TRAINING WITH THE CRIME LAB?

15 A.   YES.  I COMPLETED THE DRUG CHEMISTRY SECTION TRAINING

16 PROGRAM, WHICH IS A SIX MONTH TRAINING PROGRAM, WHICH INVOLVES

17 THE IDENTIFICATION OF SEVERAL SETS OF CONTROLLED AND NON-

18 CONTROLLED SUBSTANCES.

19 Q.   AND HAVE YOU ATTAINED -- HAVE YOU ALSO ATTENDED

20 ADDITIONAL TRAININGS WITH OTHER LAW ENFORCEMENT AGENCIES?

21 A.   YES.  I ATTENDED THE FORENSIC CHEMIST SEMINAR WITH THE

22 DRUG ENFORCEMENT ADMINISTRATION.  I HAVE ALSO ATTENDED IN-

23 HOUSE TRAINING AT MY LAST JOB WITH IDENTIFICATION OF

24 CONTROLLED SUBSTANCES.

25 Q.   AND CAN YOU DESCRIBE FOR THE MEMBERS OF THE JURY WHAT YOU

1 DO IN YOUR JOB ON A DAILY BASIS?

2 A.   ON A DAILY BASIS MY MAIN JOB DUTIES ARE TO IDENTIFY

3 CONTROLLED SUBSTANCES THROUGH SUBMITTED EVIDENCE, GENERATE

4 REPORTS BASED ON MY ANALYSIS, AND TESTIFY IN COURT WHEN

5 NEEDED.

6 Q.   OKAY.  HOW MANY TIMES HAVE YOU BEEN QUALIFIED AS AN

7 EXPERT IN EITHER STATE OR FEDERAL COURT?

8 A.   IN STATE OR FEDERAL COURT APPROXIMATELY TEN TIMES.  IN

9 FEDERAL COURT APPROXIMATELY TWICE.

10 Q.   OKAY.

11        MS. WELLS:  YOUR HONOR, AT THIS TIME I WOULD OFFER

12 SPECIAL AGENT PATRICK AS AN EXPERT IN THE FIELD OF FORENSIC

13 DRUG CHEMISTRY.

14        THE COURT:  HE MAY EXPRESS OPINIONS IN THAT FIELD.

15 BY MS. WELLS:

16 Q.   SPECIAL AGENT PATRICK, I'M GOING TO DIRECT YOUR ATTENTION

17 TO JUNE THE 30TH OF THIS YEAR, 2011, WERE YOU WORKING FOR THE

18 CRIME LAB AT THAT TIME?

19 A.   YES.

20 Q.   AND DID YOU RECEIVE A CALL OR INFORMATION FROM THE

21 SPECIAL -- OR THE SUPERVISING AGENT IN CHARGE, ANN HAMLIN?

22 A.   YES.

23 Q.   AND WHAT DID SHE NEED YOU TO DO?

24 A.   SHE NEEDED ME TO RESPOND TO A CLAN LAB AT 20 FLEET

25 SERVICES DRIVE IN SMITHFIELD, NORTH CAROLINA.

1 Q.   OKAY.  AND YOU SAY A CLAN LAB.  WHAT IS A CLAN LAB?

2 A.   A CLAN LAB IS ESSENTIALLY A CRIME SCENE WHERE A

3 CONTROLLED SUBSTANCE IS BEING PRODUCED.

4 Q.   ALL RIGHT.  20 FLEET SERVICES DRIVE IS IN SMITHFIELD, IS

5 THAT CORRECT?

6 A.   CORRECT.

7 Q.   AND WERE YOU TO GO THAT DAY OR DID YOU ALL AGREE THAT YOU

8 WOULD GO THE NEXT DAY?

9 A.   I WAS -- I RESPONDED TO THIS CRIME SCENE ON JULY 1ST OF

10 2011.

11 Q.   ALL RIGHT.  AND WHEN YOU RESPONDED TO THE CRIME SCENE

12 WHO, IF ANYONE, FROM THE STATE BUREAU OF INVESTIGATION

13 RESPONDED WITH YOU?

14 A.   KELLY PAGE AND NATE THOMPSON.

15 Q.   ALL RIGHT.  AND THERE WERE ALSO MEMBERS OF THE JOHNSTON

16 COUNTY SHERIFF'S OFFICE PRESENT?

17 A.   CORRECT, JAY CREECH AND OTHER MEMBERS OF THE SHERIFF'S

18 OFFICE.

19 Q.   NOW, AS A DRUG CHEMIST WITH THE CRIME LAB, PART OF YOUR

20 DUTIES ARE TO RESPOND TO METHAMPHETAMINE LABORATORIES, IS THAT

21 CORRECT?

22 A.   THAT IS CORRECT.

23 Q.   AND IS THIS, IN FACT, WHAT YOU WERE RESPONDING TO ON JULY

24 THE 1ST?

25 A.   CORRECT.

1 Q.   WHEN YOU -- AS THE FORENSIC CHEMIST RESPONDING TO THE

2 SCENE, WHEN YOU GET TO THE SCENE IS THERE ANYTHING THAT YOU

3 GENERALLY DO WHEN YOU FIRST GET TO A METHAMPHETAMINE LAB OR A

4 SUSPECTED LAB?

5 A.   I GENERALLY GET CASE INFORMATION.  YOU WANT TO KNOW

6 BASICALLY THE ESSENTIALS OF WHO THE REQUESTING OFFICER IS OR

7 REQUESTING AGENCY.  JUST GENERAL CASE INFORMATION.

8 Q.   IS IT IMPORTANT TOO THAT COORDINATE WITH THE SITE SAFETY

9 OFFICER?

10 A.   THAT IS CORRECT.

11 Q.   AND WHO'S YOUR SITE SAFETY -- WHO IS THE SITE SAFETY

12 OFFICER IN THIS CASE?

13 A.   KELLY PAGE.

14 Q.   DID YOU COORDINATE WITH SPECIAL AGENT PAGE?

15 A.   YES.

16 Q.   AND DID YOU ALL DETERMINE HOW THIS VEHICLE WOULD BE

17 SEARCHED?

18 A.   YES.  YES, WE DID.

19 Q.   OKAY.  WHAT PORTION OF THE SEARCH WERE YOU RESPONSIBLE

20 FOR?

21 A.   I ASSISTED IN THE SEARCH OF A BOOK BAG AND A WHITE CANVAS

22 BAG.

23 Q.   NOW, INSIDE -- WHEN YOU RESPOND TO A METHAMPHETAMINE LAB

24 IS IT IMPORTANT THAT YOU ALL HAVE A SEARCH WARRANT AND A

25 DESTRUCTION ORDER IN PLACE BEFORE YOU DO ANY SEARCHING?

1 A.   THAT IS CORRECT.

2 Q.   AND, IN FACT, YOU CAN'T SEARCH UNLESS YOU HAVE THOSE

3 ITEMS?

4 A.   CORRECT.

5 Q.   DID YOU HAVE THOSE DOCUMENTS PRIOR TO SEARCHING?

6 A.   TO MY KNOWLEDGE, YES.

7 Q.   OKAY.  AND YOU CERTAINLY WOULDN'T HAVE CONDUCTED A SEARCH

8 WITHOUT THEM?

9 A.   CORRECT.

10 Q.   ALL RIGHT.  NOW, YOU SEARCHED, YOU SAID, THE BLUE BACK

11 PACK?

12 A.   YES.

13 Q.   I'M GOING TO DIRECT YOU -- AND DID YOU PRODUCE ANY

14 REPORTS IN CONJUNCTION WITH THIS SEARCH?

15 A.   YES, I DID.

16 Q.   AND PART OF THAT REPORT IS A TECHNICAL FIELD ASSISTANT'S?

17 A.   THAT IS CORRECT.

18 Q.   WHEN YOU SEARCHED THIS BACK PACK, DID YOU FIND ANY ITEMS

19 INSIDE THE BACK PACK THAT WERE OF SIGNIFICANCE TO YOU?

20 A.   YES, I DID.

21 Q.   AND WHAT WERE THOSE ITEMS?

22 A.   JUST TO NAME A FEW OF THOSE ITEMS.

23 Q.   THAT'S FINE, YOU CAN START THERE.

24 A.   DRAIN OPENER -- DIFFERENT TYPES OF DRAIN OPENER TO

25 INCLUDE HOT POWER, AEROBIC CRYSTAL DRAIN OPENER, FUNNELS, A

1 PLASTIC BAG CONTAINING A WHITE POWDER AND A PLASTIC BOTTLE

2 CONTAINING A WHITE MATERIAL.

3 Q.    OKAY.  DID YOU LOCATE ANY TUBING DURING THIS SEARCH?

4 A.    THAT IS CORRECT.

5 Q.    NOW, AND WERE THESE ITEMS REMOVED FROM THE BACK PACK?

6 A.    YES, THEY WERE.

7 Q.    AND WERE THE ITEMS THAT WERE SIGNIFICANT TO YOU ALL, WERE

8 THEY PHOTOGRAPHED?

9 A.    YES.

10          MS. WELLS:  YOUR HONOR, MAY I APPROACH THE WITNESS?

11          THE COURT:  YES, MA'AM.

12          MS. WELLS:  THANK YOU.

13 BY MS. WELLS:

14 Q.    IF YOU HAVE ROOM.  OKAY.  NOW, YOU SAID YOU REMOVED THE

15 ITEMS AND YOU HAVE NAMED THEM.  I'M GOING TO SHOW YOU WHAT'S

16 BEEN MARKED FOR IDENTIFICATION PURPOSES AS GOVERNMENT'S

17 EXHIBIT 73, AND ASK YOU IF YOU RECOGNIZE THAT?

18 A.    YES.

19 Q.    AND WHAT DOES GOVERNMENT'S EXHIBIT 73 SHOW?

20 A.    THERE WERE ITEMS THAT WERE LOCATED DURING THE SEARCH AND

21 WERE REMOVED AND PLACED ON THE BED OF THE TRUCK.

22                 (GOVERNMENT EXHIBIT NUMBER 73

23                 WAS IDENTIFIED FOR THE RECORD.)

24 Q.    OKAY.  AND ARE THOSE ITEMS IN THE SAME OR SUBSTANTIALLY

25 THE SAME CONDITION AS WHEN THEY WERE -- DOES THIS PHOTO

1 DOCUMENT HOW THEY APPEARED TO YOU ON JULY THE 1ST OF 2011?

2 A.   YES.

3         MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

4 EXHIBIT 73 AT THIS TIME.

5         THE COURT:  ADMITTED.

6             (GOVERNMENT EXHIBIT NUMBER 73 WAS

7             OFFERED AND ADMITTED INTO EVIDENCE.)

8         MS. WELLS:  PERMISSION TO PUBLISH, PLEASE?

9 BY MS. WELLS:

10 Q.   NOW, I'M GOING TO -- THE JURY'S LOOKING AT THIS SAME

11 PICTURE

12 A.   OKAY.

13 Q.   -- THAT WE'RE GOING TO LOOK AT HERE AND THAT WAY WE DON'T

14 HAVE TO STAND IN FRONT OF IT.  YOU SAID THAT YOU IDENTIFIED

15 SEVERAL TYPES OF DRAIN OPENER.  WHAT WERE -- CAN YOU DESCRIBE

16 FOR THE -- AND ACTUALLY, YOU KNOW WHAT --

17         MS. WELLS:  MAY HE HAVE PERMISSION TO LEAVE THE

18 STAND, YOUR HONOR?

19         THE COURT:  YES, MA'AM.

20         MS. WELLS:  THANK YOU.

21 BY MS. WELLS:

22 Q.   AND SPECIAL AGENT PATRICK, SHOWING YOU GOVERNMENT'S

23 EXHIBIT 73 ON THE SCREEN, WHAT WERE THE ITEMS THAT WERE DRAIN

24 OPENER THAT YOU FOUND INSIDE THIS BACK PACK?

25 A.   THE AEROBIC CRYSTAL OPENER, THE DRAIN OPENER IN THESE TWO

1 BOTTLES DOWN HERE, AND THE HOT POWER DRAIN OPENER RIGHT THERE.

2 Q.   OKAY.  SO, THERE WERE FOUR SEPARATE DRAIN OPENERS IN THIS

3 PARTICULAR BACK PACK, IS THAT CORRECT?

4 A.   CORRECT.

5 Q.   OKAY.  NOW, YOU ALSO SAID THAT YOU -- THERE WAS --

6 ACTUALLY, IF YOU WANT TO TAKE THE STAND, WE'LL GO BACK AND

7 TALK ABOUT SOME SPECIFIC ITEMS.

8         I'M GOING TO SHOW YOU WHAT'S BEEN MARKED FOR

9 IDENTIFICATION PURPOSES AS GOVERNMENT'S 77, 78 AND 79.  WHAT

10 ARE THOSE PHOTOGRAPHS OF?

11 A.   THESE ARE PHOTOS OF THE FOUR DIFFERENT TYPES OF DRAIN

12 OPENER.

13 Q.   JUST CLOSER UP THAN WHAT'S IN GOVERNMENT'S EXHIBIT 73, IS

14 THAT CORRECT?

15 A.   CORRECT.

16             (GOVERNMENT EXHIBIT NUMBER 77, 78,

17             AND 79 WERE IDENTIFIED FOR THE RECORD.)

18 Q.   FAIR AND ACCURATE DEPICTIONS OF HOW THEY APPEARED TO YOU

19 WHEN YOU SEIZED THEM ON JULY THE 1ST OF 2011?

20 A.   YES.

21         MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

22 EXHIBIT 77, 78 AND 79 AT THIS TIME.

23         THE COURT:  THEY'RE ADMITTED.

24             (GOVERNMENT EXHIBIT NUMBER 77, 78 AND 79

25             WERE OFFERED AND ADMITTED INTO EVIDENCE.)

1          MS. WELLS:  THANK YOU VERY MUCH.

2   BY MS. WELLS:

3   Q.   NOW, YOU ALSO STATED THAT YOU RECOVERED -- YOU RECOVERED

4   FUNNELS, IS THAT CORRECT?

5   A.   CORRECT.

6   Q.   AND I BELIEVE THAT'S NUMBER FOUR IN YOUR TECHNICAL

7   ASSISTANT'S REPORT?

8   A.   THAT IS -- APPEARS TO BE NUMBER FOUR, YES.

9   Q.   OKAY.  TAKING A LOOK AT GOVERNMENT'S EXHIBIT 73, CAN YOU

10  IDENTIFY WHERE THE PAPER FUNNELS ARE ON GOVERNMENT'S 73?

11  A.   THE PAPER FUNNELS ARE WHITE CONE SHAPED NEXT TO THE GREEN

12  TOP.

13  Q.   OKAY.  SO, WHITE CONE SHAPED NEXT TO THE GREEN TOP, IS

14  THAT CORRECT?

15  A.   YES.

16  Q.   OKAY.  WHAT WAS THE SIGNIFICANCE OF THE PAPER FUNNELS TO

17  YOU?

18  A.   PAPER FUNNELS ARE USED TO FILTER -- IN THE FILTERING

19  PROCESS IN THE METHAMPHETAMINE PRODUCTION.

20  Q.   OKAY.  NOW, YOU ALSO STATED THAT THERE WAS A PLASTIC

21  BOTTLE CONTAINING WHITE MATERIAL AND THAT YOU ALSO RECOVERED

22  SOME TUBING, IS THAT CORRECT?

23  A.   CORRECT.

24  Q.   AND I'M SHOWING YOU NOW GOVERNMENT'S EXHIBIT -- WHAT'S

25  BEEN MARKED FOR IDENTIFICATION PURPOSES AS GOVERNMENT'S

1 EXHIBIT 74.  DO YOU RECOGNIZE THAT PHOTO?

2 A.   YES, THIS IS WHAT I'M REFERRING TO.

3 Q.   OKAY.  AND THAT'S A PLASTIC BOTTLE WITH A WHITE SUBSTANCE

4 WITH TUBING, IS THAT CORRECT?

5 A.   CORRECT.

6              (GOVERNMENT EXHIBIT NUMBER 74

7               WAS IDENTIFIED FOR THE RECORD.)

8 Q.   AND IS THAT A FAIR AND ACCURATE DEPICTION OF HOW IT

9 APPEARED ON JULY THE 1ST OF 2011?

10 A.   YES, IT IS.

11         MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

12 EXHIBIT 74 AT THIS TIME.

13         THE COURT:  IT'S ADMITTED.

14              (GOVERNMENT EXHIBIT NUMBER 74 WAS

15               OFFERED AND ADMITTED INTO EVIDENCE.)

16         MS. WELLS:  THANK YOU VERY MUCH.

17 BY MS. WELLS:

18 Q.   OKAY.  AND LOOKING AT GOVERNMENT'S EXHIBIT 74 --

19         MS. WELLS:  ACTUALLY, MAY HE HAVE PERMISSION TO

20 LEAVE THE STAND?

21         THE COURT:  YES, MA'AM.

22         MS. WELLS:  THANK YOU VERY MUCH.

23 BY MS. WELLS:

24 Q.   SPECIAL AGENT PATRICK, LOOKING AT GOVERNMENT'S EXHIBIT

25 74, THIS IS -- IS THERE ANYTHING THAT -- WHAT WAS SIGNIFICANT

1 ABOUT GOVERNMENT'S EXHIBIT 74 TO YOU?

2 A.   THIS CONTAINED A WHITE MATERIAL AND THE WHITE MATERIAL IS

3 -- COMMONLY CONTAINS SULFURIC ACID AND SALT, WHICH IS USED IN

4 THE PRODUCTION OF METH.  AND I RECOGNIZE THIS ESSENTIALLY FROM

5 MY TRAINING AND EXPERIENCE.

6 Q.   DID IT HAVE -- DID IT HELP YOU REACH THAT CONCLUSION IN

7 THE FACT THAT THERE WAS TUBING LOCATED IN CONJUNCTION WITH

8 THIS BOTTLE?

9 A.   YES.

10 Q.   OKAY.  AS WELL AS THE TOP OF THIS BOTTLE HAS BEEN

11 ALTERED?

12 A.   THAT IS CORRECT.

13 Q.   OKAY.  NOW, LET ME TAKE THIS.  AND IS THIS COMMONLY KNOWN

14 AS AN HCL GENERATOR?

15 A.   YES, IT IS.

16 Q.   OKAY.  NOW, YOU ALSO DISCOVERED A PLASTIC CONTAINER WITH

17 A SUBSTANCE AROUND THE BOTTOM, IS THAT CORRECT?

18 A.   CORRECT.

19 Q.   DID YOU SEIZE THIS ITEM FOR FURTHER ANALYSIS?

20 A.   YES, I DID.

21 Q.   AND THAT WOULD HAVE BEEN YOUR LAB NUMBER WHAT?

22 A.   LAB NUMBER ONE.

23 Q.   LAB NUMBER ONE?

24 A.   UH-HUH.

25 Q.   I'M SHOWING YOU WHAT'S BEEN MARKED FOR IDENTIFICATION

1 PURPOSES AS GOVERNMENT'S EXHIBIT 75.  DO YOU RECOGNIZE THAT

2 ITEM?

3 A.    YES.

4 Q.    AND WHAT DOES GOVERNMENT'S EXHIBIT 75 DEPICT?

5 A.    A PLASTIC CONTAINER WITH A WHITE RESIDUE.

6                    (GOVERNMENT EXHIBIT NUMBER 75

7                    WAS IDENTIFIED FOR THE RECORD.)

8 Q.    OKAY.  AND IS THAT A FAIR AND ACCURATE DEPICTION OF HOW

9 IT WAS WHEN IT SEIZED IT -- WHEN YOU SEIZED THAT ITEM ON JULY

10 THE 1ST OF 2011?

11 A.    YES, IT IS.

12            MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

13 EXHIBIT 75 AT THIS TIME.

14            THE COURT:  IT'S ADMITTED.

15                    (GOVERNMENT EXHIBIT NUMBER 75 WAS

16                    OFFERED AND ADMITTED INTO EVIDENCE.)

17            MS. WELLS:  THANK YOU VERY MUCH.

18 BY MS. WELLS:

19 Q.    NOW, SPECIAL AGENT PATRICK, I'M GOING TO SHOW YOU WHAT'S

20 BEEN MARKED FOR IDENTIFICATION PURPOSES AS GOVERNMENT'S

21 EXHIBIT 159.  IS THAT ITEM INSIDE GOVERNMENT'S EXHIBIT 159?

22 A.    YES.

23 Q.    AND IS THAT -- WHICH ONE OF THE ITEMS IS IT?

24 A.    THIS PLASTIC CONTAINER RIGHT HERE, ITEM ONE.

25 Q.    OKAY.  AND ALSO THE TUBING THAT YOU TESTIFIED ABOUT

1 LOCATING PREVIOUSLY, IS THAT ALSO CONTAINED INSIDE

2 GOVERNMENT'S EXHIBIT 159?

3 A.   YES, IT IS.

4 Q.   OKAY.  AND CAN YOU POINT THAT OUT FOR THE MEMBERS OR THE

5 JURY?

6 A.   THE TUBING IS RIGHT HERE.

7              (GOVERNMENT EXHIBIT NUMBER 159

8              WAS IDENTIFIED FOR THE RECORD.)

9 Q.   OKAY.  NOW, YOU ALSO -- I WANT TO GO BACK TO THE HCL

10 GENERATOR THAT WE SPOKE ABOUT IN GOVERNMENT'S EXHIBIT 74.  DID

11 YOU CONDUCT A Ph TEST ON THAT ITEM?

12 A.   YES, I DID.

13 Q.   AND WHAT WAS THE RESULT OF THAT TESTING?

14 A.   IT INDICATED THAT THAT BOTTLE OR THAT TUBING WAS ACIDIC.

15 Q.   ACIDIC, OKAY.  AND WAS THAT SIGNIFICANT TO YOU FOR ANY

16 REASON?

17 A.   YES, BECAUSE THIS IS COMMONLY SEEN WITH AN HCL GENERATOR.

18 Q.   THAT THAT WOULD HAVE A Ph THAT WAS ACIDIC, IS THAT

19 CORRECT?

20 A.   THAT IS CORRECT.

21 Q.   OKAY.  NOW, YOUR TECHNICAL FIELD ASSISTANT'S REPORT ALSO

22 INDICATES THAT YOU LOCATED A PLASTIC BAG CONTAINING WHITE

23 PELLET MATERIAL, IS THAT CORRECT?

24 A.   CORRECT.

25 Q.   I'M SHOWING YOU WHAT'S BEEN MARKED FOR IDENTIFICATION

1 PURPOSES AS GOVERNMENT'S EXHIBIT 80.  DO YOU RECOGNIZE THAT?

2 A.   YES.

3 Q.   AND WHAT DOES GOVERNMENT'S EXHIBIT 80 SHOW?

4 A.   IT IS A WHITE -- PLASTIC BAG CONTAINING A WHITE PELLET

5 LIKE MATERIAL.

6                    (GOVERNMENT EXHIBIT NUMBER 80

7                    WAS IDENTIFIED FOR THE RECORD.)

8 Q.   OKAY.  AND IS THAT A FAIR AND ACCURATE DEPICTION OF HOW

9 THAT BAG APPEARED TO YOU ON JULY THE 1ST OF 2011?

10 A.   THAT'S CORRECT.

11 Q.   OKAY.

12          MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

13 EXHIBIT 80 AT THIS TIME.

14          THE COURT:  IT'S ADMITTED.

15               (GOVERNMENT EXHIBIT NUMBER 80 WAS

16               OFFERED AND ADMITTED INTO EVIDENCE.)

17 BY MS. WELLS:

18 Q.   WHAT WAS THE SIGNIFICANCE OF THE WHITE -- WHAT

19 SIGNIFICANCE DID THIS BAG HAVE, IF ANY, TO YOU AS YOU LOOKED

20 THROUGH THIS BAG, THE LARGER BACK PACK, LOOKING FOR ITEMS

21 CONSISTENT WITH PRODUCTION OF METHAMPHETAMINE?

22 A.   THAT IS -- HAS THE APPEARANCE OF AMMONIA NITRATE.  IT'S A

23 SUBSTANCE THAT'S USED IN THE PRODUCTION OF METHAMPHETAMINE,

24 ALSO.

25 Q.   AND A COMMON FERTILIZER, IS THAT CORRECT?

1  A.   CORRECT, A COMMON FERTILIZER.

2  Q.   OKAY.  NOW, DID YOU ALSO ACTUALLY TAKE A PORTION OR TEST

3  A PORTION OF THE LINING OF THE BACK PACK IN THIS CASE?

4  A.   THAT'S CORRECT.

5  Q.   OKAY.  I'M GOING TO SHOW YOU WHAT'S BEEN MARKED FOR

6  IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT 76.  DO YOU

7  RECOGNIZE THAT?

8  A.   YES, THAT IS THE INSIDE OF THE BOOK BAG.

9                 (GOVERNMENT EXHIBIT NUMBER 76

10                 WAS IDENTIFIED FOR THE RECORD.)

11 Q.   OKAY.  IS THAT A FAIR AND ACCURATE DEPICTION OF HOW IT

12 APPEARED TO YOU ON JULY THE 1ST OF 2011?

13 A.   YES, IT IS.

14           MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

15 EXHIBIT 76 AT THIS TIME.

16           THE COURT:  ADMITTED.

17                 (GOVERNMENT EXHIBIT NUMBER 76 WAS

18                 OFFERED AND ADMITTED INTO EVIDENCE.)

19           MS. WELLS:  THANK YOU.  MAY HE HAVE PERMISSION TO

20 LEAVE THE STAND?

21           THE COURT:  YES, MA'AM.

22           MS. WELLS:  THANK YOU.

23 BY MS. WELLS:

24 Q.   SPECIAL AGENT PATRICK, WHAT WAS IT ABOUT THE LINING OF

25 THIS BACK PACK THAT INDICATED TO YOU IT MIGHT BE AN ITEM THAT

1 YOU WOULD WANT TO TEST?

2 A.   THE LINER CONTAINED MARKINGS FOR WHAT I CONSIDER WHITE

3 RESIDUE, WHICH WOULD BE A GOOD INDICATOR OF THE PRESENCE OF --

4 THE POSSIBILITY OF A CONTROLLED SUBSTANCE BEING PRESENT.  IT'S

5 A GOOD PLACE TO TEST.

6 Q.   OKAY.  AND, IN FACT, DID YOU SEIZE -- HOW DID YOU -- DID

7 YOU ACTUALLY SEIZE THE LINER AND TAKE IT BACK WITH YOU OR DID

8 YOU TAKE A SAMPLE?

9 A.   I ACTUALLY CUT OUT A PORTION OF THE LINER OF THE BOOK

10 BAG.

11 Q.   OKAY.  YOU CAN TAKE THE STAND.  AND IS THAT PORTION THAT

12 YOU CUT OUT ACTUALLY INSIDE WHAT'S BEEN MARKED FOR

13 IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT 159?

14 A.   CORRECT.

15 Q.   AND CAN YOU INDICATE THAT TO THE MEMBERS OF THE JURY?

16 A.   THE LINER IS RIGHT HERE, THIS BLACK CLOTH RIGHT HERE.

17 Q.   OKAY.  AND WHAT ITEMS -- WHEN YOU RESPOND TO A

18 METHAMPHETAMINE LAB OR WHAT'S SUSPECTED TO BE A

19 METHAMPHETAMINE LAB, DO YOU SEIZE EVERY ITEM AT THE SCENE?

20 A.   NO, EVERY ITEM IS NOT SEIZED, ONLY ITEMS THAT MAY HAVE

21 EVIDENTIARY VALUE ARE SEIZED AND TAKEN BACK TO THE LAB.

22 Q.   OKAY.  AND THE OTHER ITEMS ARE GENERALLY DESTROYED, IS

23 THAT CORRECT?

24 A.   CORRECT.

25 Q.   AND WHY ARE THEY DESTROYED?

1 A.   BECAUSE OF THE HEALTH HAZARDS THAT THEY MAY HAVE.  A LOT

2 OF THESE ARE DANGEROUS CHEMICALS LIKE STRONG ACIDS AND BASES.

3 Q.   AND WHICH ITEMS DID YOU SEIZE TO TAKE BACK TO THE LAB

4 WITH YOU IN THIS CASE?

5 A.   I SEIZED THE LINER OF THE BOOK BAG, THE PLASTIC CONTAINER

6 WITH THE WHITE RESIDUE, THE PLASTIC TUBING THAT WAS WITH THE

7 PLASTIC BOTTLE, AND THE KNOTTED PLASTIC BAG CONTAINING WHITE

8 POWDER.

9 Q.   AND THAT BAG WAS GIVEN TO YOU BY SPECIAL AGENT -- BY

10 INVESTIGATOR JAY CREECH WITH THE SHERIFF'S OFFICE, IS THAT

11 CORRECT?

12 A.   CORRECT.

13 Q.   DO YOU KNOW WHERE THAT BAG CAME FROM?

14 A.   IT WAS A WHITE CANVAS BAG THAT WAS LOCATED INSIDE OF THIS

15 TRUCK.

16 Q.   OKAY.  AND YOU TOOK THOSE BACK TO THE LAB WITH YOU TO

17 TEST, IS THAT CORRECT?

18 A.   CORRECT.

19 Q.   I'M GOING TO LEAVE THIS UP HERE WITH YOU FOR A MINUTE.

20 NOW, SPECIAL AGENT PATRICK, WHEN YOU BACK TO THE LAB -- LET'S

21 TALK ABOUT ITEM NUMBER ONE, THE PLASTIC BAG CONTAINING THE

22 PLASTIC CONTAINER WITH PINK AND WHITE RESIDUE.  AND YOUR ITEM

23 NUMBER ONE IS WHAT'S DEPICTED IN GOVERNMENT'S EXHIBIT 75, IS

24 THAT CORRECT?  IT'S GOING TO APPEAR ON THE SCREEN.  IF YOU

25 NEED TO STEP DOWN TO SEE IT, THAT'S FINE.

1 A.    THAT IS CORRECT.

2 Q.    OKAY.  WHAT TYPE OF TESTING OR ANALYSIS DID YOU CONDUCT

3 ON GOVERNMENT'S EXHIBIT 75, YOUR ITEM NUMBER ONE?

4 A.    ITEM ONE I PERFORMED A PRELIMINARY COLOR TEST.

5 Q.    OKAY.  AND WHAT DOES A PRELIMINARY COLOR TEST INDICATE TO

6 YOU?

7 A.    A PRELIMINARY COLOR TEST INDICATES THE PRESENCE OF A

8 CONTROLLED SUBSTANCE.  IT DOESN'T IDENTIFY A CONTROLLED

9 SUBSTANCE.  IT PRODUCES A COLOR THAT JUST GIVES AN INDICATION

10 OF WHAT COULD BE PRESENT.

11 Q.    OKAY.  AND WHAT WAS THE RESULT OF THAT TEST IN THIS CASE?

12 A.    FOR ITEM ONE THERE WAS NO SIGNIFICANT REACTION.

13 Q.    OKAY.  AND DID YOU CONDUCT ANY FURTHER TESTING ON

14 GOVERNMENT'S EXHIBIT 75, ITEM NUMBER ONE?

15 A.    I PERFORMED A CONFIRMATORY INSTRUMENT TEST, WHICH IS AN

16 INFRARED.  THIS ESSENTIALLY ALLOWS ME TO COMPARE A UNKNOWN

17 SAMPLE TO A KNOWN STANDARD AND COMPARE THE TWO TO SEE IF IT IS

18 -- IF A CONTROLLED SUBSTANCE IS PRESENT.

19 Q.    AND WHEN YOU PERFORMED THAT INFRARED TEST, WHAT WAS THE

20 RESULT OF THAT TESTING?

21 A.    AN UNIDENTIFIED SUBSTANCE, MEANING IT DID NOT IDENTIFY A

22 CONTROLLED SUBSTANCE.

23 Q.    IT DID NOT IDENTIFY A CONTROLLED SUBSTANCE FOR YOUR ITEM

24 NUMBER ONE, GOVERNMENT'S EXHIBIT 75, CORRECT?

25 A.    CORRECT.

1 Q.   ALL RIGHT.  MOVING ON TO YOUR ITEM NUMBER TWO, WHAT WAS

2 YOUR ITEM NUMBER TWO?

3 A.   ITEM TWO WAS A PLASTIC BAG CONTAINING CLEAR TUBING WITH

4 WHITE RESIDUE.

5 Q.   AND IS THAT -- WE'RE GOING TO SHOW NOW GOVERNMENT'S

6 EXHIBIT 74.  IS THAT THE TUBING THAT YOU ARE REFERRING TO?

7 A.   THAT IS CORRECT, THE TUBING BESIDE THE BOTTLE.

8 Q.   OKAY.  AND THE BOTTLE YOU DID NOT SEIZE, IS THAT CORRECT?

9 A.   THAT IS CORRECT.

10 Q.   THAT WAS PART OF THE DESTRUCTION ORDER?

11 A.   CORRECT.

12 Q.   ALL RIGHT.  AS TO THE TUBING, DID YOU CONDUCT ANY TESTING

13 OR ANALYSIS ON THE TUBING, YOUR ITEM NUMBER TWO AND WHAT'S

14 DEPICTED IN GOVERNMENT'S EXHIBIT 74?

15 A.   I DID.  I PERFORMED A CONFIRMATORY INSTRUMENTAL TEST,

16 WHICH IS A GAS CHROMATOGRAPH MASS SPECTROMETER, AND THIS

17 INSTRUMENT ESSENTIALLY ALLOWS ME TO COMPARE THE SAME AS

18 BEFORE, AN UNKNOWN STANDARD TO A KNOWN, TO SEE IF THERE IS A

19 CONTROLLED SUBSTANCE PRESENT.

20 Q.   OKAY.  AND WHAT WAS THE RESULT OF YOUR TESTING IN THIS

21 CASE?

22 A.   I WAS ABLE TO IDENTIFY METHAMPHETAMINE.

23 Q.   OKAY.  AND DOES METHAMPHETAMINE HAVE WHAT IS CALLED A

24 SCHEDULE?

25 A.   CORRECT.  IT IS METHAMPHETAMINE SCHEDULE II.

1 Q.   OKAY.  AND WERE YOU ABLE TO DETERMINE A WEIGHT FOR THE

2 METHAMPHETAMINE THAT YOU FOUND ON THIS TUBING?

3 A.   NO.  BECAUSE IT WAS A RESIDUE THERE'S NO -- THERE'S NO

4 MATERIAL TO WEIGH.

5 Q.   OKAY.  I'M NOW GOING TO DIRECT YOU TO YOUR ITEM NUMBER

6 THREE.  WHAT WAS YOUR ITEM NUMBER THREE?

7 A.   ITEM THREE WAS A PLASTIC BAG CONTAINING WHITE POWDER.

8 Q.   AND ITEM THREE, IS THAT THE ITEM THAT YOU RECEIVED FROM

9 INVESTIGATOR JAY CREECH?

10 A.   CORRECT.

11 Q.   ALL RIGHT.  AND DID YOU CONDUCT ANY -- AND THAT'S THE

12 ITEM THAT CAME OUT OF THE BAG INSIDE THE VEHICLE?

13 A.   CORRECT.

14 Q.   NOT OUTSIDE -- NOT FROM THE BACK PACK, CORRECT?

15 A.   CORRECT.

16 Q.   ALL RIGHT.  AND DID YOU CONDUCT ANY TESTING OR ANALYSIS

17 ON YOUR ITEM NUMBER THREE?

18 A.   YES, I DID.  I PERFORMED THE SAME PRELIMINARY COLOR TEST

19 AND A CONFIRMATORY INSTRUMENTAL TEST, WHICH WAS THE INFRARED

20 THAT I MENTIONED BEFORE.

21 Q.   OKAY.  WHAT WAS THE RESULT OF YOUR COLOR TEST?

22 A.   IT PRODUCED AN ORANGE COLOR, WHICH IS INDICATIVE OF A

23 SUBSTANCE CONTAINING METHAMPHETAMINE.

24 Q.   AND WHEN YOU WENT ON TO DO YOUR CONFIRMATORY TEST, AND I

25 THINK YOU SAID, BUT IT ESCAPED ME, WHICH TEST DID YOU PERFORM

1 ON IT TO CONFIRM?

2 A.    THE CONFIRMATORY TEST WAS THE INFRARED.

3 Q.    OKAY.  THAT YOU CONDUCTED ON ONE OF THE PREVIOUS ITEMS,

4 CORRECT?

5 A.    CORRECT.

6 Q.    AND WHAT WAS THE RESULT OF THAT TESTING?

7 A.    I WAS ABLE TO IDENTIFY METHAMPHETAMINE, WHICH IS A

8 SCHEDULE II CONTROLLED SUBSTANCE.

9 Q.    OKAY.  AND WERE YOU ABLE TO DETERMINE A WEIGHT FOR THAT

10 METHAMPHETAMINE?

11 A.    YES, 1.06 GRAMS.

12 Q.    ALL RIGHT.  AND NOW DIRECTING YOU TO ITEM NUMBER FOUR,

13 WHICH WAS THE LINING OF THE BACK PACK, IS THAT CORRECT?

14 A.    THAT IS CORRECT.

15 Q.    AND YOUR ITEM NUMBER FOUR, DID YOU CONDUCT ANY TESTING OR

16 ANALYSIS ON ITEM FOUR?

17 A.    I PERFORMED THE CONFIRMATORY INSTRUMENT, THE GAS

18 CHROMATOGRAPH MASS SPECTROMETER.

19 Q.    AND WHAT WAS THE RESULT OF THAT TESTING?

20 A.    I WAS ABLE TO IDENTIFY METHAMPHETAMINE.

21 Q.    AND COULD YOU DETERMINE A WEIGHT FOR THAT

22 METHAMPHETAMINE?

23 A.    NO, BECAUSE THAT TOO WAS A RESIDUE.

24 Q.    AND YOU PRODUCED A LAB REPORT AND A TECHNICAL FIELD

25 ASSISTANT'S REPORT BASED ON YOUR ANALYSIS AND TESTING IN THIS

1 CASE, CORRECT?

2 A.    CORRECT.

3           MS. WELLS:  MAY I APPROACH, YOUR HONOR?

4           THE COURT:  YES, MA'AM.

5           MS. WELLS:  THANK YOU.

6 BY MS. WELLS:

7 Q.    SPECIAL AGENT GENARD (SIC), I'M GOING TO SHOW YOU WHAT'S

8 BEEN MARKED FOR IDENTIFICATION PURPOSES AS GOVERNMENT'S

9 EXHIBIT 53 (SIC).  WILL YOU TAKE A LOOK AT THIS AND TELL ME IF

10 YOU RECOGNIZE IT?

11 A.    THIS IS MY LAB REPORT.

12           (GOVERNMENT EXHIBIT NUMBER 153

13           WAS IDENTIFIED FOR THE RECORD.)

14 Q.    AND DOES IT CONTAIN THE TECHNICAL FIELD ASSISTANT'S?

15 A.    YES, ALSO THE TECHNICAL FIELD ASSISTANT'S.

16 Q.    AND YOUR SIGNATURE APPEARS ON THIS DOCUMENT -- THESE

17 DOCUMENTS?

18 A.    CORRECT.

19 Q.    AND ARE THOSE A FAIR AND ACCURATE REPORTING OF THE

20 TESTING AND THE EVIDENCE COLLECTION THAT YOU DID IN THIS CASE?

21 A.    YES.

22 Q.    OKAY.

23           MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

24 EXHIBIT 153 AT THIS TIME.

25           THE COURT:  IT'S ADMITTED.

1          (GOVERNMENT EXHIBIT NUMBER 153 WAS

2          OFFERED AND ADMITTED INTO EVIDENCE.)

3          MS. WELLS:  THANK YOU VERY MUCH.

4  BY MS. WELLS:

5  Q.   I'M ALSO -- WE'VE REFERRED TO WHAT'S BEEN MARKED FOR

6  IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT 159.  YOU

7  IDENTIFIED THE TUBING, THE PLASTIC CONTAINER, AND THE LINING

8  OF THE BACK PACK.  IS THE METHAMPHETAMINE ALSO CONTAINED IN

9  HERE?

10 A.   YES, IT IS.

11 Q.   AND WHERE IS THAT?

12 A.   IT IS THIS PLASTIC BAG CONTAINING A WHITE POWDER DOWN

13 HERE.

14 Q.   OKAY.  AND THESE ITEMS ARE IN THE SAME OR SUBSTANTIALLY

15 THE SAME CONDITION AS WHEN YOU TESTED THEM?

16 A.   CORRECT.

17 Q.   AND ARE YOU ABLE TO IDENTIFY THIS BAG AS THE BAG THAT YOU

18 ACTUALLY CONDUCTED THE TESTING ON?

19 A.   YES.

20 Q.   AND HOW ARE YOU ABLE TO DO THAT?

21 A.   I'M ABLE TO IDENTIFY THIS BAG BASED ON THE CASE NUMBER

22 AND MY INITIALS AND THE AGENCY CASE NUMBER ALSO.

23 Q.   OKAY.  AND HAS THIS -- HAVE THESE ITEMS OF EVIDENCE

24 CHANGED IN ANY SUBSTANTIAL WAY SINCE THE TIME THAT YOU

25 CONDUCTED YOUR TESTING?

1  A.   NO.

2  Q.   HAVE THEY BEEN MAINTAINED IN THE SAME OR SUBSTANTIALLY

3  THE SAME CONDITION?

4  A.   THAT'S CORRECT.

5           MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

6  EXHIBIT 159 AT THIS TIME.

7           THE COURT:  IT'S ADMITTED.

8               (GOVERNMENT EXHIBIT NUMBER 159 WAS

9               OFFERED AND ADMITTED INTO EVIDENCE.)

10          MS. WELLS:  THANK YOU VERY MUCH.  ONE MOMENT,

11 PLEASE, YOUR HONOR.

12          (PAUSE.)

13          MS. WELLS:  YOUR HONOR, I HAVE NO FURTHER QUESTIONS

14 FOR SPECIAL AGENT GENARD AT THIS TIME -- I MEAN, PATRICK.

15 EXCUSE ME.

16          THE COURT:  CROSS?

17          MR. STEWART:  NOT FOR THIS WITNESS, YOUR HONOR.

18          THE COURT:  YOU MAY STEP DOWN.  YOUR NEXT WITNESS?

19          MS. WELLS:  THANK YOU VERY MUCH, YOUR HONOR.  MAY

20 SPECIAL AGENT PATRICK BE EXCUSED?

21          THE COURT:  MR. STEWART?

22          MR. STEWART:  NO OBJECTION, YOUR HONOR.

23          THE COURT:  ALL RIGHT, SIR.  HE'S EXCUSED.

24          MS. WELLS:  YES, SIR, YOUR HONOR, THE GOVERNMENT

25 CALLS SPECIAL AGENT KELLY PAGE TO THE STAND.

1          THE COURT:  THANK YOU.

2          **KELLY PAGE, GOVERNMENT WITNESS, SWORN**

3          **D I R E C T   E X A M I N A T I O N**   10:43 A.M.

4   BY MS. WELLS:

5   Q.   SPECIAL AGENT PAGE, WHERE ARE YOU EMPLOYED?

6   A.   I'M EMPLOYED WITH THE NORTH CAROLINA STATE BUREAU OF

7   INVESTIGATION.

8   Q.   AND WHAT IS YOUR CURRENT ASSIGNMENT?

9   A.   I AM CURRENTLY ASSIGNED AS A SITE SAFETY OFFICER

10  RESPONDING TO METHAMPHETAMINE LABORATORIES PRIMARILY IN

11  EASTERN NORTH CAROLINA.

12  Q.   CAN YOU TELL THE MEMBERS OF THE JURY ABOUT YOUR EDUCATION

13  AND BACKGROUND?

14  A.   YES, MA'AM.  I'VE BEEN WITH THE SBI A LITTLE OVER TEN

15  YEARS.  I HAVE A BACHELOR OF SCIENCE DEGREE IN CHEMISTRY AND I

16  WAS HIRED BY THE SBI TO WORK IN THE DRUG CHEMISTRY SECTION OF

17  THE CRIME LABORATORY.

18          SO, WHEN I WAS FIRST HIRED, I WENT THROUGH A BASIC

19  LAW ENFORCEMENT TRAINING AND THEN A SPECIAL AGENT ACADEMY WITH

20  THE SBI.  THEN I WENT THROUGH ADDITIONAL IN-HOUSE TRAINING IN

21  THE CRIME LABORATORY WHERE I LEARNED HOW TO ANALYZE ITEMS OF

22  EVIDENCE FOR THE PRESENCE OF CONTROLLED SUBSTANCES.

23          AS A PART OF MY DUTIES IN DRUG CHEMISTRY, I ALSO

24  RESPONDED TO METHAMPHETAMINE LABORATORIES AS A DRUG CHEMIST.

25  Q.   APPROXIMATELY DURING THE TIME THAT YOU HAVE BEEN EMPLOYED

1 WITH THE STATE BUREAU OF INVESTIGATION HOW MANY

2 METHAMPHETAMINE LABS HAVE YOU RESPONDED TO?

3 A.   I'VE RESPONDED TO MORE THAN 85 METH LABS AS A CHEMIST AND

4 I'VE RESPONDED TO AN ADDITIONAL 250 TO 300 METH LABS AS A SITE

5 SAFETY OFFICER.

6 Q.   WHAT OTHER TYPES OF TRAINING AND EXPERIENCE DO YOU HAVE

7 AS IT PERTAINS TO METHAMPHETAMINE PRODUCTION AND

8 METHAMPHETAMINE IN GENERAL?

9 A.   AS FAR AS MY TRAINING FOR METHAMPHETAMINE IN GENERAL AND

10 PRODUCTION, IN 2003, I ATTENDED THE DRUG ENFORCEMENT

11 ADMINISTRATION'S CLANDESTINE LABORATORY CERTIFICATION TRAINING

12 WHICH WAS HELD IN RALEIGH, NORTH CAROLINA.  THAT'S THE 40-HOUR

13 CLASS WHICH CERTIFIES LAW ENFORCEMENT OFFICERS TO BE ABLE TO

14 ENTER METH LABS.

15         I ALSO COMPLETED A SITE SAFETY SCHOOL ALSO GIVEN BY

16 THE DRUG ENFORCEMENT ADMINISTRATION WHICH WAS IN QUANTICO,

17 VIRGINIA, IN 2005, WHICH TAUGHT ME HOW TO BE A SITE SAFETY

18 OFFICER FOR METH LABS.

19         I'VE ALSO ATTENDED SEVERAL CONFERENCES BY THE -- BY

20 CLIA, WHICH IS THE CLANDESTINE LABORATORY INVESTIGATORS

21 ASSOCIATION, AND THAT'S AN ANNUAL CONFERENCE THAT'S HELD IN

22 DIFFERENT CITIES ACROSS THE COUNTRY.

23         IN ADDITION TO THAT, I'M CURRENTLY THE SECRETARY ON

24 THE BOARD -- I'M A BOARD MEMBER, SECRETARY POSITION, ON THE

25 NORTH CAROLINA NARCOTICS ENFORCEMENT OFFICERS ASSOCIATION.

1 Q.   OKAY.  NOW, SPECIAL AGENT PAGE --

2          MS. WELLS:  WELL, YOUR HONOR, AT THIS TIME I'D OFFER

3 SPECIAL AGENT PAGE AS AN EXPERT IN METHAMPHETAMINE

4 LABORATORIES, METHAMPHETAMINE AND FORENSIC DRUG CHEMISTRY.

5          THE COURT:  SHE MAY EXPRESS OPINIONS IN THAT FIELD.

6 BY MS. WELLS:

7 Q.   SPECIAL AGENT PAGE, CAN YOU DESCRIBE FOR THE MEMBERS OF

8 THE JURY WHAT YOUR DUTIES ARE AS A -- WHAT A SITE SAFETY

9 OFFICER IS AND WHAT YOUR DUTIES ARE?

10 A.   YES, MA'AM.  A SITE SAFETY OFFICER IS BASICALLY A

11 COORDINATOR POSITION.  AND THE REASON WE HAVE SITE SAFETY

12 OFFICERS IS DUE TO THE VOLATILE NATURE OF METHAMPHETAMINE

13 LABORATORIES.

14          SO, JUST LIKE YOUR EMPLOYER WOULD HAVE TO PROTECT

15 YOU AT THE WORKPLACE, WE HAVE CERTAIN STEPS WE HAVE TO TAKE TO

16 MAKE SURE THAT POLICE OFFICERS ARE SAFE AND HAVE PROTECTIVE

17 EQUIPMENT PROVIDED TO THEM AND THEY'RE WEARING IT WHEN THEY GO

18 TO A METH LAB.

19          THAT'S ESSENTIALLY MY JOB FUNCTION IS TO PROVIDE

20 THAT SAFETY EQUIPMENT.  I ALSO DO QUITE A BIT OF COORDINATING

21 WHEN IT COMES TO A METH LAB.

22          AS YOU'VE HEARD IN PREVIOUS TESTIMONY, WE HAVE

23 CHEMISTS THAT COME TO THE SCENE, WE HAVE HAZARDOUS WASTE

24 CONTRACTORS THAT COME TO THE SCENE.  SO, I MAKE THOSE

25 CONTACTS.

1           IN ADDITION, I WORK WITH LOCAL LAW ENFORCEMENT TO

2   INSURE THAT THE SEARCH WARRANT HAS BEEN WRITTEN, SIGNED BY A

3   SUPERIOR COURT JUDGE.  I ALSO CONTACT FIRE AND EMS AND HAVE

4   THEM ON STANDBY OR ON THE SCENE IN THE EVENT THAT THERE'S SOME

5   SORT OF FIRE OR INJURY.

6   Q.   OKAY.  AND DURING THE COURSE OF CARRYING OUT YOUR DUTIES

7   AND IN YOUR TRAINING AND EXPERIENCE, WHAT TYPES OF METHODS ARE

8   USED TO PRODUCE METHAMPHETAMINE?

9   A.   THERE ARE TWO MAIN METHODS THAT ARE USED TO MANUFACTURE

10  METHAMPHETAMINE; THE AMMONIA METHOD AND THE RED PHOSPHOROUS

11  METHOD.

12          IN EASTERN NORTH CAROLINA, WE PRIMARILY SEE THE

13  AMMONIA METHOD UTILIZED.  HOWEVER, THERE ARE THREE DIFFERENT

14  AMMONIA METHODS AVAILABLE AND OVER THE COURSE OF TIME WE HAVE

15  ACTUALLY SEEN METH LABS EVOLVE.

16          AS TIME GOES ON, METH COOKS FIND OUT NEW WAYS TO DO

17  IT.  THEY TRY TO SKIRT AROUND THE LAWS AND COME UP WITH FASTER

18  METHODS OR IN THEIR OPINION MAYBE LESS DANGEROUS METHODS OR

19  MAYBE SOMETHING THAT WOULD BE MORE ELUSIVE TO LAW ENFORCEMENT,

20  YOU KNOW, EASIER TO HIDE, SMALLER CONTAINERS AND THINGS LIKE

21  THAT.

22          SO, THERE'S ACTUALLY THREE AMMONIA METHODS THAT ARE

23  CURRENTLY -- WE SEE IN NORTH CAROLINA.

24  Q.   OKAY.  AND CAN YOU DESCRIBE THOSE THREE METHODS THAT YOU

25  SEE?

A.    SURE.  THE FIRST METHOD THAT I -- THE FIRST AMMONIA

METHOD THAT I HAD EVER SEEN WAS THE ANHYDROUS AMMONIA METHOD

AND THAT'S THE ONE WHERE METH COOKS WILL GO OUT AND THEY WILL

STEAL ANHYDROUS AMMONIA FROM FARMERS.  YOU CAN ALSO STEAL

ANHYDROUS AMMONIA FROM CERTAIN COMPANIES THAT USE IT AS A

REFRIGERANT.

        SO, ANHYDROUS AMMONIA IS A VERY, VERY COLD CHEMICAL.

IT'S ALSO VERY, VERY CORROSIVE.  IF YOU EVER GET A WHIFF OF

IT, YOU WILL KNOW IT.  IT SMELLS LIKE HOUSEHOLD AMMONIA, BUT

IT'S TOTALLY DIFFERENT.

        SO, IF YOU SMELL IT, IT CAN BURN YOUR LUNGS.  VERY,

VERY DANGEROUS TO DEAL WITH.  ALSO, IT HAS TO BE IN A

COMPRESSED CYLINDER, WHICH MAY POTENTIALLY EXPLODE AS WELL.

        SO, THE METH COOKS GO OUT IN THE MIDDLE OF THE

NIGHT, THEY STEAL THE ANHYDROUS AMMONIA, THEY BRING IT BACK TO

WHEREVER THEY'RE GOING TO COOK.  AND THAT'S ONE OF THE

INGREDIENTS THEY NEED IN ADDITION TO THE LITHIUM BATTERIES,

THE COLEMAN FUEL, AND THEN THE PSEUDOEPHEDRINE, WHICH IS THE

MAIN INGREDIENT.  THOSE ARE THE PRIMARY INGREDIENTS THEY NEED

TO MANUFACTURE.  SO, THAT'S THE FIRST METHOD.

Q.    THAT'S THE ANHYDROUS METHOD?

A.    THAT'S THE ANHYDROUS METHOD.

Q.    NOW, YOU SAID YOU'VE SEEN THIS EVOLVE.  HOW HAVE YOU SEEN

IT EVOLVE?

A.    AFTER A WHILE OUR FARMERS IN NORTH CAROLINA AND

1 BUSINESSES REALIZED THAT THEIR ANHYDROUS AMMONIA WAS GETTING

2 STOLEN.  SO, A LOT OF FARMERS HAVE STOPPED USING IT OR THEY'VE

3 TAKEN STEPS TO PREVENT METH COOKS FROM BEING TO STEAL IT SUCH

4 AS LOCKING UP TANKS OR HIDING TANKS, OR THERE'S EVEN ONE

5 COMPANY THAT CAN PUT AN ADDITIVE IN TANKS THAT TURNS METH

6 PINK.  IT TURNS THE ANHYDROUS AMMONIA PINK AND THEN IT TURNS

7 METH PINK, OR BASICALLY IT'S NOT EVEN METH IN THE END AND IT

8 WILL TURN EVERYTHING PINK.

9           SO, OVER THE TIME ANHYDROUS IS HARDER TO FIND SO OUR

10 METH COOKS FOUND A WAY TO MAKE AMMONIA AT HOME USING NORMAL

11 HOUSEHOLD CHEMICALS.

12           AND WHAT THOSE CHEMICALS ARE, ARE BASICALLY AMMONIUM

13 NITRATE FERTILIZER PELLETS, WHICH YOU CAN PURCHASE A LOT OF

14 PLACES.  IT'S PRETTY COMMON.  AND THEN THEY COMBINE THAT WITH

15 LYE, DRAIN OPENER, WHICH IS ALSO A VERY COMMON HOUSEHOLD

16 CHEMICAL.

17           THEY COMBINE THESE TWO INGREDIENTS TOGETHER AND THEN

18 THEY MAKE WHAT WE CALL A CONDENSER, WHICH IS BASICALLY COIL

19 TUBING.  THEY ADD THESE TWO CHEMICALS IN A CONTAINER.  IT

20 MAKES AMMONIA GAS.  THE GAS GOES THROUGH THE CONDENSER COILS

21 AND THEN THEY COOL THE CONDENSER COILS EITHER USING DRY ICE OR

22 PROPANE.  AND WHEN I SAY PROPANE, I MEAN LIQUID PROPANE, LIKE

23 TURN A PROPANE TANK UPSIDE DOWN AND THE LIQUID COMES OUT,

24 WHICH IS ALSO VERY, VERY COLD.

25           SO, WHEN THEY COOL THE COILS OF THE CONDENSER, THE

1 GAS GOES THROUGH IT AND IT CONDENSES IT INTO A LIQUID AMMONIA.

2 SO, YOU DON'T HAVE TO STEAL ANHYDROUS AMMONIA, YOU CAN MAKE

3 YOUR AMMONIA RIGHT THERE AT HOME.

4 Q.   OKAY.  I'M GOING TO SHOW YOU WHAT'S BEEN ENTERED INTO

5 EVIDENCE AS GOVERNMENT'S EXHIBIT 15.

6        MS. WELLS:  MAY SHE HAVE PERMISSION TO LEAVE THE

7 STAND AS NECESSARY?

8            THE COURT:  YES, MA'AM.

9        MS. WELLS:  THANK YOU.

10 BY MS. WELLS:

11 Q.   DO YOU RECOGNIZE GOVERNMENT'S EXHIBIT 15?

12 A.   I DO.

13 Q.   AND WHAT DO YOU RECOGNIZE GOVERNMENT'S 15 TO BE?

14 A.   GOVERNMENT'S EXHIBIT 15 IS A PHOTOGRAPH OF AN AMMONIA

15 CONDENSER.

16            (GOVERNMENT EXHIBIT NUMBER 15

17            WAS IDENTIFIED FOR THE RECORD.)

18 Q.   OKAY.  AND THAT WORKS IN THE MANNER IN WHICH YOU JUST

19 DESCRIBED?

20 A.   YES, MA'AM.

21 Q.   AND THAT'S ANOTHER ONE OF THE METHODS.  AND ONCE THEY'VE

22 CREATED THIS AMMONIA, WHAT STEPS DO THEY NOW TAKE?

23 A.   AFTER CREATING THE AMMONIA, THE REST OF THE PROCESS IS

24 EXACTLY THE SAME AS THE ANHYDROUS METHOD.  SO, ONCE THEY HAVE

25 THE AMMONIA THEY PUT THE AMMONIA IN A BUCKET OR A TEA PITCHER

1 OR SOME SORT OF OTHER CONTAINER ALONG WITH THE CRUSHED UP

2 PSEUDOPHED, COLEMAN FUEL AND THE LITHIUM BATTERIES, WHICH THEY

3 ACTUALLY USE PLIERS TO PEEL OPEN BATTERIES.

4        IT'S ALMOST -- I WAS GOING TO SAY LIKE PEELING A

5 BANANA, BUT YOU ACTUALLY PEEL AROUND THE BATTERY AND TAKE THAT

6 SHINY CASING OFF OF THE ENERGIZER BATTERIES.  AND INSIDE EACH

7 BATTERY IS A PIECE OF LITHIUM.  IT'S ABOUT THAT LONG AND ABOUT

8 THAT WIDE.  THAT DOESN'T PROBABLY HELP THE RECORD.  BUT IT'S

9 ROLLED UP INSIDE THE BATTERY AND THEY TAKE THOSE STRIPS OUT

10 AND PUT IT DOWN INTO THE COLEMAN FUEL, THE AMMONIA AND THE

11 PSEUDOPHED.

12        AND THAT REACTION BETWEEN ALL THOSE CHEMICALS CAUSES

13 A BUBBLING TO HAPPEN.  WE CALL IT COOKING, BUT TECHNICALLY WE

14 DON'T HEAT IT UP.  YOU ACTUALLY JUST MIX THE CHEMICALS AND IT

15 BUBBLES BY ITSELF BECAUSE OF THE CHEMICAL REACTION.

16 Q.  OKAY.  AND YOU SAID THAT IN -- WELL, LET'S TALK ABOUT THE

17 FINAL -- OR THE MOST RECENT VERSION OF THIS TYPE OF METH -- OF

18 THE AMMONIA METHOD.  AND WHAT IS THAT?

19 A.  OVER TIME, I GUESS BECAUSE -- I REALLY DON'T KNOW WHY,

20 BUT OVER TIME WE STARTED SEEING OUR METH COOKS GO ONE STEP

21 FURTHER.  AND INSTEAD OF MAKING THIS CONDENSER, WHICH IS KIND

22 OF LARGE AND ANOTHER STEP IN THE PROCESS, THE COOKS THOUGHT,

23 WELL, IF WE ALREADY HAVE THE FERTILIZER FOR THIS AND WE

24 ALREADY HAVE THE LYE FOR THIS, WHY NOT JUST PUT EVERYTHING IN

25 ONE CONTAINER AND SHAKE IT UP.

1    AND OVER TIME THAT EVOLVED INTO WHAT WE NOW KNOW TO

2 BE THE SHAKE AND BAKE METHOD OR THE ONE POT METHOD.  AND THAT

3 PARTICULAR METHOD IS THE METHOD THAT WE ARE SEEING NATIONWIDE

4 EVERYWHERE POP UP.  AND IN NORTH CAROLINA, RIGHT NOW, THAT'S

5 -- PROBABLY 70 TO 75 PERCENT OF THE METH LABS WE GO TO ACROSS

6 NORTH CAROLINA RIGHT NOW ARE ONE POT OR SHAKE AND BAKE LABS.

7    AND THEY THROW ALL THE INGREDIENTS TOGETHER IN A

8 BOTTLE.  INSTEAD OF STIRRING, THEY SHAKE IT UP.  THE BOTTLE

9 WILL START TO PRESSURIZE FROM THE VAPORS.  THEY HAVE TO VENT

10 IT, THEY CALL BURPING THE BOTTLE.  THEY'LL VENT IT, THAT'LL

11 RELEASE THE PRESSURE, PUT THE CAP BACK ON AND SHAKE IT AGAIN.

12    THAT SHAKING MAKES ALL THE CHEMICALS COME TOGETHER

13 AND THAT ACTUALLY CAUSES IT TO BUBBLE OR COOK RATHER THAN

14 HAVING TO STIR IT.

15 Q.   OKAY.  NOW, WHEN THEY PUT THESE ITEMS IN, DO THEY PUT THE

16 ACTUAL FERTILIZER PELLETS INSIDE THE BOTTLE WITH THE OTHER

17 INGREDIENTS?

18 A.   YES, MA'AM.

19 Q.   AND THOSE ARE THE SAME FERTILIZER PELLETS WE DISCUSSED IN

20 THE CONDENSER VERSION OF THIS COOK, CORRECT?

21 A.   YES, MA'AM.  THE FERTILIZER PELLETS EITHER COME FROM LIKE

22 A FARM SUPPLY STORE WHERE YOU CAN BUY A 50 POUND BAG OF 34-0-0

23 AMMONIUM NITRATE FERTILIZER OR, AGAIN, ESPECIALLY IN THE

24 MOUNTAINS OF NORTH CAROLINA, IT'S HARD TO GET A 50 POUND BAG

25 OF FERTILIZER SO WHAT THEY'VE GONE TO AS WELL IS BUYING COLD

1 INSTANT -- INSTANT COLD PACKS -- EXCUSE ME -- INSTANT COLD

2 PACKS, WHICH YOU CAN BUY AT ANY GROCERY STORE OR PHARMACY.

3 AND THEN THEY OPEN UP THE COLD PACK, TAKE THE FERTILIZER

4 PELLETS OUT OF IT, AND THEN THEY'LL USE THAT IN THE METH COOK

5 RATHER THAN HAVING TO BUY A 50 POUND BAG.

6 Q.   OKAY.  I'M GOING TO SHOW YOU GOVERNMENT'S EXHIBIT 62.

7 WHAT ARE WE SEEING IN GOVERNMENT'S EXHIBIT 62?

8 A.   GOVERNMENT'S EXHIBIT 62 IT LOOKS LIKE TO ME A PIGGLY

9 WIGGLY PLASTIC BAG.  THIS ONE WAS FOUND IN THE CORVETTE SHOP

10 IN WILSON, AND IT CONTAINS WHAT APPEARS TO BE AMMONIUM NITRATE

11 PELLETS.

12        THESE PELLETS AT SOME POINT HAVE BEEN REMOVED FROM A

13 LARGER BAG OR EITHER FROM COLD PACKS, BUT IT'S IMPOSSIBLE FOR

14 US TO TELL WHICH IT CAME FROM.

15                (GOVERNMENT EXHIBIT NUMBER 62

16                WAS IDENTIFIED FOR THE RECORD.)

17 Q.   OKAY.  I'M GOING TO SHOW YOU NOW GOVERNMENT'S EXHIBIT 80.

18 AND WHAT ARE WE SEEING IN GOVERNMENT'S EXHIBIT 80?

19 A.   GOVERNMENT'S EXHIBIT 80 IS THE PHOTOGRAPH FROM THE

20 JOHNSTON COUNTY SHERIFF'S OFFICE METH LAB WHERE MR. LEWIS AND

21 MS. SMITH WERE ARRESTED.  AND THAT IS A ZIPLOCK BAG CONTAINING

22 AMMONIUM NITRATE FERTILIZER PELLETS.  AGAIN, COULD HAVE COME

23 FROM A LARGER BAG OR COULD HAVE COME FROM COLD PACKS.

24                (GOVERNMENT EXHIBIT NUMBER 80

25                WAS IDENTIFIED FOR THE RECORD.)

1 Q.   NOW, SPECIAL AGENT PAGE, DURING -- WELL, TALK ABOUT --

2 YOU'VE HAD -- HOW MANY INTERVIEWS HAVE YOU CONDUCTED WITH

3 METHAMPHETAMINE ADDICTS DURING THE COURSE OF YOUR EMPLOYMENT

4 WITH THE STATE BUREAU OF INVESTIGATION?

5 A.   AT THIS POINT, I'VE CONDUCTED SEVERAL HUNDRED INTERVIEWS.

6 Q.   OKAY.  AND WHAT IS -- CAN WE TALK A LITTLE BIT ABOUT

7 METHAMPHETAMINE, THE DRUG ITSELF?  HOW IS METHAMPHETAMINE

8 INGESTED?

9 A.   METHAMPHETAMINE CAN BE INGESTED PRETTY MUCH ANY WAY YOU

10 CAN GET IT IN YOUR BODY YOU'RE GOING TO GET A HIGH.  SO, YOU

11 CAN EAT METHAMPHETAMINE LIKE EAT THE POWDER OR YOU CAN PUT THE

12 POWDER IN A CAPSULE.  YOU CAN BUY CAPSULES FROM THE GROCERY

13 STORE, GNC, PUT METHAMPHETAMINE IN THE CAPSULES AND SWALLOW

14 THE CAPSULES, OR YOU CAN TAKE THE COFFEE FILTERS THAT HAVE

15 METH ON THEM AT THE END OF THE REACTION, EAT THE COFFEE

16 FILTERS.  I'VE HAD METH COOKS WHO TALKED -- AND METH USERS

17 WHO'VE TALKED ABOUT SHREDDING THE COFFEE FILTERS AND EATING

18 THE SHREDS.  I'VE ALSO HAD METH COOKS TALK ABOUT USING THE

19 COFFEE FILTER WITH RESIDUE ON IT AND BREWING COFFEE THROUGH IT

20 SO THAT WHEN YOU DRINK THE COFFEE, THE METH IS IN THE COFFEE.

21         IF YOU DON'T WANT TO GO THROUGH THAT STEP, YOU CAN

22 TAKE A DRINK -- I COULD TAKE THIS DRINK OF WATER HERE, PUT THE

23 COFFEE FILTER IN IT, DRINK THE WATER AND THE METH HAS

24 DISSOLVED IN THE WATER.

25         SO, PRETTY MUCH ANY WAY, YOU KNOW, INGESTION-WISE OR

1 SWALLOWING IT IT'LL GET YOU HIGH.

2        THE SECOND WAY THAT YOU CAN USE IT IS SNORTING IT

3 AND SNORTING IT IS VERY SIMILAR TO SNORTING OTHER TYPES OF

4 CONTROLLED SUBSTANCES LIKE COCAINE.  SO, USUALLY THEY USE A

5 STRAW TO DO THAT.

6        METHAMPHETAMINE CAN ALSO BE SMOKED.  IT CAN BE

7 SMOKED GENERALLY OFF OF PIECES OF TIN FOIL.  THEY PUT THE METH

8 ON TOP OF THE TIN FOIL, LIGHT IT FROM BELOW, AND INHALE THE

9 FUMES THROUGH A PEN TUBE.  YOU CAN ALSO USE A GLASS PIPE TO

10 SMOKE METH AND WE DO SEE THAT FROM TIME TO TIME.  BUT

11 GENERALLY IT'S THE TIN FOIL BEING USED.

12        AND THEN THE LAST METHOD OF GETTING IT INTO YOUR

13 BODY IS BY INJECTION.  AND SO THEY'LL BUY INSULIN SYRINGES OR

14 SOMETHING LIKE THAT FROM A PHARMACY AND THEN THEY'LL SHOOT IT

15 UP GENERALLY IN THEIR ARMS, BUT IT COULD BE OTHER LOCATIONS IN

16 THE BODY AS WELL.

17 Q.   AND WHAT TYPE OF BEHAVIORS DO METHAMPHETAMINE ADDICTS

18 GENERALLY EXHIBIT?

19 A.   METHAMPHETAMINE TAKES A TOLL ON ADDICTS BOTH BEHAVIORALLY

20 AND ALSO PHYSICALLY.  SO, SOME OF THE PHYSICAL SIDE EFFECTS OF

21 METH USE INCLUDE TOOTH LOSS.  IT MAKES YOUR TEETH ROT, BREAK

22 OFF, AND FALL OUT.  WE CALL THAT METH MOUTH.

23        IT ALSO CAUSES PEOPLE TO LOSE WEIGHT VERY, VERY

24 RAPIDLY.  ESPECIALLY FEMALES WHO USE METHAMPHETAMINE SEEM TO

25 DROP WEIGHT SIGNIFICANTLY PRETTY QUICKLY.

1          IT ALSO CAUSES ONE TO AGE QUITE A BIT.  SO, SOMEONE

2  WHO IS ACTUALLY 40 YEARS OLD MAY LOOK 60, 70 YEARS OLD.  I'M

3  JUST USING THOSE FOR EXAMPLES.

4          IT'S A VERY DIFFICULT LIFESTYLE.  IT KEEPS YOU AWAKE

5  SO YOU'RE NOT SLEEPING.  AND BECAUSE YOU'RE INGESTING THE

6  CHEMICALS YOU'RE NOT SLEEPING, YOU'RE NOT EATING, YOU'RE NOT

7  TAKING CARE OF YOURSELF.  IT JUST INCREASES THE AGING PROCESS.

8          THERE'S ALSO CERTAIN SIDE EFFECTS AS FAR AS

9  BEHAVIORS.  PEOPLE WHO USE METHAMPHETAMINE -- IT'S A STIMULANT

10 SO THEY'RE UP.  THEY'RE VERY, VERY ACTIVE AND VERY, VERY

11 TALKATIVE.  UP 24/7 FOR HOWEVER MANY DAYS THEY MAY BE AWAKE.

12 THEY'RE UP 24/7.

13         IT ALSO MAKES YOU WANT TO -- WE CALL IT TWEAKING

14 WHEN SOMEONE'S COMING OFF OF METHAMPHETAMINE.  SO, METH USERS

15 LIKE TO TAKE THINGS APART.  THEY'LL TAKE APART CARS OR LAWN

16 MOWERS OR CELL PHONES OR COMPUTERS AND THINGS LIKE THAT.  AND

17 WE CALL THAT PART TWEAKING.

18         IT ALSO CAUSES YOU TO BE VERY PARANOID.  MOST METH

19 USERS THINK EVERYBODY IS A POLICE OFFICER.  THEY THINK POLICE

20 OFFICERS ARE FOLLOWING THEM DOWN THE ROAD.  THEY THINK POLICE

21 OFFICERS ARE IN THE PHARMACIES WATCHING THEM.  THEY DON'T LIKE

22 VIDEO CAMERAS VERY MUCH OR BEING RECORDED.

23         SO, THE PARANOIA, THE AGGRESSION, AND SOME OF THESE

24 THINGS GO -- AND HALLUCINATIONS GO ALONG WITH METH USE.

25 Q.  CAN YOU DESCRIBE FOR THE MEMBERS OF THE JURY THE SITE

1  SAFETY PROCESS AND SPECIFICALLY WHAT YOU DO WHEN YOU ARRIVE ON

2  A SCENE?

3  A.  YES, MA'AM.  GENERALLY WHEN THERE'S A METHAMPHETAMINE

4  LAB, I'M CONTACTED EITHER BY AN SBI AGENT IN A PARTICULAR AREA

5  OR BY A LOCAL LAW ENFORCEMENT OFFICER.  AND I WILL THEN, IN

6  TURN, MAKE CONTACT WITH THE CHEMIST AND THE HAZARDOUS WASTE

7  CONTRACTOR DEPENDING ON WHETHER WE NEED ONE OR NOT.

8         THEN WE ALL RESPOND TO THE SCENE TOGETHER.  ONCE THE

9  SEARCH WARRANT'S EXECUTED WE USUALLY HAVE AT LEAST TWO

10 CERTIFIED OFFICERS TO GO IN.  USUALLY ONE'S A CHEMIST AND

11 ONE'S ANOTHER OFFICER.  AND THEY'LL SUIT UP IN WHATEVER

12 PROTECTIVE EQUIPMENT IS NECESSARY.  IT MAY BE SUITS, IT MAY BE

13 BOOTS, GLOVES.  SOMETIMES IT'S JUST A GAS MASK WITH FILTERS

14 AND SOMETIMES WE HAVE TO USE SCBAS LIKE FIREFIGHTERS WEAR.

15        SO, WE'LL GO IN WITH THE PROTECTIVE EQUIPMENT,

16 SEARCH -- DO AN INITIAL ASSESSMENT JUST TO MAKE SURE THERE'S

17 NOTHING BOILING OR SEE IF WE NEED TO CUT POWER OR ANYTHING --

18 MAJOR HAZARDS IN THERE.  WE'LL DEAL WITH THOSE.

19        AND THEN WE DO THE PROCESSING, WHICH IS TAKING AN

20 INVENTORY OF THE ITEMS, WHICH THE CHEMIST DOES, TAKE

21 PHOTOGRAPHS, WHICH USUALLY THE OTHER AGENT THAT GOES IN WILL

22 DO.  BRING ALL THE ITEMS OUT AND THEN THE CHEMIST WILL TAKE

23 SAMPLES OF EACH OF THE ITEMS AS THEY'RE LAID OUT ON A PIECE OF

24 PLASTIC OUTSIDE OF THE RESIDENCE.

25 Q.  OKAY.  AND WHAT ARE SOME OF THE DANGERS THAT ARE

1 ENCOUNTERED COMMONLY BY AGENTS AS THEY ENTER METHAMPHETAMINE

2 LABS?

3 A.   THE BIGGEST DANGER TO ANYONE THAT'S DEALING WITH A

4 METHAMPHETAMINE LAB ARE INHALATION HAZARDS.  SO, THAT'S WHY NO

5 MATTER WHAT I TELL PEOPLE THAT I TEACH PEOPLE TO WEAR SOME

6 SORT OF A RESPIRATOR BECAUSE ALL OF THESE CHEMICALS, AS YOU

7 HAVE PROBABLY NOTICED DURING THE TRIAL, ARE AVAILABLE AT

8 WALMART OR YOUR LOCAL HARDWARE STORE.

9         AND BY THEMSELVES SOME OF THEM ARE STRONG ACIDS AND

10 BASES, WHICH YOU OBVIOUSLY WOULDN'T WANT TO INGEST AND THEY'RE

11 GOING TO BURN YOUR SKIN IF THEY TOUCH YOU, BUT COMBINED THEY

12 ARE -- THEY FORM DEADLY GASSES.

13         AND THAT'S THE PROBLEM WITH THE METH PROCESS IS

14 THEY'RE COMBINING HOUSEHOLD CHEMICALS WHICH THEN PRODUCES

15 ANOTHER SUBSTANCE WHICH CAN HURT YOU.

16         SO, WE'VE HAD OFFICERS WHO HAVE INHALED ANHYDROUS

17 AMMONIA AND WHO HAD TO GO TO THE HOSPITAL AS A RESULT OF IT.

18 WE'VE HAD -- THAT'S THE BIGGEST ONE.  WE'VE HAD OFFICERS WHO

19 HAVE INHALED HYDROCHLORIDE GAS AND HAVE HAD TO SEEK TREATMENT.

20 AND THOSE ARE THE BIGGEST ONES.

21         IT'S ALSO A POTENTIAL THAT YOU WOULD HAVE SOME SORT

22 OF CHEMICAL SPILLED ON YOU.  BUT TO MY KNOWLEDGE WE HAVE NEVER

23 HAD A LAW ENFORCEMENT OFFICER HAVE THAT HAPPEN HERE IN NORTH

24 CAROLINA.

25 Q.   OKAY.  SPECIAL AGENT PAGE, YOU RESPONDED TO TWO OF THE

1  LABS -- THE TWO LABS THAT WE'VE DISCUSSED DURING THE COURSE OF

2  THIS TRIAL, IS THAT CORRECT?

3  A.    THAT'S CORRECT.

4  Q.    I WANT TO DIRECT YOUR ATTENTION TO FEBRUARY THE 8TH OF

5  2010.  DID YOU RESPOND TO THE LAB AT THE CORVETTE SHOP IN

6  WILSON?

7  A.    YES, MA'AM.

8  Q.    OKAY.  AND YOU'VE DESCRIBED YOUR PROCESS THAT YOU

9  GENERALLY CONDUCT.  DID YOU CONDUCT THAT PROCESS AT THIS

10  PARTICULAR LAB?

11  A.    YES, MA'AM.

12  Q.    I WANT TO SHOW YOU GOVERNMENT'S EXHIBIT 27.  DO YOU

13  RECOGNIZE GOVERNMENT'S EXHIBIT 27?

14  A.    YES, MA'AM, I DO.

15  Q.    WHAT IS GOVERNMENT'S EXHIBIT 27?

16  A.    GOVERNMENT'S EXHIBIT 27 IS A PHOTOGRAPH OF A TUPPERWARE

17  CONTAINER AND IT LOOKS LIKE A PLASTIC MIXING CONTAINER THAT

18  WAS FOUND IN THE CORVETTE SHOP.

19              (GOVERNMENT EXHIBIT NUMBER 27

20              WAS IDENTIFIED FOR THE RECORD.)

21  Q.    OKAY.  AND WHAT IS IN GOVERNMENT'S EXHIBIT 27?  WHAT IS

22  IN THAT TUPPERWARE CONTAINER?

23  A.    THE TUPPERWARE CONTAINER HAS WHAT WE COMMONLY REFER TO AS

24  MUD OR WHAT THE METH COOKS COMMONLY REFER TO AS MUD.  BUT WHAT

25  THAT IS, IS THAT IS LEFTOVER FERTILIZER, LYE, BATTERIES AND

1  PSEUDOPHED TABLET MATERIAL FROM A COOK.

2         FOR INSTANCE, WHEN YOU USE A BOX OF PSEUDOEPHEDRINE

3  TO COOK METH WITH, YOU'LL HAVE EITHER A 30 MILLIGRAM TABLET OR

4  A 120 MILLIGRAM TABLET OR A 240 MILLIGRAM TABLET OF

5  PSEUDOPHED.  WELL, THEY HAVE TO -- THE PHARMACEUTICAL

6  COMPANIES HAVE TO MAKE THEM LARGE ENOUGH SO YOU CAN SWALLOW,

7  BUT THAT WHOLE TABLET IS NOT PSEUDOEPHEDRINE.

8         SO, THE LEFTOVER -- THE PSEUDOEPHEDRINE ITSELF GETS

9  TURNED INTO METH AND ALL OF THAT OTHER TABLET MATERIAL IS

10 TRASH.  SO, THE MUD IS BASICALLY ALL OF THE LEFTOVER MATERIAL

11 FROM A COOK AND THE PSEUDOPHED TURNS INTO METH.

12 Q.   OKAY.  NOW, DURING THE COURSE OF THIS WE SAW -- LET'S

13 SEE.  LET ME FIND A GOOD EXAMPLE OF WHERE YOU ALL PULLED

14 EVERYTHING OUT FROM THE RESIDENCE.

15         MS. WELLS:  ONE MOMENT, PLEASE, YOUR HONOR.

16         THE COURT:  YES, MA'AM.

17         (PAUSE.)

18 BY MS. WELLS:

19 Q.   I SHOW YOU GOVERNMENT'S EXHIBIT 9.  NOW, YOU ALL MADE THE

20 DETERMINATION TO PULL THESE ITEMS OUT, IS THAT CORRECT?

21 A.   YES, MA'AM.

22 Q.   NOW, SPECIAL AGENT PAGE, WHAT MAKES THIS A

23 METHAMPHETAMINE -- THESE ITEMS A METHAMPHETAMINE LAB AS

24 OPPOSED TO JUST ITEMS THAT ARE GENERALLY FOUND AROUND

25 SOMEONE'S HOUSE OR A GARAGE?

A.   RIGHT.  THAT'S THE DIFFICULT PART ABOUT THIS AND

RECOGNIZING A METHAMPHETAMINE LABORATORY, AND THAT'S WHY WE GO

THROUGH QUITE A BIT OF TRAINING, NOT TO MENTION THE NUMBER OF

METHAMPHETAMINE LABS THAT WE RESPOND TO.

        BUT BASICALLY WHAT WE'RE LOOKING FOR IS ALTHOUGH

EVERY METH LAB MAY LOOK -- HAVE SLIGHTLY DIFFERENT PRODUCTS

REPRESENTED LIKE A BRAND OF PSEUDOPHED OR A BRAND OF DRAIN

OPENER, EVERY SINGLE METH LAB THAT WE GO TO HAS TO HAVE THE

SAME BASIC CHEMICALS.

        YOU HAVE TO HAVE PSEUDOEPHEDRINE OR EPHEDRINE TO

COOK METH.  YOU HAVE TO HAVE IT.  YOU HAVE TO HAVE A SOLVENT

TO COOK METH.  A SOLVENT COULD BE ACETONE OR PAINT THINNER OR

NAPFA OR COLEMAN FUEL.  MOST METH COOKS PREFER COLEMAN FUEL.

        YOU HAVE TO HAVE SOME SORT OF CHEMICAL TO SPARK THE

REACTION.  IN AN AMMONIA LAB THAT'S GOING TO BE LITHIUM METAL.

SO, EVERY SINGLE AMMONIA LAB WE HAVE THERE'S GOING TO BE

EITHER LITHIUM BATTERY CASES, LITHIUM BATTERIES OR THE LITHIUM

METAL ITSELF OR REMNANTS OF.

        SO, WHAT WE'RE LOOKING AT IS THE TOTALITY OF THE

CIRCUMSTANCES.  THERE'S NOT ONE CHEMICAL THAT MAKES IT A METH

LAB.  IT'S MORE A COMBINATION OF THE DRANO AND THE LYE AND THE

BATTERIES AND THE PSEUDOPHED THAT MAKES IT A METH LAB.

        IT ALSO DOESN'T HAVE TO BE BUBBLING TO BE A METH

LAB.  IT COULD BE REMNANTS OF A METH LAB OR IT COULD BE SET UP

JUST BEFORE THEY'RE GETTING READY TO COOK.  AND THOSE ARE THE

1  DETERMINATIONS THAT WE MAKE WHEN WE GET THERE, WHAT POINT OF

2  THE PROCESS ARE THEY AT.

3            ALSO, WE LOOK AT THINGS SUCH AS THERE'S A COFFEE

4  GRINDER, FOR INSTANCE.  DOES THE COFFEE GRINDER HAVE COFFEE IN

5  IT AND IS A BROWN MATERIAL OR DOES IT HAVE WHITE MATERIAL

6  WHICH COULD POTENTIALLY BE PSEUDOPHED WHERE THE PILLS ARE

7  BEING CRUSHED UP.  AND IS THERE A COFFEE GRINDER IN THE

8  KITCHEN WHERE YOU WOULD KEEP YOUR COFFEE GRINDER OR IS IT IN

9  THE BATHROOM OR IS IT IN A SHOP OR IS IT IN A GARAGE WHERE ONE

10 WOULD NORMALLY NOT KEEP THEIR COFFEE GRINDER.

11 Q.   NOW, WHO MAKES -- YOU'RE THE SITE SAFETY OFFICER.  DO YOU

12 MAKE THE DECISION WHETHER OR NOT TO FINGERPRINT ITEMS IN

13 CASES?

14 A.   GENERALLY, IT'S NOT MY FINAL DECISION.  SOMETIMES I WILL

15 CONSULT, BUT GENERALLY IT IS THE REQUESTING AGENCY'S DECISION

16 BASED ON THE CASE DETAILS WHETHER THEY WANT ANY ITEMS

17 FINGERPRINTED.

18            WE CANNOT COLLECT ITEMS FROM A METH LAB AND SEND

19 THEM TO THE CRIME LAB BECAUSE THEY'RE HAZARDOUS.  SO, WE WOULD

20 HAVE TO HAVE SOMEONE FINGERPRINT THEM ON SCENE.

21 Q.   OKAY.  NOW, SPECIAL AGENT PAGE, I WANT TO CHANGE

22 DIRECTIONS HERE.  WE'RE STILL TALKING ABOUT THE CORVETTE SHOP

23 ON FEBRUARY THE 8TH OF 2010, BUT I WANT TO TALK ABOUT THE

24 PSEUDOEPHEDRINE THAT WAS LOCATED IN THE SHOP, OKAY?

25            NOW, WHAT ITEMS -- IF YOU RECALL, WHAT ITEMS OF

1 PSEUDOEPHEDRINE WERE LOCATED THERE?

2 A.   TO MY RECOLLECTION, THERE WAS A BLISTER PACK, A FULL

3 BLISTER PACK, SEIZED FROM THE CORVETTE SHOP.  AND WHAT THAT

4 MEANS -- THE BLISTER PACK IS THE ALUMINUM FOIL PACKET THAT THE

5 PSEUDOPHED COMES IN.  SO, THERE WAS A FULL BLISTER PACK IN THE

6 CORVETTE SHOP AND THEN THERE WAS A POKEMON BAG FULL OF LOOSE

7 PSEUDOPHED TABLETS.

8 Q.   OKAY.  AND SPECIAL AGENT DEWELL TESTIFIED THAT SHE HAD

9 SEPARATED THOSE ITEMS OUT, IS THAT CORRECT?

10 A.   THAT'S CORRECT.

11 Q.   INTO DIFFERENT -- INTO THE DIFFERENT TYPES OF

12 PSEUDOEPHEDRINE THAT WERE INSIDE THAT BAG?

13 A.   YES, MA'AM.

14 Q.   BASED ON YOUR TRAINING AND EXPERIENCE, WAS IT UNUSUAL TO

15 LOCATE MULTIPLE TYPES OF PSEUDOEPHEDRINE MIXED IN ONE BAG LIKE

16 THAT?

17 A.   NO, MA'AM.  GENERALLY, A METH COOK WILL USE WHATEVER

18 PSEUDOPHED THEY CAN GET.  AND SO IF IT'S A RED TABLET, THAT'S

19 FINE.  IF IT'S A WHITE TABLET, THAT'S FINE.  WHATEVER PILLS OR

20 PSEUDOEPHEDRINE PRODUCTS CAN BE BROUGHT TO THE LOCATION OF THE

21 COOK THAT'S WHAT THEY'RE GOING TO COOK WITH.  SO, OFTEN

22 THEY'RE MIXED BY DIFFERENT STORE BRANDS, DIFFERENT DOSAGES,

23 AND THINGS LIKE THAT.

24 Q.   ARE YOU FAMILIAR WITH THE TERM THEORETICAL YIELD?

25 A.   I AM.

1 Q.   AND WHAT DOES THAT TERM MEAN?

2 A.   THE THEORETICAL YIELD IS THE AMOUNT OF METHAMPHETAMINE --

3 IT COULD BE ANOTHER DRUG, BUT IN THIS CASE THE AMOUNT OF

4 METHAMPHETAMINE THAT COULD BE PRODUCED FROM THE AMOUNT OF

5 PSEUDOEPHEDRINE LOCATED AT THE SCENE.

6 Q.   OKAY.  AND WERE YOU ABLE BASED ON THE INFORMATION

7 PROVIDED TO YOU TO CONDUCT A THEORETICAL YIELD FOR -- TO

8 DETERMINE A THEORETICAL YIELD FOR THE AMOUNT OF

9 PSEUDOEPHEDRINE LOCATED AT THE CORVETTE SHOP ON FEBRUARY THE

10 8TH OF 2010?

11 A.   YES, I WAS.

12 Q.   ALL RIGHT.

13        MS. WELLS:  MAY I APPROACH, YOUR HONOR?

14        THE COURT:  YES, MA'AM.

15 BY MS. WELLS:

16 Q.   SPECIAL AGENT PAGE, I'M GOING TO REFER YOU TO WHAT'S BEEN

17 MARKED FOR IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT

18 149.  DO YOU RECOGNIZE THAT DOCUMENT?

19 A.   YES, I DO.

20 Q.   AND THIS A DOCUMENT THAT SUMMARIZES THE -- WELL, LET ME

21 ASK YOU, WHAT IS THIS DOCUMENT?

22 A.   THIS IS A -- GOVERNMENT'S EXHIBIT NUMBER 149 IS A

23 DOCUMENT THAT I PRODUCED THAT IS A SUMMARY OF THE

24 PSEUDOEPHEDRINE SEIZED FROM THE CORVETTE SHOP AND THE AMOUNT

25 OF METHAMPHETAMINE THAT COULD HAVE BEEN PRODUCED FROM THAT

1 PSEUDOEPHEDRINE.

2              (GOVERNMENT EXHIBIT NUMBER 149

3              WAS IDENTIFIED FOR THE RECORD.)

4 Q.   AND THIS WAS DONE DURING THE COURSE OF THE TRIAL BASED ON

5 THE TESTIMONY THAT WAS PROFFERED HERE IN COURT, IS THAT

6 CORRECT?

7 A.   THAT'S CORRECT.

8 Q.   OKAY.  AND THIS IS YOUR -- BASICALLY A SUMMARY OF YOUR

9 ANALYSIS FOR EACH OF THE TYPES OF PSEUDOEPHEDRINE LOCATED?

10 A.   THAT'S CORRECT.

11              MS. WELLS:  YOUR HONOR, AT THIS TIME I'D OFFER

12 GOVERNMENT'S EXHIBIT 149.

13              THE COURT:  IT'S ADMITTED.

14                  (GOVERNMENT EXHIBIT NUMBER 149 WAS

15                  OFFERED AND ADMITTED INTO EVIDENCE.)

16              MS. WELLS:  THANK YOU VERY MUCH.  MAY WE PUBLISH?

17              THE COURT:  YES, MA'AM.

18              MS. WELLS:  THANK YOU.  MAY SPECIAL AGENT PAGE HAVE

19 PERMISSION TO LEAVE THE STAND?

20              THE COURT:  YES, MA'AM.

21 BY MS. WELLS:

22 Q.   SPECIAL AGENT PAGE, CAN YOU WALK THE MEMBERS OF THE JURY

23 THROUGH GOVERNMENT'S EXHIBIT 149?

24 A.    YES, MA'AM.  AT THE TOP OF THE PAGE THE FIRST THING THAT

25 I HAVE LISTED THERE IS THE FULL BLISTER PACK THAT WAS FOUND IN

1 THE CORVETTE SHOP.  IN THAT BLISTER PACK THERE WERE 12 TABLETS

2 PRESENT.  EACH ONE OF THOSE TABLETS CONTAINED 30 MILLIGRAMS OF

3 PSEUDOEPHEDRINE.

4            IF YOU MULTIPLY THE 12 TABLETS BY THE 30 MILLIGRAMS

5 OF PSEUDOEPHEDRINE, YOU GET A TOTAL OF .36 GRAMS OF

6 PSEUDOEPHEDRINE TOTAL IN THAT BLISTER PACK.  IF YOU WEIGHED

7 THE TABLETS, IT WOULD INCLUDE THE TABLET BINDER AND EVERYTHING

8 ELSE.  SO, WE GO JUST ON THE AMOUNT OF PSEUDOPHED IN EACH

9 INDIVIDUAL TABLET.

10 Q.   OKAY.  NOW, WHAT ABOUT THE ITEMS THAT WERE RECOVERED FROM

11 THE POKEMON BAG?

12 A.   IN THE POKEMON BAG THE FIRST -- THE FIRST ONE THAT AGENT

13 DEWELL TESTIFIED TO WAS 107 TABLETS THAT WERE 30 MILLIGRAMS.

14 WE -- THERE WAS ACTUALLY AN EMPTY BLISTER PACK ALSO FOUND IN

15 THE CORVETTE SHOP.  SO, IN ALL FAIRNESS, WE SUBTRACTED THAT 11

16 TABLETS FROM THE 107 TABLETS THAT WERE IN THERE AND CAME UP

17 WITH A TOTAL OF 96 TABLETS.

18 Q.   AND WHY DID YOU DO THAT?

19 A.   WE DID THAT BECAUSE THE EMPTY BLISTER PACK COULD HAVE

20 BEEN EMPTIED INTO THE POKEMON BAG AND WE DON'T WANT TO DOUBLE

21 COUNT.  SO, THAT'S TO GIVE EVERYBODY THE BENEFIT OF THE DOUBT.

22 IT COULD HAVE BEEN EMPTIED IN THE POKEMON BAG SO WE GO WITH

23 THE 96 TABLETS.

24 Q.   OKAY.  AND SO YOU WENT WITH 96 TABLETS AND WHAT WAS --

25 WHAT TYPE OF PILLS WERE THOSE, IF YOU RECALL?

1  A.   CAN I REFER?

2  Q.   YEAH.

3  A.   THE 96 TABLETS WERE RED CIRCULAR TABLETS WITH THE IMPRINT

4  44112 AND THEY WERE 30 MILLIGRAM PSEUDOEPHEDRINE HCL TABLETS.

5  Q.   OKAY.  AND WHAT IS THE RESULT OF YOUR ANALYSIS ON THAT

6  OR --

7  A.   THE RESULT OF MY CALCULATION --

8  Q.   -- CALCULATION?

9  A.   -- IS THAT 96 TABLETS AT 30 MILLIGRAMS EACH TABLET, YOU

10  MULTIPLY THE TWO NUMBERS, AND YOU GET 2.88 GRAMS OF

11  PSEUDOEPHEDRINE.

12  Q.   OKAY.  MOVING ON TO THE NEXT, WHERE IT SAYS 60 TABLETS.

13  A.   YES, MA'AM.  AGENT DEWELL TESTIFIED THAT THERE WERE 60

14  TABLETS IN THE POKEMON BAG WITH THE IMPRINT CODE L054 AND THEY

15  WERE WHITE OBLONG TABLETS.  SHE ALSO TESTIFIED THAT THESE

16  TABLETS CONTAINED 120 MILLIGRAMS OF PSEUDOEPHEDRINE HCL EACH.

17          SO, IN MULTIPLYING THE 60 TABLETS TIMES 120

18  MILLIGRAMS OF PSEUDO THE RESULT IS 7.20 GRAMS OF

19  PSEUDOEPHEDRINE.

20  Q.   OKAY.  NOW, WHAT ABOUT THE TEN TABLETS THAT WE SEE NEXT?

21  A.   THE TEN TABLETS AGENT DEWELL IDENTIFIED AS HAVING A STAMP

22  -- A STAMP ON THEM, SU-24 WAS THE STAMP, AND THEY WERE WHITE

23  CIRCULAR TABLETS.

24          AGENT DEWELL TESTIFIED THAT THERE WERE TEN OF THOSE

25  TABLETS AND EACH TABLET CONTAINED 240 MILLIGRAMS OF

1  PSEUDOEPHEDRINE HYDROCHLORIDE.  AND IF YOU MULTIPLY THOSE TWO

2  NUMBERS, THAT EQUALS 2.40 GRAMS OF PSEUDOEPHEDRINE.

3  Q.    OKAY.  AND FINALLY THE 15 TABLETS?

4  A.    THE 15 TABLETS AGENT DEWELL TESTIFIED THAT THEY HAD A

5  STAMP OF ANDRX-605 AND THAT THEY WERE WHITE OVAL TABLETS.  SHE

6  TESTIFIED THERE WERE 15 OF THOSE TABLETS, EACH TABLET

7  CONTAINED 240 MILLIGRAMS OF PSEUDOEPHEDRINE SULFATE WITH TEN

8  MILLIGRAMS OF LORATADINE IN EACH TABLET.

9          THE LORATADINE CANNOT BE CONVERTED TO

10 METHAMPHETAMINE SO THAT'S NOT INCLUDED IN THE CALCULATION.

11         SO, WHAT WE DO IS WE MULTIPLY THE 15 TABLETS TIMES

12 240 MILLIGRAMS OF PSEUDO SULFATE AND WE GET 3.6 GRAMS OF

13 PSEUDOEPHEDRINE.

14 Q.    OKAY.  NOW, WHAT WAS THE TOTAL GRAMS OF PSEUDOPHED --

15 TOTAL NUMBER OF GRAMS FOR ALL OF THESE THAT COULD BE RECOVERED

16 FROM THESE TABLETS?

17 A.    CAN YOU GIVE ME ONE SECOND?

18 Q.    YES.

19     (PAUSE.)

20 A.    THE TOTAL NUMBER OF GRAMS OF PSEUDOEPHEDRINE THAT COULD

21 BE PRODUCED, WE ADDED THESE NUMBERS AND WE GET 6.4 GRAMS OF

22 PSEUDOEPHEDRINE.

23 Q.    6.4?

24 A.    OH, I'M SORRY.  16.4 GRAMS OF PSEUDOEPHEDRINE.

25 Q.    OKAY.  AND LET'S TALK ABOUT THEORETICAL YIELD.  YOU'VE

1 TESTIFIED YOU'RE FAMILIAR WITH WHAT THAT IS.  HOW DO YOU

2 CALCULATE THEORETICAL YIELD OF WHAT METHAMPHETAMINE COULD BE

3 PRODUCED FROM THE PSEUDOEPHEDRINE?

4 A.    WE CALCULATE --

5 Q.    FOR THE PURPOSES OF THE LAB.

6 A.    WE CALCULATE THEORETICAL YIELD BY TAKING THE TOTAL AMOUNT

7 OF PSEUDOEPHEDRINE THAT'S ON THE SCENE AND THEN WE MULTIPLY

8 THAT BY .92 BECAUSE AT A HUNDRED PERCENT THEORETICAL YIELD

9 ONLY 92 PERCENT OF THE PSEUDOPHED CAN BE CONVERTED TO

10 METHAMPHETAMINE.

11        IN OTHER WORDS, IF YOU START WITH TEN GRAMS OF

12 PSEUDOPHED, YOU CAN ONLY -- THE MOST YOU CAN GET IS 9.2 GRAMS

13 OF METHAMPHETAMINE.

14 Q.    SO, WHAT IS THE RESULT OF THAT CALCULATION FOR THE

15 PSEUDOEPHEDRINE THAT WAS LOCATED AT THE CORVETTE SHOP ON

16 FEBRUARY THE 8TH, 2010?

17 A.    THE RESULT OF THAT CALCULATION IS IF YOU HAVE 16.4 GRAMS

18 OF PSEUDOEPHEDRINE, IT RESULTS IN 15.0 GRAMS OF

19 METHAMPHETAMINE.

20 Q.    AND THAT'S THE MAXIMUM AMOUNT OF METHAMPHETAMINE THAT

21 COULD BE PRODUCED AT THE CORVETTE SHOP FROM THE

22 PSEUDOEPHEDRINE LOCATED THERE THAT DAY, IS THAT CORRECT?

23 A.    THAT'S CORRECT, YES.

24        MS. WELLS:  ONE MOMENT, PLEASE, YOUR HONOR.

25        THE COURT:  YES, MA'AM.

1           (PAUSE.)

2           MS. WELLS:  MAY I APPROACH THE WITNESS?

3           THE COURT:  YES, MA'AM.

4  BY MS. WELLS:

5  Q.   NOW, SPECIAL AGENT PAGE, WE ALSO DISCUSSED A RECEIPT THAT

6  WAS RECOVERED AT THE CORVETTE SHOP ON FEBRUARY 8TH, 2010.  DO

7  YOU RECALL THAT TESTIMONY FROM AGENT BRAD CARTER?

8  A.   YES, MA'AM.

9           MS. WELLS:  MAY I APPROACH THE CLERK, YOUR HONOR?

10           THE COURT:  YES, MA'AM.

11  BY MS. WELLS:

12  Q.   SPECIAL AGENT PAGE, I'M GOING TO SHOW YOU WHAT'S BEEN

13  ENTERED INTO EVIDENCE AS GOVERNMENT'S EXHIBIT 136.

14  A.   YES, MA'AM.

15  Q.   AND WHAT IS GOVERNMENT'S EXHIBIT 136?

16  A.   GOVERNMENT'S EXHIBIT 136 IS A PAPER BAG, BROWN PAPER BAG,

17  CONTAINING A RECEIPT.

18           (GOVERNMENT EXHIBIT NUMBER 136

19            WAS IDENTIFIED FOR THE RECORD.)

20  Q.   OKAY.  AND DID YOU RECOVER THAT RECEIPT?

21  A.   YES, MA'AM, I DID.

22  Q.   AND DID YOU HAVE AGENT CARTER COLLECT IT?

23  A.   YES, MA'AM.

24  Q.   AND AFTER THAT, DID YOU DO ANYTHING WITH THAT RECEIPT?

25  A.   YES, MA'AM, I DID.

1 Q.    AND WHAT DID YOU DO?

2 A.    I -- THE RECEIPT IS FROM WALGREENS FOR A PURCHASE OF WAL-

3 PHED 12-HOUR TABLETS ON FEBRUARY 6TH OF 2010, AT 11:40 P.M.

4 FROM THE WALGREENS AT 4408 NEW BERN AVENUE IN RALEIGH, NORTH

5 CAROLINA.

6         SO, I WENT TO THE WALGREENS ON NEW BERN AVENUE IN

7 RALEIGH, NORTH CAROLINA, AND I PULLED THE PSEUDOEPHEDRINE LOG

8 TO SEE WHO MADE THIS PURCHASE ON THE RECEIPT.

9 Q.    OKAY.  AND WHAT WAS THE RESULT OF LOOKING AT THE

10 PSEUDOEPHEDRINE LOG?

11        MS. WELLS:  MAY I APPROACH THE WITNESS?

12        THE COURT:  YES, MA'AM.

13 BY MS. WELLS:

14 Q.    SPECIAL AGENT PAGE, I'M GOING TO SHOW YOU WHAT'S BEEN

15 MARKED FOR IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT

16 130.  DO YOU RECOGNIZE THAT DOCUMENT?

17 A.    YES, I DO.

18 Q.    AND WHAT IS GOVERNMENT'S EXHIBIT 130?

19 A.    GOVERNMENT'S EXHIBIT 130 IS THE PSEUDOEPHEDRINE LOG THAT

20 I OBTAINED FROM THE WALGREENS ON NEW BERN AVENUE IN RALEIGH

21 FOR THE DATE OF FEBRUARY 6TH, 2010.

22            (GOVERNMENT EXHIBIT NUMBER 130

23            WAS IDENTIFIED FOR THE RECORD.)

24 Q.    AND IS THAT THE DATE THAT THE RECEIPT REFLECTS THAT

25 PSEUDOEPHEDRINE WAS PURCHASED THERE?

1 A.   YES, MA'AM.

2 Q.   OKAY.  AND ONCE YOU RECEIVED THAT LOG, WHAT -- HOW DO YOU

3 GET THAT LOG FROM THE PHARMACY?

4 A.   THE PSEUDOEPHEDRINE LOGS ARE HOUSED DIFFERENTLY IN EACH

5 PHARMACY CHAIN.  IN THE WALGREENS PHARMACY THE PHARMACY

6 ACTUALLY SCANS PEOPLE'S DRIVER'S LICENSES WHEN THEY PURCHASE

7 PSEUDOEPHEDRINE AND THEN IT GOES INTO A DATABASE.  THAT

8 DATABASE IS THEN ACCESSED BY THE STORE MANAGER.

9        SO, I WENT TO THIS PARTICULAR WALGREENS IN RALEIGH

10 AND I TALKED TO THE STORE MANAGER AND I ASKED FOR A PRINTOUT

11 OF THE PSEUDOPHED LOG FOR FEBRUARY 6TH OF 2010.

12 Q.   OKAY.  AND ONCE YOU OBTAINED THAT LOG WERE YOU ABLE TO

13 DETERMINE WHO PURCHASED THE PSEUDOEPHEDRINE FROM THE RECEIPT

14 THAT WAS RECOVERED FROM THE CORVETTE SHOP?

15 A.   YES, I WAS.

16 Q.   AND WHO WAS THAT?

17 A.   THE PERSON THAT PURCHASED FROM THE RECEIPT WAS A TARA

18 PRIEVE OR PRIEVE.

19 Q.   OKAY.  AND IS THAT HERE ON PAGE FOUR OF GOVERNMENT'S

20 EXHIBIT 130?

21 A.   YES, IT IS.

22        MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

23 EXHIBIT 130 AT THIS TIME.

24        THE COURT:  IT'S ADMITTED.

25        (GOVERNMENT EXHIBIT NUMBER 130 WAS

1          OFFERED AND ADMITTED INTO EVIDENCE.)

2 BY MS. WELLS:

3 Q.    AND ARE YOU FAMILIAR WITH TARA PRIEVE OR PRIEVE?

4 A.    YES, I AM.

5 Q.    AND HOW ARE YOU FAMILIAR WITH HER?

6 A.    MS. PRIEVE IS PHILLIP POPPELL'S GIRLFRIEND.

7 Q.    OKAY.  NOW, WHY DO PHARMACIES KEEP PSEUDOEPHEDRINE LOGS?

8 A.    IN 2005, THE STATE OF NORTH CAROLINA PURCHASED -- OR I'M

9 SORRY, PASSED -- THE LEGISLATURE PASSED A LAW THAT REQUIRES

10 CERTAIN THINGS REGARDING PSEUDOEPHEDRINE AND EPHEDRINE

11 PRODUCTS.  ONE OF THOSE THINGS IS THAT EACH PHARMACY MAINTAIN

12 A LOG OF ALL OF THE SALES OF PSEUDOEPHEDRINE PRODUCTS.

13          ANOTHER REQUIREMENT IS THAT ONE MUST SHOW THEIR

14 PHOTO I.D. WHEN THEY PURCHASE PSEUDOEPHEDRINE.  ANOTHER

15 REQUIREMENT IS THAT PSEUDOEPHEDRINE AND EPHEDRINE PRODUCTS ARE

16 HELD BEHIND THE PHARMACY COUNTER.  WHEREAS, THEY USED TO BE

17 OUT OPEN TO THE PUBLIC, NOW THEY'RE BEHIND THE PHARMACY.  AND

18 THAT ELIMINATED THESE PRODUCTS FROM BEING SOLD IN GAS STATIONS

19 AND GROCERY STORES THAT DIDN'T HAVE PHARMACIES.  SO, THAT

20 ELIMINATED A LOT OF PLACES ONE COULD FIND IT.  AND IT ALSO

21 LIMITS THE AMOUNT OF PSEUDOEPHEDRINE THAT ONE CAN PURCHASE BY

22 LAW.

23 Q.    OKAY.  AND CARRYING OUT YOUR DUTIES, DO YOU REVIEW LOGS

24 ON A REGULAR BASIS?

25 A.    YES, MA'AM, I DO.

1  Q.   AND WHEN YOU'RE REVIEWING A LOG, WHAT IS IT THAT YOU'RE

2  LOOKING FOR THAT INDICATES CONCERNS FOR YOU AS SOMEONE WHO'S

3  INVESTIGATING METHAMPHETAMINE PRODUCTION?

4  A.   THERE ARE SEVERAL THINGS THAT WE LOOK AT AT LOGS THAT ARE

5  WHAT I CALL RED FLAGS.  ONE OF THE RED FLAGS WOULD BE IF

6  SOMEONE IS PURCHASING IN MANY DIFFERENT COUNTIES OR IN MANY

7  DIFFERENT STORES IN ONE COUNTY BECAUSE GENERALLY SPEAKING

8  PEOPLE GO TO ONE PHARMACY OR IF YOU LIVE IN ONE COUNTY, WORK

9  IN ANOTHER COUNTY, YOU MAY GO TO A PHARMACY IN EACH COUNTY.

10         BUT GENERALLY PEOPLE FREQUENT THE SAME STORE OVER

11 AND OVER AND OVER TO GET THEIR PRESCRIPTIONS FILLED OR TO PICK

12 UP PRODUCTS.  SO, THAT'S ONE OF THE THINGS.

13 Q.   ANY OTHER AREAS OR RED FLAGS?

14 A.   YES, MA'AM.  I ALSO LOOK FOR PEOPLE THAT PURCHASE

15 PSEUDOEPHEDRINE PRODUCTS TOGETHER.  SO, THEY'LL COME IN THE

16 STORE TOGETHER, ONE WILL PURCHASE AND THEN THE OTHER WILL

17 PURCHASE SOMETIMES IN VERY CLOSE PROXIMITY TO ONE ANOTHER.

18 THEY MAY WAIT TILL THEIR BUDDY GOES BACK OUTSIDE AND THEN COME

19 IN OR THEY MAY ACTUALLY COME IN AT THE SAME TIME AND PURCHASE.

20         ONE OF THE OTHER THINGS WE LOOK FOR IS AN INDIVIDUAL

21 GOING TO MULTIPLE PHARMACIES IN ONE DAY.  SO, THEY MAY GO TO

22 THIS PHARMACY AND THEN GO FIVE MILES DOWN THE ROAD AND GO TO

23 ANOTHER PHARMACY IN THE SAME DAY, WHICH IS WHAT WE CONSIDER

24 SMURFING.

25         AND I DON'T KNOW WHERE THE TERM SMURFING CAME FROM,

1 BUT SMURFING IS WHAT LAW ENFORCEMENT REFERS TO AS PEOPLE WHO

2 COLLECT PSEUDOEPHEDRINE FOR METH COOKS.  SO, TYPICAL SMURFING

3 ACTIVITY WOULD BE GOING TO MULTIPLE PHARMACIES.

4 Q.    AND BEING A METH COOK DOES NOT PRECLUDE YOU FROM ALSO

5 SMURFING, CORRECT?

6 A.    THAT IS CORRECT.

7 Q.    OKAY.  NOW, IS IT POSSIBLE TO HAVE A PRESCRIPTION FOR

8 PSEUDOEPHEDRINE?

9 A.    YES, MA'AM, IT IS.

10 Q.    AND IF YOU HAVE A PRESCRIPTION FOR PSEUDOEPHEDRINE, DO

11 YOU HAVE TO SIGN THE PSEUDOEPHEDRINE LOGS?

12 A.    NO, MA'AM, YOU DO NOT.

13 Q.    THE LOGS ONLY SHOW THE OVER-THE-COUNTER SALES, IS THAT

14 CORRECT?

15 A.    THAT'S CORRECT.

16 Q.    OKAY.  SPECIAL AGENT PAGE, IN PREPARATION FOR THIS CASE,

17 DID YOU PULL THE PSEUDOEPHEDRINE LOGS IN REFERENCE TO THE

18 DEFENDANT IN THIS CASE?

19 A.    YES, I DID.

20 Q.    AND WHAT PHARMACIES DID YOU GO TO OR HOW DID YOU DO THAT?

21 A.    THERE IS CURRENTLY NO STATEWIDE DATABASE FOR PHARMACY --

22 FOR PSEUDOEPHEDRINE LOGS IN NORTH CAROLINA.  FORTUNATELY,

23 BEGINNING JANUARY 1, 2012, WE WILL HAVE A STATE DATABASE THAT

24 IS AVAILABLE TO LAW ENFORCEMENT OFFICERS, BUT AT THIS TIME

25 THAT IS NOT AVAILABLE.

1          SO, WHAT INVESTIGATORS HAVE TO DO IS WE HAVE TO GO

2   TO EACH PHARMACY CHAIN.  THERE WAS A TIME WE HAD TO GO TO EACH

3   PHARMACY AND NOW A LOT OF THE CHAINS HAVE THEIR OWN DATABASE.

4          SO, WE CAN GO TO ONE STORE WITHIN THE CHAIN, WE GIVE

5   THE SUSPECT'S NAME OR DEFENDANT'S NAME OR WHOEVER WE'RE

6   LOOKING AT, AND THEN THEY'LL RUN THAT PERSON'S NAME AND DATE

7   OF BIRTH OR DRIVER'S LICENSE NUMBER AND IT'LL TELL THEM --

8   IT'LL PULL UP A LOG OF EVERY TIME THAT PERSON HAS PURCHASED

9   ANYWHERE IN THAT PARTICULAR CHAIN.

10          FOR THIS PARTICULAR INVESTIGATION, I CONTACTED

11  WALMART AND WALMART'S SYSTEM IS ELECTRONIC.  I GAVE THEM THE

12  DEFENDANT'S NAME, MR. LEWIS IN THIS CASE, AND WALMART SENT ME

13  THE PSEUDOEPHEDRINE LOGS FOR ALL OF MR. LEWIS'S PURCHASES OF

14  PSEUDOEPHEDRINE IN WALMART STORES.

15          I THEN WENT TO WALGREENS AND I CONTACTED THE STORE

16  MANAGER AND I GAVE THEM MR. LEWIS'S NAME, DATE OF BIRTH OR

17  DRIVER'S LICENSE NUMBER, AND THEY RAN HIS NAME AND GAVE ME A

18  PRINTOUT OF EVERY PSEUDOEPHEDRINE PURCHASE THAT MR. LEWIS MADE

19  AT A WALGREENS STORE.

20          THE THIRD WAY THAT WE DO IT IS THERE IS A SYSTEM OUT

21  THERE CALLED NPLX.  I DON'T WANT TO SPECULATE TO WHAT IT

22  STANDS FOR.  BUT BASICALLY WHAT THIS IS -- I THINK IT'S

23  NATIONAL PRECURSOR LOG EXCHANGE IS WHAT IT STANDS FOR

24  ACTUALLY.  AND THIS IS THE DATABASE THAT WE'RE GOING TO IN

25  JANUARY WHERE EVERY PHARMACY WILL BE ON THIS NPLX SYSTEM.

1    FOR RIGHT NOW THE ONLY PHARMACIES ON THAT SYSTEM ARE

2 RITEAID, CVS AND KMART.  AND I CURRENTLY HAVE ACCESS TO THIS

3 DATABASE AS DO OTHER LAW ENFORCEMENT OFFICERS.

4    `    SO, I PERSONALLY RAN MR. LEWIS'S NAME THROUGH NPLX

5 TO SEE ALL OF HIS PURCHASES AT CVS, RITEAID AND AT KMART

6 STORES.

7    I ALSO WENT TO THE HARRIS TEETER IN WILSON, NORTH

8 CAROLINA, AND THE TARGET IN WILSON, NORTH CAROLINA, BECAUSE

9 THOSE ARE THE ONLY OTHER TWO PHARMACIES IN WILSON COUNTY.

10 Q.   OKAY.  AND WERE YOU ABLE TO PULL LOGS FOR MR. LEWIS'S

11 PURCHASES?

12 A.   YES, MA'AM.

13    MS. WELLS:  MAY I APPROACH, YOUR HONOR?

14    THE COURT:  YES, MA'AM.

15 BY MS. WELLS:

16 Q.   SPECIAL AGENT PAGE, I'M GOING TO SHOW YOU WHAT'S BEEN

17 MARKED FOR IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT

18 145.  WHAT IS GOVERNMENT'S EXHIBIT 145?

19 A.   GOVERNMENT'S EXHIBIT 145 IS THE WALMART PSEUDOEPHEDRINE

20 SALES TO DAVID LEWIS.

21    (GOVERNMENT EXHIBIT NUMBER 145

22    WAS IDENTIFIED FOR THE RECORD.)

23 Q.   OKAY.  AND IS THAT IN THE SAME OR SUBSTANTIALLY THE SAME

24 CONDITION AS WHEN YOU OBTAINED THOSE RECORDS?

25 A.   YES, MA'AM, IT IS.

1          MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

2  EXHIBIT 145 AT THIS TIME.

3          THE COURT:  IT'S ADMITTED.

4              (GOVERNMENT EXHIBIT NUMBER 145 WAS

5              OFFERED AND ADMITTED INTO EVIDENCE.)

6  BY MS. WELLS:

7  Q.   I'M NOW GOING TO SHOW YOU GOVERNMENT'S EXHIBIT 146.  DO

8  YOU RECOGNIZE GOVERNMENT'S EXHIBIT 146?

9  A.   YES, I DO.

10  Q.   AND WHAT IS GOVERNMENT'S EXHIBIT 146?

11  A.   GOVERNMENT'S EXHIBIT 146 IS A PRINTOUT OF THE WALGREENS

12  PSEUDOEPHEDRINE LOGS FOR DAVID LEWIS.

13              (GOVERNMENT EXHIBIT NUMBER 146

14              WAS IDENTIFIED FOR THE RECORD.)

15  Q.   OKAY.  AND IS THAT IN THE SAME OR SUBSTANTIALLY THE SAME

16  CONDITION AS WHEN YOU OBTAINED THAT FROM WALGREENS?

17  A.   YES, MA'AM.

18          MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

19  EXHIBIT 146 AT THIS TIME?

20          THE COURT:  ADMITTED.

21              (GOVERNMENT EXHIBIT NUMBER 146 WAS

22              OFFERED AND ADMITTED INTO EVIDENCE.)

23  BY MS. WELLS:

24  Q.   I'M NOW GOING TO SHOW YOU GOVERNMENT'S EXHIBIT 147.  DO

25  YOU RECOGNIZE THAT?

1  A.   YES, MA'AM, I DO.

2  Q.   OKAY.  AND WHAT IS GOVERNMENT'S EXHIBIT 147?

3  A.   GOVERNMENT'S EXHIBIT 147 IS THE NPLX, WHICH IS THE

4  DATABASE I REFERRED TO EARLIER, THE NPLX PRINTOUT OF ALL OF

5  DAVID LEWIS'S PURCHASES AT CVS, RITEAID AND KMART STORES.

6               (GOVERNMENT EXHIBIT NUMBER 147

7               WAS IDENTIFIED FOR THE RECORD.)

8  Q.   AND IS THAT IN THE SAME OR SUBSTANTIALLY THE SAME

9  CONDITION AS WHEN YOU OBTAINED IT?

10 A.   YES, MA'AM.

11          MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

12 EXHIBIT 147 AT THIS TIME.

13          THE COURT:  IT'S ADMITTED.

14               (GOVERNMENT EXHIBIT NUMBER 147 WAS

15               OFFERED AND ADMITTED INTO EVIDENCE.)

16          MS. WELLS:  ONE MOMENT, PLEASE, YOUR HONOR.

17          (PAUSE.)

18          MS. WELLS:  MAY I APPROACH, YOUR HONOR?

19          THE COURT:  YES, MA'AM.

20          MS. WELLS:  THANK YOU.

21 BY MS. WELLS:

22 Q.   SPECIAL AGENT PAGE, I'M NOW GOING TO SHOW YOU -- I HAVE

23 DUELING FOLDERS HERE -- WHAT'S BEEN MARKED FOR IDENTIFICATION

24 PURPOSES AS GOVERNMENT'S EXHIBIT 124.  DO YOU RECOGNIZE THAT?

25 A.   YES, MA'AM, I DO.

1  Q.   AND WHAT IS THAT?

2  A.   GOVERNMENT'S EXHIBIT 124 IS THE PSEUDOEPHEDRINE LOG THAT

3  I OBTAINED FROM TARGET IN WILSON, NORTH CAROLINA, FROM ONE OF

4  THE PHARMACISTS, AND THESE ARE PSEUDOEPHEDRINE PURCHASES BY

5  DAVID LEWIS.

6               (GOVERNMENT EXHIBIT NUMBER 124

7                 WAS IDENTIFIED FOR THE RECORD.)

8  Q.   AND IS THAT IN THE SAME OR SUBSTANTIALLY THE SAME

9  CONDITION AS WHEN YOU OBTAINED IT?

10 A.   YES, MA'AM.

11 Q.   WITH THE PHARMACIST THAT YOU RECEIVED IT FROM AND THE

12 STORE NUMBER IDENTIFIED VIA A CARD THAT'S ATTACHED TO THAT, IS

13 THAT CORRECT?

14 A.   THAT'S CORRECT, YES, MA'AM.

15          MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

16 EXHIBIT 124 AT THIS TIME.

17          THE COURT:  IT'S ADMITTED.

18               (GOVERNMENT EXHIBIT NUMBER 124 WAS

19                 OFFERED AND ADMITTED INTO EVIDENCE.)

20          MS. WELLS:  THANK YOU.

21 BY MS. WELLS:

22 Q.   I'M SHOWING YOU NOW GOVERNMENT'S EXHIBIT -- WHAT'S BEEN

23 MARKED FOR IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT

24 120.  DO YOU RECOGNIZE THAT DOCUMENT?

25 A.   I DO.

1  Q.   AND WHAT IS THAT?

2  A.   GOVERNMENT'S EXHIBIT 120 IS A HARRIS -- A PRINTOUT OF

3  PSEUDOEPHEDRINE LOGS FROM HARRIS TEETER IN WILSON, NORTH

4  CAROLINA, WHICH ARE MR. LEWIS'S PURCHASES AT THAT STORE.

5                   (GOVERNMENT EXHIBIT NUMBER 120

6                   WAS IDENTIFIED FOR THE RECORD.)

7  Q.   AND IS THAT IN THE SAME OR SUBSTANTIALLY THE SAME

8  CONDITION AS WHEN YOU OBTAINED IT FROM THE HARRIS TEETER IN

9  WILSON?

10  A.   YES, MA'AM.

11             MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

12  EXHIBIT 120 AT THIS TIME.

13             THE COURT:  IT'S ADMITTED.

14                   (GOVERNMENT EXHIBIT NUMBER 120 WAS

15                   OFFERED AND ADMITTED INTO EVIDENCE.)

16  BY MS. WELLS:

17  Q.   SHOWING YOU NOW GOVERNMENT'S EXHIBIT 121 AND 122.  DO YOU

18  RECOGNIZE THOSE DOCUMENTS?

19  A.   YES, I DO.

20  Q.   AND WHAT ARE GOVERNMENT'S EXHIBIT 121 AND 122?

21  A.   GOVERNMENT'S EXHIBITS 121 AND 122 ARE ALSO PRINTOUTS THAT

22  I RECEIVED FROM THE HARRIS TEETER PHARMACY, WHICH HAS THE TIME

23  AND THE DATE OF EACH TRANSACTION OF PSEUDOEPHEDRINE PURCHASES

24  AT HARRIS TEETER BY DAVID LEWIS.

25                   (GOVERNMENT EXHIBITS NUMBER 121 AND

1          122 WERE IDENTIFIED FOR THE RECORD.)

2 Q.   AND ARE THOSE IN THE SAME OR SUBSTANTIALLY THE SAME

3 CONDITION AS WHEN YOU OBTAINED THEM FROM HARRIS TEETER?

4 A.   YES, MA'AM.

5          MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

6 EXHIBIT 121 AND 122 AT THIS TIME.

7          THE COURT:  THEY'RE ADMITTED.

8               (GOVERNMENT EXHIBIT NUMBER 121 AND 122

9               WERE OFFERED AND ADMITTED INTO EVIDENCE.)

10 BY MS. WELLS:

11 Q.   NOW, BASED ON PULLING ALL OF THESE LOGS, SPECIAL AGENT

12 PAGE, DID YOU IN CONJUNCTION WITH PREPARING FOR THIS TRIAL

13 PREPARE AN EXHIBIT OF THE PURCHASES OF PSEUDOEPHEDRINE BY MR.

14 LEWIS?

15 A.   YES, I DID.

16 Q.   AND THAT'S A SUMMARY DOCUMENT OF WHAT WE'VE ADMITTED IN

17 GOVERNMENT'S 120 THROUGH 124 AND 145 THROUGH 147, IS THAT

18 CORRECT?

19 A.   YES, MA'AM.

20 Q.   I'M GOING TO SHOW YOU WHAT'S BEEN MARKED FOR

21 IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT 148, AND ASK

22 IF YOU RECOGNIZE THAT?

23 A.   YES, I DO.

24 Q.   AND WHAT IS GOVERNMENT'S EXHIBIT 148?

25 A.   GOVERNMENT'S EXHIBIT 148 IS A PRINTOUT OF A CHART THAT I

1  PREPARED OF ALL OF DAVID LEWIS'S PSEUDOEPHEDRINE PURCHASES AT

2  THE PHARMACIES THAT I VISITED OR THE CHAINS THAT I GOT THE

3  LOGS FROM.

4                (GOVERNMENT EXHIBIT NUMBER 148

5                WAS IDENTIFIED FOR THE RECORD.)

6  Q.   AND HOW ARE THEY ORGANIZED -- HOW IS GOVERNMENT'S EXHIBIT

7  148 ORGANIZED?

8  A.   IT IS ORGANIZED IN CHRONOLOGICAL ORDER FROM THE FIRST

9  DATE THAT HE PURCHASED UP UNTIL THE MOST CURRENT DATE THAT HE

10 PURCHASED.

11 Q.   OKAY.  AND YOU USED AGAIN THE INFORMATION FROM

12 GOVERNMENT'S 120 THROUGH 124 AND 145 THROUGH 147 TO CREATE

13 THIS, IS THAT CORRECT?

14 A.   THAT'S CORRECT, YES, MA'AM.

15          MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

16 EXHIBIT 148 AT THIS TIME.

17          THE COURT:  IT'S ADMITTED.

18                (GOVERNMENT EXHIBIT NUMBER 148 WAS

19                OFFERED AND ADMITTED INTO EVIDENCE.)

20          MS. WELLS:  THANK YOU VERY MUCH.  MAY AGENT PAGE

21 HAVE PERMISSION TO LEAVE THE STAND?

22          THE COURT:  YES, MA'AM.

23 BY MS. WELLS:

24 Q.   SPECIAL AGENT PAGE, LOOKING AT GOVERNMENT'S EXHIBIT 148

25 ON THE SCREEN, THESE ARE MR. LEWIS'S PURCHASES OF

1 PSEUDOEPHEDRINE, IS THAT CORRECT?

2 A.   THAT'S CORRECT.

3 Q.   OKAY.  AND WHEN YOU REVIEWED HIS PURCHASES OF

4 PSEUDOEPHEDRINE, DID ANY OF THE RED FLAGS THAT YOU TESTIFIED

5 ABOUT PREVIOUSLY APPEAR IN HIS PSEUDOEPHEDRINE PURCHASES?

6 A.   YES, MA'AM.

7 Q.   AND CAN YOU -- STARTING WITH MULTIPLE PURCHASES ON A

8 SINGLE DAY, CAN YOU IDENTIFY FOR THE MEMBERS OF THE JURY WHERE

9 THOSE RED FLAGS OCCURRED?

10 A.   YES, MA'AM.  THE PSEUDOEPHEDRINE LOGS BEGIN ON APRIL 1ST,

11 2009.  THE FIRST TIME THAT THERE ARE MULTIPLE PURCHASES ON A

12 DAY ARE JUNE 15TH OF 2009.  AND MR. LEWIS ON THAT PARTICULAR

13 DAY -- ON THAT PARTICULAR DAY, MR. LEWIS PURCHASED

14 PSEUDOEPHEDRINE AT CVS IN WILSON AT 8:27 P.M., AND THEN AT

15 8:42 P.M. ON THE SAME DAY HE WENT TO TARGET IN WILSON AND MADE

16 AN ADDITIONAL PURCHASE.  SO, WITHIN 15 MINUTES OR SO HE

17 VISITED TWO DIFFERENT STORES.

18 Q.   OKAY.  WERE THERE ANY OTHER INCIDENTS OR INCIDENTS OF MR.

19 LEWIS MAKING MULTIPLE PURCHASES ON A SINGLE DAY?

20 A.   YES, MA'AM, ON 7/22/2009.

21 Q.   AND WHERE WERE THOSE PURCHASES MADE?

22 A.   ON 7 -- LET ME MAKE SURE I'M READING IT RIGHT.  YEAH,

23 THAT'S RIGHT.  ON 7/22/2009 MR. LEWIS PURCHASED

24 PSEUDOEPHEDRINE AT 8:35 P.M. AT CVS IN WILSON, AND THEN ON THE

25 SAME DAY THAT NIGHT LATER AT 10:55 P.M. HE PURCHASED AT THE

1 WALGREENS IN WILSON.

2 Q.   OKAY.  AND LET'S LOOK AT JUST THE 7/22 JUST AS AN

3 EXAMPLE.

4 A.   UH-HUH.

5 Q.   FOR THE PURCHASE THAT HE MADE AT 8:35 AT THE CVS, HOW

6 MANY TABLETS DID HE PURCHASE?

7 A.   FOR THAT PARTICULAR DAY 96 PLUS 48.

8 Q.   SO, 48 WAS PURCHASED --

9 A.   AT CVS HE PURCHASED 96 TABLETS.  AT WALGREENS HE

10 PURCHASED 48 TABLETS.  THAT IS 144, IF MY MATH IS CORRECT.

11 Q.   OKAY.  WERE THERE ANY OTHER INCIDENTS OF MR. LEWIS

12 PURCHASING TWO TIMES IN A -- OR TWO OR MORE TIMES IN A SINGLE

13 24-HOUR PERIOD OR IN A DAY?

14 A.   YES, MA'AM, ON JUNE 23RD, 2010.

15 Q.   OKAY.  AND WHERE DID THOSE PURCHASES OCCUR?

16 A.   ON JUNE 23RD, 2010, MR. LEWIS PURCHASED AT WALGREENS IN

17 WILSON AT 4:55 P.M., AND THEN ON THE SAME DAY AT 5:14 P.M.,

18 WHICH IS ABOUT 20 MINUTES LATER, HE PURCHASED AT THE CVS ON

19 FOREST HILLS ROAD.

20 Q.   OKAY.  AND DID HE HAVE OTHER PURCHASES OF -- WERE THERE

21 ANY ADDITIONAL ONES?

22 A.   YES, MA'AM, ON OCTOBER 23RD, 2010.

23 Q.   OKAY.  AND WHERE DID HE PURCHASE ON THOSE DATES?

24 A.   ON OCTOBER 23RD, 2010, HE PURCHASED AT 7:18 P.M. AT CVS

25 IN WILSON, AND THEN ON THE SAME DAY AT 7:30 P.M., 12 MINUTES

1  LATER, HE PURCHASED AT THE WALGREENS IN WILSON.

2  Q.  OKAY.  NOW DIRECTING YOUR ATTENTION NOW TO NOVEMBER THE

3  9TH OF 2010, DID HE MAKE MULTIPLE PURCHASES AGAIN ON THAT

4  DATE?

5  A.  YES, MA'AM.  ON NOVEMBER 9TH, 2010, AT 8:54 P.M. HE

6  PURCHASED AT THE WALMART IN WILSON AND ON THE SAME EVENING

7  APPROXIMATELY 15 MINUTES LATER AT 9:11 P.M. HE PURCHASED AT

8  THE WALGREENS IN WILSON.

9  Q.  OKAY.  NOW DIRECTING YOUR ATTENTION NOW TO JANUARY THE

10  1ST -- EXCUSE ME, JANUARY THE 20TH OF 2011, DID HE MAKE

11  MULTIPLE PURCHASES ON THAT DATE?

12  A.  YES, MA'AM.

13  Q.  AND WHERE WERE THOSE PURCHASES FROM?

14  A.  ON JANUARY 20TH, 2011, MR. LEWIS PURCHASED AT 6:38 P.M.

15  AT THE WALMART IN WILSON, AND ON THE SAME EVENING

16  APPROXIMATELY 12 MINUTES LATER HE PURCHASED AT 6:50 P.M. AT

17  THE TARGET IN WILSON.

18  Q.  OKAY.  AND NOW DIRECTING YOUR ATTENTION TO MARCH THE 18TH

19  OF 2011.  DID HE MAKE MULTIPLE PURCHASES ON THAT DATE?

20  A.  YES, MA'AM.  ON MARCH THE 18TH, 2011, MR. LEWIS PURCHASED

21  PSEUDOEPHEDRINE AT 2:36 P.M. AT THE TARGET IN WILSON, AND ON

22  THE SAME DAY AT 2:49 P.M., WHICH IS 13 MINUTES LATER, HE

23  PURCHASED AT THE HARRIS TEETER IN WILSON.

24  Q.  OKAY.  NOW, DIRECTING YOUR ATTENTION TO APRIL THE 4TH OF

25  2011, DID MR. LEWIS, THE DEFENDANT IN THIS CASE, MAKE MULTIPLE

1 PURCHASES OF PSEUDOEPHEDRINE ON THAT DATE?

2 A.   YES, MA'AM.

3 Q.   AND WHAT DID HE PURCHASE?  WHEN AND WHERE?

4 A.   ON APRIL 4TH, 2011, MR. LEWIS PURCHASED PSEUDOEPHEDRINE

5 AT 7:52 P.M. AT THE WALGREENS IN WILSON, AND ON THE SAME DAY

6 AT EIGHT O'CLOCK P.M., WHICH IS EIGHT MINUTES LATER, HE

7 PURCHASED PSEUDOEPHEDRINE AT THE CVS IN WILSON.

8 Q.   OKAY.  NOW, SPECIAL AGENT PAGE, YOU MENTIONED THERE WERE

9 OTHER RED FLAGS FOR YOU.  WHAT OTHER RED FLAGS DID YOU SEE IN

10 THE PSEUDOEPHEDRINE LOGS FOR MR. LEWIS?

11 A.   THE OTHER THING THAT STANDS OUT TO ME IMMEDIATELY IS THE

12 FREQUENCY AT WHICH PSEUDOEPHEDRINE WAS BEING PURCHASED.  SO,

13 NOT ONLY DID HE VISIT MULTIPLE STORES ON ONE DAY, BUT ALSO IF

14 YOU'LL LOOK AT THE DATES, I'M NOT SURE IF THEY'RE LEGIBLE FROM

15 THAT DISTANCE, BUT IF YOU'LL LOOK AT THE DATES, THERE ARE SOME

16 DAYS WHERE HE GOES IN BACK TO BACK ONE DAY AND THEN THE

17 FOLLOWING DAY AND THEN SEVERAL DAYS MAY LAPSE AND THEN HE'LL

18 GO IN AGAIN.

19           AND THEN THE AMOUNT OF TABLETS THAT HE'S PURCHASING

20 ARE MORE THAN THE RECOMMENDED DOSAGE ON THE PACKAGE.  SO, MORE

21 THAN ONE WOULD NEED IF THEY HAVE A COLD.  MORE THAN ONE WOULD

22 TAKE FOR A COLD IF YOU'RE FOLLOWING WHAT THE RECOMMENDATION ON

23 THE PACKAGE IS.

24 Q.   OKAY.  SO, FOR EXAMPLE, LET'S LOOK AT THE VERY END OF

25 THIS REPORT, JUNE OF 2011.  FOR EXAMPLE, THERE'S A PURCHASE ON

1 -- THERE'S A PURCHASE OF JUNE THE 10TH OF 2011, IS THAT

2 CORRECT?

3 A.   YES, MA'AM.  THERE'S A PURCHASE ON JUNE THE 10TH OF 2011,

4 AT RITEAID.  THIS ONE'S IN GOLDSBORO, NORTH CAROLINA.  THEN

5 THE FOLLOWING DAY -- I'M SORRY, LET ME GO BACK.  ON JUNE 10TH

6 THERE WERE 20 TABLETS PURCHASED IN GOLDSBORO.  THE VERY NEXT

7 DAY MR. LEWIS PURCHASED AT WALGREENS IN WILSON AND BOUGHT AN

8 ADDITIONAL 48 TABLETS.

9         A COUPLE WEEKS LATER, THAT'S 11 DAYS LATER ACTUALLY,

10 HE GOES TO WALGREENS IN WILSON AND BUYS ANOTHER ADDITIONAL 48

11 AND THEN THE VERY FOLLOWING DAY HE GOES TO CVS IN WILSON AND

12 BUYS ANOTHER 20 TABLETS.

13 Q.   OKAY.  NOW, WHEN YOU LOOK AT THE LOGS, YOU SAID THAT YOU

14 OFTEN LOOK FOR PEOPLE WHO PURCHASE WITH OTHER PEOPLE.  DID YOU

15 NOTICE THAT IN THESE PARTICULAR LOGS?

16 A.   YES, MA'AM.

17 Q.   YOU CAN TAKE THE STAND.  AND I'M GOING TO DIRECT YOUR

18 ATTENTION TO -- I'M SHOWING YOU NOW GOVERNMENT'S EXHIBIT 128.

19 AND ARE YOU FAMILIAR WITH GOVERNMENT'S EXHIBIT 128?

20 A.   MAY I STAND UP?

21 Q.   YES.

22 A.   YES, I AM.

23 Q.   ALL RIGHT.  LOOK AT -- I DIRECT YOU NOW TO PAGE TWO.

24 WHERE IS THIS LOG FROM?

25 A.   THIS EXHIBIT, EXHIBIT 128, IS THE PSEUDOEPHEDRINE LOG

1  FROM WALGREENS ON HIGHWAY 42 IN WILSON, NORTH CAROLINA, FOR

2  THE DATE OF JUNE 13TH, 2009.

3  Q.   AND DID YOU NOTICE -- MR. LEWIS IS ON THIS LOG, IS THAT

4  CORRECT?

5  A.   YES, HE IS.

6  Q.   AND WHERE IS HIS PURCHASE?

7  A.   MR. LEWIS'S PURCHASE IS HERE AT 8:03 -- AT THE BOTTOM AT

8  8:03 P.M., AND HE PURCHASED 40 -- THIS MEANS 48 TABLETS, 60

9  MILLIGRAM TABLETS, FOR A TOTAL OF 2.88 GRAMS OF

10 PSEUDOEPHEDRINE.  ONE BOX.

11 Q.   OKAY.  NOW, ON THIS SAME LOG DID YOU NOTE ANYONE ELSE WHO

12 HAD PURCHASED PSEUDOEPHEDRINE?  WE'RE LOOKING AT PAGE THREE

13 NOW.

14 A.   YES, MA'AM.

15 Q.   AND WHO WAS THAT?

16 A.   AT 8:56 ON THAT SAME EVENING AARON SIMMONS PURCHASED THE

17 SAME PRODUCT.  HE PURCHASED ONE BOX, 48 COUNT, 60 MILLIGRAM

18 TABLETS.  2.88 GRAMS OF PSEUDOEPHEDRINE TOTAL.  ONE BOX.

19 Q.   AND THAT'S APPROXIMATELY 50 MINUTES APART, IS THAT

20 CORRECT?

21 A.   THAT'S CORRECT, YES, MA'AM.

22 Q.   I'M NOW GOING TO SHOW YOU GOVERNMENT'S EXHIBIT 129.

23 ACTUALLY, I'M NOT.

24         MS. WELLS:  ONE MOMENT, PLEASE, YOUR HONOR.

25         THE COURT:  YES, MA'AM.

 1            (PAUSE.)

 2            MS. WELLS:  MAY I APPROACH, YOUR HONOR?

 3            THE COURT:  YES, MA'AM.

 4            MS. WELLS:  THANK YOU.

 5  BY MS. WELLS:

 6  Q.   SPECIAL AGENT PAGE, I'M GOING TO SHOW YOU WHAT'S BEEN

 7  MARKED FOR IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT

 8  129.  DO YOU RECOGNIZE THAT DOCUMENT?

 9  A.   YES, MA'AM, I DO.

10  Q.   AND WHAT IS GOVERNMENT'S EXHIBIT 129?

11  A.   GOVERNMENT'S EXHIBIT 129 IS A WALGREENS PSEUDOEPHEDRINE

12  LOG FROM THE WALGREENS ON HIGHWAY 42 IN WILSON, NORTH

13  CAROLINA, FOR NOVEMBER 1ST, 2009.  IT'S THE ENTIRE DAY

14  PRINTOUT OF ALL THE PSEUDOEPHEDRINE PURCHASES.

15            (GOVERNMENT EXHIBIT NUMBER 129

16            WAS IDENTIFIED FOR THE RECORD.)

17  Q.   OKAY.  AND DID YOU PERSONALLY COLLECT GOVERNMENT'S

18  EXHIBIT 129 FROM THIS WALGREENS IN WILSON?

19  A.   YES, I DID.

20  Q.   OKAY.  AND IS IT IN THE SAME OR SUBSTANTIALLY THE SAME

21  CONDITION AS WHEN YOU COLLECTED IT?

22  A.   YES, MA'AM.

23            MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

24  EXHIBIT 129 AT THIS TIME.

25            THE COURT:  IT'S ADMITTED.

1                  (GOVERNMENT EXHIBIT NUMBER 129 WAS

2                     OFFERED AND ADMITTED INTO EVIDENCE.)

3            MS. WELLS:  THANK YOU VERY MUCH.

4 BY MS. WELLS:

5 Q.   SPECIAL AGENT PAGE, I'M ALSO GOING TO SHOW YOU WHAT'S

6 BEEN MARKED FOR IDENTIFICATION PURPOSES AS GOVERNMENT'S

7 EXHIBIT 126, AND ASK IF YOU RECOGNIZE THAT?

8 A.   YES, MA'AM.

9 Q.   AND WHAT IS GOVERNMENT'S EXHIBIT 126?

10 A.   GOVERNMENT'S EXHIBIT 126 IS AGAIN A WALGREENS

11 PSEUDOEPHEDRINE LOG FROM THE WALGREENS ON HIGHWAY 42 IN

12 WILSON, NORTH CAROLINA, FOR MAY 17TH, 2011, WHICH I PERSONALLY

13 COLLECTED.

14                  (GOVERNMENT EXHIBIT NUMBER 126

15                     WAS IDENTIFIED FOR THE RECORD.)

16 Q.   OKAY.  AND IS THAT IN THE SAME OR SUBSTANTIALLY THE SAME

17 CONDITION AS WHEN YOU COLLECTED IT?

18 A.   YES, IT IS.

19 Q.   OKAY.

20            MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

21 EXHIBIT 126 AT THIS TIME.

22            THE COURT:  ADMITTED.

23                  (GOVERNMENT EXHIBIT NUMBER 126 WAS

24                     OFFERED AND ADMITTED INTO EVIDENCE.)

25 BY MS. WELLS:

1 Q.   SPECIAL AGENT PAGE, I'M NOW GOING TO SHOW YOU WHAT'S BEEN

2 MARKED FOR IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT

3 127.  DO YOU RECOGNIZE THAT?

4 A.   YES, I DO.

5 Q.   AND WHAT IS GOVERNMENT'S EXHIBIT 127?

6 A.   GOVERNMENT'S EXHIBIT 127 IS A WALGREENS PSEUDOEPHEDRINE

7 LOG FROM THE WALGREENS ON HIGHWAY 42 IN WILSON, NORTH

8 CAROLINA, FOR MAY 30TH, 2011, AND I COLLECTED IT.

9                    (GOVERNMENT EXHIBIT NUMBER 127

10                    WAS IDENTIFIED FOR THE RECORD.)

11 Q.   OKAY.  AND IS IT IN THE SAME OR SUBSTANTIALLY THE SAME

12 CONDITION AS WHEN YOU COLLECTED IT?

13 A.   YES, MA'AM.

14          MS. WELLS:  YOUR HONOR, I'D OFFER GOVERNMENT'S

15 EXHIBIT 127 AT THIS TIME.

16          THE COURT:  IT'S ADMITTED.

17               (GOVERNMENT EXHIBIT NUMBER 127 WAS

18               OFFERED AND ADMITTED INTO EVIDENCE.)

19          MS. WELLS:  THANK YOU.  ONE MOMENT, PLEASE, YOUR

20 HONOR.

21          (PAUSE.)

22 BY MS. WELLS:

23 Q.   SPECIAL AGENT PAGE, I'M GOING TO SHOW YOU WHAT'S BEEN

24 ADMITTED INTO EVIDENCE AS GOVERNMENT'S EXHIBIT 125.  ARE YOU

25 FAMILIAR WITH GOVERNMENT'S EXHIBIT 125?

1  A.    YES, I AM.

2  Q.    AND WHAT IS GOVERNMENT'S EXHIBIT 125?

3  A.    GOVERNMENT'S EXHIBIT 125 IS A PSEUDOEPHEDRINE LOG

4  COLLECTED FROM WALGREENS ON HIGHWAY 42 IN WILSON, NORTH

5  CAROLINA, FOR THE DATE OF APRIL 1ST, 2009, WHICH I COLLECTED.

6                    (GOVERNMENT EXHIBIT NUMBER 125

7                    WAS IDENTIFIED FOR THE RECORD.)

8  Q.    ALL RIGHT.  I'M GOING TO SHOW YOU NOW PAGE THREE OF

9  GOVERNMENT'S EXHIBIT 125.  DID YOU NOTICE IF MR. LEWIS MADE A

10 PURCHASE ON APRIL THE 1ST OF 2009?

11 A.    YES, MA'AM.

12 Q.    OKAY.  AND WHAT DID HE PURCHASE?

13 A.    MR. LEWIS MADE A PURCHASE ON APRIL 1ST, 2009, AT 22:42,

14 WHICH IS 10:42 P.M., AND HE PURCHASED ONE BOX OF WAL-PHED 12-

15 HOUR CAPLETS, WHICH ARE -- AND THERE WERE 20 IN THE BOX AND

16 THOSE ARE COMMONLY REFERRED TO AS 20 120'S.  IN OTHER WORDS,

17 20 TABLETS, 120 MILLIGRAMS.  THAT'S A TOTAL OF 2.4 GRAMS IN

18 THIS ONE BOX.

19 Q.    OKAY.  AND DID ANYONE ELSE OF SIGNIFICANCE TO YOU MAKE A

20 PURCHASE ON THAT SAME DATE?

21 A.    YES, MA'AM.

22 Q.    AND WHO WAS THAT?

23 A.    AARON BRENT SIMMONS PURCHASED AT THE EXACT SAME TIME AT

24 10:42 P.M., IN THE SAME STORE AND HE PURCHASED THE EXACT SAME

25 PRODUCT.  SO, HE PURCHASED WAL-PHED 12-HOUR CAPLETS, 20

1  TABLETS, 2.4 GRAMS, ONE BOX.

2          SO, MR. SIMMONS AND MR. LEWIS PURCHASED AT THE EXACT

3  SAME TIME IN THE EXACT SAME STORE.

4  Q.   OKAY.  I'M NOW GOING TO SHOW YOU ON THE SCREEN

5  GOVERNMENT'S EXHIBIT THAT'S ALREADY BEEN ADMITTED 123.  ARE

6  YOU FAMILIAR WITH GOVERNMENT'S EXHIBIT 123?

7  A.   YES, I AM.

8  Q.   AND IS THAT BECAUSE YOU COLLECTED IT?

9  A.   YES, MA'AM.

10  Q.   OKAY.  GOVERNMENT'S EXHIBIT 123 IS WHAT?

11  A.   GOVERNMENT'S EXHIBIT 123 IS A PRINTOUT FROM THE CVS ON

12  FOREST HILLS ROAD IN WILSON OF THE PSEUDOEPHEDRINE LOGS FOR

13  JULY 13TH OF 2009.  AND THAT'S THE WHOLE DAY'S LOGS.  THERE

14  WERE TWO PURCHASES ON THAT DATE.

15                  (GOVERNMENT EXHIBIT NUMBER 123

16                   WAS IDENTIFIED FOR THE RECORD.)

17  Q.   OKAY.  AND WHO PURCHASED PSEUDOEPHEDRINE FROM THE CVS ON

18  FOREST HILLS ROAD IN WILSON ON JULY 13TH, 2009?

19  A.   DAVID LEWIS PURCHASED AT 7:25 P.M.  IF YOU'LL NOTICE, THE

20  PHARMACY PUT HIS NAME IN AS DAVIS LEWIS FROM HASSELL, NORTH

21  CAROLINA, BUT HIS DATE OF BIRTH AND HIS DRIVER'S LICENSE

22  NUMBER ARE CONSISTENT WITH MR. LEWIS WHO IS THE DEFENDANT

23  HERE.  AND HE PURCHASED 48 PILLS, ONE BOX, AND THAT WAS 1.44

24  GRAMS OF PSEUDOEPHEDRINE.

25  Q.   OKAY.  AND WHO WAS THE OTHER PERSON WHO PURCHASED ON THAT

1 DATE?

2 A.   AT 7:12 P.M. ON THAT SAME DAY DUSTIN BOYKIN PURCHASED

3 PSEUDOEPHEDRINE AND HE PURCHASED A BOX OF THE 20 COUNT 120

4 MILLIGRAM PSEUDOEPHEDRINE AND THAT WAS 2.4 GRAMS OF

5 PSEUDOEPHEDRINE.

6 Q.   SPECIAL AGENT PAGE, I'M NOW GOING TO SHOW YOU

7 GOVERNMENT'S EXHIBIT 129 THAT YOU JUST TESTIFIED ABOUT JUST A

8 FEW MOMENTS AGO.  AND I'M GOING TO SHOW YOU PAGE TWO OF

9 GOVERNMENT'S EXHIBIT 129.  AND THIS IS THE PSEUDOEPHEDRINE LOG

10 YOU TESTIFIED PREVIOUSLY FOR NOVEMBER THE 1ST OF 2009, IS THAT

11 CORRECT?

12 A.   YES, MA'AM.

13 Q.   IS MR. LEWIS ON THE PSEUDOEPHEDRINE LOG FOR THE

14 PSEUDOEPHEDRINE PURCHASES FOR THAT DAY?

15 A.   YES, MA'AM, HE IS.

16 Q.   OKAY.  AND WHAT DID HE PURCHASE?

17 A.   MR. LEWIS PURCHASED ONE BOX OF THE 20 COUNT WAL-PHED 120

18 MILLIGRAM PILLS.  THAT'S A TOTAL OF 2.4 GRAMS OF PSEUDOPHED

19 AND HE PURCHASED AT 6:16 P.M.

20 Q.   OKAY.  NOW, WAS THERE ANYONE ELSE OF SIGNIFICANCE THAT

21 PURCHASED ON THAT DATE?

22 A.   YES, MA'AM.

23 Q.   AND WHO WAS THAT?

24 A.   CAN I HAVE THE REPORT?  OR I CAN WAIT TILL IT COMES UP.

25 Q.   I'M GOING TO DIRECT YOU TO PAGE THREE.

1  A.   OKAY.  YES, MA'AM.  ON THE SAME DAY AT 7:36 P.M. VALERIE

2  A. LLOYD PURCHASED A BOX OF PSEUDOEPHEDRINE.

3  Q.   OKAY.  AND HOW IS VALERIE LLOYD?

4  A.   VALERIE A. LLOYD IS ALSO VALERIE LLOYD SIMMONS.

5  Q.   OKAY.  AND WHAT DID VALERIE SIMMONS PURCHASE?

6  A.   MS. SIMMONS PURCHASED A BOX OF 20 COUNT 120 MILLIGRAM

7  PSEUDOEPHEDRINE TABLETS CALLED WAL-PHED IS THE BRAND NAME.

8  SHE BOUGHT ONE BOX.  THAT'S 2.4 GRAMS OF PSEUDOEPHEDRINE.

9  Q.   OKAY.  I'M NOW GOING TO SHOW YOU GOVERNMENT'S EXHIBIT 126

10  YOU JUST TESTIFIED TO PREVIOUSLY.  AND SHOWING YOU PAGE ONE OF

11  GOVERNMENT'S EXHIBIT 126, DID MR. LEWIS PURCHASE ON THAT DATE?

12  A.   YES, MA'AM.

13  Q.   AND WHAT TIME DID HE PURCHASE?

14  A.   MR. LEWIS PURCHASED ON MAY 17TH OF 2011, AT 12:23 IN THE

15  MORNING.

16  Q.   OKAY.  AND WHAT DID HE PURCHASE?

17  A.   HE PURCHASED ONE BOX, 2.4 GRAMS OF PSEUDOEPHEDRINE OF

18  WAL-PHED 20 COUNT 120 MILLIGRAMS OF PSEUDOEPHEDRINE IN EACH

19  TABLET.

20  Q.   OKAY.  DID ANYONE ELSE PURCHASE ON THAT DATE?

21  A.   YES, MA'AM.

22  Q.   AND WHO WAS THE FIRST PERSON WHO PURCHASED ON THAT DATE?

23  STILL ON PAGE ONE.

24  A.   THE NEXT NAME ON THAT PAGE RIGHT AFTER MR. LEWIS'S IS A

25  KEVIN HALPIN.  AND MR. HALPIN PURCHASED IN THAT SAME STORE ON

1 THE SAME DAY AT 2:10 A.M. IN THE MORNING AND HE BOUGHT A BOX

2 OF WAL-PHED 12-HOUR TABLETS, 120 MILLIGRAM TABLETS, 20 COUNT.

3 ONE BOX.  2.4 GRAMS OF PSEUDOEPHEDRINE.

4 Q.   AND, AGAIN, THOSE ARE THE SAME 20 120'S THAT MR. LEWIS

5 PURCHASED, IS THAT CORRECT?

6 A.   YES, MA'AM.

7 Q.   OKAY.  NOW, I'M GOING TO SHOW YOU PAGE TWO OF

8 GOVERNMENT'S EXHIBIT 126.  ANYONE ELSE OF SIGNIFICANCE

9 PURCHASE ON THIS SAME DATE, MAY THE 17TH OF 2011?

10 A.   YES, MA'AM.  IF YOU FAST FORWARD TOWARDS THE END OF THE

11 DAY, IT LOOKS LIKE 9:01 P.M., IF MY MILITARY TIME IS CORRECT,

12 AT 9:01 P.M. THAT EVENING AARON SIMMONS PURCHASED AND MR.

13 SIMMONS PURCHASED THAT DAY A BOX OF 48 TABLETS, THE 60

14 MILLIGRAM TABLETS.  THAT'S ONE BOX.  2.88 GRAMS OF

15 PSEUDOEPHEDRINE.

16 Q.   IF I MAY SHOW YOU WHAT'S BEEN MARKED -- WHAT'S BEEN

17 ADMITTED INTO EVIDENCE AS GOVERNMENT'S EXHIBIT 127.  AND

18 GOVERNMENT'S EXHIBIT 127 YOU TESTIFIED PREVIOUSLY WAS A LOG

19 FROM MAY THE 30TH OF 2011, IS THAT CORRECT?

20 A.   THAT'S CORRECT, YES, MA'AM.

21 Q.   OKAY.  DID MR. LEWIS PURCHASE ON THIS DATE?

22 A.   YES, MA'AM, HE DID.

23 Q.   WHAT TIME DID HE PURCHASE?

24 A.   MR. LEWIS PURCHASED ON MAY 30TH, 2011, AT 2:11 P.M.

25 Q.   AND WHAT WAS IT THAT HE PURCHASED?

1  A.   HE PURCHASED ONE BOX OF WAL-ITIN 24-HOUR TABLETS, THERE'S

2  TEN TABLETS IN A BOX, AND THERE ARE 240 MILLIGRAMS OF PSEUDO.

3  SO, THE TOTAL GRAMS IN THE BOX ARE 2.4 GRAMS OF

4  PSEUDOEPHEDRINE.

5  Q.   OKAY.  AND DID ANYONE ELSE OF SIGNIFICANCE TO YOU IN THE

6  COURSE OF YOUR INVESTIGATION PURCHASE ON THE SAME DAY?

7  A.   YES, MA'AM, I RECOGNIZE THE FIRST NAME ON THE

8  PSEUDOEPHEDRINE LOG.

9  Q.   AND WHO IS THAT?

10 A.   THE FIRST NAME ON THE PSEUDOEPHEDRINE LOG IS AMANDA

11 SPENCER.

12 Q.   AND WHO IS AMANDA SPENCER?

13 A.   AMANDA SPENCER IS A METH COOK AND A CO-CONSPIRATOR IN MR.

14 LEWIS'S INDICTMENT.

15 Q.   AND SHE WAS AARON SIMMONS' GIRLFRIEND AT THE TIME THEY

16 WERE ARRESTED, IS THAT CORRECT?

17 A.   YES, MA'AM, SHE WAS AARON SIMMONS' GIRLFRIEND.

18 Q.   OKAY.  AND WHAT DID MS. SPENCER PURCHASE?

19 A.   MS. SPENCER -- THIS WAS AT 12:17 IN THE MORNING.  MS.

20 SPENCER PURCHASED ONE BOX OF WAL-PHED SINUS, ALLERGY,

21 DECONGESTANT, 48 TABLETS, 60 MILLIGRAMS OF PSEUDOEPHEDRINE,

22 AND THAT'S 2.88 GRAMS OF PSEUDOEPHEDRINE TOTAL.

23 Q.   OKAY.  NOW, GOING BACK TO GOVERNMENT'S EXHIBIT 148, AND

24 IF YOU WANT -- YOU MAY WANT TO STAY RIGHT THERE ACTUALLY.  ARE

25 ALL THOSE PURCHASES FOR MR. LEWIS REFLECTED ON GOVERNMENT'S

1 EXHIBIT 148?

2 A.   YES, MA'AM.  EVERY PURCHASE THAT I COULD LOCATE FOR MR.

3 LEWIS IS IN THIS EXHIBIT.

4 Q.   OKAY.  AND WHAT WAS THE TOTAL NUMBER OF PURCHASES THAT

5 MR. LEWIS MADE BETWEEN APRIL THE 1ST OF 2009, TO THE DATE OF

6 HIS -- I MEAN, RIGHT UP TO THE DATE OF HIS ARREST?  WELL, I

7 GUESS, IT WOULD BE -- THE LAST PURCHASE BEING JUNE THE 23RD OF

8 2011.

9 A.   MR. LEWIS PURCHASED 47 TIMES.

10 Q.   OKAY.  HOW MANY TOTAL TABLETS DID HE PURCHASE?

11 A.   HE PURCHASED 1,526 PSEUDOEPHEDRINE TABLETS.

12 Q.   AND HOW MANY GRAMS OF PSEUDOEPHEDRINE IS THAT?

13 A.   HE PURCHASED 117.1 GRAMS OF PSEUDOEPHEDRINE.

14 Q.   OKAY.  AND DID YOU USE THE SAME CALCULATION TO DO

15 THEORETICAL YIELD HERE AS YOU DID TO DO THE THEORETICAL YIELD

16 FOR THE AMOUNT OF PSEUDOEPHEDRINE THAT WAS FOUND AT HIS

17 CORVETTE SHOP ON FEBRUARY THE 8TH OF 2010?

18 A.    YES, MA'AM.  I TOOK THE GRAMS OF PSEUDOEPHEDRINE AND

19 MULTIPLIED IT BY .92, WHICH IS 92 PERCENT, WHICH IS THE MOST

20 AT A HUNDRED PERCENT THEORETICAL YIELD THAT ONE COULD PRODUCE,

21 AND THAT CAME UP TO 107.7 GRAMS OF METHAMPHETAMINE AT A

22 HUNDRED PERCENT THEORETICAL YIELD.

23 Q.   OKAY.  THANKS.  YOU CAN TAKE THE STAND.

24         THE COURT:  THIS MIGHT BE A GOOD TIME TO STOP FOR

25 LUNCH.

1          MS. WELLS:  I THINK SO, YOUR HONOR.

2          THE COURT:  MEMBERS OF THE JURY, IF YOU'LL REPORT

3 BACK TO THE JURY ROOM JUST A MINUTE OR TWO BEFORE 1:00, WE'LL

4 GET A PROMPT START.  REMEMBER THE USUAL ADMONITIONS ABOUT

5 DISCUSSING THE CASE.

6          YOU MAY STEP OUT AND WE'LL SEE YOU BACK AT ONE

7 O'CLOCK.

8          (OUT OF THE PRESENCE OF THE JURY AND ALTERNATES.)

9          THE COURT:  ANYTHING FURTHER AT THIS TIME, MS.

10 WELLS?

11         MS. WELLS:  NOT FROM THE GOVERNMENT, YOUR HONOR.

12         THE COURT:  MR. STEWART?

13         MR. STEWART:  NOT FROM THE DEFENSE, YOUR HONOR.

14         THE COURT:  OKAY.  WE'LL TAKE A RECESS TILL ONE

15 O'CLOCK.

16         (LUNCHEON RECESS FROM 11:58 A.M., UNTIL 1:02 P.M.)

17         (DEFENDANT PRESENT.)

18         THE COURT:  GOOD AFTERNOON, EVERYONE.  PLEASE BE

19 SEATED.  WE'LL CONTINUE.

20         (IN THE PRESENCE OF THE JURY AND ALTERNATES.)

21         THE COURT:  MS. PAGE, YOU'RE STILL UNDER OATH.  MS.

22 WELLS, THE WITNESS IS WITH YOU.

23         MS. WELLS:  THANK YOU VERY MUCH, YOUR HONOR.

24 BY MS. WELLS:

25 Q.  SPECIAL AGENT PAGE --

1    MS. WELLS:  MAY THE WITNESS HAVE PERMISSION TO LEAVE

2 THE STAND, YOUR HONOR?

3         THE COURT:  YES, MA'AM.

4         MS. WELLS:  THANK YOU VERY MUCH.

5 BY MS. WELLS:

6 Q.   SPECIAL AGENT PAGE, I'M GOING TO SHOW YOU WHAT'S BEEN

7 ADMITTED INTO EVIDENCE AS GOVERNMENT'S EXHIBIT 149.  ARE YOU

8 FAMILIAR WITH THAT EXHIBIT?

9 A.   YES, MA'AM.

10 Q.   DURING THE COURSE OF YOUR TESTIMONY PRIOR TO THE LUNCH

11 BREAK, DID YOU BECOME CONCERNED ABOUT A CALCULATION YOU

12 CONDUCTED IN REFERENCE TO GOVERNMENT'S EXHIBIT 149?

13 A.   YES, MA'AM, I DID.

14 Q.   AND WHAT WAS THAT?

15 A.   I WAS CONCERNED ABOUT THE LAST NUMBER, THE AMOUNT OF

16 METHAMPHETAMINE THAT COULD HAVE BEEN PRODUCED FROM THIS AMOUNT

17 OF PSEUDOEPHEDRINE.

18 Q.   AND WHY WERE YOU CONCERNED ABOUT THAT?

19 A.   THE REASON I WAS CONCERNED ABOUT THIS IS THERE'S A BIG

20 CHEMISTRY BACKGROUND TO THIS.  BUT IN ORDER TO MAKE

21 METHAMPHETAMINE IN THE END, IN THE END IT'S GOING TO BE

22 METHAMPHETAMINE HYDROCHLORIDE.  SO, IF YOU START WITH

23 PSEUDOEPHEDRINE HYDROCHLORIDE, THAT'S WHERE THE 92 PERCENT

24 CONVERSION COMES INTO PLAY.

25         HOWEVER, ON PRODUCTS THAT ARE PSEUDOEPHEDRINE

1 SULFATE THERE IS SOME ADDITIONAL MATH THAT HAS TO HAPPEN IN

2 ORDER TO TURN THAT INTO METH HYDROCHLORIDE AND IT HAS TO DO

3 WITH THE SIZE OF THE MOLECULES AND THE MOLAR RATIOS AND SOME

4 TECHNICAL CHEMISTRY TERMS.

5          SO, INSTEAD OF A 92 PERCENT CONVERSION WHERE THERE'S

6 SULFATE IT ENDS UP BEING ABOUT 86.666 PERCENT CONVERSATION.

7          SO, DURING THE BREAK I WENT BACK THROUGH JUST TO

8 DOUBLE-CHECK IN ALL FAIRNESS AND THESE NUMBERS ARE ALL

9 CORRECT.  THE .36 GRAMS IS CORRECT, 2.88 GRAMS OF PSEUDO IS

10 CORRECT, 7.2 GRAMS IS CORRECT, 2.4 GRAMS OF PSEUDO IS CORRECT,

11 AND 3.6 GRAMS OF PSEUDO IS CORRECT FOR A TOTAL OF 16.4 GRAMS

12 OF PSEUDOEPHEDRINE.

13          HOWEVER, WHEN WE CALCULATE THEORETICAL YIELD INSTEAD

14 OF 15 GRAMS, IT SHOULD HAVE BEEN 14.9 GRAMS OF

15 METHAMPHETAMINE.

16 Q.   OKAY.  AND, SPECIAL AGENT PAGE, AT THIS TIME I'M GOING TO

17 HAND YOU THE ORIGINAL GOVERNMENT'S EXHIBIT 149 AND A BLACK INK

18 PEN, IF IT PLEASES THE COURT THAT WE ADDRESS THIS THIS WAY,

19 AND ASK YOU IF YOU WILL MAKE THAT CHANGE TO THE ORIGINAL

20 EXHIBIT 149.  AND IF YOU'LL INITIAL THAT?

21 A.   (WITNESS COMPLIES.)

22 Q.   NOW, BASED ON YOUR CONCERN WITH THIS CALCULATION, DID YOU

23 THEN GO LOOK AT GOVERNMENT'S EXHIBIT 148?

24 A.   YES, MA'AM.

25 Q.   OKAY.  AND DURING -- OVER THE LUNCH BREAK, WHAT STEPS DID

1 YOU TAKE TO LOOK AT GOVERNMENT'S EXHIBIT 148, AND MAKE SURE

2 THAT THE EXHIBIT THAT GOES BACK WITH THE JURY IS ACCURATE?

3 A.   WHEN I PREPARED THIS CHART, I WENT BASED ON THE

4 PSEUDOEPHEDRINE LOGS.  SO, EACH PURCHASE ON THE

5 PSEUDOEPHEDRINE LOGS SAYS THE DATE, THE TIME, THE LOCATION,

6 THE PURCHASER, THE NUMBER OF TABLETS, AND THE NUMBER OF GRAMS

7 AND THEN I PREPARED THIS CHART.

8         SO, THE NUMBER OF PURCHASES IS THE SAME, THAT'S

9 CORRECT.  THE NUMBER OF PSEUDOEPHEDRINE TABLETS IS THE SAME,

10 THAT'S CORRECT.  THE NUMBER OF GRAMS OF PSEUDOEPHEDRINE IS

11 CORRECT, THAT'S A TOTAL FROM ALL THE PHARMACIES.

12         WHAT CHANGED IS, AGAIN, BECAUSE SOME OF MR. LEWIS'S

13 PURCHASES WERE THESE 3.6 GRAMS OF PSEUDO SULFATE, IT CHANGED

14 THE THEORETICAL YIELD -- THE NUMBER OF THE THEORETICAL YIELD.

15 Q.   OKAY.  AND IN GOVERNMENT'S EXHIBIT 148, WHAT DOES THAT

16 THEORETICAL YIELD CHANGE TO?

17 A.   THE THEORETICAL YIELD CHANGES TO 106.9 GRAMS OF

18 METHAMPHETAMINE.

19 Q.   I'M NOW GOING TO HAND YOU THE ORIGINAL GOVERNMENT'S

20 EXHIBIT 148, AND A BLACK INK PEN AND I'LL ASK YOU IF YOU'LL

21 CHANGE -- MAKE THAT CHANGE TO THAT ORIGINAL DOCUMENT AND

22 INITIAL THAT.

23 A.   (WITNESS COMPLIES.)

24 Q.   SPECIAL AGENT PAGE, BEFORE WE TOOK THE LUNCH BREAK YOU

25 HAD TESTIFIED ABOUT GOVERNMENT'S EXHIBIT 148, AND THAT'S WHERE

November 17, 2011

1 WE STOPPED. I NOW WANT TO ASK YOU, YOU WERE PRESENT IN THE

2 COURTROOM WHEN AARON SIMMONS TESTIFIED, IS THAT CORRECT?

3 A.   YES, MA'AM.

4 Q.   OKAY.  AND MR. SIMMONS TESTIFIED ABOUT STEALING TANKS

5 FROM NATIONAL WELDERS IN PIKEVILLE, IS THAT CORRECT?

6 A.   YES, MA'AM, HE DID.

7 Q.   AND WHILE HE WAS TESTIFYING, DID YOU DOCUMENT FOR

8 PURPOSES OF LATER GOING BACK AND MAKING SOME CALCULATIONS WHAT

9 HE TESTIFIED THAT HE STOLE AND HOW MUCH ANHYDROUS AMMONIA WAS

10 INSIDE OF THAT?

11 A.   YES, MA'AM.

12 Q.   OKAY.  LET'S TALK ABOUT THE FIRST TANK THAT HE DISCUSSED

13 STEALING FROM NATIONAL WELDERS IN PIKEVILLE.  BASED ON YOUR

14 NOTES, WHAT DID MR. SIMMONS SAY ABOUT THAT FIRST TANK?

15 A.   MR. SIMMONS SAID THAT HE STOLE THE FIRST TANK FROM

16 NATIONAL WELDERS IN PIKEVILLE, NORTH CAROLINA, AND THAT HE

17 APPROXIMATED THERE WERE ABOUT 15 GALLONS OF ANHYDROUS AMMONIA

18 IN THE TANK WHEN HE STOLE IT.  HE FURTHER TESTIFIED --

19         MR. STEWART:  OBJECTION TO JUST ALLOWING HER TALKING

20 ABOUT WHAT HE TESTIFIED TO, YOUR HONOR.  THAT'S FOR THE JURY

21 TO RECALL.

22         THE COURT:  WELL, SHE'S GOING TO HAVE AN OPINION AS

23 I UNDERSTAND IT.

24         MS. WELLS:  SHE'S GOING TO RENDER AN OPINION BASED

25 ON HIS TESTIMONY, YOUR HONOR.  HE'S ALREADY TESTIFIED.  IT'S

1 NOT HEARSAY.  AND SHE SAID THAT THIS WAS BASED ON HER

2 DOCUMENTATION, NOT ON THE WAY THE JURY SHOULD REMEMBER --

3          THE COURT:  I'M GOING OVERRULE YOUR OBJECTION, MR.

4 STEWART.

5          MS. WELLS:  THANK YOU, YOUR HONOR.

6 BY MS. WELLS:

7 Q.  HE FURTHER TESTIFIED -- HE SAID THAT HE STOLE THE TANK

8 FROM NATIONAL WELDERS IN PIKEVILLE AND IT HAD APPROXIMATELY 15

9 GALLONS IN IT, IS THAT CORRECT?

10 A.  YES, MA'AM.

11 Q.  AND THEN WHAT DID HE GO ON -- AND BASED ON YOUR NOTES,

12 WHAT DID HE GO ON TO TESTIFY?

13 A.  HE TESTIFIED THAT HE AND MR. LEWIS TOOK THE TANK TO WADE

14 TURNAGE IN FOUR OAKS AND SOLD MR. TURNAGE TEN GRAMS -- I MEAN,

15 I'M SORRY, TEN GALLONS OF ANHYDROUS AMMONIA IN THAT TANK.

16 Q.  OKAY.  AND BASED ON THAT, YOU CALCULATED HOW MANY GALLONS

17 THAT MR. SIMMONS COOKED METHAMPHETAMINE WITH BASED ON HIS

18 TESTIMONY?

19 A.  YES, HE COOKED METHAMPHETAMINE WITH FIVE GALLONS.

20 Q.  OKAY.

21 A.  AND GAVE THE ADDITIONAL TEN TO MR. TURNAGE.

22 Q.  ALL RIGHT.  NOW, HIS TESTIMONY WENT ON TO TALK ABOUT HOW

23 MUCH METHAMPHETAMINE HE COULD COOK WITH A PINT OF AMMONIA, WAS

24 THAT YOUR RECOLLECTION?

25 A.  YES, MA'AM.

1 Q.   OKAY.  AND WHAT DID HE APPROXIMATE THAT HE COULD COOK

2 WITH TEN -- WITH ONE PINT OF ANHYDROUS AMMONIA?

3 A.   MR. SIMMONS SAID THAT WITH ONE PINT OF ANHYDROUS AMMONIA

4 HE COULD MAKE BETWEEN TEN AND 12 GRAMS OF METHAMPHETAMINE.

5 Q.   OKAY.  AND DID YOU GO BACK, BASED ON THAT TESTIMONY ABOUT

6 THE FIRST STOLEN TANK, AND CALCULATE HOW MUCH METHAMPHETAMINE

7 HE COULD PRODUCE WITH FIVE GALLONS OF ANHYDROUS AMMONIA?

8 A.   YES, MA'AM.  WITH FIVE GALLONS OF ANHYDROUS AMMONIA AND

9 USING A CONVERSION FROM GALLONS TO PINTS THERE ARE EIGHT PINTS

10 IN A GALLON.  SO, IF YOU HAVE FIVE GALLONS OF ANHYDROUS

11 AMMONIA, THAT WOULD BE 40 PINTS OF ANHYDROUS AMMONIA.  AND IF

12 YOU TAKE THAT 40 PINTS OF ANHYDROUS AND MULTIPLY IT BY TEN

13 GRAMS, WHICH HE SAID HE COULD GET OUT OF ONE PINT, THAT'S A

14 TOTAL OF 400 GRAMS OF METHAMPHETAMINE THAT HE COULD HAVE

15 PRODUCED.

16 Q.   OKAY.  AND THAT'S NOT INCLUDING THE TEN GALLONS THAT HE

17 SAID THAT HE GAVE TO WADE TURNAGE?

18 A.   THAT'S RIGHT.

19 Q.   NOT INCLUDING THAT?

20 A.   THAT'S CORRECT.

21 Q.   NOW, DO YOU RECALL, BASED ON YOUR RECOLLECTION, MR.

22 SIMMONS TESTIFYING ABOUT A SECOND TANK OF ANHYDROUS AMMONIA?

23 A.   YES, MA'AM.

24 Q.   ALL RIGHT.  AND WHAT DID MR. SIMMONS -- BASED ON YOUR

25 NOTES AND YOUR RECOLLECTION, WHAT DID HE TESTIFY ABOUT THAT

1 SECOND TANK?

2 A.   ON THE SECOND TANK THAT MR. SIMMONS STOLE FROM NATIONAL

3 WELDERS IN PIKEVILLE, HE ESTIMATED THAT THAT TANK HAD ABOUT 20

4 GALLONS OF ANHYDROUS AMMONIA IN IT AT THE TIME HE STOLE IT.

5 Q.   OKAY.  AND HOW MANY PINTS OF ANHYDROUS AMMONIA ARE IN 20

6 GALLONS?

7 A.   USING THE SAME FORMULA, ONE GALLON EQUALS EIGHT PINTS.

8 IF YOU HAVE 20 GALLONS OF ANHYDROUS AMMONIA, MULTIPLY THAT BY

9 EIGHT PINTS, THAT WOULD BE 160 PINTS OF ANHYDROUS AMMONIA.

10 Q.   AND BASED ON HIS ESTIMATION THAT HE COULD OBTAIN AT LEAST

11 TEN GRAMS OF METHAMPHETAMINE FROM THAT, HOW MANY GRAMS OF

12 METHAMPHETAMINE TOTAL COULD HE GET FROM 160 PINTS OF ANHYDROUS

13 AMMONIA?

14 A.   160 PINTS OF AMMONIA TIMES TEN GRAMS PER PINT EQUALS

15 1,600 GRAMS OF METHAMPHETAMINE OR 1.6 KILOS OF METHAMPHETAMINE

16 OUT OF TANK NUMBER TWO.

17 Q.   OKAY.

18          MS. WELLS:  ONE MOMENT, PLEASE, YOUR HONOR.

19          (PAUSE.)

20          MS. WELLS:  YOUR HONOR, I HAVE NO FURTHER QUESTIONS

21 FOR SPECIAL AGENT PAGE AT THIS TIME.

22          THE COURT:  CROSS?

23          MR. STEWART:  THANK YOU, YOUR HONOR.

24          **C R O S S - E X A M I N A T I O N**   1:12 P.M.

25 BY MR. STEWART:

1 Q.   SPECIAL AGENT PAGE, YOU MADE A LOT OF CHARTS FROM

2 PSEUDOEPHEDRINE PURCHASES, DIDN'T YOU?

3 A.   YES, SIR.  OH, I MADE ONE -- I MADE ONE CHART AND THEN

4 ANOTHER EXHIBIT, YES, SIR.

5 Q.   YOU MADE ANOTHER CHART WHERE YOU PUT ALL OF THE PURCHASES

6 AND THE SIGNATURES TOGETHER, DIDN'T YOU, AND PROVIDED IT IN

7 DISCOVERY?

8 A.   YOU'D HAVE TO SHOW ME.  I'M SORRY.

9 Q.   THAT'S OKAY.

10         MR. STEWART:  IF I MAY APPROACH, YOUR HONOR?

11         THE COURT:  SURELY.

12         THE WITNESS:  YES, SIR.  I DID NOT PRODUCE THIS

13 CHART, BUT WALGREENS PROVIDED THIS LOG TO ME, YES, SIR.

14 BY MR. STEWART:

15 Q.   THIS WAS PROVIDED BY WALGREENS?

16 A.   YES, SIR.

17 Q.   WITH ALL OF THE SIGNATURES BACK TO BACK TO BACK?

18 A.   YES, SIR.

19 Q.   BUT YOU DID NOT PRODUCE THAT IN AN ALTOGETHER CHART TO

20 PUT ON THE BOARD, DID YOU?

21 A.   NO, SIR, JUST IN THAT -- I BELIEVE THAT WAS REPRESENTED

22 IN A TABLE, BUT NOT -- WE DID NOT SHOW THAT LOG, IF I REMEMBER

23 CORRECTLY.

24 Q.   YOU DID SHOW ONE LOG AND YOU TESTIFIED TO IT BRIEFLY THAT

25 ON SEVERAL OF THE PURCHASES IT DOESN'T SAYS DAVID LEWIS, BUT

1 IT SAYS DAVIS LEWIS --

2 A.    YES, SIR, IT DOES.

3 Q.    -- IS THAT CORRECT?

4 A.    THAT'S CORRECT.

5 Q.    DO YOU KNOW ON EACH OF THESE SPECIFIC OCCASIONS IN

6 OCTOBER OR APRIL, ALL THAT YOU'VE LISTED, DO YOU KNOW THAT

7 DAVID GERALD LEWIS WALKED INTO THE PHARMACIES?

8 A.    NO, THE -- NO, SIR.

9 Q.    DO YOU KNOW WHETHER HE PRODUCED HIS IDENTIFICATION FOR

10 EACH ONE OF THESE PURCHASES?

11 A.    I KNOW YOU HAVE TO PROVIDE YOUR I.D. IN ORDER TO

12 PURCHASE, BUT I DON'T KNOW THAT MR. LEWIS DID THAT, YES, SIR.

13 Q.    DO YOU KNOW WHETHER ANYONE ELSE EVER HAD MR. LEWIS'S

14 IDENTIFICATION?

15 A.    NO, SIR, I HAVE NO KNOWLEDGE.

16 Q.    YOU HAVE PROVIDED IN DISCOVERY A VIDEOTAPE OF MR. MILLER

17 PURCHASING SOME PSEUDOPHED, IS THAT CORRECT?

18 A.    YES, SIR, I BELIEVE SO.

19 Q.    DID YOU EVER COME ACROSS ANY VIDEO OF MR. LEWIS

20 PURCHASING ANY OF THIS?

21 A.    NO, SIR, I DON'T HAVE ANY VIDEOS WITH MR. LEWIS

22 PURCHASING.

23 Q.    SO, IT IS AT ALL POSSIBLE THAT SOMEONE ELSE WENT INTO ONE

24 OF THESE PHARMACIES AND PRESENTED THEMSELVES AS DAVID LEWIS,

25 IS THAT CORRECT?

1 A.   YES, SIR.  YES, SIR, ANYTHING'S POSSIBLE.  YES, SIR.

2 Q.   NOW, ON DIRECT YOU WERE ASKED ABOUT FINGERPRINTS, IS THAT

3 CORRECT?

4 A.   YES, SIR.

5 Q.   AND YOU SAID THAT THAT WAS NOT YOUR CALL?

6 A.   YEAH, I SAID GENERALLY IT'S REQUESTED BY THE AGENCY, BUT

7 WE -- WE COMMUNICATE ABOUT IT ON SCENE.

8 Q.   ON FEBRUARY THE 8TH --

9 A.   YES, SIR, WE TALKED ABOUT --

10 Q.   -- WHO DID YOU COMMUNICATE WITH?

11 A.   WE GENERALLY TALK -- I GENERALLY TALK ABOUT IT -- I DON'T

12 REMEMBER THAT PARTICULAR OCCASION, BUT GENERALLY I HAVE THE

13 DISCUSSION WITH THE CASE AGENT FOR THE SBI, WHO WAS AGENT

14 GENTHENER, AND WITH THE LOCAL LAW ENFORCEMENT AGENCY WHO'S

15 REQUESTING ASSISTANCE, WHICH WAS WILSON COUNTY SHERIFF'S

16 OFFICE.

17 Q.   AGENT GENTHENER WHO TESTIFIED EARLIER?

18 A.   YES, SIR.  USUALLY WE HAVE THAT CONVERSATION TOGETHER.

19 ON THAT PARTICULAR DAY, I DON'T REMEMBER EVER DISCUSSING

20 FINGERPRINTS.

21 Q.   DO YOU RECALL HIS TESTIMONY THAT IT WAS NOT HIS CALL?

22 A.   I DO RECALL THAT, YES, SIR.

23 Q.   IF IT WAS NOT HIS --

24 A.   UH-HUH.

25 Q.   -- WAS IT YOURS?

1 A.   I DON'T REMEMBER DISCUSSING FINGERPRINTS AT ALL ON

2 FEBRUARY 8TH, 2010.  I'VE BEEN TO SEVERAL HUNDRED METH LABS.

3 SO, I KNOW THAT IF FINGERPRINTS ARE NEEDED, WE'LL HAVE THAT

4 DISCUSSION ON SCENE.

5         AND IF THAT'S NECESSARY, THEN I'M THE ONE THAT WILL

6 REACH OUT TO THE CRIME LAB AND HAVE A CHEMIST -- I MEAN, I'M

7 SORRY, A LATENT EXAMINER COME TO THE SCENE.  BUT I DON'T

8 REMEMBER THAT DISCUSSION ON THAT DAY.

9 Q.   WHY WOULD FINGERPRINTS BE NEEDED?

10 A.   FINGERPRINTS WOULD BE NEEDED IN CASES WHERE WE HAVE NO

11 IDEA -- WE HAVE NO SUSPECTS IDENTIFIED.  SAY IT'S ABANDONED --

12 FOR INSTANCE, WE'VE HAD METH LABS IN WOODS.  IT MIGHT BE THAT

13 WE HAVE NO SUSPECTS.  WE MAY DO FINGERPRINTS AT THAT POINT IN

14 ORDER TO IDENTIFY A SUSPECT AND THEN GO FOLLOW UP ON OUR

15 INVESTIGATION THAT WAY.

16 Q.   SO, IT'S NOT UNHEARD OF TO REMOVE FINGERPRINTS FROM METH

17 LABS?

18 A.   NO, SIR, THAT'S NOT UNHEARD OF.  WE DO IT ON OCCASION.

19 Q.   DID YOU FEEL THAT YOU KNEW WHOSE METH LAB THIS WAS?

20 A.   I FELT LIKE THAT WE HAD SOME SUSPECTS, YES, SIR.

21 Q.   ON THAT DATE YOU ARRESTED SOME SUSPECTS?

22 A.   I DID NOT, BUT, YES, SIR, THERE WERE SOME SUSPECTS IN

23 CUSTODY BY THE TIME I GOT THERE.  YES, SIR.

24 Q.   SO, THE GROUP THERE THAT COLLABORATED FELT THAT THE ONES

25 WHO WERE ARRESTED IT WAS THEIR METH LAB?

1  A.   I DON'T KNOW WHAT THEY FELT.  I'M ASSUMING, OF COURSE,

2  THAT, YES, SIR, THEY FELT LIKE THAT THOSE WERE VALID CHARGES

3  ON THOSE INDIVIDUALS WHO THEY HAD ARRESTED.

4  Q.   DID YOU FOLLOW UP WITH WHAT THOSE INDIVIDUALS DID WITH

5  THEIR CHARGES?

6  A.   NO, SIR, I DID NOT.

7  Q.   DID YOU SPEAK WITH DAVID LEWIS AND CATHY LEWIS ON THAT

8  OCCASION ON FEBRUARY THE 8TH?

9  A.   I DO NOT BELIEVE THAT I SPOKE WITH MR. LEWIS OR MS. LEWIS

10 ON THAT DAY, NO, SIR.

11 Q.   HOW LONG WOULD YOU SAY YOU WERE OUT AT THEIR HOUSE ON

12 FEBRUARY THE 8TH?

13 A.   WE WERE THERE FOR A NUMBER OF HOURS.  I DON'T REMEMBER

14 EXACT TIMES, BUT IT WAS WELL IN -- GENERALLY, IT TAKES A LONG

15 TIME TO PROCESS A METH LAB.  AND BY THE TIME WE WAIT ON THE

16 CLEAN UP CREW -- GET THE SEARCH WARRANT, SEARCH, WAIT ON THE

17 CLEAN UP CREW, AND HAVE IT DISPOSED OF, IT'S GENERALLY A

18 LENGTHY PROCESS.  SO, IT WAS QUITE LATE AT NIGHT.

19 Q.   DO YOU RECALL WHAT TIME OF DAY YOU ACTUALLY ARRIVED?

20 A.   I DO NOT.  AGENT GENTHENER HAS IT IN HIS REPORT, BUT I

21 DON'T HAVE THAT UP HERE WITH ME.

22 Q.   I UNDERSTAND.

23 A.   IT WAS DAYLIGHT WHEN I ARRIVED.

24 Q.   WAS ANYONE IN CUSTODY WHEN YOU ARRIVED?

25 A.   THERE WERE SEVERAL INDIVIDUALS IN CUSTODY OR THEY HAD

1 BEEN DETAINED AT THAT POINT. I'M NOT SURE IF THE CHARGES HAD

2 BEEN DECIDED UPON. BUT THERE WERE SEVERAL PEOPLE IN CUSTODY,

3 YES, SIR, OR BEING DETAINED IN HANDCUFFS.

4 Q. WAS BRAD CARTER THE GENTLEMAN WHO ARRESTED THOSE THAT

5 WERE ARRESTED?

6 A. I'M NOT SURE. I WASN'T THERE WHEN THEY WERE ORIGINALLY

7 -- WHEN THEY ORIGINALLY ARRIVED AFTER THE MARSHALS ARRIVED.

8 I'M NOT SURE WHO DECIDED TO PUT WHO IN HANDCUFFS.

9 Q. I UNDERSTAND. PLEASE DON'T LET ME BE TOO BLUNT AND --

10 A. NO, THAT'S OKAY. GO AHEAD.

11 Q. -- I MEAN THIS VERY RESPECTFULLY. WHAT WAS YOUR POINT OF

12 BEING OUT THERE ON FEBRUARY 8TH?

13 A. SITE SAFETY OFFICER.

14 Q. JUST TO MAKE SURE NOTHING BLEW UP?

15 A. YES, SIR, AND TO PROVIDE PROTECTIVE EQUIPMENT TO THE

16 OFFICERS WHO WERE GOING TO GO IN. IT TURNED OUT THAT I WAS

17 THE OFFICER THAT WENT IN. SO, I SUITED MYSELF UP AND BRITTANY

18 DEWELL UP AND WE WENT IN. AND THEN MY OTHER ROLE WAS TO TAKE

19 PHOTOGRAPHS THAT DAY AND TO ASSIST AGENT DEWELL IN THE SEARCH

20 AND HELPING BRING CHEMICALS OUT.

21 Q. SO, ALL OF THE STUFF THAT WE'VE SEEN PUT UP HERE, THOSE

22 ARE YOUR PICTURES?

23 A. I TOOK THE PHOTOGRAPHS AT THE CORVETTE SHOP, YES, SIR,

24 AND I TOOK THE PHOTOGRAPHS IN JOHNSTON COUNTY OF THE VEHICLE

25 METH LAB.

1 Q.   WERE YOU RESPONSIBLE FOR TAKING THE ITEMS OUT OF THE

2 CORVETTE SHOP?

3 A.   I WOULD SAY THAT IT WAS A JOINT EFFORT BETWEEN MYSELF AND

4 AGENT DEWELL.  WE SEARCHED THE CORVETTE SHOP TOGETHER, SUITED

5 UP, I TOOK PHOTOGRAPHS, AND SHE DOCUMENTED WHERE THE ITEMS

6 WERE LOCATED.  AND THEN TOGETHER WE BROUGHT THEM OUT AND PUT

7 THEM ON A PIECE OF PLASTIC.  AND THEN, AT THAT POINT, MY JOB'S

8 DONE AS FAR AS ASSISTING HER AND THEN SHE TAKES SAMPLES OF

9 WHAT SHE NEEDS TO BACK TO THE CRIME LAB.

10 Q.   DID YOU MAKE THE DECISION WITH HER ABOUT WHAT TO DESTROY

11 AND WHAT TO TAKE BACK OR DID SHE MAKE THAT HERSELF?

12 A.   EVERYTHING GETS DESTROYED EXCEPT HER SAMPLES AND IT WAS

13 HER DECISION WHAT TO SAMPLE, YES, SIR.

14 Q.   DO YOU RECALL HOW MUCH TIME YOU ACTUALLY SPENT INSIDE OF

15 THE CORVETTE SHOP SEARCHING?

16 A.   I DON'T RECALL EXACTLY, BUT I WOULD SAY INSIDE THE SHOP

17 IT WAS AT LEAST AN HOUR.  MAY HAVE BEEN A LITTLE MORE, BUT I

18 WOULD SAY AT LEAST AN HOUR.  AND THEN I SPENT SOME TIME ON THE

19 PROPERTY AS WELL OUTSIDE AROUND THE CORVETTE SHOP.

20 Q.   DID YOU GO INTO EVERY ROOM OF THE CORVETTE SHOP?

21 A.   YES, SIR, I DID.

22 Q.   THE ACTUAL GARAGE PART?

23 A.   YES, SIR.

24 Q.   THE CAR PARTS STORAGE --

25 A.   YES, SIR.

1 Q.   -- WHERE THE METH LAB WAS FOUND?

2 A.   YES, SIR.

3 Q.   THE BATHROOM AND THE LOBBY?

4 A.   YES, SIR, I WENT INTO ALL THOSE ROOMS.

5 Q.   WAS THERE ONLY PARAPHERNALIA FOUND WHERE THE METH LAB --

6 IN AND WHERE THE METH LAB WAS?

7 A.   CAN YOU EXPLAIN PARAPHERNALIA?

8 Q.   I CAN TRY.

9 A.   OKAY.

10 Q.   DID YOU FIND ANY SYRINGES, NEEDLES, PENS IN THE LOBBY?

11 A.   NO, SIR.  THE ONLY TWO ITEMS -- THE ONLY TWO ITEMS THAT

12 WERE NOT IN THE ROOM WHERE THE METH LAB WAS LOCATED WAS A

13 GALLON OF COLEMAN CAMP FUEL AND THEN THE TWO LITER BOTTLE WITH

14 SOME SORT OF LIQUID AND HOLES IN THE CAP.  EVERYTHING ELSE WAS

15 FOUND IN THE BACK ROOM THAT WE HAD DESIGNATED METH LAB

16 LOCATION ON THE CHART.  AND THEN THERE WAS A RECEIPT LOCATED

17 OUTSIDE.

18 Q.   WE SAW SOME PICTURES OF A WHITE TABLE, DO YOU RECALL

19 THAT?

20 A.   IN THE BACK ROOM?

21 Q.   YES, MA'AM.

22 A.   YES, SIR.

23 Q.   IT HAD SOME GREEN BOTTLES ON IT --

24 A.   YES, SIR.

25 Q.   -- AND SOME SALT.  WERE THOSE BOTTLES IN THE ORDER THEY

1 WERE IN THE PICTURE OR DID YOU PUT THEM IN THAT ORDER?

2 A.   THERE WERE -- THERE'S DIFFERENT PHOTOGRAPHS.

3 Q.   YES, MA'AM.

4 A.   SO, WE TOOK -- I TOOK A PICTURE BEFORE WE EVER TOUCHED

5 ANYTHING, AN OVERALL.  AND THEN AS WE STARTED MOVING THINGS

6 AROUND WE TOOK UP CLOSE PICTURES AND THEN I MOVED THEM TO LINE

7 THEM UP ACROSS THE TABLE FOR AN ADDITIONAL PICTURE JUST TO

8 SHOW WHAT WAS IN THE BOTTLES A LITTLE BIT CLEARLY, YOU KNOW,

9 IN A PHOTOGRAPH.

10 Q.   YOU AND AGENT DEWELL ASSUMED, APPARENTLY, THAT THE TWO

11 BAGS, THE RED ONE AND THE ORANGE ONE, HAD SOMETHING TO DO WITH

12 THAT METH LAB, IS THAT CORRECT?

13 A.   YES, SIR, WE DID.

14 Q.   YOU BROUGHT THEM OUTSIDE?

15 A.   YES, SIR, WE DID.

16 Q.   CAN YOU TELL US WHAT YOU ASSUMED THEY HAD TO DO WITH THE

17 METH LAB?

18 A.   YES, SIR.  AT LEAST ONE OF THE BAGS HAD THE -- WHAT I

19 CALL THE MUD, WHICH IS THE TUPPERWARE CONTAINERS WITH THE

20 LEFTOVER BINDER AND REACTION MATERIAL.  AND I DON'T RECALL OFF

21 THE TOP OF MY HEAD WHAT WAS IN THE OTHER BAG, BUT BOTH OF THEM

22 CONTAINED ITEMS THAT ARE CONSISTENT WITH MANUFACTURING

23 METHAMPHETAMINE.

24 Q.   THIS COOK ON FEBRUARY THE 8TH, I THINK AGENT GENTHENER

25 TESTIFIED THAT IT WAS EASILY SET UP.  DO YOU AGREE WITH THAT?

1 HE SAID IT WAS QUICK, IT COULD BE A QUICK SETUP.

2 A.    YES, SIR.   YES, SIR, IT COULD BE SET UP QUICKLY.

3 Q.    DID YOU FIND ANY EVIDENCE IN THE CORVETTE SHOP THAT WOULD

4 TEND TO SHOW THERE WAS ONGOING COOK THERE?

5 A.    (NO RESPONSE.)

6 Q.    WOULD YOU LIKE ME TO CLARIFY OR ARE YOU THINKING?

7 A.    I'M THINKING.   I THINK I KNOW WHAT YOUR QUESTION IS.   WE

8 FOUND -- WE FOUND VARIOUS STAGES OF THE PROCESS SO IT'S

9 DIFFICULT FOR ME TO SAY WHETHER -- LIKE FOR INSTANCE, WE KNOW

10 THE CONDENSER HAD BEEN USED BECAUSE WE GOT A POSITIVE AMMONIA

11 DRAGER.   IF YOU'LL REMEMBER THE DRAGER PUMP AND HOW THE

12 CRYSTALS TURNED PURPLE, THAT'S A POSITIVE INDICATION.   SO, WE

13 KNOW THE CONDENSER HAD BEEN USED AT SOME TIME.

14        HOWEVER, THE FERTILIZERS AND THE BOTTLES WERE BRAND

15 NEW AND THE FERTILIZER HAD NOT BEEN USED.   HOWEVER, THE MUD IN

16 THE TUPPERWARE IS AN INDICATION THAT IT HAD BEEN USED.

17        SO, I BELIEVE THERE WERE VARIOUS -- A POSSIBILITY

18 THERE WAS COMPONENTS THERE FROM A PAST COOK AND MAYBE FROM A

19 FUTURE COOK.

20        THAT ALSO IS CONSISTENT WITH THE PILLS.   THERE WAS

21 AN EMPTY BLISTER PACK THAT HAD ALREADY BEEN EMPTIED AND THEN

22 THERE WAS ALSO A FULL ONE THAT HAD NOT BEEN EMPTIED YET.   SO,

23 IT WAS IN SOME POINT OF PROCESS.   DOES THAT ANSWER YOUR

24 QUESTION?

25 Q.    SOMEWHAT.

1  A.   OKAY.

2  Q.   BUT WE'LL GO INTO MUCH MORE DETAIL HERE IN A MINUTE --

3  A.   OKAY.  YEAH.  GO AHEAD.

4  Q.   -- IF THAT'S ALL RIGHT.  ALL OF THESE ITEMS COULD HAVE

5  BEEN SET UP OUT OF THESE TWO BAGS, IS THAT CORRECT?

6  A.   BESIDES THE PROPANE TANK --

7  Q.   YES, MA'AM.

8  A.   -- AND MAYBE THE BLUE BUCKET PROBABLY --

9  Q.   THE BLUE BUCKET --

10 A.   PROBABLY EVERYTHING WOULD HAVE FIT, YES, SIR.

11 Q.   NOW, WHEN DUSTIN WAS SHOWN THAT BLUE BUCKET, DO YOU

12 RECALL WHAT HE SAID ABOUT IT?

13 A.   I BELIEVE HE SAID THAT IT WAS CONSISTENT WITH SOMETHING

14 HE WOULD USE TO COOK IN.

15 Q.   HE SAID IT'S ONE LIKE --

16 A.   LIKE.  OKAY.

17 Q.   -- I USE, IS THAT CORRECT?

18 A.   YES, SIR.

19 Q.   SO, HE DIDN'T SAY THAT'S THE BUCKET I USED?

20 A.   NO, SIR, HE DID NOT SAY THAT.

21 Q.   DID YOU SEARCH IN ALL OF THE COMPARTMENTS -- NOW, YOU SAW

22 IN THE CORVETTE SHOP THAT THERE WERE SHELVES AND ALL SORTS OF

23 THINGS.  DID YOU LOOK IN ALL OF THAT KIND OF STUFF?

24 A.   NO, SIR.  WE DID NOT GO INTO ANY BINS THAT WERE LABELED

25 SPARK PLUGS, BOLTS.  I MEAN, THERE WERE PARTS ALL OVER THE

1 SHOP.  SO, WE DID NOT GO IN EVERY NOOK AND CRANNY.

2          WE WENT WHERE A HOT POWER BOTTLE COULD BE LOCATED OR

3 DRANO.  THAT'S WHAT WE WERE LOOKING FOR WAS EVIDENCE OF

4 MANUFACTURING AND METH USE.

5 Q.   IF I MAY SWITCH GEARS AND TAKE YOU BACK TO THE

6 METHAMPHETAMINE AND PSEUDOEPHEDRINE RECORDS.

7 A.   YES, SIR.

8 Q.   YOU SHOWED US ON THERE THAT THERE WERE SEVERAL PURCHASES

9 WITH A DAVID LEWIS'S NAME ON THEM --

10 A.   YES, SIR.

11 Q.   -- WITH ONE OF THE OTHER CO-DEFENDANT'S NAMES?

12 A.   YES, SIR.

13 Q.   DO YOU HAVE ANY CHARTS THAT SHOW ANY OF THE OTHER TWO CO-

14 DEFENDANTS PURCHASING AT THE SAME TIME?

15 A.   I DON'T HAVE ANY CHARTS THAT SHOW THAT.  THAT DOESN'T SAY

16 THAT THEY DON'T EXIST IN A PHARMACY.  BUT I HAVE NO RECORDS

17 TODAY FOR THAT.  I WAS SPECIFICALLY LOOKING FOR DAYS WHERE

18 DAVID LEWIS'S NAME WAS ON THERE.

19 Q.   A DAVID LEWIS'S NAME?

20 A.   YES, SIR.

21 Q.   DID YOU EVER USE A MIDDLE NAME IN YOUR SEARCH?

22 A.   LET ME CHECK REAL FAST.

23 Q.   YES, MA'AM.

24 A.   I KNOW THAT AT WALGREENS YOU USE A NAME AND A DRIVER'S

25 LICENSE NUMBER.  AT WALMART I PROVIDED A NAME, ADDRESS, DATE

1 OF BIRTH, AND DRIVER'S LICENSE NUMBER.  AND IN THE NPLX SYSTEM

2 FOR CVS AND RITEAID I BELIEVE I HAD TO PUT MR. LEWIS'S MIDDLE

3 NAME IN, BUT I'M NOT A HUNDRED PERCENT SURE, BUT THEY ALSO

4 PRINT OUT ON HIS LOG HIS MIDDLE NAME, DATE OF BIRTH AND

5 DRIVER'S LICENSE NUMBER AND ADDRESS.  SO, DIFFERENT STORES

6 WORK A LITTLE BIT DIFFERENTLY.

7 Q.   WHAT, IF YOU KNOW, ARE PHARMACISTS OR CLERKS, WHOMEVER IS

8 SELLING THE PSEUDOPHED, SUPPOSED TO CHECK ON THE LICENSE?

9 WHAT THINGS DO THEY SAY, OKAY, THIS IS CORRECT, LET'S GO?

10 A.   REALLY ALL YOU HAVE TO HAVE IS A PHOTO I.D., IT DOESN'T

11 EVEN HAVE TO BE VALID.  YOU REALLY JUST HAVE TO HAVE SOMETHING

12 SHOWING A PHOTOGRAPH AND THAT THAT'S YOU.

13        IT COULD EVEN BE AN I.D. CARD.  IT DOESN'T HAVE TO

14 BE A DRIVER'S LICENSE.  IF YOU'VE LOST YOUR DRIVER'S LICENSE,

15 YOU COULD USE AN IDENTIFICATION CARD.  BUT SOMETHING WITH YOUR

16 PHOTO AND THEN SHOWING THAT YOU'RE AT LEAST 18 BECAUSE THAT'S

17 A REQUIREMENT AS WELL.

18        AND THEN GENERALLY A LOT OF THESE STORES WILL SCAN

19 THE DRIVER'S LICENSE AND THAT INFORMATION WILL BE DUMPED IN

20 AND THEN THEIR SYSTEM WILL SHOW HOW MANY TIMES THE PERSON'S

21 PURCHASED TO KNOW IF THEY'VE EXCEEDED THE PURCHASE LIMITS BY

22 LAW.

23 Q.   IS THERE ANY POSSIBILITY THAT THE DAVID AND/OR DAVIS

24 LEWIS THAT YOU HAVE HERE COULD BE MULTIPLE DAVID OR DAVIS

25 LEWISES IN THE AREA?

1 A.   NO, SIR.  FROM THE LOGS THAT I PULLED HE WAS IDENTIFIED

2 EITHER BY A DATE OF BIRTH, DRIVER'S LICENSE, ADDRESS AND/OR A

3 COMBINATION -- AT LEAST ONE OF THOSE FACTORS AND SOMETIMES A

4 COMBINATION OF THOSE FACTORS.

5 Q.   AND HOW WOULD THE PHARMACISTS KNOW ANY OF THESE FACTORS?

6 WOULD THEY BE TOLD IT?

7 A.   FROM THE I.D. ONLY, YES, SIR.

8 Q.   MAY I TAKE YOU TO THE JOHNSTON COUNTY --

9 A.   ABSOLUTELY.

10 Q.   -- MOBILE METH LAB, IF YOU WILL.  THAT WAS NOT IN THE

11 PROCESS OF COOKING AT THE TIME?

12 A.   NO, SIR.

13 Q.   AGAIN, YOU DECIDED -- WAS IT YOUR CALL NOT TO TAKE

14 FINGERPRINTS?

15 A.   I DON'T REMEMBER HAVING A DISCUSSION ABOUT FINGERPRINTS

16 ON THAT DAY EITHER.  AGAIN, WE HAD TWO PEOPLE IN CUSTODY.  I

17 DON'T REMEMBER HAVING THAT CONVERSATION ON THAT DAY.

18        MR. STEWART:  YOUR HONOR, IF I MAY HAVE ONE MOMENT,

19 PLEASE, SIR?

20        THE COURT:  YES, SIR.

21        (PAUSE.)

22 BY MR. STEWART:

23 Q.   JUST ONE MORE QUESTION --

24 A.   SURE.

25 Q.   -- IF I MAY.  YOU SAID THAT THERE WERE 47 TOTAL PURCHASES

November 17, 2011

1 FOR DAVID LEWIS?

2 A.   YES, SIR.  IN THE CHART THAT WE SHOWED, YES, SIR.

3 Q.   YES, MA'AM.  HOW MANY OF THOSE 47 CAN YOU SAY WITH A

4 HUNDRED PERCENT ACCURACY WAS DAVID GERALD LEWIS?

5 A.   OTHER THAN HIS IDENTIFIERS ON THE LOGS INCLUDING THE

6 SIGNATURE NONE.  I HAVE NO VIDEOS.

7         MR. STEWART:  YES, MA'AM.  THANK YOU.  YOUR HONOR, I

8 HAVE NO FURTHER QUESTIONS.

9         THE COURT:  ANY REDIRECT?

10        MS. WELLS:  ONE MOMENT, PLEASE, YOUR HONOR.

11        (PAUSE.)

12        MS. WELLS:  I HAVE NOTHING, YOUR HONOR.

13        THE COURT:  YOU MAY STEP DOWN.

14        THE WITNESS:  THANK YOU, YOUR HONOR.

15        THE COURT:  YOUR NEXT WITNESS?

16        MS. WELLS:  YOUR HONOR, MAY I HAVE A MOMENT?

17        THE COURT:  YES, MA'AM.

18        MS. WELLS:  THANK YOU.

19        (PAUSE.)

20        MS. WELLS:  YOUR HONOR, AT THIS TIME THE GOVERNMENT

21 HAS TWO STIPULATIONS, IF IT PLEASES THE COURT, I CAN READ INTO

22 THE RECORD?

23        THE COURT:  YES, MA'AM.

24        MS. WELLS: THANK YOU VERY MUCH.  YOUR HONOR, I HAVE

25 WHAT'S BEEN MARKED FOR IDENTIFICATION PURPOSES AS GOVERNMENT'S

1 EXHIBIT 118, AND THAT IS A STIPULATION THAT'S ENTITLED THE

2 UNITED STATES OF AMERICA VERSUS DAVID LEWIS.

3          THE UNITED STATES OF AMERICA BY AND THROUGH THE

4 UNITED STATES ATTORNEY FOR THE EASTERN DISTRICT OF NORTH

5 CAROLINA AND THE DEFENDANT BY AND THROUGH HIS RESPECTIVE

6 ATTORNEYS HEREBY STIPULATE AS FOLLOWS; THAT THE

7 PSEUDOEPHEDRINE PURCHASE DOCUMENTS PROVIDED BY WALMART

8 PHARMACY BE INTRODUCED INTO EVIDENCE AS AN AID WITHOUT FURTHER

9 AUTHENTICATION OR CUSTODIAN OF EVIDENCE -- EXCUSE ME --

10 CUSTODIAN OF RECORD EVIDENCE IF OTHERWISE ADMISSIBLE.

11          THAT THE PSEUDOEPHEDRINE PURCHASE DOCUMENTS PROVIDED

12 BY WALGREENS PHARMACY BE INTRODUCED INTO EVIDENCE AS AN AID

13 WITHOUT FURTHER AUTHENTICATION OR CUSTODIAN OF RECORD EVIDENCE

14 IF OTHERWISE ADMISSIBLE.

15          THAT THE PSEUDOEPHEDRINE PURCHASE DOCUMENTS PROVIDED

16 BY CVS PHARMACY BE INTRODUCED INTO EVIDENCE AS AN AID WITHOUT

17 FURTHER AUTHENTICATION OR CUSTODIAN OF RECORD EVIDENCE IF

18 OTHERWISE ADMISSIBLE.

19          THAT THE PSEUDOEPHEDRINE PURCHASE DOCUMENTS PROVIDED

20 BY RITEAID PHARMACY BE INTRODUCED INTO EVIDENCE AS AN AID

21 WITHOUT FURTHER AUTHENTICATION OR CUSTODIAN OF RECORD EVIDENCE

22 IF OTHERWISE ADMISSIBLE.

23          THAT THE PSEUDOEPHEDRINE PURCHASE DOCUMENTS PROVIDED

24 BY TARGET PHARMACY BE INTRODUCED INTO EVIDENCE AS AN AID

25 WITHOUT FURTHER AUTHENTICATION OR CUSTODIAN OF RECORD EVIDENCE

1  IF OTHERWISE ADMISSIBLE.

2         AND FINALLY, THAT THE PSEUDOEPHEDRINE PURCHASE

3  DOCUMENTS PROVIDED BY HARRIS TEETER PHARMACY BE INTRODUCED

4  INTO EVIDENCE AS AN AID WITHOUT FURTHER AUTHENTICATION OR

5  CUSTODIAN OF RECORD EVIDENCE IF OTHERWISE ADMISSIBLE.

6         AND THIS DOCUMENT IS SIGNED BY MYSELF, MR. STEWART

7  AND MR. LEWIS.

8         YOUR HONOR, I'D MOVE TO INTRODUCE GOVERNMENT EXHIBIT

9  118 AT THIS TIME.

10        THE COURT:  IT'S ADMITTED.

11           (GOVERNMENT EXHIBIT NUMBER 118 WAS

12           OFFERED AND ADMITTED INTO EVIDENCE.)

13        MS. WELLS:  THANK YOU VERY MUCH.  YOUR HONOR, I NOW

14 HAVE WHAT'S BEEN MARKED FOR IDENTIFICATION PURPOSES AS

15 GOVERNMENT'S EXHIBIT 119, AND THAT TOO IS ENTITLED UNITED

16 STATES OF AMERICA VERSUS DAVID LEWIS.

17        AND THIS READS, THE UNITED STATES OF AMERICA BY AND

18 THROUGH THE UNITED STATES ATTORNEY FOR THE EASTERN DISTRICT OF

19 NORTH CAROLINA AND THE DEFENDANT BY AND THROUGH HIS RESPECTIVE

20 ATTORNEY HEREBY STIPULATE AS FOLLOWS; THAT THE CONTROLLED

21 SUBSTANCES SEIZED BY THE WILSON COUNTY SHERIFF'S DEPARTMENT ON

22 FEBRUARY 8TH, 2010, AND ANALYZED BY CHEMIST T.E. SHOOPMAN OF

23 THE NORTH CAROLINA STATE BUREAU OF INVESTIGATION ON FEBRUARY

24 26TH, 2010, IS .2 GRAMS OF METHAMPHETAMINE, AND HAVING BEEN

25 PROPERLY PRESERVED MAY BE INTRODUCED INTO EVIDENCE ALONG WITH

1 LAB REPORT NUMBER R202002240 WITHOUT FURTHER AUTHENTICATION OR

2 CHAIN OF CUSTODY EVIDENCE IF OTHERWISE ADMISSIBLE.

3       THAT THE CONTROLLED SUBSTANCES SEIZED BY THE WILSON

4 COUNTY SHERIFF'S DEPARTMENT ON FEBRUARY 8TH, 2010, AND

5 ANALYZED BY CHEMIST T.E. SHOOPMAN OF THE NORTH CAROLINA STATE

6 BUREAU OF INVESTIGATION ON FEBRUARY 26TH, 2010, IS A RESIDUE

7 AMOUNT OF METHAMPHETAMINE, AND HAVING BEEN PROPERLY PRESERVED

8 MAY BE INTRODUCED INTO EVIDENCE ALONG WITH LAB REPORT NUMBER

9 R201002241 WITHOUT FURTHER AUTHENTICATION OR CHAIN OF CUSTODY

10 EVIDENCE IF OTHERWISE ADMISSIBLE.

11       AND GOVERNMENT'S EXHIBIT 119 HAS BEEN SIGNED BY

12 MYSELF, MR. STEWART AND MR. LEWIS.  AND I MOVE IT INTO

13 EVIDENCE AT THIS TIME.

14       THE COURT:  IT'S ADMITTED.

15         (GOVERNMENT EXHIBIT NUMBER 119 WAS

16         OFFERED AND ADMITTED INTO EVIDENCE.)

17       MS. WELLS:  MAY I HAVE ONE MOMENT, PLEASE, YOUR

18 HONOR?

19       THE COURT:  YES, MA'AM.

20       (PAUSE.)

21       MS. WELLS:  AND AT THIS TIME, YOUR HONOR, THE

22 GOVERNMENT WOULD OFFER THOSE REPORTS AS REFERENCED IN THE

23 STIPULATIONS AS GOVERNMENT'S EXHIBIT 160 AND 161.

24       THE COURT:  ALL RIGHT.  THEY'RE ADMITTED.

25         (GOVERNMENT EXHIBITS NUMBER 160 AND 161

1            WERE OFFERED AND ADMITTED INTO EVIDENCE.)

2            MS. WELLS:  THANK YOU VERY MUCH.  THE GOVERNMENT

3 RESTS.

4            THE COURT:  ALL RIGHT.  MEMBERS OF THE JURY, I'M

5 GOING TO HAVE A SHORT CONFERENCE WITH THE LAWYERS.  IF YOU'LL

6 STEP TO THE JURY ROOM AT THIS TIME WE'LL BRING YOU BACK PRETTY

7 SHORTLY.

8            (OUT OF THE PRESENCE OF THE JURY AND ALTERNATES.)

9            THE COURT:  ALL RIGHT.  MR. STEWART, YOU WANT TO

10 MAKE YOUR MOTION, YOUR RULE 29 MOTION?

11           MR. STEWART:  I'M SORRY, YOUR HONOR?

12           THE COURT:  YOU WANT TO MAKE YOUR RULE 29 MOTION?

13           MR. STEWART:  WELL, YOUR HONOR, I WOULD MAKE A

14 MOTION TO DISMISS NOW.

15           THE COURT:  WELL, DO YOU WANT TO ARGUE IT?

16           MR. STEWART:  JUST TO SAY, YOUR HONOR, I DON'T THINK

17 THAT THE GOVERNMENT HAS AT THIS POINT MET THEIR BURDEN TO GO

18 FORWARD.

19           THE COURT:  ANYTHING YOU WANT TO SAY, MS. WELLS?

20           MS. WELLS:  YOUR HONOR, I CERTAINLY THINK THE

21 GOVERNMENT HAS MET THE BURDEN TO GO FORWARD TO -- FOR THE CASE

22 TO EITHER GO TO THE JURY OR FOR THE DEFENSE TO PUT UP THEIR

23 CASE.

24           THE GOVERNMENT HAS PUT FORTH EVIDENCE ON EVERY

25 SINGLE ELEMENT OF EACH COUNT OF THE INDICTMENT IN WHICH MR.

1  LEWIS IS CHARGED AND THAT IS CERTAINLY ENOUGH TO SEND THIS

2  CASE TO THE JURY.

3          I MEAN, THERE'S NO QUESTION THAT THERE'S NOT BEEN

4  EVIDENCE PLACED BEFORE THIS JURY ON EVERY SINGLE ELEMENT OF

5  EVERY CHARGE AND WE'D ASK THE CASE -- THAT THE RULE 29 MOTION

6  BE DENIED AND THE GOVERNMENT ALLOWED TO GO FORWARD.

7          THE COURT:  WELL, I'M GOING TO OVERRULE YOUR

8  OBJECTION -- YOUR MOTION, MR. STEWART.  ARE YOU READY TO GO

9  FORWARD WITH YOUR CASE?

10         MR. STEWART:  YES, YOUR HONOR, I AM READY TO

11 PROCEED.

12         THE COURT:  IF YOU'D ASK THE JURY TO COME BACK.

13         (IN THE PRESENCE OF THE JURY AND ALTERNATES.)

14         THE COURT:  MEMBERS OF THE JURY, THE GOVERNMENT HAS

15 RESTED.  NOW, IT'S TIME FOR THE DEFENDANT TO PUT ON HIS CASE.

16 MR. STEWART.

17         MR. STEWART:  THANK YOU, YOUR HONOR.  THE DEFENSE

18 WOULD CALL JOHN THOMPSON TO THE STAND.

19         THE COURT:  THANK YOU.

20         MADAM CLERK:  I'M SORRY, DID YOU SAY JOHN THOMPSON

21 OR?

22         MR. STEWART:  IT'S JONATHAN THOMPSON, JONATHAN LEE

23 THOMPSON.

24         THE COURT:  IS IT JOHN THOMPSON?

25         MR. STEWART:  YES, YOUR HONOR.  MAY WE APPROACH?

1              THE COURT:  YES, IF YOU'LL COME UP.

2              (BENCH CONFERENCE ON THE RECORD.)

3              THE COURT:  THIS IS THE FELLOW WHO IS INCARCERATED?

4              MR. STEWART:  YEAH, JOHN THOMPSON.

5              THE COURT:  YEAH.  THAT'S RIGHT.  THANK YOU VERY

6  MUCH.  THANK YOU.

7              MR. STEWART:  THANK YOU.

8              MS. WELLS:  THANK YOU.

9              (BENCH CONFERENCE CONCLUDED.)

10        **JONATHAN LEE THOMPSON, DEFENSE WITNESS, SWORN**

11         **D I R E C T   E X A M I N A T I O N**   1:42 P.M.

12  BY MR. STEWART:

13  Q.   MR. THOMPSON, WILL YOU TELL THE JURY WHERE YOU CURRENTLY

14  RESIDE?

15  A.   I RESIDE AT THE BRUNSWICK COUNTY JAIL.

16  Q.   WHAT BLOCK?

17  A.   M.  M BLOCK.

18  Q.   HAVE YOU EVER MET DAVID LEWIS BEFORE?

19  A.   YES, SIR.

20  Q.   WHERE DID YOU MEET HIM?

21  A.   AT THE BRUNSWICK COUNTY JAIL IN M BLOCK.

22  Q.   IN M BLOCK?

23  A.   YES, SIR.

24  Q.   IS HE STILL IN M BLOCK?

25  A.   NO, HE'S NOT.

1  Q.   ARE YOU FAMILIAR WITH ANY OF HIS CO-DEFENDANTS?

2  A.   YES, SIR.

3  Q.   HOW DO YOU KNOW THEY'RE CO-DEFENDANTS OF MR. LEWIS?

4  A.   THEY RESIDE IN THE SAME BLOCK THAT I DO.

5  Q.   HAVE YOU HEARD ANY OF THEM DISCUSS THIS CASE?

6  A.   A COUPLE OF THEM, YES.

7  Q.   WHO HAVE YOU HEARD DISCUSS IT?

8  A.   BARRY MILLER, KEVIN HALPIN AND RANDY MOORE.

9  Q.   HAVE YOU HEARD AARON SIMMONS SAY ANYTHING?

10         MS. WELLS:  I'M GOING TO OBJECT TO LEADING, YOUR

11 HONOR.

12         THE COURT:  OVERRULED.

13         MS. WELLS:  THANK YOU.

14         THE WITNESS:  I CAN'T SAY THAT I HAVE, NO.

15 BY MR. STEWART:

16 Q.   KELVIN (SIC) HALPIN, WHAT HAVE YOU HEARD HIM SAY ABOUT

17 THIS CASE?

18 A.   HE SPOKE QUITE A BIT ABOUT IT.  WE WORKOUT TOGETHER AND

19 HE TALKS TO ME A LOT.

20         THE COURT:  LET ME SEE COUNSEL JUST FOR A SECOND.

21         (BENCH CONFERENCE ON THE RECORD.)

22         MR. STEWART:  YES, SIR.

23         THE COURT:  ARE YOU GOING TO INTRODUCE HIS

24 STATEMENTS AS TO WHAT THESE PEOPLE SAID?

25         MR. STEWART:  AM I GOING TO -- I'M SORRY, YOUR

1 HONOR, I DIDN'T FOLLOW YOU.

2          THE COURT:  IS THAT GOING TO BE A HEARSAY PROBLEM?

3          MS. WELLS:  I THINK, YOUR HONOR -- I MEAN, HE'S

4 TESTIFYING TO SOMETHING THAT SOMEBODY ELSE TOLD HIM.  SO, I

5 MEAN, THAT'S THE DEFINITION -- THAT'S HEARSAY.

6          THE COURT:  THAT'S THE WAY IT WOULD SEEM TO ME.

7          MR. STEWART:  WELL, YOUR HONOR, AT LEAST AS OF RIGHT

8 NOW WE'RE TALKING ABOUT KEVIN HALPIN WHO HAS ALREADY TESTIFIED

9 AND ALL OF THESE FOLKS ARE AVAILABLE TO TESTIFY AND ON THE

10 WITNESS, BUT RIGHT NOW I'VE JUST KEPT IT TO KEVIN HALPIN.

11          THE COURT:  WELL, I STILL DON'T SEE HOW YOU -- I

12 MEAN, THE FACT THAT HE'S TESTIFIED DOESN'T MEAN IT'S NOT

13 HEARSAY.

14          MR. STEWART:  WELL, I CAN RECALL HIM IF --

15          THE COURT:  YOU CAN RECALL HIM, SURE.

16          MR. STEWART:  IF I NEED TO RECALL KEVIN THAN I CAN

17 AND WILL.

18          MS. WELLS:  WELL, YOUR HONOR, LIKE I SAID, I THINK

19 THERE'S A HEARSAY -- I MEAN, I --

20          THE COURT:  I'M SORRY?

21          MS. WELLS:  THAT'S OKAY.

22          THE COURT:  LET ME GET MY --

23          (PAUSE.)

24          MS. WELLS:  I THINK IT'S -- I MEAN, OBVIOUSLY, IT'S

25 HEARSAY.  I DON'T KNOW OF A DEFINITION OF -- I DON'T KNOW OF A

1 HEARSAY EXCEPTION THAT THIS FALLS INTO WHERE IT WOULD BE

2 ADMISSIBLE.  IT'S NOT -- I MEAN, I DON'T KNOW -- I CAN'T THINK

3 OF A HEARSAY EXCEPTION THAT THIS WOULD FALL INTO THAT WOULD

4 ALLOW IT TO COME IN.

5          MR. STEWART:  WELL, YOUR HONOR --

6          MS. WELLS:  I MEAN, I CAN GO BACK AND LOOK AND I'M

7 HAPPY TO DO THAT.

8          MR. STEWART:  WE'RE ABLE TO CROSS-EXAMINE ANY OF THE

9 FOLKS HE TESTIFIES TO WHAT THEY WERE SAYING AND THAT'S --

10          THE COURT:  YEAH, YOU CAN CALL HIM BACK IN HERE AND

11 TALK TO HIM.

12          MR. STEWART:  YES, SIR, THEN I THINK THAT'S HOW WE

13 GET AROUND THE HEARSAY AND IF I HAVE TO DO THAT I'M MORE THAN

14 WILLING TO.

15          THE COURT:  WELL, THAT'S THE ONLY WAY I SEE IT CAN

16 BE DONE.

17          MR. STEWART:  YES, SIR.

18          LAW CLERK:  COULD I TALK TO HIM FOR A SECOND?

19          MS. WELLS:  YEAH.  YEAH, YEAH, YEAH.

20          MR. STEWART:  DO YOU WANT US --

21          LAW CLERK:  YEAH, IF YOU DON'T MIND.

22          MR. STEWART:  YES, MA'AM.

23          (BENCH CONFERENCE CONCLUDED.)

24          (COURT CONFERS WITH LAW CLERK.)  (PAUSE.)

25          THE COURT:  LET ME SEE COUNSEL AGAIN.

1          (BENCH CONFERENCE ON THE RECORD.)

2          THE COURT:  WELL, IT SEEMS TO ME THAT YOU'D HAVE TO

3 CALL THOSE FOLKS TO EXAMINE THEM.

4          MR. STEWART:  FIRST?  I MEAN, THEY OBVIOUSLY --

5          THE COURT:  HE'S GOING TO SAY WHAT SOMEBODY ELSE

6 TOLD HIM.

7          MR. STEWART:  THAT'S EXACTLY RIGHT.  IF I NEED TO

8 CALL THEM FIRST, YOUR HONOR, I CERTAINLY CAN.

9          THE COURT:  WELL, THAT'S WHAT I THINK YOU HAVE TO DO

10 AS I SEE IT.

11          MR. STEWART:  YES, SIR.

12          THE COURT:  DO YOU SEE ANY OTHER WAY?

13          MS. WELLS:  WELL, YOUR HONOR, THE ONLY WAY I COULD

14 SEE IS THAT IF IT WERE CONSIDERED A PRIOR INCONSISTENT

15 STATEMENT, BUT, I MEAN, YOU KNOW, AT THIS POINT, I DON'T THINK

16 THAT'S WHAT IT IS.

17          I MEAN, THEY WERE QUESTIONED ABOUT IT.  THEY

18 ADMITTED THAT THEY KNEW HIM.  THEY ADMITTED -- YOU KNOW, AND

19 THEY SAID THAT, BUT I DON'T THINK THAT'S INCONSISTENT WITH --

20 I DON'T THINK THAT REACHES -- I MEAN, I WENT BACK AND GRABBED

21 MY EVIDENCE BOOK, BUT, YOU KNOW --

22          THE COURT:  I DON'T -- IT SEEMS TO ME YOU'VE GOT A

23 PROBLEM -- IT'S JUST A STRAIGHT HEARSAY PROBLEM.

24          MR. STEWART:  WELL, THEN, WHAT I PLAN TO DO, YOUR

25 HONOR, IS STOP ON THIS WITNESS AND CALL THE THREE HE'S GOING

1 TO TESTIFY TO.  IN THE MEANTIME, I HAVE OTHER WITNESSES I CAN

2 CALL.

3          MS. WELLS:  WELL, YOUR HONOR, AT THIS POINT, I WOULD

4 OBJECT TO CALLING WITNESSES -- I MEAN, AT THIS POINT I DON'T

5 -- I THINK IT WOULD SEEK TO CONFUSE THE JURY IF WE TALKED --

6 IF WE BROUGHT MR. MOORE --

7          THE COURT:  IF HE WANTS TO CALL HIM, HE CAN CALL

8 HIM.

9          MS. WELLS:  -- AND OTHER WITNESSES WHO DIDN'T -- THE

10 GOVERNMENT DIDN'T BRING TO TESTIFY.  I THINK THAT WOULD

11 CONFUSE THE JURY AS TO THE ISSUE.

12          THE COURT:  IF HE WANTS TO CALL A WITNESS HE CAN DO

13 THAT.

14          MS. WELLS:  THIS IS TRUE.

15          THE COURT:  WELL, DO YOU HAVE OTHER WITNESSES YOU

16 CAN GO AHEAD WITH NOW?

17          MR. STEWART:  ABSOLUTELY, YOUR HONOR.

18          THE COURT:  OKAY.  LET'S DO THAT.

19          MR. STEWART:  YES, SIR.  I'LL BE MORE THAN HAPPY TO.

20          THE COURT:  DO YOU HAVE ANYTHING ELSE FOR THIS

21 FELLOW?

22          MR. STEWART:  NOT TODAY UNLESS SHE HAD -- FOR ANY

23 REASON NEEDS TO CROSS ON WHAT WAS ALREADY SAID.

24          MS. WELLS:  NO.

25          THE COURT:  OKAY.  THANK YOU.  THANK YOU VERY MUCH.

1          MR. STEWART:  YES, YOUR HONOR.  THANK YOU, SIR.

2          THE COURT:  IF YOU'LL CALL YOUR NEXT WITNESS.

3          MR. STEWART:  YES, SIR.

4          (BENCH CONFERENCE CONCLUDED.)

5          THE COURT:  WE'RE GOING TO CALL ANOTHER WITNESS AT

6   THIS TIME.  I'VE GOT SOMETHING I'VE GOT TO WORK OUT HERE.

7          ALL RIGHT, MR. STEWART, IF YOU'LL CALL YOUR NEXT

8   WITNESS.

9          MR. STEWART:  THANK YOU, YOUR HONOR.  SHE'S OUT IN

10  THE HALL.  IF I MAY GO TELL HER TO COME IN, PLEASE.

11         THE COURT:  THANK YOU.

12         **CATHY LEWIS, DEFENSE WITNESS, SWORN**

13         **D I R E C T   E X A M I N A T I O N**   1:48 P.M.

14  BY MR. STEWART:

15  Q.   GOOD AFTERNOON, MS. LEWIS.

16  A.   GOOD AFTERNOON.

17  Q.   YOU DOING ALL RIGHT?

18  A.   OKAY.

19  Q.   MS. LEWIS, WOULD YOU INTRODUCE YOURSELF TO THE JURY?

20  A.   I'M CATHY LEWIS, THE WIFE OF DAVID LEWIS.

21  Q.   MS. LEWIS, HOW LONG HAVE YOU KNOWN DAVID?

22  A.   11 YEARS.

23  Q.   WHERE DID YOU FIRST MEET HIM?

24  A.   WE WERE NEIGHBORS.  HIS DAUGHTER ACTUALLY LIVED IN

25  BETWEEN US.  ACTUALLY, WENT OUT ON A DATE.  I HAD BEEN

1  SEPARATED AND IN THE PROCESS OF A DIVORCE FROM MY HUSBAND.

2  ACTUALLY, I BELIEVE I WAS DIVORCED -- I WAS DIVORCED AT THAT

3  TIME WHEN I MOVED.  AND SO, WE DID ARRANGE A DATE BECAUSE I

4  KNEW HIS DAUGHTER VERY WELL AND THEN COFFEE AND THAT TYPE OF

5  THING.

6  Q.   DID YOU EVENTUALLY GET MARRIED?

7  A.   YES.

8  Q.   DO YOU RECALL WHAT YEAR YOU GOT MARRIED?

9  A.   2001.

10 Q.   DID YOU AND DAVID TALK ABOUT HIS PAST?

11 A.   YES.

12 Q.   AND YOU UNDERSTOOD THAT HE WAS ON SUPERVISED PROBATION?

13 A.   YES.

14 Q.   DO YOU KNOW HOW LONG THAT PROBATION WAS SUPPOSED TO LAST?

15 A.   WELL, NORTH CAROLINA SAID FIVE YEARS.

16          MS. WELLS:  OBJECTION.  OBJECTION TO WHAT NORTH

17 CAROLINA SAID.  DOES SHE KNOW.

18          THE WITNESS:  OH.  OH.  I APOLOGIZE.

19          THE COURT:  DO YOU KNOW?

20          THE WITNESS:  FIVE YEARS I THOUGHT.  IS THAT THE

21 BETTER ANSWER?

22 BY MR. STEWART:

23 Q.   IF YOU KNOW, TELL US.  IF YOU DON'T JUST SAY I DON'T

24 KNOW.

25 A.   OKAY.  WELL, I WASN'T SURE.  WE THOUGHT FIVE YEARS.

1  Q.    DID YOU EVER GO OUT TO DAVID'S CORVETTE SHOP?

2  A.    YES.

3  Q.    HOW LONG DID HE HAVE A CORVETTE SHOP?

4  A.    EXACTLY WHEN WE MOVED IN.

5  Q.    WHEN DID YOU MOVE IN TOGETHER?

6  A.    I'M SORRY?

7  Q.    WHEN DID YOU AND DAVID MOVE IN TOGETHER?

8  A.    WHEN DID WE GET MARRIED?

9  Q.    YES, MA'AM.  YOU SAID 2001.  IS THAT WHEN YOU MOVED IN

10 TOGETHER?

11 A.    THAT'S WHEN WE GOT MARRIED, 2001.

12 Q.    DID YOU IMMEDIATELY MOVE INTO YOUR HOUSE IN LUCAMA?

13 A.    NO.

14 Q.    WHERE DID YOU LIVE PRIOR TO LIVING IN LUCAMA?

15 A.    WE WERE IN SHARPSBURG.  SHARPSBURG, NORTH CAROLINA.

16 Q.    WHAT DID DAVID DO WHILE YOU LIVED IN SHARPSBURG?

17 A.    HE WORKED ON CORVETTES.

18 Q.    WHERE?

19 A.    THERE WERE A COUPLE OF PLACES THAT RENTED HIM OUT A

20 BUILDING TO WORK IN.  I THINK INITIALLY HE MAY HAVE STARTED

21 ONE CAR RIGHT WHERE HE LIVED AND THEN MOVED INTO A SHOP.  TWO

22 SHOPS I THINK HE WORKED IN IN LUCAMA -- I MEAN, IN SHARPSBURG.

23 Q.    WHEN DID YOU MOVE TO LUCAMA?

24 A.    THREE OR FOUR YEARS LATER.  I'M HONESTLY NOT GOOD WITH

25 YEARS OR NUMBERS.  I DON'T KNOW THE SQUARE FOOTAGE OF MY

HOUSE. I DON'T KNOW THE EXACT DATE. BUT MAYBE FOUR YEARS

AFTER WE WERE MARRIED APPROXIMATELY.

Q. DID DAVID IMMEDIATELY BEGIN WORKING ON CORVETTES AT HIS

SHOP?

A. ACTUALLY, HE CAME WITH TWO CARS AND BECAUSE WE WERE ON A

HIGHWAY PEOPLE PUT HIM IN BUSINESS. HE DIDN'T SET OUT TO OPEN

A CORVETTE SHOP, BUT THEY JUST SAW THE CORVETTES AND IT'S A

SPECIALTY CAR AND PEOPLE STARTED CALLING AND COMING AND NEXT

THING YOU KNOW THE ZONING BOARD TOLD US WE BETTER GO IN

BUSINESS.

Q. DID YOU FILE ANY AND ALL PAPERWORK TO BE A BUSINESS?

A. YES. YES.

Q. DID YOU AND DAVID PUT A SIGN UP ON THE SHOP?

A. ACTUALLY, HE NEVER HAD TO PUT A SIGN UP OR ADVERTISE IN

THE PHONE BOOK OR NEWSPAPER. PEOPLE JUST SAW THE CARS AND THE

REPUTATION AND IT GREW. HE NEVER ADVERTISED.

Q. DO YOU KNOW A GENTLEMAN BY THE NAME OF SHANNON GRIMES?

A. I KNOW HIM AS MENTIONED FROM MY DAUGHTER AND STEPHANIE

AND SOME OF THE OTHERS, BUT I MET HIM, BUT I CERTAINLY DON'T

KNOW HIM WELL.

Q. DID YOU EVER SEE HIM OUT AT THE SHOP?

A. I BELIEVE I DID. PRIOR TO DAVID BUYING SOME CORVETTE

THINGS FROM A BUSINESS THAT WAS GOING OUT, I THINK HE CAME AT

THAT TIME AND HELPED MOVE. DAVID MADE THE PURCHASE SO WE HAD

TO GO TO NEW BERN TO GET THE MATERIALS AND MOVE, AND I BELIEVE

1 HE WAS THERE DURING THAT SPELL AND I'M NOT SURE OF ANY OTHER

2 TIME OTHER THAN THAT.

3 Q.   WHAT ABOUT A YOUNG LADY BY THE NAME OF STEPHANIE SMITH,

4 DO YOU KNOW HER?

5 A.   YES.

6 Q.   HOW DO YOU KNOW HER?

7 A.   INITIALLY, I KNEW STEPHANIE AS AN EMPLOYEE OF MY HUSBAND.

8 SHE CAME TO WORK FOR HIM AND WAS AT ONE TIME A VERY GOOD --

9 VERY GOOD EMPLOYEE.  SHE WAS MECHANICALLY INCLINED AND SHE WAS

10 ARTISTIC.  SHE WORKED ON THE INTERIOR OF THE CARS AND PAINT

11 AND DETAIL AND SHE WAS VERY GOOD.  DO YOU NEED TO KNOW MORE?

12 Q.   I DO.  I DON'T WANT YOU TO JUST GO ON.

13 A.   OKAY.

14 Q.   BUT I'LL ASK QUESTIONS IF THAT'S ALL RIGHT?

15 A.   SURE.

16 Q.   DO YOU RECALL WHEN STEPHANIE FIRST CAME TO YOUR PROPERTY?

17 A.   EXACTLY -- ONCE AGAIN, I'M NOT GOOD WITH DATES AND

18 NUMBERS, BUT POSSIBLY A YEAR AFTER DAVID HAD BEEN WORKING ON

19 CORVETTES.

20 Q.   DO YOU KNOW WHY SHE CAME TO THE SHOP?

21 A.   SEEKING EMPLOYMENT.

22 Q.   DO YOU HAVE ANY KNOWLEDGE ON WHETHER SHE DELIVERED METH

23 TO ANYONE AT THE SHOP WHEN SHE CAME?

24 A.   NO.

25 Q.   DID SHE SPEAK WITH YOU ABOUT EMPLOYMENT, YOU AND DAVID,

1 OR JUST DAVID?

2 A.   I DON'T REMEMBER STEPHANIE SPEAKING WITH ME ABOUT IT, NO.

3 Q.   DID DAVID SPEAK WITH YOU ABOUT HIRING HER?

4 A.   I BELIEVE HE DID.

5 Q.   DO YOU RECALL HOW LONG SHE WORKED AT THE CORVETTE SHOP?

6 A.   SHE CAME AND WENT A COUPLE OF TIMES, BUT I DON'T KNOW, I

7 WOULD SAY MAYBE A YEAR INITIALLY.  I REALLY DON'T KNOW.

8 Q.   HOW MANY TIMES WOULD YOU SAY SHE CAME AND WENT FROM

9 EMPLOYMENT?

10 A.   WELL, I'M SAYING I DON'T THINK SHE HELD -- I DON'T KNOW

11 WHAT SHE DID TO BE HONEST WITH YOU.  I DON'T KNOW WHAT ELSE

12 SHE MAY OR MAY NOT HAVE DONE.  I KNOW THAT INITIALLY SHE CAME,

13 SHE DID A GOOD JOB, SHE WAS THERE REGULAR AS FAR AS I KNOW,

14 SHE DID WHAT SHE WAS SUPPOSED TO DO.

15         I REALLY DON'T REMEMBER WHEN SHE LEFT.  I KNOW THE

16 LAST TIME SHE ATTEMPTED TO COME BACK --

17 Q.   WHEN WAS THE LAST TIME SHE ATTEMPTED TO COME BACK AND WHY

18 DID YOU SAY ATTEMPTED?

19 A.   WELL, I SAY ATTEMPTED BECAUSE SHE ASKED DAVID IF SHE

20 COULD COME BACK, SAID SHE HAD BEEN IN TROUBLE WITH THE LAW,

21 SHE WAS ON PROBATION.  SHE HAD A PROBATION OFFICER AND NEEDED

22 TO MAKE PAYMENTS TO THAT PROBATION OFFICER, AND PLEASE LET ME

23 COME BACK TO WORK.

24         I KNOW THAT SHE BEGGED HIM A HALF A DOZEN TIMES OR

25 MORE TO PLEASE LET HER DO THIS BECAUSE I OBJECTED TO IT.  I

1  WASN'T FOND OF THE IDEA.  BUT EVENTUALLY DAVID TALKED -- DAVID

2  AND I DISCUSSED IT AND WE AGREED THAT SHE COULD COME BACK AND

3  THAT WAS IN APRIL.

4          THE REASON I KNOW THAT DATE SO WELL IS BECAUSE I

5  ACTUALLY RECORDED IT.  NEITHER ONE OF US ACTUALLY FIGURED IT

6  WOULD WORK OUT FOR VERY LONG AND SO I WROTE HER TIMES DOWN

7  WHEN SHE CAME AND THOSE DAYS.  AND I THINK IT WAS A DURATION

8  OF ABOUT TEN DAYS.

9  Q.   THAT SHE CAME AND WORKED FOR YOU?

10 A.   THAT SHE CAME AND WORKED FOR DAVID OFF AND ON.

11 Q.   WHY DID YOU RECORD THE TIMES THAT SHE WOULD COME?

12 A.   WELL, BECAUSE I JUST DIDN'T BELIEVE THAT IT WOULD WORK

13 OUT.

14 Q.   WHY DID YOU NOT THINK IT WOULD WORK OUT AND WHAT DO YOU

15 MEAN BY WORK OUT?

16 A.   WELL, I MEAN, SHE SAID SHE WANTED TO DO THE RIGHT THINGS.

17 SHE TOLD DAVID SHE WANTED TO DO THE RIGHT THINGS.

18          MS. WELLS:  YOUR HONOR, I'M GOING TO OBJECT.

19          THE COURT:  SUSTAINED.

20 BY MR. STEWART:

21 Q.   DID STEPHANIE SMITH EVER BRING ANYBODY YOU OR DAVID DID

22 NOT KNOW TO YOUR PROPERTY?

23 A.   YES.

24 Q.   WHO DID SHE BRING TO YOUR PROPERTY THAT YOU DID NOT KNOW?

25 A.   SHE BROUGHT A GENTLEMAN BY THE NAME OF MALACHI AND I'M

1 NOT SURE OF HIS LAST NAME.

2 Q.   DID SHE BRING ANYONE ELSE WITH MALACHI?

3 A.   NOT THAT I'M AWARE OF.

4 Q.   DID SHE TELL YOU WHO MALACHI WAS?

5        MS. WELLS:  I'M GOING TO OBJECT.

6        THE COURT:  SUSTAINED.

7 BY MR. STEWART:

8 Q.   DID YOU KNOW MALACHI PRIOR TO THIS?

9 A.   NO.

10 Q.   DID YOU EVER SPEAK WITH MALACHI?

11 A.   PRIOR -- I MEAN, WHEN HE WAS AT MY -- ON MY PROPERTY I

12 SPOKE WITH HIM.

13 Q.   HOW LONG DID HE STAY ON YOUR PROPERTY?

14 A.   I'M THINKING ABOUT A WEEK.

15 Q.   DO YOU RECALL WHEN HE FIRST CAME TO YOUR PROPERTY?

16 A.   DATES?

17 Q.   YES, MA'AM.

18 A.   OKAY.  I'M GOING TO HAVE TO THINK BACK ON IT.  FEBRUARY

19 OF 2010, IS WHEN HIS BROTHER WAS -- AND HE WERE ARRESTED.  SO,

20 FEBRUARY.

21 Q.   FEBRUARY OF?

22 A.   2010.  IS THAT CORRECT ON THE DATE?  I'M SORRY.  I THINK

23 IT IS.

24 Q.   WHERE DID MALACHI STAY ON YOUR PROPERTY?

25 A.   HE STAYED IN MY HUSBAND'S SHOP.

1 Q.   DID HE DO ANY WORK WHILE HE WAS IN THE SHOP THAT YOU KNOW

2 OF?

3 A.   I THOUGHT HE DID.  I MEAN, IT'S MECHANICAL WORK AND I

4 DON'T KNOW, BUT AS FAR AS I KNEW I THOUGHT HE WAS HELPING HIM

5 OUT.

6 Q.   WHERE WAS DAVID WHEN MALACHI FIRST CAME TO YOUR PROPERTY?

7 A.   CAN YOU REPHRASE THE QUESTION?  YOU MEAN --

8 Q.   WAS DAVID WORKING IN THE GARAGE WHEN MALACHI SHOWED UP?

9 A.   YES.

10 Q.   DID DAVID EVER STOP WORKING IN THE GARAGE WHEN MALACHI

11 AND HIS BROTHER WERE THERE?

12 A.   TO MY KNOWLEDGE, HIS BROTHER WAS ONLY THERE ONE DAY.

13 Q.   WHAT DAY WAS HIS BROTHER THERE TO YOUR KNOWLEDGE?

14 A.   THE DAY THAT THEY CAME AND ARRESTED HIM.  AND I DON'T

15 THINK THEY HAD COME TO ARREST HIM, BUT, ANYWAY, I GUESS THAT'S

16 DETAILS YOU'LL GET LATER.

17 Q.   DO YOU KNOW HIS BROTHER'S NAME?

18 A.   I MET HIS BROTHER ABOUT -- BRIEFLY ABOUT FIVE MINUTES SO

19 I'M THINKING PHILLIP.  IS THAT RIGHT?

20 Q.   DID YOU SAY YOU MET PHILLIP FOR FIVE MINUTES?

21 A.   YES.

22 Q.   YOU HAD NEVER SEEN HIM BEFORE?

23 A.   NO.

24 Q.   IN AN AVERAGE WEEK, HOW OFTEN WOULD YOU SAY YOU WENT OUT

25 TO THE CORVETTE SHOP?

1 A.   WELL, I DIDN'T STAY OUT THERE BECAUSE I HAVE C.O.P.D. AND

2 THERE ARE A LOT OF FUMES AND CHEMICALS AND THINGS LIKE THAT

3 AND PAINT AND SO I DIDN'T HANG OUT AT THE SHOP, BUT I

4 CERTAINLY WENT OUT THERE.  I WON'T SAY I WENT OUT EVERY SINGLE

5 DAY.  SOME DAYS I WORKED AND WAS AWAY FROM HOME.  BUT, I MEAN,

6 IT WAS CLOSE ENOUGH THAT I COULD GO OUT THERE WHENEVER I FELT

7 LIKE IT.

8 Q.   WHEN YOU WENT TO THE CORVETTE SHOP, DID YOU EVER SEE

9 ANYONE INGEST, SMOKE, SNORT ANY TYPE OF METHAMPHETAMINE?

10 A.   NO.

11 Q.   WERE YOU AWARE OF STEPHANIE'S METHAMPHETAMINE ADDICTION?

12 A.   BECAUSE OF NEWS OF IT.  I HEARD -- IF THIS DOESN'T GET

13 OBJECTED -- I HEARD THAT SHE BEEN --

14          MS. WELLS:  OBJECTION.

15          THE WITNESS:  OKAY.  HEARD OF HER BUST.

16 BY MR. STEWART:

17 Q.   DID HE EVER SPEAK WITH STEPHANIE ABOUT IT?

18 A.   NO.

19 Q.   DID YOU EVER PRAY FOR STEPHANIE?

20 A.   YES.

21 Q.   WHY DID YOU DO THAT?

22 A.   WELL, BECAUSE THE ONES THAT NEED LOVE THE MOST DESERVE IT

23 THE LEAST.  AND THERE WAS A RELATIONSHIP THAT WE HAD WITH

24 STEPHANIE THROUGH A GRANDCHILD AND I WANTED THE BEST FOR HER.

25 Q.   WHAT WAS THE GRANDCHILD'S NAME?

1 A.    ABBY.  ABIGAIL.

2 Q.    AND THAT'S STEPHANIE'S CHILD AND WHO ELSE'S?

3 A.    MY SON.

4 Q.    WHAT YEAR DID YOUR SON PASS?

5 A.    LAST YEAR.

6 Q.    WHO IS TAKING CARE OF ABIGAIL NOW?

7 A.    HIS WIDOW.

8 Q.    DO YOU KNOW AARON SIMMONS?

9 A.    YES.

10 Q.    HOW DO YOU KNOW HIM?

11 A.    HE'S MY SON-IN-LAW.

12 Q.    AND WHO IS HE MARRIED TO?

13 A.    MY DAUGHTER VALERIE.

14 Q.    ARE YOU AWARE THAT EITHER VALERIE OR AARON HAD A METH

15 PROBLEM?

16 A.    YES.

17 Q.    HOW DID YOU BECOME AWARE THAT THEY HAD A METH PROBLEM?

18 A.    WELL, IT WASN'T ANYTHING VERBALLY SPOKEN TO ME.  MY

19 DAUGHTER -- I'M TRYING TO DECIDE AT WHAT POINT IN TIME

20 ACTUALLY -- SHE ACTUALLY SAID.  AND I DON'T REALLY KNOW THAT

21 SHE ACTUALLY SAID BEFORE SHE CAME AND MOVED IN WITH ME.

22 Q.    WHEN DID SHE MOVE IN WITH YOU?

23 A.    JUNE OF 2010.

24 Q.    WHY DID SHE MOVE IN WITH YOU?

25 A.    SHE CALLED ME AND SAID I'VE GOT TO GET OUT OF HERE, I'M

1 SCARED FOR MY LIFE AND I'M SCARED FOR THE CHILDREN.

2        MS. WELLS:  I'M GOING TO OBJECT TO WHAT SHE SAID

3 SPECIFICALLY.

4        THE COURT:  I'M SORRY?

5        MS. WELLS:  I'M GOING TO OBJECT TO WHAT MS. VALERIE

6 SIMMONS SAID SPECIFICALLY.

7        THE COURT:  SUSTAINED.

8 BY MR. STEWART:

9 Q.   HOW LONG DID VALERIE LIVE WITH YOU?

10 A.   IT'S BEEN OVER A YEAR NOW.  WELL, I GUESS YOU CAN'T COUNT

11 THE FEW MONTHS THAT SHE HAS BEEN LOCKED UP.

12 Q.   AFTER SHE MOVED IN, DID YOU BECOME AWARE OF A METH

13 PROBLEM?

14 A.   YES.

15 Q.   DID YOU OR DAVID TAKE ANY STEPS TO TRY TO REMEDY THE

16 PROBLEM?

17 A.   ASKED TO AND TRIED TO DO WHAT I COULD.

18 Q.   WHAT DID YOU TRY TO DO?

19 A.   WELL, WE STARTED BY TRYING TO MAKE PHONE CALLS TO

20 REHABILITATION PLACES THAT -- ANYWHERE I WANTED -- MAY HAVE

21 WANTED MY DAUGHTER TO BE WAS OUT OF POCKETBOOK RANGE.

22        BUT WE LOOKED FOR THINGS ON THE INTERNET, FOODS THAT

23 SHE COULD TAKE, PRAYER DEFINITELY, TRYING TO JUST TAKE HER AND

24 DO WHATEVER SHE MIGHT WANT ME TO DO, LET HER SLEEP AND LET HER

25 REST AND TRY -- I DON'T KNOW.  I MEAN, JUST WHATEVER COULD BE

1 DONE FROM HOME.

2 Q.    DID AARON EVER COME OVER WHILE SHE WAS THERE?

3 A.    YES.

4 Q.    DID YOU EVER WITNESS AN ALTERCATION BETWEEN HER AND

5 AARON?

6           MS. WELLS:  I'M GOING TO OBJECT TO RELEVANCE.

7           THE COURT:  WELL, LET ME SEE COUNSEL JUST FOR A

8 SECOND.

9           (BENCH CONFERENCE ON THE RECORD.)

10          MS. WELLS:  JUDGE, HERE'S MY PROBLEM WITH HER

11 TESTIMONY, SHE'S NOTICED AS AN ALIBI WITNESS.  THAT'S IT.  I

12 DON'T HAVE ANY STATEMENT FROM HER.  I DON'T HAVE ANY OTHER

13 INFORMATION ON ANYTHING THAT SHE'S TESTIFYING ABOUT.  SHE WAS

14 NOTICED AS AN ALIBI WITNESS TO ALIBI HIM FOR FEBRUARY THE 8TH,

15 AND JUST PRIOR TO THAT.  NOTHING ELSE.

16          SO, I'M OBJECTING NOT ONLY TO THIS ABOUT THE TOTALLY

17 IRRELEVANT -- WHETHER OR NOT THERE WAS AN ALTERCATION BETWEEN

18 AARON AND VALERIE, BUT ALSO --

19          THE COURT:  WELL --

20          MS. WELLS:  I MEAN, THAT'S ALL SHE WAS NOTICED AS.

21          THE COURT:  EXCUSE ME.

22          MS. WELLS:  YES, SIR, YOUR HONOR.

23          THE COURT:  HE HAS TO GIVE YOU NOTICE OF AN ALIBI

24 WITNESS.

25          MS. WELLS:  YES, SIR.

1          THE COURT:  HE DOESN'T HAVE TO GIVE NOTICE ABOUT

2  ANYBODY ELSE.

3          MS. WELLS:  SO --

4          THE COURT:  RIGHT?

5          MS. WELLS:  I'M SORRY, I DON'T THINK I COMPLETELY

6  UNDERSTOOD.

7          THE COURT:  HE HAS TO GIVE YOU NOTICE OF AN ALIBI

8  WITNESS.

9          MS. WELLS:  RIGHT.

10          THE COURT:  HE DOESN'T HAVE TO GIVE YOU NOTICE ABOUT

11  ANY OTHER WITNESS.

12          MS. WELLS:  NO.  NO, NOT UNTIL WE EXCHANGE WITNESS

13  LISTS.  I AGREE.

14          THE COURT:  OKAY.  NOW, WHAT'S THE RELEVANCE?

15          MR. STEWART:  YOUR HONOR, HE HAS TESTIFIED TO THIS.

16  NOW, I DIDN'T GO INTO GREAT DETAIL, BUT I WANT TO MAKE SURE

17  HIS STORY AND HERS COMPORT BECAUSE I THINK IT'S GOING TO BE A

18  LITTLE DIFFERENT THAN WHAT HE TESTIFIED TO.

19          MS. WELLS:  AND --

20          THE COURT:  WHO'S THE MAN?

21          MR. STEWART:  AARON SIMMONS, YOUR HONOR.

22          THE COURT:  WELL, YOU CAN ASK HER ANYTHING SHE'S

23  SEEN OR KNOWS.

24          MR. STEWART:  YES, SIR, THAT'S WHAT I'M GOING TO

25  STICK TO AND I THINK IT'S GOING TO CONTRACT WHAT HE SAID.

1          THE COURT:  WELL, DO YOU HAVE A PROBLEM WITH THAT?

2          MS. WELLS:  AGAIN, I DON'T THINK IT'S RELEVANT.  I

3 MEAN --

4          THE COURT:  IF HE'S MADE A PRIOR INCONSISTENT OR

5 CONDUCT THAN WHAT HE'S TESTIFIED TO.

6          MS. WELLS:  AND NOT TO ANYTHING MATERIAL.

7          THE COURT:  I'M SORRY?

8          MS. WELLS:  I SAID I DON'T THINK IT'S TO ANYTHING

9 MATERIAL.

10          THE COURT:  OVERRULED.

11          MS. WELLS:  OKAY.  THANK YOU.

12          MR. STEWART:  THANK YOU, YOUR HONOR.

13          (BENCH CONFERENCE CONCLUDED.)

14          THE COURT:  THANK YOU, COUNSEL.

15 BY MR. STEWART:

16 Q.   MS. LEWIS, DID YOU SEE AN ALTERCATION BETWEEN AARON AND

17 VALERIE?

18 A.   YES.

19 Q.   WHAT HAPPENED?

20 A.   HE TRIED TO CHOKE HER.  IS THAT WHAT YOU'RE ASKING ABOUT?

21 Q.   WHATEVER YOU OBSERVED.

22 A.   OKAY.  TWO TIMES ON MY PROPERTY.  ONCE WITH A PIECE OF

23 BROKEN GLASS.  SHE CAME RUNNING INTO THE HOUSE SCARED FOR HER

24 LIFE, HE'S TRYING TO KILL ME.  AND THE SECOND TIME, ON THE

25 KITCHEN FLOOR CHOKING HER.

1 Q.   ON THE KITCHEN FLOOR, WAS DAVID AROUND?

2 A.   HE WAS OUTSIDE.

3 Q.   DID DAVID EVER REMOVE AARON?

4 A.   HE DID COME IN THE HOUSE, YES, AND MAKE THE PEACE.

5 Q.   MS. LEWIS, DO YOU RECALL DAVID EVER BREAKING HIS NOSE?

6 A.   YES.

7 Q.   WHEN DID THAT HAPPEN AND HOW DID IT HAPPEN?

8 A.   IT WAS AN ACCIDENT AT THE SHOP.  AARON ACCIDENTALLY HIT

9 HIM TRYING TO WORK ON A PIECE OF METAL TOGETHER AND BROKE HIS

10 NOSE IN FOUR PLACES WITH A SLEDGEHAMMER.

11 Q.   DID DAVID HAVE TO GO TO THE DOCTOR?

12 A.   YES.

13 Q.   DO YOU KNOW OF ANY OTHER PERMANENT INJURIES DAVID HAS

14 EVER SUSTAINED FROM WORK?

15 A.   FROM WORK AT THE CORVETTE SHOP?

16 Q.   FURTHER BACK.

17 A.   FURTHER BACK.  YES.

18 Q.   WHAT INJURY DID HE SUSTAIN?

19 A.   AN AIR PLANE WING FELL ON HIS HEAD AND DID SEVERE NERVE

20 DAMAGE.

21 Q.   DOES HE HAVE TO GET ANY TYPE OF TREATMENT -- ONGOING

22 TREATMENT FOR THAT?

23 A.   YES.

24 Q.   WHAT KIND OF TREATMENT DOES HE HAVE TO GET?

25 A.   HE'S HAD A COUPLE OF SURGERIES.  IN NEED OF ANOTHER ONE.

1 DIFFERENT STAGES OF TIME, HE HAS HAD REHABILITATION.  NOT EVEN

2 ABLE TO PICK UP A COFFEE MUG OR ANYTHING LIKE THAT.  HAS HAD A

3 COUPLE OF SURGERIES ALREADY AND NEEDS ONE NOW.

4 Q.   ARE THERE ANY SYMPTOMS THAT SEEM TO COME AND GO WITH THIS

5 ISSUE?

6 A.   YES.  THE NECK, THE NERVES.

7 Q.   DO YOU RECALL HIM SUFFERING --

8 A.   HEADACHES.

9 Q.   YES, MA'AM.  GO AHEAD.

10 A.   WELL, I GUESS, YOU HAVE THE GIST.  THERE'S A FEW AILMENTS

11 THAT CONTINUE TO REOCCUR AND KIND OF STAY WITH HIM.

12 Q.   DOES IT EVER PREVENT HIM FROM WORKING?

13 A.   YES.

14 Q.   WAS HE PREVENTED FROM WORKING ANY TIME IN FEBRUARY OF

15 2010, BECAUSE OF THIS PROBLEM?

16 A.   YES.

17 Q.   DO YOU RECALL WHEN?

18 A.   DAVID WAS GOING THROUGH A SERIES OF SPINAL INJECTIONS

19 DURING THAT TIME.  ON THE DAY THAT THEY CAME LOOKING FOR

20 MALACHI, HE --

21 Q.   WHO IS THEY?

22 A.   THE FEDERAL GOVERNMENT OR POLICE, SHERIFFS, WHOEVER IT

23 MIGHT HAVE BEEN THAT WAS LOOKING FOR MALACHI CAME ON THAT DAY

24 AND HE HAD AN APPOINTMENT TO RECEIVE A SPINAL INJECTION THAT

25 DAY.

1  Q.   WHERE WAS HIS APPOINTMENT?

2  A.   GREENVILLE.

3  Q.   DID YOU GO TO THAT APPOINTMENT?

4  A.   NO, WE CANCELLED THAT APPOINTMENT.

5  Q.   WHY?

6  A.   THERE WAS A LOT OF THINGS GOING ON AT THE HOUSE THAT

7  MORNING.

8  Q.   DID YOU RESCHEDULE IT?

9  A.   YES.

10  Q.   FOR WHEN?

11  A.   THE NEXT DAY.

12  Q.   DO YOU KNOW WHAT WAS GOING ON AT THE HOUSE THAT DAY?

13  A.   NO.  I MEAN, I DID WHEN THE SHERIFFS CAME IN MY HOUSE

14  WITH GUNS, BUT BEFORE THAT, NOT A CLUE.

15  Q.   I MEAN, YOU NOW KNOW THAT THERE WAS A METH LAB IN THE

16  SHOP?

17  A.   THAT IS WHAT THEY TOLD US.

18  Q.   DID YOU HAVE ANY IDEA THERE WAS A METH LAB IN THE SHOP

19  PRIOR TO FEBRUARY THE 8TH OF 2010?

20  A.   NO, SIR.

21  Q.   ARE YOU OKAY WITH METH BEING IN DAVID'S SHOP?

22  A.   NOT AT ALL.

23  Q.   ARE YOU OKAY WITH HIM OR ANYONE ELSE USING IT?

24  A.   I'M NOT, NO.

25  Q.   GOING BACK TO HIS INJURY IN THE BEGINNING OF FEBRUARY,

1 DID YOU SAY WHETHER IT HAD PREVENTED HIM FROM WORKING?

2 A.   IT DID PREVENT HIM FROM WORKING, YES.

3 Q.   WHERE WAS HE DURING THIS TIME, THE BEGINNING OF FEBRUARY

4 2010?

5 A.   WHEN YOU SAY THE BEGINNING, YOU'RE SPEAKING LIKE MAYBE

6 THE FIRST?

7 Q.   THE FIRST WEEK OF FEBRUARY LEADING UP TO THE 8TH.

8 A.   OKAY.  WELL, I KNOW THAT HE WAS IN THE SHOP.  HE CAN'T

9 NOT BE.  THAT'S HIS LIVELIHOOD.  BUT HE WAS HAVING A VERY

10 DIFFICULT TIME WORKING.  IN ADDITION TO BEING SICK WITH THE

11 NECK AND THE NERVES AND THAT TYPE OF THING AND NEEDING TO HAVE

12 AN INJECTION, HE ALSO HAD A SINUS INFECTION.

13 Q.   WHEN YOU SAY HE WAS OUT AT THE SHOP BECAUSE IT WAS HIS

14 LIVELIHOOD, DO YOU KNOW WHAT HE WAS DOING OUT THERE WORKING?

15 A.   ARE YOU SPEAKING SPECIFICALLY WHAT CAR HE MIGHT HAVE BEEN

16 WORKING ON AT THAT --

17 Q.   WHAT TYPE -- I'M SPEAKING WHAT TYPE OF WORK WAS HE DOING.

18 A.   I HONESTLY DON'T KNOW IF HE WAS UNDER THE HOOD OR WHAT --

19 NO.  I'M SORRY, I'M MISUNDERSTANDING THE QUESTION.

20 Q.   YOU'VE TESTIFIED THAT HE WAS INJURED.

21 A.   YES.

22 Q.   DID IT PREVENT HIM FROM LIFTING HEAVY OBJECTS?

23 A.   YES.  HE DID IT ANYWAY.  HE WAS A DIEHARD.  BUT HE WASN'T

24 SUPPOSED TO LIFT THINGS OVER HIS HEAD AND WASN'T SUPPOSED TO

25 DO A LOT OF PHYSICAL THINGS THAT HE DID DO.

1  Q.   DID HE EVER COME INTO THE HOUSE AFTER HAVING BEEN OUT IN

2  THE SHOP COMPLAINING OF PAIN?

3  A.   OFTEN.

4  Q.   I'M TALKING ABOUT IN THE FIRST WEEK OF FEBRUARY 2010?

5  A.   YES.  YES.

6  Q.   DID IT EVER REQUIRE HIM TO JUST LAY IN BED OR ON THE

7  COUCH.

8  A.   YES, USUALLY THE COUCH.

9  Q.   HOW LONG WOULD HE HAVE TO STAY ON THE COUCH?

10 A.   MY HUSBAND FREQUENTLY CAME IN FOR HOT COMPRESSES OR REST

11 OR SOMETHING OF THAT NATURE AND THEN IF HE GOT TO FEELING

12 BETTER HE WOULD GO BACK OUT TO WORK.

13       I DON'T KNOW HOW MUCH OF THAT ACTUALLY OCCURRED THAT

14 FIRST WEEK OF FEBRUARY, BUT I KNOW THAT HE WAS VERY -- I KNOW

15 THAT THAT WEEK HE WAS VERY ILL.  I KNOW THAT.  HE HAD DOUBLE

16 -- HE HAD A SINUS INFECTION AND HE HAD THE NECK SITUATION AND

17 THE INJECTIONS GOING ON AT THE SAME TIME THAT WEEK.  THAT'S

18 HOW I KNOW THAT THAT PARTICULAR TIME HE WAS MORE ILL THAN

19 MAYBE AT SOME OTHER TIME.

20 Q.   COMPLETELY SHIFTING GEARS, WHO IS JENNIFER JONES?

21 A.   THAT'S DAVID'S PROBATION OFFICER.

22 Q.   HAVE YOU EVER MET HER?

23 A.   YES, I HAVE.

24 Q.   CAN YOU DESCRIBE HER FOR US, WHAT SHE LOOKS LIKE?

25 A.   WELL --

1  Q.   IS SHE WHITE OR BLACK?

2  A.   SHE'S BLACK.

3  Q.   IS SHE TALL OR SHORT?

4  A.   I THINK MORE SHORT.  I HAVE BEEN INTO THE OFFICE WITH HER

5  -- WITH DAVID, GONE TO SEE HIS PROBATION OFFICER, THE TWO OF

6  US TOGETHER.  AND SHE'S BEEN OUT TO OUR HOUSE A COUPLE OF

7  TIMES.  THAT EVENING SHE -- BACK TO THE MALACHI INCIDENT AND

8  PHILLIP INCIDENT, SHE CAME TO OUR HOME THAT NIGHT.

9  Q.   WHAT TIME DID SHE ARRIVE?

10  A.   IT WAS QUITE A BUSY AFTERNOON AND EVENING WITH TONS OF

11  CARS IN THE YARD AND PEOPLE RUNNING EVERYWHERE, BUT SHE DID

12  COME.  I'M THINKING EARLY EVENING.

13  Q.   DID SHE SPEAK WITH YOU AND DAVID?

14  A.   YES.

15  Q.   DID SHE PLACE DAVID UNDER ARREST?

16  A.   NO.

17  Q.   NOW, HOW MANY TIMES HAS SHE BEEN OUT TO YOUR HOUSE BEFORE

18  THAT YOU KNOW OF?

19  A.   I'M MORE FAMILIAR WITH US GOING TO HER OR DAVID GOING TO

20  HER THAN HER COMING TO US, BUT SHE HAS BEEN SEVERAL TIMES.

21  Q.   DO YOU HAVE ANY PERSONAL KNOWLEDGE WHETHER SHE WENT INTO

22  THE CORVETTE SHOP?

23  A.   ON THAT DAY?

24  Q.   ANYTIME.

25  A.   ANYTIME.  WITH ME, NO, BUT I CAN'T SAY THAT SHE HASN'T.

1 Q.  WELL, JUST DO YOU HAVE ANY PERSONAL KNOWLEDGE?  HAVE YOU

2 EVER SEEN HER GO IN THE CORVETTE SHOP?

3 A.   I HAVEN'T.  ONLY COME INTO THE HOME.

4 Q.   SO, SHE'S COME INTO YOUR HOME BEFORE?

5 A.   YES.

6 Q.   DO YOU HAVE ANY KNOWLEDGE AS TO WHETHER SHE WOULD

7 RANDOMLY DRUG TEST DAVID?

8 A.   YES.

9 Q.   WHERE WOULD SHE DO THESE DRUG TESTS?

10 A.   WHEN HE WENT FOR HIS VISITS TO SEE HER.

11 Q.   WOULD SHE TELL HIM -- DO YOU KNOW WHETHER SHE WOULD TELL

12 HIM IF HE WAS GOING TO TAKE A DRUG TEST?

13 A.   NOT THAT I'M AWARE OF.

14 Q.   DID HE EVER DISCUSS IT WITH YOU WHETHER HE HAD TO TAKE A

15 DRUG TEST?

16          MS. WELLS:  I'M GOING TO OBJECT.

17          THE COURT:  SUSTAINED.

18          MR. STEWART:  YOUR HONOR, IF I MAY HAVE ONE MOMENT,

19 PLEASE?

20          THE COURT:  CERTAINLY.

21          (PAUSE.)

22          MR. STEWART:  YOUR HONOR, AT THIS POINT, I HAVE NO

23 FURTHER QUESTIONS.

24          THE COURT:  CROSS?

25          MS. WELLS:  THANK YOU VERY MUCH, YOUR HONOR.

1            **C R O S S - E X A M I N A T I O N**    2:18 P.M.

2 BY MS. WELLS:

3 Q.    GOOD AFTERNOON.

4 A.    HI.

5 Q.    NOW, MS. LEWIS, YOU TESTIFIED ON DIRECT, YOU SAID YOU'RE

6 NOT OKAY WITH METH BEING IN YOUR HUSBAND'S SHOP, IS THAT

7 CORRECT?

8 A.    RIGHT.

9 Q.    AND YOU TESTIFIED -- YOU'RE AWARE THAT HE WAS USING

10 METHAMPHETAMINE, IS THAT CORRECT?

11 A.    I AM AWARE.  I BELIEVED IT TO BE MODERATION.

12 Q.    AND YOU'RE AWARE THAT HE WAS USING IN THE SHOP WITH YOUR

13 DAUGHTER VALERIE, YOU'RE AWARE OF THAT?

14 A.    I BELIEVE I KNOW AT LEAST OF ONE TIME SHE SAID THAT.

15 Q.    AND YOU TESTIFIED THAT YOU WEREN'T OKAY WITH HIM USING

16 IT, BUT YOU KNEW THAT THAT WAS GOING ON?

17 A.    LIKE I SAID, MODERATION.  I DIDN'T KNOW THAT IT WAS GOING

18 ON.

19 Q.    AND WHEN DID YOU FIND OUT THAT HE WAS USING

20 METHAMPHETAMINE?

21 A.    TO THE BEST OF MY KNOWLEDGE, I BELIEVE IT WAS AFTER MY

22 SON PASSED AWAY, SOMETIME AFTER THAT, OR MAYBE -- HE PASSED IN

23 AUGUST.  MY DAUGHTER MOVED IN IN JUNE.  MAYBE AFTER MY

24 DAUGHTER MOVED IN.  SOMEWHERE IN THAT PERIOD OF TIME.

25 Q.    SO, SOMETIME AROUND THE TIME THAT VALERIE MOVED IN, BUT

1  BEFORE DAVID OR JUNIOR PASSED AWAY, IS THAT CORRECT?

2  A.    YES.  YES.

3  Q.    SOMETIME IN THAT TIME FRAME?

4  A.    YES.

5  Q.    OKAY.

6          (PAUSE.)

7          NOW, YOU WERE ASKED ABOUT ASSAULTS THAT YOU

8  OBSERVED.  DURING THOSE ASSAULTS YOU CALLED 911?

9  A.    NO.

10  Q.    YOU DIDN'T CALL 911?

11  A.    NO.

12  Q.    SO YOU OBSERVED MR. SIMMONS ASSAULT YOUR DAUGHTER WITH A

13  PIECE OF BROKEN GLASS, BUT YOU DIDN'T PICK UP THE PHONE AND

14  CALL THE POLICE?

15  A.    I WANTED TO.  MY DAUGHTER DIDN'T WANT ME TO.  I REALLY

16  BELIEVED SHE WAS THE ONE WHO WOULD HAVE TO PRESS CHARGES.

17  Q.    BUT SHE DIDN'T HAVE TO BE THE ONE TO CALL 911 THOUGH, DID

18  SHE?  IT WAS YOUR PROPERTY, CORRECT?

19  A.    THIS IS CORRECT, BUT HE DID LEAVE AFTER THAT.

20  Q.    AND YOU SAID -- AND THERE WERE TWO ASSAULTS THAT YOU

21  TESTIFIED THAT YOU OBSERVED, BUT YOU DIDN'T CALL 911 FOR

22  EITHER ONE OF THOSE, DID YOU?

23  A.    NO, I DID NOT.

24  Q.    AND DID YOU -- AND YOU DIDN'T TAKE VALERIE TO SEEK

25  MEDICAL TREATMENT FOR EITHER ONE OF THOSE, DID YOU?

1 A.    SHE WASN'T ACTUALLY HARMED.

2 Q.    OKAY.

3 A.    HE DIDN'T ACTUALLY CUT HER AND, I MEAN, WHEN DAVID CAME

4 IN AND HE GOT UP -- SHE WASN'T HARMED.  IF SHE HAD BEEN

5 PHYSICALLY HARMED I WOULD HAVE TAKEN HER TO A HOSPITAL.

6 Q.    AND YOU ALL DIDN'T SEEK TO HAVE AARON TRESPASSED FROM

7 YOUR PROPERTY?

8 A.    NO.

9 Q.    OKAY.  AND, IN FACT, YOU STILL COMMUNICATE WITH AARON,

10 DON'T YOU?  YOU ALL SPEAK ON THE PHONE?

11 A.    A COUPLE OF TIMES OF MY HUSBAND CALLING I'VE GIVE THE

12 PHONE TO HIM TO SPEAK WITH HIS DAUGHTER BECAUSE SHE LIVES WITH

13 ME, MY GRANDDAUGHTER LIVES WITH ME.

14 Q.    YOUR GRANDDAUGHTER WHO IS AARON AND VALERIE'S --

15 A.    AARON AND VALERIE'S DAUGHTER.

16 Q.    -- CHILD?

17 A.    YES.

18 Q.    RIGHT.  BUT YOU DO COMMUNICATE WITH HIM ABOUT HER, ISN'T

19 THAT CORRECT?  YOU ALL DO HAVE COMMUNICATION, YOU AND AARON

20 SIMMONS?

21 A.    I HAVE COMMUNICATION WITH MY DAUGHTER OTHER THAN SAYING

22 HELLO A TIME OR TWO ON THE PHONE.  I'M NOT SURE WHAT YOU'RE

23 ASKING ME.

24 Q.    I'M JUST ASKING YOU.

25 A.    OKAY.

1 Q.   YOU UNDERSTAND THAT THE PHONE CALLS AT THE BRUNSWICK

2 COUNTY DETENTION CENTER ARE RECORDED, CORRECT?

3 A.   UH-HUH.  UH-HUH.

4 Q.   AND YOU ARE -- YOU HAVE HAD COMMUNICATION WITH MR.

5 SIMMONS OVER THE PHONE SINCE HE'S BEEN IN THE BRUNSWICK COUNTY

6 DETENTION CENTER, CORRECT?

7 A.   UH-HUH.

8 Q.   NOW, IT MAY HAVE BEEN ABOUT THE CHILD, BUT YOU ALL HAVE

9 HAD COMMUNICATION, IS THAT CORRECT?

10 A.   YES.

11 Q.   OKAY.  NOW, YOU'VE SPOKE ABOUT THE TIME LEADING UP TO THE

12 U.S. MARSHALS AND THE WILSON COUNTY SHERIFF'S OFFICE AND

13 ANOTHER -- SOME OTHER LAW ENFORCEMENT AGENCIES COMING OUT TO

14 YOUR PROPERTY BECAUSE OF THE METHAMPHETAMINE LAB IN THE

15 CORVETTE SHOP.

16 A.   UH-HUH.  UH-HUH.

17 Q.   YOUR HUSBAND WENT TO THE SHOP EVERYDAY THAT WEEK LEADING

18 UP TO IT, DIDN'T HE?

19 A.   I CAN'T SAY THAT HE WENT EVERYDAY, BUT IT'S VERY

20 POSSIBLE.  EVEN THAT MORNING HE WENT AT LEAST TOWARDS IT.  I

21 MEAN, IT'S YOUR BUSINESS, YOU DON'T -- AND PEOPLE ARE IN YOUR

22 SHOP, YOU'RE NOT GOING TO JUST NOT GO IN.  I'M NOT SAYING HE

23 DIDN'T GO IN.  JUST BECAUSE I SAID HE WAS SICK DOESN'T MEAN HE

24 DIDN'T GO INTO THE SHOP.

25 Q.   RIGHT.  JUST BECAUSE HE WAS SICK DOESN'T MEAN --

1  A.   RIGHT.

2  Q.   -- HE DIDN'T GO TO THE SHOP --

3  A.   RIGHT.

4  Q.   -- IS THAT CORRECT?  OKAY.  AND, IN FACT, YOU SAID THAT

5  HE -- THAT YOU -- DO YOU RECALL HIM GOING TO THE SHOP THAT DAY

6  THAT LAW ENFORCEMENT CAME OUT?

7  A.   AS FAR AS I KNOW, HE WENT TO GIVE MALACHI A MESSAGE.  HE

8  WAS ONE UP TIME THREE OR FOUR MINUTES ON THAT DAY.  HE WENT TO

9  GIVE HIM A MESSAGE TO COME AND EAT BECAUSE I WAS PREPARING

10 SOME FOOD.  AND I DID -- WAS HOSPITABLE TO HIM -- TO MALACHI

11 TO THE DEGREE OF COMING INTO MY HOME FOR A SHOWER OR A MEAL.

12 Q.   OKAY.  DID YOU UNDERSTAND WHY MALACHI WAS AT YOU ALL'S

13 BUSINESS?  DID YOU UNDERSTAND WHY HE WAS THERE?

14 A.   AS FAR AS I KNEW, HE INITIALLY CAME BECAUSE I BELIEVE HE

15 WAS ON A RENTAL CAR, COULD HAVE BEEN HIS, BUT I'M THINKING IT

16 WAS A RENTAL CAR, AND EITHER A WINDSHIELD HAD BUSTED OR

17 SOMETHING MECHANICAL, AND STEPHANIE HAD BROUGHT HIM OUT TO

18 DAVID'S SHOP TO FIX THE CAR.

19 Q.   DID YOU UNDERSTAND WHY HE WAS LIVING IN YOUR HUSBAND'S

20 SHOP?

21 A.   FROM WHAT I UNDERSTAND, HE WAS THERE TO HELP DAVID.

22 DAVID WAS NOT WELL AND HE OFFERED -- HE ASKED FOR A PLACE TO

23 STAY FOR A FEW DAYS.

24 Q.   NOW, MS. LEWIS, FAIR TO SAY, THERE WERE A NUMBER OF FOLKS

25 WHO WERE IN AND OUT OF YOUR HUSBAND'S SHOP ON A REGULAR BASIS,

1 CORRECT?

2 A.   THERE WERE ALWAYS PEOPLE IN AND OUT OF HIS SHOP.

3 Q.   AND THOSE PEOPLE HELPED YOUR HUSBAND DO WORK THAT HE DID

4 ON THOSE VEHICLES FOR THE MOST PART, CORRECT?  OUTSIDE OF THE

5 CUSTOMERS, THEY HELPED -- THEY ASSISTED HIM ON THE VEHICLES,

6 CORRECT?

7 A.   AS FAR AS I KNOW, PEOPLE CAME IN TO HELP MY HUSBAND OR

8 CUSTOMERS CAME IN.  THERE WERE CARS ALL THE TIME.  BUT WE

9 LIVED ON A MAJOR HIGHWAY, AS I SAID.  SOMETIMES THEY WERE

10 SIMPLY TIRE-KICKERS WANTING TO TALK ABOUT CORVETTES.  I DIDN'T

11 SPY ON MY HUSBAND'S SHOP AND KEEP TRACK.  SOME DAYS THERE WERE

12 MANY CARS, SOME DAYS THERE WEREN'T MANY CARS.

13 Q.   BUT HE HAD A REGULAR CREW OF PEOPLE WHO WORKED FOR HIM OR

14 WHO CAME AND DID WORK WITH HIM ON THE CORVETTES.  ANDY,

15 CORRECT?

16 A.   ANDY IS WORKING RIGHT NOW, YES.

17 Q.   ANDY IS WORKING RIGHT THERE RIGHT NOW, ISN'T HE?

18 A.   YES, HE IS.

19 Q.   IS THAT CORRECT?

20 A.   UH-HUH.

21 Q.   AND HE HAD PEOPLE WHO WORKED WITH HIM ON A REGULAR BASIS,

22 CORRECT?  THEY DIDN'T LIVE INSIDE THE SHOP, DID THEY?

23 A.   OH, NO.

24 Q.   ALL RIGHT.  NOW, YOUR HUSBAND KEPT UNUSUAL HOURS, FAIR TO

25 SAY?

1 A.   YES.

2 Q.   HE WORKED ALL THE TIME?

3 A.   HE WORKED QUITE A BIT.

4 Q.   HE WOULD GO AND WORK SOMETIMES FOR DAYS AT A TIME, FAIR

5 TO SAY?

6 A.   ON OCCASIONS.

7 Q.   HE WORKED IN THE MIDDLE OF THE NIGHT?

8 A.   YES.

9 Q.   HE HAD PEOPLE OUT HELPING HIM OR AT LEAST HE HAD PEOPLE

10 IN THE SHOP WITH HIM IN THE MIDDLE OF THE NIGHT, DIDN'T HE, ON

11 A REGULAR BASIS?

12 A.   NO, I WOULDN'T SAY ON A REGULAR BASIS.  AND I'D ALSO LIKE

13 TO ADD THAT HIS WORKING IN THE MIDDLE OF THE NIGHT OFTENTIMES

14 WAS BECAUSE OF THE LACK OF ABILITY TO SLEEP.

15        HE -- MY HUSBAND COULDN'T EVEN SLEEP IN OUR BED

16 BECAUSE OF HIS PHYSICAL CONDITION.  HE HAD TO -- THE BED WAS

17 TOO HARD.  HE HAD TO SLEEP ON THE COUCH.  AND IF HE COULDN'T

18 GET UP -- COULDN'T SLEEP THEN HE WOULD GET UP AND HE WOULD

19 WORK.

20        IF HE HAD A DEADLINE THAT HE HAD TO MEET HE WOULD

21 GET UP AND HE WOULD WORK.  YOU KNOW, HE HAD A LOT OF PROBLEMS

22 SLEEPING.

23 Q.   HE HAD A LOT OF PROBLEMS SLEEPING.  DID YOU OBSERVE HIM

24 STAY AWAKE FOR DAYS AT A TIME SOMETIMES BECAUSE HE WAS

25 STRUGGLING WITH SLEEPING?

1  A.   ON OCCASION.

2          MS. WELLS:  ONE MOMENT, PLEASE.

3          (PAUSE.)

4          MS. WELLS:  YOUR HONOR, I DON'T HAVE ANY FURTHER

5  QUESTIONS.

6          THE COURT:  REDIRECT?

7          MR. STEWART:  BRIEFLY, YOUR HONOR.  THANK YOU.

8            **R E D I R E C T   E X A M I N A T I O N**  2:29 P.M.

9  BY MR. STEWART:

10 Q.   MS. LEWIS, YOU SAID THAT YOU DIDN'T CALL 911 FOR VALERIE,

11 BUT YOU HAVE CALLED 911, HAVEN'T YOU --

12 A.   YES.

13 Q.   -- FROM YOUR PROPERTY?  WHY DID YOU DO THAT?

14 A.   THIS WOULD BE THE DAY AFTER THEY CAME FOR AND BUSTED

15 PHILLIP --

16         MS. WELLS:  YOUR HONOR, I'M GOING TO OBJECT.  I

17 THINK THIS IS OUTSIDE THE SCOPE OF CROSS-EXAMINE.

18         THE COURT:  SUSTAINED.

19         MR. STEWART:  I HAVE NO FURTHER QUESTIONS, YOUR

20 HONOR.

21         THE COURT:  YOU MAY STEP DOWN.

22         THE WITNESS:  STEP DOWN?

23         THE COURT:  YOU MAY STEP DOWN.  WE'RE GOING TO TAKE

24 OUR AFTERNOON RECESS, LADIES AND GENTLEMEN.  WE'LL START BACK

25 AT 2:45.  IF YOU'LL STEP TO THE JURY ROOM.

1          (OUT OF THE PRESENCE OF THE JURY AND ALTERNATES.)

2          THE COURT:  OKAY.  WE'LL TAKE A RECESS TILL 2:45.

3          (RECESS FROM 2:30 P.M., UNTIL 2:48 P.M.)

4          (DEFENDANT PRESENT.)

5          THE COURT:  ARE YOU ALL SET TO GO?  PLEASE BE

6 SEATED.

7          (IN THE PRESENCE OF THE JURY AND ALTERNATES.)

8          THE COURT:  MR. STEWART, LET ME SEE YOU JUST A

9 SECOND.  MS. WELLS.

10         MS. WELLS:  YES, SIR, YOUR HONOR.

11         (BENCH CONFERENCE ON THE RECORD.)

12         MR. STEWART:  YES, SIR.

13         THE COURT:  ARE YOU GOING TO PUT YOUR CLIENT ON?

14         MR. STEWART:  YES, SIR.

15         THE COURT:  DO YOU WANT ME TO ASK HIM IF -- DO YOU

16 WANT ME TO ASK HIM IF IT'S HIS CHOICE TO TAKE THE STAND?

17         MR. STEWART:  IF YOU WOULD WHAT, YOUR HONOR, I'M

18 SORRY?

19         THE COURT:  IT'S CLEAR IT'S HIS CHOICE.

20         MR. STEWART:  YES, SIR.  ABSOLUTELY.  DID YOU WANT

21 ME TO PUT HIM UP THERE AND HAVE YOU ASK HIM ALL THAT STUFF OR?

22         THE COURT:  I THINK I'LL HAVE TO LET THE JURY STEP

23 BACK OUT FOR A SECOND.

24         MS. WELLS:  I THINK SO.

25         (BENCH CONFERENCE CONCLUDED.)

1             THE COURT:  MEMBERS OF THE JURY, I'M SORRY, IF

2  YOU'LL STEP BACK OUT TO THE JURY ROOM JUST FOR A MOMENT VERY

3  QUICKLY.  WE'LL BRING YOU RIGHT BACK.  THANK YOU.  I'M SORRY.

4             (OUT OF THE PRESENCE OF THE JURY AND ALTERNATES.)

5             THE COURT:  ALL RIGHT.  IF YOU'LL HAVE A SEAT.

6             MR. STEWART:  YES, SIR.

7             THE COURT:  MR. LEWIS.

8             DEFENDANT:  YES, SIR.

9             THE COURT:  I WANT TO BE SURE YOU KNOW, YOU CAN

10 EITHER TAKE THE STAND OR NOT TAKE THE STAND.

11            DEFENDANT:  YES, SIR.

12            THE COURT:  IT'S YOUR DECISION.  IT'S NOT YOUR

13 LAWYER'S DECISION.  IT'S UP TO YOU.

14            DEFENDANT:  YES, SIR.

15            THE COURT:  DO YOU UNDERSTAND THAT?

16            DEFENDANT:  YES, SIR.

17            THE COURT:  YOU CAN EITHER DO IT OR NOT.

18            DEFENDANT:  YES, SIR.

19            THE COURT:  NOW, WHAT IS YOUR DECISION?

20            DEFENDANT:  YES, SIR.

21            THE COURT:  DO YOU WANT TO TAKE THE STAND OR NOT?

22            DEFENDANT:  YES, SIR.

23            THE COURT:  YOU DO?

24            DEFENDANT:  YES, SIR.

25            THE COURT:  OKAY.  IF YOU'LL BRING THEM BACK IN.

 1              (IN THE PRESENCE OF THE JURY AND ALTERNATES.)

 2              THE COURT:  MEMBERS OF THE JURY, WE APPRECIATE YOUR

 3  PATIENCE.  ALL RIGHT.

 4              MR. STEWART:  THANK YOU, YOUR HONOR.  DEFENSE WOULD

 5  LIKE TO CALL DAVID LEWIS.

 6              THE COURT:  ALL RIGHT, SIR.

 7              **DAVID LEWIS, DEFENDANT, SWORN**

 8              DEFENDANT:  I AFFIRM.

 9              **D I R E C T   E X A M I N A T I O N**   2:53 P.M.

10  BY MR. STEWART:

11  Q.   GOOD AFTERNOON, MR. LEWIS.

12  A.   GOOD AFTERNOON.

13  Q.   HAVE YOU LISTENED TO ALL THE TESTIMONY THAT'S BEEN

14  PRESENTED THUS FAR?

15  A.   YES, SIR.

16  Q.   MR. LEWIS, YOU'VE BEEN IN TROUBLE BEFORE, HAVEN'T YOU?

17  A.   YES, SIR, I HAVE.

18  Q.   HOW LONG AGO WAS THAT?

19  A.   30 YEARS.

20  Q.   NOW, FOR THE PAST 30 YEARS HAVE YOU BEEN ON PROBATION?

21  A.   YES, SIR.

22  Q.   MOST RECENTLY --

23  A.   WELL, IT'S BEEN NOT QUITE 30 NOW.

24  Q.   THEREABOUTS?

25  A.   YES, SIR.

1  Q.   MOST RECENTLY, WHO WAS YOUR PROBATION OFFICER?

2  A.   MS. JENNIFER JONES.

3  Q.   NOW, NEARLY 30 YEARS AGO WHEN YOU GOT IN TROUBLE, DID YOU

4  TURN YOUR LIFE AROUND?

5  A.   NOT UNTIL LATER ON AFTER I DID SOME TIME, BUT, YES, I

6  TURNED MY LIFE AROUND.

7  Q.   WHEN DID YOU TURN YOUR LIFE AROUND?

8  A.   I ACTUALLY GOT OUT OF INCARCERATION IN '99.  1999, I WAS

9  RELEASED AND ABOUT TWO YEARS BEFORE I GOT OUT.

10 Q.   WHAT HAPPENED?

11 A.   I HAD -- I TOOK SPECIAL CLASSES LIKE IMPROVEMENT FOR --

12 YOU KNOW, PERSONAL IMPROVEMENT FOR LIFE AND EVERYTHING AND I

13 WENT ON A WORK RELEASE PROGRAM.  AND THIS LADY THAT RAN THE

14 PROGRAM SHE WAS ACTUALLY ONE OF THE FIRST WOMEN HORSE JOCKEYS

15 EVER IN THE WORLD.  A VERY SMALL LADY, SHE WON'T BUT ABOUT

16 FOUR FOOT NINE, I GUESS.  A LITTLE TINY THING.  AND SHE SPOKE,

17 SHE GOT TO ME, YOU KNOW.  SHE TOLD ME WHAT I HAD DONE WRONG.

18 PRISON COULDN'T EVEN TURN MY LIFE AROUND.  THEY COULDN'T TURN

19 MY LIFE AROUND, BUT THIS LITTLE FOUR FOOT NINE LADY DID, YOU

20 KNOW.  SHE SAID YOU GOT TO GET YOUR LIFE STRAIGHT, YOU KNOW,

21 START CARRYING MY LOAD.

22        SO, I DECIDED I'D MOVED DOWN TO MIAMI.  THAT'S WHERE

23 I WAS LIVING.  I MOVED DOWN -- I MOVED WHEN I GOT OUT OF

24 PRISON, I MOVED UP HERE WITH MY DAUGHTER AND I MET MY WIFE,

25 YOU KNOW.  A VERY CHRISTIAN WOMAN.  YOU KNOW, SHE GOT INTO THE

1 BIBLE MORE WITH ME.  AND THAT'S WHAT WE WANTED OUR LIFE TO BE.

2 YES, WE WENT TO CHURCH AND MET A LOT OF GOOD PEOPLE.

3          MATTER OF FACT, IF THE COURT WOULD HAD ALLOWED IT, I

4 WOULD HAVE HAD MY CHURCH IN HERE AND THEY WOULD HAVE TESTIFIED

5 FOR ME, YOU KNOW.  BUT JUST TRIED TO DO MY BEST.

6 Q.   DO YOU RECALL WHAT YEAR YOU MOVED BACK TO WILSON?

7 A.   1999.

8 Q.   WHY DID YOU MOVE TO WILSON?

9 A.   THAT'S WHERE I WAS ORIGINALLY FROM.  I WAS BORN IN

10 WILSON.

11 Q.   AND AFTER YOU LEFT WILSON, DID YOU GO INTO THE COAST

12 GUARD?

13 A.   NO, I ORIGINALLY -- I HAD WENT INTO THE COAST GUARD WHEN

14 I WAS 18, OKAY?  I GOT OUT OF BOOT CAMP -- IT'S A VERY HARD

15 THING TO TALK ABOUT HERE.  ONE WEEK AFTER BOOT CAMP, I

16 ACTUALLY -- I FOUND MY MOTHER SHOT IN THE HEAD IN THE FLOOR.

17 THIS MESSED ME UP QUITE A WHILE.  I GUESS, I REBUILT AFTER

18 THAT, YOU KNOW.  I HAD A BAD RELATIONSHIP WITH MY DAD.

19          THE FIRST TIME I HAD EVER TOUCHED A DRUG WAS 19 -- I

20 WAS 24 YEARS OLD AND I WAS -- SOMEBODY GIVE ME COCAINE AND I

21 TRIED IT.  AND IT'S THE WORST MISTAKE I EVER MADE IN MY LIFE

22 BECAUSE WHEN I WAS 28 YEARS OLD I GOT IN TROUBLE AND WENT TO

23 PRISON.

24          GOT TIED UP WITH THE WRONG PEOPLE.  GOT INVOLVED

25 WITH COCAINE.  A MAN WAS ACCIDENTALLY SHOT -- HE WAS

1 ACCIDENTALLY SHOT.  THAT'S WHAT HAPPENED.  YEAH, I HATE IT

2 MORE THAN ANYTHING IN THE WORLD.

3 Q.   WHO WAS ACCIDENTALLY SHOT?

4 A.   A MAN NAMED DONALD BALL.  HE OWED SOMEBODY SOME MONEY AND

5 I JUST WENT THERE AS A COMMENTATOR TO TALK FOR HIM.  I WAS

6 TRYING TO SMOOTH THINGS OUT AND IT DIDN'T WORK OUT THAT WAY

7 AND A MAN GRABBED A GUN THE OTHER GUY HAD, I TRIED TO PREVENT

8 IT AND IT WENT OFF.

9         AND EVEN THE PLEA AGREEMENT I TOOK THE JUDGE QUOTED

10 THAT THIS WAS AN ACCIDENT, IT SHOULD HAVE NEVER TAKEN PLACE.

11 AND HE'S RIGHT, BUT IT DID.

12         BUT I WENT THROUGH PRISON.  I BECAME A STAFF BARBER

13 INSIDE PRISON.  I CUT HAIR FOR THE WHOLE TIME I WAS IN.  I CUT

14 THE OFFICERS' HAIR, NOT THE INMATES.  I ACTUALLY -- I SHAVED

15 THEM WITH A STRAIGHT RAZOR.  SO, I WASN'T NO DANGER.  CUT HAIR

16 WITH SCISSORS.  NEVER HAD A DISCIPLINARY REPORT THE WHOLE TIME

17 I WAS IN PRISON.  I NEVER HAD A PROBLEM.

18         AND I GOT OUT AND WAS NOT HAVING ANY PROBLEMS UNTIL

19 RECENTLY, YOU KNOW.

20 Q.   NOW, YOU SAY YOU MOVED BACK TO WILSON.  DID YOU MOVE

21 DIRECTLY TO HIGHWAY 301?

22 A.   NO, SIR.  I MOVED TO SHARPSBURG.  I ACTUALLY MOVED IN

23 TOWN IN SHARPSBURG INTO A TRAILER PARK.  I BOUGHT A TRAILER

24 FROM MY SON-IN-LAW, WHICH WAS RIGHT NEXT TO MY DAUGHTER'S, AND

25 IT WAS AN OLD TRAILER, A REAL OLD TRAILER, AND I RENOVATED IT

1 AND FIXED IT UP.  AND THEN CATHY LIVED ON THE OTHER SIDE.  I

2 MET CATHY.

3        MY SON-IN-LAW WAS ACTUALLY -- AT THAT TIME HE WAS A

4 POLICEMAN IN SHARPSBURG.  NOW, HE'S IN NASHVILLE -- HE'S IN

5 NASH COUNTY.  HE'S A DETECTIVE IN NASH COUNTY NOW.

6 Q.   WHEN DID YOU DECIDE TO MOVE OUT OF THE TRAILER PARK?

7 A.   WE BOUGHT THE HOUSE IN 2003.

8 Q.   THE ONE IN LUCAMA?

9 A.   YES, SIR.  LIKE I SAY, I DIDN'T INTEND TO GO INTO

10 BUSINESS WHEN WE BOUGHT IT, YOU KNOW.

11 Q.   DID IT HAVE THE CORVETTE SHOP -- NOT THE CORVETTE SHOP --

12 DID IT HAVE THE BUILDING THAT WOULD EVENTUALLY BECOME THE

13 CORVETTE SHOP IN THE YARD?

14 A.   YES, SIR.  YES, SIR.

15 Q.   SO, YOU DID NOT BUILD THAT?

16 A.   NO, SIR.  IT WAS ACTUALLY -- AT ONE TIME IT WAS LIKE A

17 CIGARETTE HOUSE TYPE THING AND THE HOUSE HADN'T BEEN LIVED IN

18 IN A COUPLE YEARS.  THE OLD MAN HAD PASSED AWAY AND THE LADY

19 WAS IN A REST HOME.

20        SO, I WENT UP THERE I TOOK THE -- IT WAS BOARDED UP

21 UP FRONT WHERE THE GLASS HAD BEEN BROKE OUT, I TOOK THE GLASS

22 OUT AND PUT TWO GARAGES DOORS IN IT AND I WENT TO WORK ON MY

23 CARS.  AND THE NEXT THING I KNOW, YOU KNOW, THE ZONING BOARD

24 ALONG AND SAID YOU CAN'T WORK ON YOUR OWN CARS THERE.  I

25 ACTUALLY HAD 55 CORVETTES IN MY FRONT YARD.

1  Q.   WHEN THE ZONING BOARD CAME BY?

2  A.   YES, SIR.

3  Q.   SO, YOU HAD A SUBSTANTIAL BUSINESS --

4  A.   YES, SIR.

5  Q.   -- FROM THE GET GO?

6  A.   YES, SIR.

7  Q.   FROM THE START, DID YOU HAVE ANY HELP WORKING ON THE

8  CARS?

9  A.   I HAD HIRED AARON COME TO WORK WITH ME.  THAT'S THE FIRST

10 ONE THAT I HIRED.

11 Q.   WHEN AND WHERE DID YOU MEET AARON?  AND WE'RE TALKING

12 ABOUT AARON SIMMONS?

13 A.   YES, SIR.

14 Q.   WHEN DID YOU --

15 A.   I MET HIM IN JACKSONVILLE, TOWARDS JACKSONVILLE, DOWN IN

16 THE EMERALD ISLE AREA.  THEY WERE HAVING A FIREWORKS THING

17 GOING ON AND WE ALL WENT DOWN THERE FOR THE WEEKEND.

18 Q.   AND HE WAS, AT THIS POINT, SEEING, DATING VALERIE?

19 A.   HE WAS DATING VAL, YES, SIR.

20 Q.   DID YOU ASK AARON OR DID AARON ASK YOU?  HOW DID HE COME

21 TO WORK AT THE SHOP?

22 A.   HE WAS GETTING TIRED OF HIS JOB AND HE WAS MISSING WORK

23 AND EVERYTHING BACK AND FORTH AND HE DIDN'T LIKE.  AND I TOLD

24 HIM, YOU KNOW -- AT FIRST I WAS PAYING HIM TO COME OVER THERE

25 AND HELP ME TO RENOVATE THE HOUSE BECAUSE THE HOUSE NEEDED

1 SOME DESPERATE REMODEL.  WE DIDN'T MOVE IN UNTIL THREE MONTHS

2 AFTER WE BOUGHT IT.  WE RE-DID THE HOUSE -- INSIDE OF THE

3 HOUSE.  AND HE WORKED WITH ME THERE.

4         AND I GOT HIM INTERESTED IN CORVETTES AND I TAUGHT

5 HIM EVERYTHING I COULD TEACH HIM.  AND HE WAS A GOOD WORKER UP

6 UNTIL HE GOT INTO MESSING WITH THINGS HE SHOULDN'T MESS WITH.

7 Q.   MESSING WITH -- DID YOU SAY THINGS?

8 A.   YEAH.

9 Q.   SO, WHEN HE STARTED AT THE CORVETTE SHOP HE WASN'T HIGH

10 ON METH EVERYDAY?

11 A.   NO, SIR.

12 Q.   WERE YOU HIGH ON METH EVERYDAY?

13 A.   NO, SIR.

14 Q.   DO YOU KNOW -- DO YOU HAVE ANY KNOWLEDGE AS TO WHEN AARON

15 STARTED MESSING WITH THE THINGS HE SHOULDN'T HAVE BEEN MESSING

16 WITH?

17 A.   I HIRED A FRIEND OF HIS, HE TOLD ME THAT WAS A GOOD

18 PAINTER, THAT TO HIRE HIM HE'D BE A GOOD WORKER.  AND I DIDN'T

19 KNOW HIM THAT GOOD, BUT I HIRED SHANNON GRIMES TO PAINT CARS

20 FOR ME.

21 Q.   YOU DID NOT KNOW SHANNON GRIMES PRIOR TO THIS?

22 A.   NO, SIR.

23 Q.   HOW OLD WAS SHANNON WHEN YOU HIRED HIM?

24 A.   I THINK HE WAS AROUND ABOUT 25 YEARS OLD SOMEWHERE AROUND

25 THERE.

1  Q.   HE WAS THE SAME AGE AS --

2  A.   CLOSE TO AARON.

3  Q.   AARON?

4  A.   UH-HUH.

5  Q.   WHAT ABOUT VALERIE?

6  A.   YEAH, AROUND VAL'S AGE.

7  Q.   AND WHAT ABOUT STEPHANIE?

8  A.   STEPHANIE I THINK WAS A LITTLE YOUNGER, BUT CLOSE TO IT.

9  YEAH, STEPHANIE WAS CLOSE TO IT.

10 Q.   DO YOU KNOW WHETHER STEPHANIE KNEW SHANNON?

11 A.   OH, YES, SIR.  STEPHANIE HAD KNOWN SHANNON FOR -- BEFORE

12 THEN SEVERAL YEARS.

13 Q.   DID STEPHANIE KNOW AARON?

14 A.   NOT AT THAT TIME, NO.

15 Q.   SO, WHEN DID SHANNON START WORKING WITH YOU?

16 A.   ABOUT 2005, SOMEWHERE AROUND THERE.

17 Q.   DO YOU BELIEVE THAT'S WHEN AARON OR DO YOU KNOW THAT'S

18 WHEN AARON GOT INVOLVED IN DRUGS?

19 A.   YEAH, THAT'S WHEN THEY GOT TOGETHER.  AND WE HAD AN

20 ARGUMENT ABOUT IT -- ME AND SHANNON HAD AN ARGUMENT ABOUT IT

21 AND I FIRED SHANNON.

22 Q.   WHEN DID YOU FIRE SHANNON?

23 A.   MAYBE ABOUT SIX MONTHS AFTER HE COME TO WORK FOR ME.

24 Q.   WHAT WAS THE ARGUMENT ABOUT?

25 A.   ABOUT THE METH.

1 Q.   HOW DID YOU KNOW THERE WAS METH?

2 A.   WELL, I WALKED IN THE BACK ROOM A COUPLE OF TIMES AND HIM

3 AND AARON BACK THERE IN THE BACK ROOM SNORTING IT.

4 Q.   WERE THEY COOKING IT BACK THERE?

5 A.   NO.  NO.  SHANNON WAS COOKING AT HIS SHOP.

6 Q.   DID YOU FIRE AARON AT THAT POINT?

7 A.   NO.

8 Q.   DID YOU SPEAK WITH HIM ABOUT THAT?

9 A.   YES, I SPOKE WITH HIM AND HE SEEMED TO STRAIGHTEN UP FOR

10 A WHILE AND THEN IT WENT -- IT WENT LIKE IT WAS ALMOST

11 EVERYDAY.  HE WAS GETTING WORSE.

12 Q.   DO YOU KNOW WHERE -- WHEN DID IT START GETTING WORSE?

13 A.   I KEPT AARON ON FOR ANOTHER YEAR AND IT WAS THAT YEAR

14 THERE WERE THINGS GETTING BROKE, THERE WERE CARS GETTING

15 HALFWAY FIXED, NOTHING LIKE WHEN WE FIRST STARTED.  THE

16 PERFORMANCE WAS WAY DOWN.

17 Q.   AND YOU KNOW THAT HE WAS ON METH OR DOING METH --

18 A.   YES, SIR.

19 Q.   -- EVERYDAY?

20 A.   YES, SIR.

21 Q.   WERE YOU DOING METH EVERYDAY WITH HIM?

22 A.   NO, SIR.

23 Q.   DID YOU EVENTUALLY FIRE AARON?

24 A.   YES, SIR.

25 Q.   WHY DID YOU FIRE AARON?

1 A.   ON THE DAY I FIRED HIM, HE BROKE TWO WINDSHIELDS IN TWO

2 DIFFERENT AUTOMOBILES, HE ROLLED ONE BACK INTO A TREE OR INTO

3 A TELEPHONE POLE, EXCUSE ME, AND TORE THE DOOR OFF OF A CAR

4 THAT HAD JUST WON FIRST PLACE IN A CAR SHOW.

5 Q.   DO YOU BELIEVE OR DO YOU KNOW -- DO YOU KNOW WHETHER HE

6 WAS HIGH AT THAT POINT?

7 A.   YES, SIR.

8 Q.   HE WAS?

9 A.   YES, SIR.

10 Q.   DID THAT HAVE ANYTHING TO DO WITH YOU FIRING HIM?

11 A.   YES, SIR, IT SURE DID.  I HAD HAD ENOUGH OF IT.

12 Q.   DID YOU TELL HIM ANYTHING ABOUT THAT?

13 A.   YEAH, I TOLD HIM -- I TALKED TO HIM SEVERAL TIMES.  I

14 TALKED TO HIM UNTIL I WAS BLUE IN THE FACE, YOU KNOW, AND I

15 JUST HAD ENOUGH.

16 Q.   ON HIS TESTIMONY HE SAID THAT HE GOT FIRED SEVERAL TIMES,

17 IS THAT CORRECT?

18 A.   ALL RIGHT, HE COME BACK A COUPLE OF TIMES AND WANTED

19 WORK.  I PAID HIM.  OPENED UP MY WALLET AND PAID HIM OUT OF MY

20 POCKET, I PAID HIM CASH MONEY BEFORE HE EVER DID THE JOB AND

21 HE NEVER DID THE JOB.

22 Q.   WHAT JOB WAS THAT?

23 A.   I HIRED HIM TO PUT FLOOR PEGS IN A 1977 CORVETTE.  I PAID

24 HIM $400 ON FRIDAY AFTERNOON.  MY WIFE AND I LEFT OUT OF TOWN,

25 WENT TO EMERALD ISLE.  I COME BACK ON SUNDAY NIGHT AND HE HAD

1 A PARTY GOING ON IN MY SHOP.  THEY ACTUALLY HAD DRUGS LAYING

2 OUT ON THE TABLE WHEN I WALKED IN AND I WENT BALLISTIC.

3 Q.   DO YOU RECALL THE DATES -- THE DATE OF THIS PARTY OR WHEN

4 YOU WENT TO EMERALD ISLE?

5 A.   I DON'T REMEMBER THE EXACT DATE, BUT IT WAS -- THIS WAS

6 ABOUT -- PROBABLY ABOUT TWO YEARS AGO.  ABOUT TWO YEARS AGO

7 WHEN THIS HAPPENED.

8 Q.   FAIR TO SAY IT WAS IN 2009?

9 A.   YES, SIR.

10 Q.   YOU SAID YOU AND MISS CATHY WENT TO EMERALD ISLE?

11 A.   YES, SIR.

12 Q.   AND YOU CAME BACK.  HOW'D YOU KNOW IT WAS A PARTY?

13 DESCRIBE THE SCENE.

14 A.   WHEN I WALKED IN HE'S GOT HIS FRIENDS THERE, CLAY, AND

15 HIS BROTHER.  I FORGOT HIS BROTHER'S NAME OFF THE BAT.  VAL

16 WAS THERE AND ONE OTHER GUY I DIDN'T KNOW.  BUT THEY WERE ALL

17 THERE AND THERE WAS SITTING THE CAR THAT HADN'T BEEN TOUCHED.

18 I SAID, I PAID YOU $400 TO PUT THE FLOOR PEGS IN.  I SAID,

19 WHAT HAPPENED?  I DON'T FEEL LIKE DOING IT, THAT WAS HIS

20 ANSWER.

21 Q.   DID YOU TELL HIM TO PUT THE FLOOR PEGS IN BEFORE YOU

22 LEFT?

23 A.   NO.  I JUST TOLD HIM TO GET OUT THERE, I DIDN'T WANT TO

24 SEE HIM BACK AT MY PLACE NO MORE.

25 Q.   DID HE HAVE PERMISSION TO INVITE ANYONE OVER TO YOUR SHOP

1  WHILE YOU AND MISS CATHY WERE AT EMERALD ISLE?

2  A.    NO.

3  Q.    STEPHANIE SMITH, HOW LONG HAVE YOU KNOWN HER?

4  A.    SINCE ABOUT 2005.

5  Q.    WHO INTRODUCED YOU TO STEPHANIE OR HOW DID YOU COME TO

6  KNOW STEPHANIE?

7  A.    THROUGH SHANNON.  SHANNON CALLED HER OVER TO THE SHOP

8  ONE DAY OR SOMETHING.  C.J. SAID HE HAD A PROBLEM WITH THE CAR

9  AND SHE BROUGHT IT OVER TO THE SHOP.

10  Q.    WHAT KIND OF CAR WAS IT?

11  A.    IT WAS A NISSAN.  I FORGOT EXACTLY WHAT IT WAS.  LIKE A

12  SENTRA KIND, YOU KNOW.

13  Q.    DO YOU RECALL WHAT WAS WRONG WITH IT?

14  A.    THE WATER PUMP OR SOMETHING.  SHE THOUGHT IT WAS THE

15  WATER PUMP AND THEN THERE WAS SOMETHING ELSE THAT WAS WRONG

16  WITH IT AND I FORGOT WHAT IT WAS EXACTLY, BUT I COULDN'T FIX

17  IT RIGHT THEN.

18  Q.    DID YOU EVENTUALLY FIX IT?

19  A.    NO, I NEVER MESS WITH IT NO MORE.  I THINK HER HUSBAND

20  ENDED UP -- HER EX-HUSBAND FIXED IT OR WHATEVER, BUT I -- I

21  HAD MORE THINGS TO DO.  I'M FOCUSED MAINLY ON CORVETTES.

22  THAT'S ALL I STAYED ON.  I DIDN'T -- I WASN'T TOO MUCH OF A

23  NISSAN MECHANIC, YOU KNOW?

24  Q.    NOW, STEPHANIE EVENTUALLY CAME TO WORK FOR YOU?

25  A.    YES, SIR.

1 Q.   HOW DID THAT --

2 A.   SHE ASKED ME DID I NEED ANY HELP, THAT, YOU KNOW, SHE

3 LIKED TO WORK ON THINGS, YOU KNOW.  AND ACTUALLY I HOLD HER

4 WHAT I NEEDED WAS SOMEBODY TO ANSWER THE TELEPHONE AND KEEP

5 PAPERWORK.  SHE REALLY DIDN'T WANT TO DO THAT MUCH.

6         SO, SHE WANTED TO DO INTERIOR.  I TAUGHT HER HOW TO

7 COVER SEATS.  SHE ALWAYS WANTED TO DO SOMETHING DIFFERENT.  I

8 TRIED TO KEEP HER FOCUSED ON ONE THING.  LIKE I SAY, I TAUGHT

9 HER HOW TO RECOVER SEATS, PUT DOOR PANELS, MORE OR LESS, DO

10 THE COSMETIC WORK ON THE INSIDE OF THE CAR.

11         I PAINTED CARS.  I DID IT ALL.  EVERYTHING.

12 FRAMEWORK.  RESTORATIONS.  EVERYTHING.

13 Q.   DO YOU RECALL HOW YOU PAID STEPHANIE?

14 A.   I PAID HER CASH.

15 Q.   DID YOU PAY HER WITH PSEUDOEPHEDRINE PILLS?

16 A.   NO, SIR.

17 Q.   DID YOU PAY HER WITH METHAMPHETAMINE?

18 A.   NO, SIR.

19 Q.   WHAT ABOUT COCAINE?

20 A.   NO, SIR.

21 Q.   YOU PAID HER ONLY IN CASH?

22 A.   YES, SIR.

23 Q.   HOW LONG DID THAT GO ON?

24 A.   IT WAS UNDER THE TABLE.  I PAID HER -- THE FIRST TIME,

25 LIKE I SAY -- MY WIFE SAID IT WAS AROUND A YEAR.  THAT'S JUST

November 17, 2011

1 ABOUT RIGHT.  MAYBE IT WAS A LITTLE OVER A YEAR SHE STAYED

2 THERE AND WORKED.

3        AND HER AND MY STEPSON HAD STARTED DATING AND SHE

4 QUIT FOR A WHILE TO HAVE THE BABY, BUT SHE COME BACK WITH THE

5 BABY AND PRACTICALLY RAISED THE BABY IN THE CORVETTE SHOP.

6 MATTER OF FACT, I HUNG A SWING UP FROM THE DOORWAY AND LET HER

7 PLAY IN THERE, YOU KNOW.  OF COURSE, WE COULDN'T PAINT

8 ANYTHING WITH THE BABY IN THERE.  WE HAD TO KEEP THE CHEMICALS

9 OUT, YOU KNOW?

10        BUT OTHER THAN THAT, WE JUST -- SHE BECAME A GOOD

11 WORKER.  YOU KNOW, AT ONE TIME SHE WAS A GOOD WORKER AND THEN

12 SHE JUST -- SHE STARTED DRIFTED ON THEN, BUT WHEN SHE CAME

13 BACK THAT SECOND TIME SHANNON KEPT COMING OVER AND SHANNON

14 KEPT COMING OVER THERE WANTING TO SEE HER.

15 Q.   SLOW DOWN AND BE SPECIFIC IF YOU WILL.

16 A.   OKAY.

17 Q.   SHANNON CAME BACK AFTER YOU HAD FIRED HIM?

18 A.   YES, SIR.  NOT TO WORK, JUST TO SEE STEPHANIE.

19 Q.   DID HE COME BACK TO SEE YOU?

20 A.   NO.  HE'D STOP IN AND SAY HELLO TO ME, YOU KNOW, BUT WE

21 DIDN'T HAVE A LOT OF RAP AFTER THAT, YOU KNOW.

22 Q.   HE CAME JUST TO SEE STEPHANIE?

23 A.   YEAH.

24 Q.   WHAT YEAR WAS THIS?

25 A.   THIS WAS AROUND 2007.  MAYBE THE BEGINNING OF 2007,

1 SOMETHING LIKE THAT.

2 Q.   NOW, HOW LONG -- THIS IS WHEN STEPHANIE CAME BACK TO WORK

3 FOR YOU, IS THAT WHAT YOU SAID?

4 A.   YES.

5 Q.   HOW LONG DID SHE WORK FOR YOU IN 2007?

6 A.   SHE STAYED ALMOST A YEAR AND A HALF I BELIEVE IT WAS,

7 SOMETHING LIKE THAT, BECAUSE SHE WORKED -- SHE WORKED -- SHE

8 DID PRETTY GOOD.  SHE GOT -- I STARTED PAYING HER MORE MONEY.

9 I STARTED PAYING HER MORE MONEY.  SHE DID A SUBSTANTIAL AMOUNT

10 OF INCOME WITH ME BY THE TIME SHE LEFT OUT OF THERE -- WHEN

11 SHE QUIT, WHICH I COULDN'T FIGURE OUT WHY SHE QUIT SHE

12 WOULDN'T MAKE THAT KIND OF MONEY NOWHERE ELSE.

13 Q.   SHE DID NOT GIVE YOU A REASON FOR QUITTING?

14 A.   WELL, SHE JUST GOT TO WHERE SHE WOULDN'T WORK.  YOU KNOW,

15 SHE JUST DIDN'T -- UP AND DOWN.  SHE'D COME TO WORK WHEN SHE

16 WANTED TO, YOU KNOW, AND THEN SHE GOT TO WHERE SHE JUST

17 WOULDN'T EVEN SHOW UP PERIOD, YOU KNOW.

18 Q.   DID YOU HIRE ANYONE ELSE TO HELP YOU IN THE SHOP?

19 A.   YEAH, I HIRED A COUPLE OF PEOPLE.

20 Q.   WHO DID YOU HIRE?

21 A.   I HIRED JOHN KYLE.  I HIRED JOHN KYLE.  I EVENTUALLY,

22 AFTER THAT, I HIRED A GUY NAMED ABEL.  HE'S THE MANAGER OF

23 O'REILLY'S AUTO PARTS NOW.  I HIRED HIM.

24 Q.   WHAT YEARS DID YOU HIRE JOHN AND ABEL?

25 A.   JOHN WAS ACTUALLY ABOUT 2007.  JOHN'S BEEN AROUND A

1 WHILE.  JOHN'S WORKED OFF AND ON PART TIME.

2 Q.    FROM 2007 --

3 A.    TO UP TO MAYBE THIS PAST JANUARY.  HE WENT TO WORK AT

4 MEDLIN BUICK.  HE WORKED FOR MEDLIN BUICK AS A TECH MANAGER

5 OVER THERE, BUT HE STILL WANTED TO WORK -- COME BACK OVER PART

6 TIME AND WORK WITH ME.

7 Q.    DID HE?

8 A.    YES, SIR.  AND ABEL, HE BECAME THE DISTRICT MANGER FOR

9 O'REILLY'S AUTO PARTS AND HE WANTED TO WORK PART TIME SO HE

10 COME OVER TO WORK PART TIME WITH ME.  AND ABEL LIVES RIGHT

11 THERE IN LUCAMA NOW.  AND JOHN BOUGHT A HOUSE IN WILSON, AND

12 RECENTLY GOT MARRIED I BELIEVE.

13 Q.    NOW, AFTER STEPHANIE JUST DECIDED TO COME TO WORK WHEN

14 SHE WANTED TO, DID YOU FIRE HER OR DID SHE QUIT?

15 A.    I JUST SAID, ARE YOU COMING BACK TO WORK FOR ME?  I'LL

16 COME WHEN I GET READY AND HUNG THE PHONE UP AND THAT'S IT.

17 THAT'S THE LAST I HEARD FROM HER FOR QUITE A WHILE.

18 Q.    SO, THAT CONVERSATION WAS ON THE PHONE?

19 A.    YES.

20 Q.    DID SHE COME BACK OVER TO THE SHOP AND NOT WORK?

21 A.    YEAH.  OH, YEAH.  YEAH, THEY COME BACK.  THAT CAME INTO

22 PLAY -- WHEN SHE COME BACK OVER -- SHE CAME -- SHE ACTUALLY

23 CAME BACK AGAIN AND WORKED ABOUT MAYBE THREE MONTHS AND LEFT

24 AGAIN AND SHE THEN BECAUSE I TOOK HER HOME AND WOULDN'T LET

25 HER WORK NO MORE.

1       THE NEXT TIME I SAW STEPHANIE SHE SHOWED UP THIS

2  PAST YEAR.  I KNEW SHE HAD BEEN BUSTED FOR A METH LAB, OKAY?

3  AND SHE CALLED ME AND SHE CALLED ME AND SHE CALLED ME AND

4  ASKED ME FOR A JOB.  MY WIFE SAID NO.  MY WIFE SAID NO.  SHE

5  KEPT ON.  SHE DID NOT WANT STEPHANIE BACK OVER.  THE REASON

6  SHE DIDN'T WANT STEPHANIE BACK OVER AND IT WAS A BAD TIME, MY

7  WIFE -- MY WIFE'S GOT A SON.  I'VE GOT A STEPSON.  YOU KNOW

8  WHAT HAPPENED TO HIM.  SHE GETS SURROUNDED BY HIM SHE FORGETS

9  A LOT THINGS LIKE THAT, BUT HER AND STEPHANIE -- I MEAN, HIM

10 AND STEPHANIE HOOKED UP TOGETHER.  THEY HAD THE BABY, OKAY?

11 DAVID CALLED US ONE NIGHT AND SAID PLEASE GET --

12       MS. WELLS:  OBJECTION.

13       THE WITNESS:  ANYWAY SHE --

14       THE COURT:  SUSTAINED.

15 BY MR. STEWART:

16 Q.   NOTHING ABOUT WHAT DAVID SAID.

17 A.   OKAY.

18 Q.   JUST WHAT STEPHANIE DID.  SHE HAD THE BABY?

19 A.   YEAH.

20 Q.   SHE QUIT WORKING?

21 A.   OH, YEAH.  SHE DIDN'T WORK ANY AT ALL AND SHE WAS SO

22 HEAVY ON METH THAT DAVID COULDN'T LIVE WITH HER.

23 Q.   WHEN WAS SHE SO HEAVY ON METH?

24 A.   THIS WAS IN ABOUT -- THIS WAS 2008, RIGHT AROUND THAT

25 PERIOD RIGHT THEN, BECAUSE DAVID WAS IN HER HOUSE UP THERE IN

1 ELM CITY.

2 Q.   HOW DO YOU KNOW STEPHANIE WAS HEAVY ON METH?

3 A.   I SAW HER.  SHE COME TO THE SHOP TWO OR THREE TIMES AND

4 COULDN'T EVEN TALK TO ME.

5 Q.   DID SHE COME TO THE SHOP WITH ACTUAL METHAMPHETAMINE OR

6 WAS SHE HIGH WHEN SHE GOT --

7 A.   NO, SHE WAS JUST SO HIGH YOU COULDN'T -- YOU COULDN'T

8 UNDERSTAND NOTHING SHE WAS SAYING.

9 Q.   DID SHE ADMIT TO BEING HIGH?

10 A.   OH, YEAH.  SHE'D SAY, I'M SO MESSED UP I CAN'T EVEN TALK.

11 Q.   NOW, YOU TESTIFIED THAT SHE HAS COME AND GONE A LOT.

12 A.   UH-HUH.

13 Q.   AT SOME POINT, SHE INTRODUCED YOU TO SOMEBODY IN 2010.

14 A.   YES, SIR.

15 Q.   WHO DID SHE INTRODUCE YOU TO?

16 A.   SHE INTRODUCED TO POPPELL -- PHILLIP POPPELL AND MALACHI.

17 Q.   DO YOU RECALL WHEN SHE FIRST INTRODUCED YOU TO THEM?

18 A.   THIS WAS IN JANUARY OF 2010.  IT WAS ONLY A COUPLE OF

19 WEEKS BEFORE THAT HAPPENED -- WHAT HAPPENED AT THE CORVETTE

20 SHOP.  THEY COME OVER AND WHAT HAPPENED, THEY SAID THEY HAD

21 BEEN OUT THERE DOWN A WOOD -- DOWN A PATH IN THE WOODS, OKAY?

22 I WAS FAMILIAR WITH THE PATH THEY WERE TALKING ABOUT BECAUSE I

23 WAS DRIVING A GO CART OUT THERE WHERE IT WAS AT ONE TIME.

24         THEY SAID THEY BEEN OUT THERE ON A BMW, WHICH WAS

25 LIKE A -- PRACTICALLY A BRAND NEW LOOKING BMW.  I DON'T KNOW

1 WHY THEY WERE GOING DOWN THAT PATH WITH IT.  BUT THEY GOT

2 STUCK AND SOMEBODY HOOKED A TOW CHAIN -- A TOW CHAIN AROUND

3 THE FRONT TIE ROD AND IT BENT THE TIRE ROD.

4          WHEN THEY COME INTO THE SHOP THE CAR WAS SITTING

5 LIKE THIS WITH BOTH TIRES LIKE THIS RIGHT HERE, LITERALLY

6 TEARING THE RUBBER OFF THE TIRES, AND ASKED ME COULD I DO

7 ANYTHING ABOUT IT.  AND I ADJUSTED THE TIE RODS BEST I COULD

8 AND SET THE FRONT WHEELS STRAIGHTENED OUT.  SHE INTRODUCED ME

9 TO THEM.

10          AT THIS TIME I WAS STARTING TO HAVE PROBLEMS WITH MY

11 NECK AGAIN.  AND I COULD ALWAYS TELL TWO OR THREE WEEKS BEFORE

12 I WAS GOING TO -- BEFORE IT WAS GOING TO CARRY ME DOWN.

13          AND I TOLD STEPHANIE I WAS LOOKING FOR SOMEBODY JUST

14 TO TAKE CARE OF THE SHOP, LOOK OVER THE SHOP FOR A COUPLE OF

15 WEEKS, JUST HELP CLEAN UP, DO SOMETHING, YOU KNOW, I SAID,

16 BECAUSE I HAVEN'T BEEN ABLE TO WORK REAL WELL LATELY.  I'VE

17 BEEN WORKING, BUT I HAVEN'T PUT IN A LOT OF HOURS.

18          WELL, MALACHI, MY UNDERSTANDING WAS HE HAD JUST LOST

19 A BUSINESS, THAT HE HAD A LIMO BUSINESS, AND HE HAD JUST LOST

20 THE BUSINESS IS WHAT I WAS TOLD AND HE DIDN'T HAVE ANY PLACE

21 TO STAY, OKAY?  SO --

22 Q.   IS THIS PHILLIP OR --

23 A.   NO, THIS IS MALACHI.

24 Q.   OKAY.

25 A.   SO, THE FRONT OFFICE UP THERE, WHAT THEY CALL A LOBBY,

1 WHEN YOU WALK IN, THERE'S A COUCH SITTING THERE.  IT'S BEEN

2 THERE FOR YEARS.  NICE LEATHER COUCH.  HE SAID I CAN SLEEP

3 HERE IF YOU DON'T MIND.  THERE WAS HEAT AND AIR AND EVERYTHING

4 IN THE SHOP.  AND I SAID, IF YOU WANT TO WORK THAT WILL BE

5 FINE.  I SAID I NEED TO CLEAN UP, I NEED TO -- I BOUGHT A

6 CORVETTE SHOP OUT AND THE INVENTORY WAS NEVER COMPLETELY PUT

7 UP.  I HAD A LOT OF STUFF.  AND I NEEDED SOMEBODY TO HELP ME

8 LIKE THAT.  AND THIS IS WHAT STEPHANIE WAS SUPPOSED TO DO, BUT

9 I COULD NEVER KEEP HER THERE LONG ENOUGH TO DO THAT.  SHE LOST

10 INTEREST IN THAT.

11         SO, THAT'S MY UNDERSTANDING.  I WAS NEVER TOLD

12 NOTHING ABOUT MALACHI BEING IN TROUBLE, YOU KNOW.  THEY SEEMED

13 LIKE DECENT GUYS WHEN I MET THEM, YOU KNOW?

14 Q.   DID MALACHI OFFER TO STAY THERE?

15 A.   YEAH, HE SAID HE NEEDED A PLACE TO STAY.

16 Q.   DID HIS BROTHER TELL YOU ANYTHING ABOUT PROBATION?

17 A.   NO, SIR.

18         MS. WELLS:  OBJECT TO ANYTHING ANYBODY ELSE SAID.

19         THE COURT:  SUSTAINED.

20         THE WITNESS:  I NEVER HEARD ANYTHING ABOUT ANYBODY.

21 BY MR. STEWART:

22 Q.   I'M TALKING ABOUT PHILLIP POPPELL WHO HAS TESTIFIED

23 EARLIER.  DID HE TALK TO YOU ABOUT PROBATION?

24 A.   NO.

25 Q.   WERE YOU AWARE OF ANY REASON WHY THE LAW MAY BE LOOKING

1 FOR JONATHAN MALACHI?

2 A.   NO, SIR.

3 Q.   HOW OFTEN WOULD YOU GO -- WHAT DAY DID MALACHI FIRST STAY

4 IN YOUR SHOP?

5 A.   IT WAS APPROXIMATELY A WEEK, A WEEK AND A HALF BEFORE THE

6 INCIDENT TOOK PLACE.  I'M GUESSING RIGHT AROUND THE LAST WEEK

7 IN JANUARY.  THAT'S WHAT I'M GUESSING.

8 Q.   IS WHEN MALACHI STAYED?

9 A.   YES, SIR.

10 Q.   HOW OFTEN DURING THAT WEEK WOULD YOU GO TO THE SHOP?

11 A.   I WENT RIGHT ON UP UNTIL AROUND THE MIDDLE OF THE WEEK --

12 MIDDLE OF THE FIRST WEEK IN FEBRUARY, I WAS GETTING DOWN, I

13 COULDN'T WORK NO MORE.  I KNEW I COULDN'T WORK.

14 Q.   WHAT WAS GOING ON THAT YOU COULDN'T WORK?

15 A.   I HAVE TO GET EPIDERMAL STEROID SHOTS IN THE BACK OF MY

16 NECK, OKAY?  WHAT HAPPENS WHEN I DON'T GET THEM, I'LL GO DOWN

17 THEN I'LL FEEL LIKE I'M JUST -- I CAN'T EVEN WALK.  I MEAN,

18 I'M JUST -- IT JUST WEARS ME OUT.  MY NECK -- I CAN'T HOLD MY

19 NECK UP OR ANYTHING.  I'VE GOT THREE COLLAPSED VERTEBRAES IN

20 MY NECK.

21 Q.   FROM?

22 A.   WHERE THAT AIRPLANE WING FELL ON ME.  AND I'VE HAD THIS

23 FOR A WHILE.  HAD TWO OR THREE OPERATIONS.  I NEED ONE MORE

24 NOW.

25          BUT I WAS GOING DOWN.  I KNEW I WAS GOING DOWN.

 1 THAT'S WHY I NEEDED SOME HELP.  SO, I WAS DOWN ON THE COUCH

 2 THE MORNING THIS TOOK PLACE.  MY WIFE ASKED ME WOULD I GO --

 3 WE WERE GETTING READY TO GO TO THE DOCTOR.  WE HAD A DOCTOR'S

 4 APPOINTMENT THAT DAY.  AND SHE ASKED ME WOULD I GO GET MALACHI

 5 AND HOLLER AT HIM, TO ASK HIM TO COME GET SOMETHING TO EAT.  I

 6 WALKED OUT OF THE SHOP (SIC), WALKED UP THE DRIVEWAY, AND HE

 7 COME OUT OF THE SHOP AT THE TIME TO MEET ME HALFWAY, AND I

 8 TOLD HIM -- WE DIDN'T ACTUALLY EVEN MEET.  I SAID, COME ON,

 9 CATHY'S GOT SOMETHING TO EAT.  AND HE SAID I'LL BE THERE IN A

10 MINUTE.

11          THEN I WALKED BACK.  WHEN I WALKED IN THE HOUSE, AND

12 I WALKED IN, WE'VE GOT A COMPUTER ROOM WITH A DESK WHERE CATHY

13 DOES HER WORK, I LOOKED OUT THE WINDOW AT THIS TIME AND I SAW

14 PICKUP TRUCKS PULL IN.  I THINK IT WAS A COUPLE OF THEM PULLED

15 IN AND SLID ACROSS THE PAVEMENT.  I DIDN'T KNOW WHAT IN THE

16 WORLD WAS GOING ON AT FIRST.

17 Q.   WHAT TIME WAS THIS?

18 A.   I'M THINKING AROUND TOWARDS LUNCHTIME.  I WASN'T SURE

19 EXACTLY WHAT TIME IT WAS.  BUT ANYWAY, THE TRUCK SLID IN AND

20 THEY GOT OUT RUNNING AND HAD COATS ON AND EVERYTHING.  I

21 DIDN'T KNOW WHAT WAS GOING ON AT FIRST.

22          BEFORE I COULD EVEN STEP BACK OUTSIDE AND DO

23 ANYTHING THE MARSHAL IS AT THE FRONT DOOR, THE UNITED STATES

24 MARSHALS; GET OUT OF THE HOUSE, GET OUT OF THE HOUSE.  SCARED

25 BOTH OF US TO DEATH.

1    WE WALKED OUTSIDE AND GET OUT THERE AND COME TO FIND

2 OUT THEY TELL US THEY BUSTED A METH LAB IN THE BACK OF THE

3 SHOP.  I TOLD THEM IT'S IMPOSSIBLE.  I COULDN'T BELIEVE IT.

4    AND THEY SAT THERE AND TALKED TO US A FEW MINUTES

5 AND TOLD US TO COME BACK IN THE HOUSE, WOULD WE SIGN A CONSENT

6 TO LET THEM SEARCH THE HOUSE AND EVERYTHING AND I SAID YES.

7 Q.   WELL, WHO DID YOU FIRST SPEAK WITH THAT DAY?

8 A.   IT WAS A SHERIFF.  I'M NOT SURE IF IT WAS BRAD CARTER OR

9 WHAT, YOU KNOW, OR SOMEBODY -- WELL, THE FIRST PERSON WAS THE

10 MARSHAL, THE UNITED STATES MARSHAL, YOU KNOW.

11 Q.   WAS IT MR. LUX OR AGENT LUX WHO TESTIFIED?

12 A.   IT MIGHT HAVE BEEN LUX.  YES, SIR, I BELIEVE IT WAS HIM.

13 Q.   YOU SPOKE WITH HIM?

14 A.   IT SEEMED LIKE IT WAS HIM, THE FIRST QUESTIONS, YES, SIR.

15 Q.   DID YOU EVER SPEAK WITH BRAD CARTER?

16 A.   YES, SIR. I DID.

17 Q.   NOW, DID BRAD CARTER ASK YOU WHETHER YOU WOULD CONSENT TO

18 SEARCH?

19 A.   YES, SIR.

20 Q.   WHAT DID HE ASK TO SEARCH?

21 A.   TO SEARCH THE HOUSE, THE SHOP, WHATEVER, YOU KNOW,

22 EVERYTHING.  AND I SAID, YES, SIR.  I SAID, YOU DO WHATEVER

23 YOU WANT TO DO.  THEY THOUGHT AT FIRST WE HAD HELPED MALACHI

24 ESCAPE BECAUSE HE HAD ESCAPED AND WE DIDN'T KNOW WHERE HE

25 WENT.  I TOLD HIM HE NEVER COME IN THE HOUSE, WHERE'D HE GO?

1 Q.   YOU SAID HE WAS ON HIS WAY TO THE HOUSE TO EAT?

2 A.   YES, SIR.

3 Q.   AND YOU DID NOT SEE HIM AFTER THAT?

4 A.   NO.  HE NEVER MADE IT IN THE HOUSE.  AND THEY THOUGHT HE

5 HAD RUN INTO THE HOUSE.

6 Q.   AND YOU LET -- DID YOU LET THEM GO THROUGH THE HOUSE --

7 A.   YES, SIR.

8 Q.   -- AND LOOK?

9 A.   YES, SIR.  THEY WENT ALL THE WAY THROUGH THE HOUSE AND

10 CHECKED AND EVERYTHING.  AND I HAD NO IDEA WHERE HE WENT.  WE

11 SAT THERE -- IT WAS LATE IN THE AFTERNOON, I'M SAYING IT WAS

12 AROUND FOUR O'CLOCK MY PAROLE OFFICER STOPPED BY, JENNIFER

13 JONES STOPPED BY.  AND SHE CAME IN, I WAS LAYING ON THE COUCH,

14 YOU KNOW, AND SHE ASKED ME HOW I WAS DOING.  AND I SAID -- I

15 TOLD HER -- I MADE THE COMMENT I'VE BEEN BETTER.  I SAID --

16 AND I TOLD HER, I SAID, JUST FOR THE RECORD, JENNIFER, I HAVE

17 NOTHING TO DO WITH THIS RIGHT HERE.  AND SHE SAID I NEVER

18 FIGURED YOU DID.

19          MS. WELLS:  OBJECTION.

20          THE COURT:  OBJECTION SUSTAINED.

21          MR. STEWART:  DON'T SAY ANYTHING THAT SHE MAY SAY.

22          THE WITNESS:  OKAY.

23 BY MR. STEWART:

24 Q.   BY THE TIME THAT JENNIFER JONES HAD ARRIVED, DO YOU KNOW

25 WHETHER THE LAB HAD BEEN DISCOVERED IN THE BACK ROOM?

1  A.   OH, YES, SIR.  YES, SIR.  THEY HAD BEEN THERE FOUR OR

2  FIVE HOURS BY THAT TIME.

3  Q.   DID YOU EVER GO OUT TO THE SHOP AND SEE WHAT THEY WERE

4  DOING?

5  A.   NO, SIR.

6  Q.   DID YOU EVER GO OUT THERE ON FEBRUARY THE 8TH, TO SEE

7  WHAT WAS GOING ON?

8  A.   NO, SIR.  I WAS TOLD TO STAY IN THE HOUSE.

9  Q.   DO YOU RECALL WHO TOLD YOU THAT?

10  A.   THE OFFICERS.  I DON'T KNOW WHICH PARTICULAR ONE.

11  Q.   DID YOU STAY IN THE HOUSE ALL DAY?

12  A.   YES, SIR.

13  Q.   DID YOU EVENTUALLY GO BACK TO THE SHOP?

14  A.   THE NEXT DAY.

15  Q.   WHY DID YOU GO TO THE SHOP THE NEXT DAY?

16  A.   WELL, IT WAS ACTUALLY TOWARDS NIGHTTIME.  WE CANCELLED

17  THE APPOINTMENT TILL THE NEXT MORNING.  WELL, MR. CARTER --

18  BRAD CARTER COME IN AND TALKED TO US ABOUT 11:00 OR 11:30 THAT

19  NIGHT HE TALKED TO US.

20  Q.   ON THE 8TH?

21  A.   YES, SIR.  AND HE ASKED ME DID I TOUCH ANY OF THE

22  MATERIAL OR ANYTHING OUT THERE.  I DON'T KNOW WHAT MATERIAL IS

23  OUT THERE TO TOUCH OR ANYTHING.  HE'S EXPLAINING EVERYTHING TO

24  ME.  BUT I SAID, NO, SIR, I HAVEN'T TOUCHED ANYTHING.

25            BUT ANYWAY, THE NEXT MORNING I WENT TO GREENVILLE

1 AND HAD THE INJECTION, OKAY?  AND I COME HOME, I WENT STRAIGHT

2 TO THE COUCH BECAUSE I HAVEN'T SLEEP IN MY BED IN YEARS.  I

3 HAVE TO SLEEP ON THE COUCH.  I HAVE TROUBLE SLEEPING.

4          I LAID THERE AND I WAS SLEEPING ALL AFTERNOON AND I

5 REMEMBER -- I REMEMBER HEARING A VOICE, WAKING UP HEARING A

6 VOICE, AND THE VOICE WAS ACTUALLY MY WIFE ON THE PHONE AND

7 NEVER HEARD THE PHONE RING, BUT SHE'S GOING, DAVID, DAVID,

8 ANSWER THE TELEPHONE.  SHE SAID I NEED TO TALK TO YOU QUICK.

9 I ANSWERED IT, YOU KNOW, LIKE AN EMERGENCY.  SHE SAID -- I

10 SAID WHAT'S WRONG?  SHE SAID --

11          MS. WELLS:  OBJECTION TO WHAT SHE SAID.

12          THE COURT:  SUSTAINED.

13 BY MR. STEWART:

14 Q.   WHAT DID YOU DO AFTER SHE -- AFTER YOU HEARD THE VOICE,

15 WHAT DID YOU DO?

16 A.   I ANSWERED THE TELEPHONE.

17 Q.   DID YOU SPEAK WITH YOUR WIFE?

18 A.   YES, I SPOKE WITH MY WIFE.

19 Q.   THEN WHAT DID YOU DO?

20 A.   I WAS GIVEN INFORMATION.  I WALKED OUTSIDE.  I STARTED

21 TOWARDS THE SHOP AND I WENT BACK AT THIS ANGLE BECAUSE I HAVE

22 CAMERAS IN THE SHOP.  I HAVE CAMERAS THAT WATCH THE CORNERS OF

23 MY SHOP.  THE REASON I HAVE CAMERAS BECAUSE I HAD $8,000 WORTH

24 OF ALUMINUM RIMS AND TIRES AND EVERYTHING STOLEN FROM MY SHOP

25 SO I HAVE TO KEEP SURVEILLANCE ON IT.

1          INSTEAD OF GOING IN IN THE FRONT WHERE HE COULD SEE

2  ME ON THE CAMERA, I COME AROUND THE BACKSIDE, OKAY?  I HAD

3  PICKED UP A STICK ON THE WAY BECAUSE HE IS A BIG BOY.

4  Q.   WHAT WERE YOU LOOKING FOR WHEN YOU LEFT YOUR HOUSE AFTER

5  THE PHONE CALL?

6  A.   I WAS GOING DOWN THERE I WAS LOOKING FOR MALACHI BECAUSE

7  I HEARD HE WAS IN THE SHOP.  HE HAD COME BACK.

8  Q.   SO, YOU'RE AVOIDING YOUR OWN CAMERAS AT THIS POINT?

9  A.   YES, SIR.

10 Q.   OKAY.  THEN WHAT HAPPENED?

11 A.   I COME AROUND, I PICKED UP A STICK BECAUSE I DON'T HAVE

12 ANY WEAPONS AT MY HOUSE.  I JUST PICKED UP A STICK AND I WENT

13 TOWARDS THE SHOP.  AND HE IS A BIG BOY.  PROBABLY OUTWEIGHED

14 ME BY A HUNDRED POUNDS.

15          I WENT TO GO INSIDE THE SHOP AND HE HAD A FILE

16 CABINET PULLED AND HAD THE DOOR BARRICADED SO I COULDN'T OPEN

17 THE DOOR.  I BUSTED THE FRONT WINDOW OUT WITH THE STICK, THREW

18 THE FILE CABINET BACK AND WALKED IN THE SHOP.  I WENT TOWARDS

19 THE BACK, THE BACK DOOR WAS OPEN, HE WAS GONE.

20          I COME BACK THROUGH THE FRONT AND AS I COME BACK

21 THROUGH THE FRONT MY WIFE WAS PULLING UP AND MY STEPSON WAS

22 WITH HER.  AND SHE SAID, DID YOU GET HIM?  AND I SAID, NO, HE

23 WENT OUTSIDE -- HE WENT OUT THE BACKDOOR SOMEWHERE.  I DON'T

24 KNOW WHERE HE'S AT.  SHE SAID, WELL, HERE'S SOMEBODY -- HERE'S

25 SOMEBODY WALKING ACROSS THE STREET AND THERE HE WAS.  AND HE'S

1 WALKING TOWARDS THE SHOP AND HE WALKED RIGHT IN THE SHOP AND

2 HE SAID, HEY, HOW YOU DOING?  AND I LET HIM WALK RIGHT ON IN

3 THE SHOP AND HE SAT DOWN ON THE COUCH.  AND HE SAID, WHAT'S

4 GOING ON?  I SAID -- MY WORDS WERE, WHAT DO YOU THINK THIS IS

5 A JOKE THAT YOU JUST GOT MY SHOP BUST?  YOU AND YOUR BROTHER

6 JUST GOT MY SHOP BUSTED.  AND NOW YOU'RE COMING BACK HERE AND

7 BREAK IN MY SHOP AND THINK YOU'RE STAYING HERE.  I SAID THEY

8 THINK I TRIED TO HELP YOU ESCAPE IN THE FIRST PLACE AND YOU'RE

9 NOT CARRYING ME TO JAIL WITH YOU.  I SAID YOU MIGHT AS WELL

10 SIT DOWN BECAUSE THE SHERIFF'S DEPARTMENT WILL BE HERE

11 SHORTLY.

12         AT THAT TIME, HE SAID I'M NOT WAITING ON THE

13 SHERIFF --

14         MS. WELLS:  OBJECTION.

15         THE WITNESS:  OKAY.

16 BY MR. STEWART:

17 Q.   DON'T SAY WHAT HE SAID.

18 A.   I'M SORRY.

19 Q.   BUT CONTINUING WITH WHAT HAPPENED NEXT.

20 A.   OKAY.  AT THAT TIME HE JUMPED UP AND MADE AN ATTEMPT TO

21 LEAVE THE SHOP, OKAY?

22 Q.   YES, SIR.  AND THEN WHAT?

23 A.   I USED FORCE TO HOLD HIM.

24 Q.   WHAT TYPE OF FORCE DID YOU USE?

25 A.   I POPPED HIS KNEECAP WITH THAT PIECE OF WOOD I HAD IN MY

1 HAND AND MADE HIM SIT BACK DOWN.

2 Q.    IS IT FAIR TO SAY THAT THE SHOT YOU HAD RECEIVED THAT

3 MORNING MADE YOUR NECK FEEL BETTER?

4 A.    YES, SIR, BUT I WAS HURTING, BUT I KNEW THAT I DIDN'T

5 WANT TO GO TO JAIL OVER SOMETHING I AIN'T DONE.

6 Q.    DID THE SHERIFF'S DEPARTMENT EVENTUALLY ARRIVE?

7 A.    YES, SIR.

8 Q.    WHO WAS IT?

9 A.    TWO OFFICERS COME AT FIRST AND THEY REALLY DIDN'T KNOW

10 WHY I WAS HOLDING HIM OR WHO HE WAS AND I TOLD THEM TO CONTACT

11 BRAD CARTER.  AND THEY CONTACTED BRAD CARTER AND BRAD CAME

12 OVER.

13 Q.    AND DID BRAD CARTER PLACE HIM UNDER ARREST?

14 A.    YES, SIR.

15 Q.    ON FEBRUARY THE 9TH?

16 A.    YES, SIR.

17 Q.    WERE YOU EVER ARRESTED FOR A METH LAB ON FEBRUARY THE

18 8TH --

19 A.    NO, SIR.

20 Q.    -- OF 2010?

21 A.    NO, SIR.

22 Q.    AND MICHAEL BATTEN WAS ARRESTED ON THAT DAY, IS THAT

23 CORRECT?

24 A.    YES, SIR.  YES, HE WAS.

25 Q.    WHO IS MICHAEL BATTEN TO YOU?

1 A.   I DON'T KNOW HIM.  I DON'T KNOW WHO HE IS.  I SAW -- FROM

2 A DISTANT I SAW PHILLIP AND HIM WALKING IN THE SHOP THAT DAY.

3 Q.   WHAT DAY, FEBRUARY THE 8TH?

4 A.   YES, SIR.

5 Q.   YOU SAW TWO FOLKS WALKING INTO THE SHOP?

6 A.   YES, SIR.

7 Q.   YOU SAW PHILLIP AND ANOTHER MAN.  DID YOU KNOW IT WAS

8 MICHAEL BATTEN?

9 A.   NO, SIR, I DIDN'T HAVE NO IDEA WHO IT WAS.

10 Q.   WHEN DID YOU REALIZE OR WHEN DID YOU COME TO FIND OUT

11 THAT WAS A MAN NAMED MICHAEL BATTEN?

12 A.   WHEN IT COME OUT IN THE NEWSPAPER THE NEXT DAY, THAT'S

13 WHEN I READ HIS NAME.

14 Q.   BECAUSE YOU HAD NEVER MET MR. BATTEN BEFORE THEN?

15 A.   NO, SIR.

16 Q.   HAVE YOU EVER MET HIM AFTERWARDS?

17 A.   NO, SIR.

18 Q.   YOU HAVE MET A GENTLEMAN NAMED DUSTIN BOYKIN, IS THAT

19 CORRECT?

20 A.   YES.  YES, SIR, I SURE HAVE.

21 Q.   HOW DO YOU KNOW DUSTIN BOYKIN?

22 A.   WELL, THE FIRST TIME I MET DUSTIN, HE COME OVER TO THE

23 HOUSE, HIM AND A GUY, I WORKED ON A CAR FOR, DANIEL SHERATON.

24 THEY COME OVER AND DANIEL SHERATON HAD BOUGHT A TRAILER FROM

25 AARON, A HOUSE TRAILER, ALL RIGHT?  AND HE NEEDED A SET OF --

1  IN ORDER TO PASS INSPECTION -- THEY HAD MOVED THE TRAILER OVER

2  TO ANOTHER LOT.  IN ORDER TO PASS INSPECTION THEY NEEDED A SET

3  OF STAIR STEPS FOR THE BACK OF TRAILER.

4  Q.  WE'RE TALKING ABOUT A MOBILE HOME?

5  A.  YES, SIR.

6  Q.  YES, SIR.  CONTINUE, PLEASE.

7  A.  I HAD A SET OF WOODEN STEPS AT MY HOUSE THAT EVIDENTLY

8  AARON TOLD DANIEL OR WHATEVER OR DANIEL SAW THEM OUT THERE,

9  EITHER ONE.

10 Q.  WHO IS DANIEL?

11 A.  DANIEL SHERATON WAS THE ONE WHO INTRODUCED ME TO DUSTIN.

12 Q.  HOW DID YOU KNOW DANIEL SHERATON?

13 A.  I HAD WORKED ON HIS CAR.  HE WAS A CUSTOMER OF MINE.  HE

14 HAD A FORD LTD.  ONE OF THE FEW TIMES I WORKED ON A FORD,

15 OKAY?

16        THEY NEEDED A SET OF WOODEN STAIR STEPS, OKAY?  AND

17 SUPPOSEDLY DUSTIN WAS A CARPENTER AND -- WHICH HE DIDN'T HAVE

18 ANY TOOLS EITHER.  SO, THEY BORROWED MY TOOLS IN ORDER TO

19 MODIFY THE STEPS AND PUT THEM UP ON THE BACK OF THE TRAILER.

20        THE NEXT TIME I SAW DUSTIN, HE COME OVER, HE HAD A

21 RED FIREBIRD --

22 Q.  LET ME INTERRUPT YOU AND LET'S SEE IF WE CAN BE A LITTLE

23 MORE SPECIFIC ABOUT WHEN DID DUSTIN FIRST COME.  WHEN DID HE

24 WANT THOSE STAIRS?

25 A.  THIS WAS ABOUT 2008.

1  Q.   DO YOU RECALL THE MONTH?

2  A.   NO, I CAN'T.  IT WAS WARM WEATHER, I KNOW THAT.  IT WAS

3  OUTSIDE SO IT WAS SUMMERTIME.

4  Q.   PLEASE CONTINUE WITH WHAT YOU WERE SAYING.

5  A.   OKAY.  THE NEXT TIME -- I DIDN'T SEE -- I DIDN'T SEE

6  DUSTIN FOR ABOUT, I GUESS, SIX MONTHS AFTER THAT.  HE COME UP

7  WITH A RED FIREBIRD.  HE WANTED -- I THINK A TIRE ON IT WAS

8  BAD OR SOMETHING AND HE WANTED FIXED, BUT HE ENDED UP CHANGING

9  THE TIRE HIMSELF.  I JUST LET HIM USE THE TOOLS, OKAY?  HE

10  LEFT.  WE DIDN'T HAVE BUT A FEW MINUTES CONVERSATION.

11          THE NEXT TIME I SAW HIM WAS 2009.  HE CAME UP WITH A

12  BLAZER.  HE HAD A CHEVROLET BLAZER AND I DON'T THINK ANY OF

13  THE LIGHTS WORKED ON IT, BUT HE WANTED IT FIXED.

14          SO, I LOOKED AT IT AND JUSTIN LOOKED AT IT, THE GUY

15  THAT WORKED FOR ME.  WE WENT OVER IT.  AND BASICALLY GIVE HIM

16  A FIGURE.  I FORGOT WHAT IT WAS GOING TO COST.  JUSTIN GIVE

17  HIM A BALLPARK FIGURE OF WHAT IT WAS GOING TO COST TO FIX IT.

18  AND HE ASKED JUSTIN ABOUT TRADING IT FOR METH.

19          JUSTIN COME AND TALKED TO ME.  TRADING THE LABOR FOR

20  METH.  JUSTIN COME AND TALKED TO ME.  I WENT BACK AND TOLD

21  DUSTIN THAT I DON'T WORK ON TRADING DRUGS, I WORK FOR CASH.

22  HE SAID HE HAD JUST STARTED A JOB DOING ROOFING WORK AND HE

23  DIDN'T HAVE NO CASH.

24          WHEN HE SAID HE DID ROOFING WORK, I SAID, WELL, I

25  NEED SOME SHINGLES FOR MY PLACE, FOR MY SHOP HERE.  I SAID,

1  I'LL MAKE A DEAL WITH YOU, I SAID, I'LL TRADE YOU SOME

2  SHINGLES.  HE SAID, WELL, I NEED SOME CASH TOO.  I SAID, WHAT

3  DO YOU NEED?  HE SAID, GIVE ME $150 AND I'LL GIVE YOU THE

4  SHINGLES AND DO THE WORK ON THE TRUCK.  I SAID IT'S A DEAL.

5           WHAT THE DEAL WAS, HE DIDN'T HAVE NOTHING TO GO PICK

6  UP THE SHINGLES.  I GIVE HIM THE KEY TO MY TRUCK.  TOLD MY

7  WIFE TO GIVE HIM $150, HE'S GOING TO GO PICK UP SOME SHINGLES.

8           HE TOOK MY TRUCK AND I DIDN'T HEAR FROM HIM FOR

9  THREE DAYS.  I HAD NO IDEA WHERE HE WAS LIVING OR ANYTHING.  I

10 STARTED CALLING ANYBODY I COULD AND TRYING TO FIND OUT WHERE

11 HE WAS AT.

12 Q.   PRIOR TO THIS, HIM TAKING THE TRUCK TO BORROW (SIC)

13 SHINGLES, HAD HE EVER BORROWED THE TRUCK BEFORE?

14 A.   NO, SIR.

15 Q.   WAS THIS THE FIRST TIME HE HAD BORROWED --

16 A.   YES, SIR.

17 Q.   -- THE TRUCK?

18 A.   YES, SIR.

19 Q.   DID HE GIVE YOU ANY METHAMPHETAMINE FOR BORROWING THE

20 TRUCK?

21 A.   NO, SIR.

22 Q.   HE TOOK THE TRUCK TO GET THE SHINGLES AND YOU SAY YOU

23 DIDN'T SEE HIM FOR THREE DAYS?

24 A.   THREE DAYS.

25 Q.   DID YOU TRY TO CALL HIM?

1 A.   I DIDN'T KNOW WHERE HE WAS AT.  DIDN'T HAVE A PHONE

2 NUMBER OR NOTHING.  HE DIDN'T LEAVE ME NO PHONE NUMBER OR

3 ANYTHING.

4 Q.   SO, WHAT DID YOU DO?

5 A.   I CALLED -- STARTED CALLING ANYBODY AROUND.  CALLED

6 DANIEL SHERATON.  DANIEL SAID HE THOUGHT HE LIVED IN KENLY THE

7 LAST HE HEARD.  I GOT INTO KENLY, I ASKED A COUPLE OF PEOPLE

8 AT A BP STATION OVER THERE IF THEY KNEW HIM.  ONE GIRL KNEW

9 HIM.  SHE SAID LAST SHE HEARD HIS FAMILY WAS STAYING OUT AT AN

10 APARTMENT THAT WAS A RENOVATED FIREHOUSE OR SOMETHING IS WHAT

11 IT WAS.

12 Q.   YOU WERE UNDER THE IMPRESSION THAT HE LIVES IN AN

13 APARTMENT IN KENLY?

14 A.   RIGHT.

15 Q.   AND WHAT DID YOU DO THEN?

16 A.   SO, I WENT LOOKING FOR IT AND WE FOUND IT.  ABOUT 12:30

17 AT NIGHT WE FOUND THE PLACE.  MY TRUCK WAS SITTING IN THE

18 MIDDLE OF THE PARKING LOT UNDER A STREET LIGHT, OKAY, WITH THE

19 KEY IN IT.  IN THE BACK THERE WAS A SUITCASE -- A SMALL

20 SUITCASE LIKE THIS RIGHT HERE WITH FLOWERS ON IT, OKAY?

21        I OPENED THE SUITCASE UP AND IT HAD ALL KINDS OF

22 PARAPHERNALIA IN IT, NEEDLES AND EVERYTHING ELSE.  OFF TO THE

23 OTHER SIDE, AND I'M LOOKING AT THE SUITCASE, WON'T PAYING MUCH

24 ATTENTION TO IT, AND JUSTIN TURNS AROUND AND SAYS, OH, GOD.

25 AND I SAID, WHAT'S GOING ON?  I LOOK IN THE BACK OF THE TRUCK,

1 I DIDN'T KNOW WHAT IT WAS, BUT I HAD TO ASK, AND IT WAS A METH

2 LAB IN THE BACK OF MY TRUCK, COOKING IN THAT PARKING LOT IN

3 THE BACK OF MY TRUCK.

4          WE THREW THE TAILGATE DOWN, KICKED EVERYTHING THAT

5 WAS IN THE BACK OF THE TRUCK OUT ONTO THE PAVEMENT, BUSTED

6 WHATEVER.  I CRANKED THE TRUCK UP AND RUN OVER IT, EVERYTHING

7 WITH THE TIRES.  I HAD GREAT BIG TIRES ON THE TRUCK.  I RAN

8 OVER EVERY BIT OF IT, OKAY?  I'M NOT GOING TO TELL YOU I

9 WASN'T MAD BECAUSE I WAS PRETTY MAD.

10          I PULLED IN FRONT OF THE APARTMENT AND THERE WAS

11 LIKE A FOYER DOOR, A GLASS DOOR, AND IT WAS LOCKED.  ONE OF

12 THESE I MEAN SOLID GLASS DOORS AND IT WAS LOCKED.  AND DUSTIN

13 AND HIS GIRLFRIEND MISSY WAS SITTING THERE LOOKING AT ME.  AND

14 AS SOON AS I WENT AND GOT OUT OF THE TRUCK DUSTIN TOOK OFF

15 RUNNING, YOU KNOW?  AND THEY WOULDN'T UNLOCK THE DOOR OR

16 ANYTHING.  I JUST TOLD HIM, I SAID, DON'T EVER COME NEAR MY

17 PLACE NO MORE.  DON'T EVER COME NEAR MY PLACE.

18          I WENT BACK TO THE SHOP.  WE TOOK HIS TRUCK AND

19 PUSHED IT OUT OF THE GATE AT MY HOUSE RIGHT THERE BY THE

20 DITCH, OKAY?

21 Q.   YOU'RE TALKING ABOUT THE BLAZER?

22 A.   YES, SIR.  THE NEXT MORNING SOME YOUNG KID, I DON'T KNOW

23 WHO IT WAS, COME BY TO PICK UP THE TRUCK, AND TOLD ME HE

24 NEEDED TO PICK UP DUSTIN'S TRUCK AND UNDERSTOOD THAT I HAD

25 COST $2,000 WORTH OF METH TO DUSTIN BECAUSE I DESTROYED IT.

1        SO, THAT'S HOW OUR RELATIONSHIP ENDED AND I NEVER

2  SAW DUSTIN NO MORE.

3  Q.   YOU NEVER SAW DUSTIN AFTER YOU RAN OVER --

4  A.   NO, SIR.

5  Q.   -- HIS METH LAB?

6  A.   NO, SIR.

7  Q.   WHEN'S THE NEXT TIME YOU DID SEE DUSTIN BOYKIN?

8  A.   I DIDN'T.  I SAW HIM IN THE NEWSPAPER WHEN HE GOT LOCKED

9  UP.  THAT WAS IT.

10 Q.   DID YOU SEE HIM AT ANY OF THE --

11 A.   OH, I SAW HIM IN COURT.

12 Q.   DID HE SAY ANYTHING TO YOU ABOUT COURT?

13 A.   NO, I MEAN, THIS IS THE FIRST TIME I'VE SEEN HIM SINCE

14 HE'S BEEN BACK AND HE TOOK THE STAND THE OTHER DAY.  THAT'S

15 THE FIRST TIME I SAW HIM.

16 Q.   BUT HE DIDN'T COME TO YOUR HOUSE AND DO METH EVERYDAY FOR

17 SEVERAL MONTHS?

18 A.   NO, SIR, HE DIDN'T.  I'M 59 YEARS OLD AND I'M IN BETTER

19 SHAPE THAN ANY OF THEM YOUNG GUYS WERE AND I'M SICK.

20 Q.   SPEAKING OF YOUR BEING SICK AND AARON SIMMONS, YOUR WIFE

21 TESTIFIED THAT HE HAD BROKEN YOUR NOSE ACCIDENTALLY, IS THAT

22 CORRECT?

23 A.   YES, SIR.

24 Q.   WHAT HAPPENED?

25 A.   WE WERE UNDERNEATH A CAR, AN '84 CORVETTE, AND THE

1 CHASSIS, IT HAD HIT A CONCRETE PILING IN A DRIVEWAY AND IT WAS

2 OFF ABOUT MAYBE AN INCH AND A QUARTER IT WAS OFF, BUT WE HAD

3 TO GET IT COMPLETELY STRAIGHT BECAUSE IT'S FIBERGLASS AND WE

4 HAD TO BOLT IT BACK UP AND WE HAD TO HAVE ALL OF IT, YOU KNOW,

5 FAST AND EVEN.  AND HE HAD BEEN OUT THERE HITTING ON IT FOR A

6 WHILE AND I KNEW HE WAS TIRED, I GUESS, I JUST DIDN'T KNOW HOW

7 TIRED HE WAS, BUT HE WAS HITTING IT WITH A SLEDGEHAMMER.  I

8 SAID, WELL, LET ME GET UP UNDER IT AND HIT IT WITH THE TORCH.

9 AND I CLIMBED UP UNDER THE CAR WITH THE TORCH --

10 Q.   NOW, WHY DID YOU CLIMB UNDER THE CAR WITH A TORCH?

11 A.   WELL, I CLIMBED UP UNDER IT WITH THE TORCH HEATING THE

12 CHASSIS.

13 Q.   AND WHAT WILL THAT DO?

14 A.   WELL, I WAS GOING TO HEAT IT TO SOFTEN THE CHASSIS UP

15 WHERE HE COULD BUMP IT OVER.  AND I WAS HEATING UP THE CHASSIS

16 AND I SAID, HIT IT NOW, AND I WAS RIGHT BEHIND IT AND I DIDN'T

17 KNOW.  YOU KNOW, I'M THINKING IT'S HITTING THE FRONT OF THE

18 CHASSIS.  I JUST MORE OR LESS CLOSED MY EYES JUST THINKING,

19 YOU KNOW, HE WAS GOING TO HIT IT.  AND THE NEXT THING I KNOW

20 I'M 15 FEET AWAY FROM THE CAR AND HE HIT ME SQUARE IN THE FACE

21 WITH A SLEDGEHAMMER.  IT BROKE MY NOSE IN FOUR PLACES.

22 Q.   DID YOU GO TO THE HOSPITAL?

23 A.   OH, YES, SIR.  YES, SIR.  WE GOT A THING AT THE SHOP,

24 WHEN WE CUT OURSELF USUALLY WE HOLLER WHERE'S THE SUPERGLUE.

25 AND I REMEMBER GOING IN THE BATHROOM AND LOOKING IN THE MIRROR

1 AND SAYING SUPERGLUE WON'T FIX THIS ONE, WE'VE GOT TO GO TO

2 THE HOSPITAL.

3          SO, THAT'S WHERE WE WENT AND HAD IT FIXED.  THEY --

4 AT THAT TIME, THE DOCTOR SAID MAYBE A QUARTER-INCH MORE AND IT

5 WOULD HAVE KILLED ME.  THAT'S HOW CLOSE IT WAS.  THEY BROKE IT

6 THREE MORE TIMES.  I WENT TO THE HOSPITAL THREE MORE TIMES AND

7 HAD TO HAVE MY NOSE BROKEN THREE MORE TIMES AND HAD TO HAVE IT

8 ACTUALLY DRILLED OUT WITH WHAT LOOKED LIKE A BLACK AND DECKER

9 DRILL.  I HAD INFECTIONS FOR A LONG TIME AFTER THAT.

10 Q.    WHAT DID DRILLING YOUR NOSE DO TO IT?

11 A.    WELL, THEY HAD TO -- ALL MY SINUS CANALS HALFWAY BEEN

12 REMOVED.

13 Q.    I'M SORRY, I DIDN'T CATCH THAT.

14 A.    THE SINUS CANAL, THEY REMOVED HALF MY SINUS CANAL WHERE

15 IT WAS JUST TORE ALL TO PIECES.  EVERYTHING WAS BUSTED UP IN

16 HERE.  I COULDN'T BREATHE.  I WENT TO ROCKY MOUNT NOSE, THROAT

17 AND EAR SPECIALISTS UP THERE.  I HAD A REAL BAD INFECTION

18 THERE -- WHEN I WENT UP THERE.

19 Q.    WHAT YEAR WAS THIS?

20 A.    THIS WAS IN -- WHEN I BROKE MY NOSE?

21 Q.    YES, SIR.

22 A.    I THINK IT WAS IN ABOUT 2006, I BELIEVE.  SOMEWHERE

23 AROUND IN THERE.  I'M NOT SURE.

24 Q.    HAS THERE BEEN ONGOING TREATMENT FOR YOUR NOSE?

25 A.    I'VE HAD TO TAKE ALL KINDS OF MEDICATIONS FOR IT.  I'VE

1 TOOK -- I KEEP A BOTTLE OF THIS SALINE NOSE WASH STUFF.  I

2 KEEP ALL THAT.  I HAVE TO -- I'VE GOT A PUMP THAT I HAVE TO

3 PUT UP AND PUMP -- PUMP IT OUT.  IF I DON'T DO THAT AT LEAST

4 EVERY COUPLE OF MONTHS, PUMP IT OUT, I GET AN INFECTION.

5 Q.    AND IS IT FAIR TO SAY THAT YOU HAVE NASAL PROBLEMS?

6 A.    YES, SIR.

7 Q.    DOES IT EVER KEEP YOU UP AT NIGHT?

8 A.    YES, SIR.

9 Q.    HOW DOES IT KEEP YOU UP?

10 A.    MY WHOLE FACE HURTS RIGHT HERE SOMETIMES LIKE THAT.  MY

11 FACE -- IN BETWEEN MY FACE AND MY NECK.  I HAVE -- I'VE GOT

12 THREE GLASS VERTEBRAES IN THE BACK OF MY NECK, YOU KNOW, AND

13 NEED AN OPERATION FOR THAT.  BETWEEN THAT AND EVERYTHING, I'M

14 PRETTY MUCH IN PAIN, BUT I DON'T LIKE TO TAKE PAIN PILLS.  I

15 TRY TO STAY AWAY FROM THAT.

16 Q.    DOES YOUR SINUS PROBLEMS EVER CAUSE YOU TO NOT BE ABLE TO

17 BREATHE AT NIGHT?

18 A.    YES, SIR.

19 Q.    DESCRIBE THE FEELING AT NIGHT?

20 A.    I JUST FEEL LIKE I'M CHOKING OR I'VE GOTTEN UP IN THE

21 MIDDLE OF THE NIGHT A LOT OF TIMES -- SEE, I TRIED SLEEPING IN

22 THE BED FOR LONG TIME.  IF I TRY TO SLEEP IN THE BED, MY HEAD

23 LAYS FLAT BACK, I WOKE MY WIFE UP SEVERAL TIMES HITTING HER

24 AND AUTOMATICALLY SHE JUMPS UP AND SHE KNOWS TO START HITTING

25 ME ON THE BACK BECAUSE SHE KNOWS I'M CHOKING.  SO, I HAVE TO

1  SLEEP WITH MY HEAD PROPPED UP.  LIKE MY MATTRESS IS DOWN HERE

2  AND I HAVE TWO OR THREE PILLOWS TO PROP MY HEAD UP AND THEN

3  HALF THE TIME I CAN'T EVEN SLEEP THEN.

4  Q.   WHERE DO YOU MOST -- WHERE HAVE YOU BEEN MOST OFTEN

5  SLEEPING?

6  A.   I SLEEP ON THE COUCH -- SLEPT ON THE COUCH THE PAST THREE

7  OR FOUR YEARS.

8  Q.   EVER SLEPT IN THE SHOP?

9  A.   YES, SIR.

10  Q.   AND WHERE IN THE SHOP WOULD YOU SLEEP?

11  A.   I'VE GOT A CHAIR SIMILAR TO THESE CHAIRS HERE, IT WAS A

12  DESK CHAIR THAT I TOOK THE CHAIR ITSELF OFF AND I PUT A

13  CORVETTE CHAIR, JUST LIKE WHAT'S IN A CORVETTE, I MOUNTED IT

14  ON THERE, AND IT'S LIKE A RECLINER.  IT'S NICE AND

15  COMFORTABLE.  WHEN I GET A LITTLE TIRE, I KICK IT BACK AND

16  THROW MY FEET ON THE DESK AND A GOOD HOUR AND HALF, MAN, I GET

17  UP AND ROLL AGAIN, YOU KNOW.

18         BUT MY WIFE TALKED ABOUT DEADLINES.  I'VE GOT -- THE

19  CARS I DO, THEY'RE EXPENSIVE CARS.  THERE'S A LOT OF HIGH

20  PRICE CARS.  WHEN I TELL SOMEBODY I'M GOING TO FINISH A CAR A

21  CERTAIN DATE I'VE GOT TO ROLL WITH IT.  AND IF I'VE GOT A

22  DEADLINE ON ONE, I'LL PUSH IT -- I'LL PUSH IT TO FINISH THAT

23  CAR BECAUSE A MAN'S GETTING READY TO COME IN THE SHOP AND

24  GOING TO PAY ME 25, $30,000.  I NEED TO KEEP HIM HAPPY, YOU

25  KNOW.

1  Q.   KEVIN HALPIN.  YOU KNOW KEVIN, DON'T YOU?

2  A.   OH, YEAH.

3  Q.   YOU SAW HIM TESTIFY?

4  A.   YES, SIR.

5  Q.   HOW DO YOU KNOW KEVIN?

6  A.   I'LL TELL YOU, THE FIRST TIME I MET HIM, I BELIEVE, MISSY

7  STOPPED BY --

8  Q.   WHO IS MISSY?

9  A.   IT'S HEATHER WEBB.  AND SHE COME AROUND YEARS AGO WITH

10  STEPHANIE.  THAT WAS A FRIEND OF STEPHANIE'S.  SHE'D COME

11  AROUND.

12  Q.   WHEN DID YOU FIRST MEET MISSY WEBB?

13  A.   ABOUT THE TIME STEPHANIE STARTED COMING TO WORK, 2005,

14  AROUND THAT AREA.

15  Q.   HOW OFTEN WOULD MISSY COME BY?

16  A.   OH, I THINK THAT'S THE FIRST TIME I HAD SEEN HER IN TWO

17  YEARS.

18  Q.   WHEN STEPHANIE WAS WORKING THERE, HOW OFTEN WOULD MISSY

19  COME BY?

20  A.   TWO OR THREE TIMES.  THAT'S IT.  SHE -- YOU KNOW, SHE WAS

21  JUST A FRIEND, ASSOCIATED WITH HER.  SHE WANTED TO COME TO

22  WORK THERE AND I WOULDN'T LET HER.  I DIDN'T -- SHE TRIED TO

23  WORK ONE NIGHT AND I COULDN'T SEE NO WORK OUT OF HER, YOU

24  KNOW.  AND WHEN I WORK, I WANT TO WORK, YOU KNOW?

25        BUT ANYWAY, SHE INTRODUCED ME TO KEVIN.  I DON'T

1 KNOW, HE JUST COME AROUND JUST AS A FRIEND.  I DON'T KNOW.

2 THAT'S HOW I MET HIM.

3         WELL, I DIDN'T SEE THEM AGAIN -- I HEARD MISSY GOT

4 LOCKED UP OR WHATEVER, BUT WHEN VAL MOVED IN THE HOUSE AND HE

5 COME AROUND ABOUT TWO WEEKS AFTER VAL HAD BEEN THERE AND I

6 MUST HAVE TOLD HIM TO LEAVE THE HOUSE FIVE OR SIX TIMES.  MY

7 WIFE TOLD HIM TO LEAVE BECAUSE MY WIFE -- THE FIRST TIME MY

8 WIFE WALKED IN THE BEDROOM --

9         MS. WELLS:  OBJECTION TO ANYTHING HIS WIFE SAID.

10         THE WITNESS:  OKAY.  WELL, ANYWAY, THEY WERE -- MY

11 WIFE WALKED IN THE BEDROOM AND THEY WERE THERE COMPLETELY

12 NAKED IN THE BED AND WIFE JUST DON'T ABIDE WITH ADULTERY IN

13 THE HOUSE.

14 BY MR. STEWART:

15 Q.   YOU'RE TALKING ABOUT VALERIE AND KEVIN?

16 A.   YEAH, VALERIE AND KEVIN.  SO, KICKED KEVIN OUT OF THE

17 HOUSE, MADE HIM LEAVE.  I HAD ARGUMENTS WITH HIM OVER STEALING

18 GAS OUT OF A CUSTOMER'S CAR.  I CAUGHT HIM THREE TIMES

19 STEALING GAS.

20 Q.   WELL, HE SAID HE DIDN'T STEAL ANYTHING.

21 A.   WELL, HE STOLE IT.  THREE TIMES I CAUGHT HIM.  I SAT

22 THERE AND WATCHED HIM ON THE CAMERA ONE TIME POP THE GAS TANK

23 OPEN AND GET THE GAS OUT OF IT.

24 Q.   HOW WOULD HE DO THAT?

25 A.   HE HAD HIM A THING THAT HE KEPT IN THE BACK OF HIS CAR, A

1 PUMP, AND HE PUT IT RIGHT THERE AND PUMPED IT OUT.  THAT'S THE

2 WAY HE GOT GAS.  HE'D PULL IN ANYWHERE -- HE BRAGGED ONE TIME

3 ABOUT STEALING GAS FROM A CHURCH, YOU KNOW.  YOU KNOW, I DON'T

4 PLAY THAT.  AND THAT'S THE PROBLEM I HAD WITH KEVIN.  I HAD A

5 PROBLEM WITH AARON.  I HAD A PROBLEM WITH TWO OR THREE OF THEM

6 AROUND THERE.  EVERYTHING I TURNED AROUND GOT STOLEN, YOU

7 KNOW.

8           WHEN I FIRST GOT LOCKED UP HERE, THEY WENT AROUND

9 THERE AND HELPED MY WIFE MAKE SOME MONEY, ENOUGH TO TRY TO GET

10 ME BOUNDED OUT AND EVERYTHING.  AND TURNED AROUND, I HAD A

11 PRESS I BOUGHT, A 30,000 TON PRESS.  I PAID $400 FOR THIS

12 PRESS.  IT WAS SOLD AT GOLDSBORO IRON AND METAL FOR $28 FOR

13 SCRAP METAL.  THAT'S THE KIND OF STUFF I PUT UP WITH.  I PUT

14 UP WITH THIS FOR FOUR OR FIVE YEARS.

15 Q.   WHAT ABOUT KEVIN?  HOW LONG WAS YOUR ASSOCIATION WITH

16 HIM?  I MEAN, HOW MANY TIMES WOULD YOU SAY HE CAME TO YOUR

17 SHOP?

18 A.   OH, YEAH, HE USED TO COME ALL THE TIME.  HIM AND VAL --

19 HIM AND VAL COME ALL THE TIME.

20 Q.   TO THE SHOP?

21 A.   OH, YEAH.  AND THEN I'D RUN HIM OUT AND HE'D COME BACK,

22 RUN HIM OUT, COME BACK.

23 Q.   AND WHY WOULD YOU RUN THEM OUT?

24 A.   WE JUST HAD ARGUMENTS.  ME AND KEVIN HAD ARGUMENTS.  WE

25 CLASHED.  WE DIDN'T GET ALONG AT ALL.  WE JUST DIDN'T GET

1 ALONG AT ALL BECAUSE I JUST -- I KNEW WHAT HE WAS ABOUT, YOU

2 KNOW.  AND ONE TIME HE GOT LOCKED UP AND VAL WAS DRIVING HIS

3 CAR AND SHE COMES DOWN THERE AND HAD PROBLEMS WITH THE CAR OR

4 SOMETHING AND I OPENED THE TRUNK AND HALF MY TOOLS ARE IN THE

5 BACK OF THE TRUNK.  WELL, NOT HALF MY TOOLS, BUT A BIG GOOD

6 MAJORITY OF TOOLS LAYING IN THE BACK.

7            I HAD A LOT OF TOOLS IN THE SHOP.  I'VE GOT FIVE

8 TOOLBOXES AS BIG AS THAT DESK RIGHT THERE PROBABLY FULL OF

9 TOOLS.  AND I JUST HAD TO WATCH EVERYBODY THAT WALKED IN MY

10 SHOP.  I JUST HAD TO WATCH THEM BECAUSE A LOT OF THINGS GOT

11 STOLEN.

12 Q.   AND DO YOU RECALL KEVIN'S TESTIMONY ABOUT COOKING AT THE

13 SHOP?

14 A.   HE NEVER COOKED METH AT THE SHOP.

15 Q.   DID YOU EVER SUSPECT HE WAS COOKING METH AT THE SHOP?

16 A.   SIR, I COME OUT THERE TWO OR THREE TIMES -- WE HAD SOME

17 ARGUMENTS BECAUSE I FOUND -- I FOUND SOME EVIDENCE SEVERAL

18 TIMES.

19 Q.   AND WHAT DO YOU MEAN BY EVIDENCE?

20 A.   I WALKED OUT THERE AND I FOUND OUT -- I FOUND IN THE

21 BACKYARD, I FOUND -- I DIDN'T EVEN KNOW WHAT IT WAS.  I HAVE

22 NEVER KNOWN THIS STUFF RIGHT HERE.  I'VE NEVER MESSED WITH NO

23 STUFF LIKE THAT.  I FOUND A -- ONE TIME I FOUND A PLASTIC

24 BOTTLE WITH A PLASTIC HOSE COMING OUT OF IT JUST LAYING BY

25 ITSELF BACK THERE IN THE BACK IN WHAT WE CALL A BONE YARD.

1 I'VE GOT ABOUT 15 CORVETTES SITTING BACK THERE, PARTS CARS.

2          AND ANOTHER TIME I WENT BACK THERE AND I COULDN'T

3 TELL WHAT IT WAS.  IT LOOKED LIKE A BOWL OF MASHED POTATOES OR

4 SOMETHING, YOU KNOW, BEEN HALFWAY COOKED OR SOMETHING,

5 WHATEVER, YOU KNOW.  AND ONE THING I DIDN'T KNOW WHAT IT WAS,

6 I SHOWED IT TO AARON ONE TIME AND AARON TOLD ME WHAT IT WAS,

7 THAT SOMEBODY HAD BEEN COOKING METH.

8          AND ANOTHER TIME I FOUND MY SHOVEL IN THE BACKYARD

9 AND A HOLE DUG, YOU KNOW.  I DIDN'T KNOW WHAT WAS GOING ON

10 HERE.

11          SO, ANYWAY, WE HAD A BIG ARGUMENT ABOUT IT, YOU

12 KNOW, WHICH HE DENIED, IT WASN'T HIM.  AND THEN AARON WOULD

13 SAY IT WAS KEVIN.  THEN KEVIN WOULD SAY IT WAS AARON.  BOTH OF

14 THEM BACK AND FORTH, YOU KNOW.

15          BUT I NEVER PUT A LOCK ON MY SHOP UNTIL 2009.  I

16 NEVER LOCKED MY SHOP.  NEVER PUT A LOCK ON IT.

17 Q.   WELL, WHAT HAPPENED IN 2009, THAT CAUSED YOU TO LOCK THE

18 SHOP?

19 A.   TWO DEADLOCKS GOT CUT OFF MY SHOP.  NOBODY KNOWS WHERE

20 THE LOCKS WENT.  BOTH DEADLOCKS GOT CUT OFF.  I'D WAKE UP AT

21 FOUR O'CLOCK IN THE MORNING AND LOOK OUT THE DOOR AND KEVIN'S

22 CAR IS SITTING OUT THERE SOMETIMES AT MY SHOP.

23 Q.   WHAT YEAR WAS THIS?

24 A.   THIS WAS LAST YEAR.  LAST YEAR.

25 Q.   WHAT KIND --

1  A.   THIS WAS ALL THE WAY UP TO THE YEAR 2011 HERE HE DID THE

2  SAME THING.  IF IT WON'T HIM, IT WAS AARON IN MY SHOP.

3  Q.   ALL RIGHT.  YOU'RE SAYING THAT YOU HAVE KNOWLEDGE THAT

4  KEVIN AND AARON WENT IN YOUR SHOP WHEN YOU WERE NOT THERE?

5  A.   YES, SIR.

6  Q.   WHAT KIND OF CAR WAS IT THAT KEVIN DROVE?

7  A.   HE DROVE A THUNDERBIRD.  ABOUT A '94 -- I THINK IT WAS A

8  '94 MODEL.

9  Q.   WELL, HOW DO YOU KNOW IT WAS KEVIN'S CAR AND NOT SOMEONE

10 ELSE'S?

11 A.   I KNOW HIS CAR WAS PAINTED SPECIAL.  IT LOOKED LIKE M&M

12 BLUE.  IT WAS PAINTED LIKE M&M BLUE.  I USED TO CALL IT

13 THUNDER CHICKEN.

14 Q.   WHY IS THAT?

15 A.   JUST BECAUSE IT WAS A FORD AND I DIDN'T LIKE IT AND I

16 DIDN'T LIKE HIM EITHER.

17 Q.   NOW, BACK TO STEPHANIE SMITH.  YOU AND HER WERE ARRESTED

18 JUNE THE 30TH OF THIS YEAR?

19 A.   YES, SIR.

20 Q.   WHAT HAPPENED JUNE THE 30TH, THAT MORNING?

21 A.   OKAY.  STEPHANIE CALLED ME THAT MORNING AND ASKED ME

22 COULD I COME GIVE HER A RIDE, COULD I PICK HER UP.  SHE WAS IN

23 JOHNSTON COUNTY.

24 Q.   SHE CALLED YOU?

25 A.   YES, SIR.  I HAD NOT SEEN HER IN ABOUT A WEEK SO.  I'VE

1 FORGOTTEN EXACTLY WHEN IT WAS.  SHE HAD A COURT DATE TO GO TO

2 FOR A PROBATION VIOLATION.  SHE WAS AT MY SHOP AND SHE ASKED

3 ME TO TAKE HER TO COURT.  I HAD PICKED HER UP EARLY THAT

4 MORNING, OKAY?

5 Q.   WE'RE TALKING ABOUT JUNE THE 30TH?

6 A.   NO, THIS WAS BEFORE TO GO TO COURT I PICKED HER UP.

7 Q.   YES, SIR.

8 A.   AND SHE DIDN'T WANT TO WORK.  SHE JUST DIDN'T WANT TO DO

9 NOTHING.  SHE JUST WANTED TO SIT AROUND.  I HAD A COUPLE OF

10 DEADLINES ON CARS.

11 Q.   DID YOU PICK HER UP TO HAVE HER WORK AT THE SHOP OR FOR

12 SOME OTHER REASON?

13 A.   YEAH, SHE WAS GOING TO WORK AT THE SHOP AND THEN I WAS

14 GOING TO TAKE HER COURT.  SHE DIDN'T FEEL LIKE DOING NOTHING.

15 AND I SAID -- AND ALL SHE WANTED TO DO WAS TALK ABOUT GETTING

16 HIGH.  WELL, I DIDN'T BRING YOU HERE TO GET HIGH, I BROUGHT

17 HERE TO WORK ON A JOB.  I'VE GOT TWO CARS TO FINISH.  I NEED

18 TO FINISH THEM.  LET'S WORK ON THE CARS AND THEN YOU DO WHAT

19 YOU'VE GOT TO DO.  SHE DIDN'T WANT TO DO NOTHING.

20         SO, SHE DIDN'T WANT TO DO NOTHING.  SHE MADE ME MAD.

21 I SAID I'M TAKING YOU HOME.  YOU'RE NOT TAKING ME TO COURT?

22 I'M NOT TAKING YOU NOWHERE.  I'M TAKING YOU HOME, THAT'S WHERE

23 I'M TAKING YOU.  AND I DON'T CARE.  I DON'T WANT YOU BACK

24 AROUND MY SHOP.  AND I DIDN'T.

25         BUT SHE CALLED ME.  SHE WAS DOWN IN JOHNSTON COUNTY.

1 I HAD OFFERED HER BEFORE -- I TOLD HER, I SAID, IF YOU WANT

2 SOME HELP, I'LL GO UP TO THE PROBATION OFFICE WITH YOU RIGHT

3 HERE IN WILSON COUNTY AND I'LL TALK TO THESE PEOPLE WITH YOU.

4 I'VE GOT A GOOD RAPPORT WITH THEM.  I'LL TALK TO THEM AND TRY

5 TO HELP YOU GET THIS PROBATION STRAIGHTENED OUT.  YOU'VE GOT

6 TO GET YOURSELF STRAIGHTENED OUT.  YOU CAN'T LIVE EVERYDAY

7 LIKE YOU'RE LIVING, STEPHANIE.  YOU CAN'T DO IT.

8         WELL, SHE AGREED SHE WANTED TO DO THAT.  THAT'S WHY

9 SHE CALLED ME THAT MORNING AND ASKED ME WOULD -- COULD I COME

10 AND PICK HER UP.

11 Q.   DID YOU TELL HER WHAT SHE NEEDED TO DO TO STRAIGHTEN OUT?

12 A.   YES, SIR.

13 Q.   WHAT'D YOU TELL HER?

14 A.   TO GET UP OFF THAT METH.  LET ME TELL YOU SOMETHING,

15 THERE'S SOME PEOPLE THAT TAKES DRUGS, THAT'S THEIR BUSINESS,

16 OKAY?  I AIN'T GOT NO PROBLEM WITH IT RIGHT THERE.  I'M NOT

17 GOING TO SIT IN THERE AND RAT ON EVERYBODY THAT DOES DRUGS I

18 KNOW.  THAT'S THEIR THING IF THAT'S WHAT THEY WHAT TO DO.

19         BUT WHEN IT INTERFERES THAT ALL YOU CAN DO IN THE

20 MORNINGS IS GET UP AND STARE AT THE WALL AND SIT IN A SEAT AND

21 NOT DO NOTHING AND THAT'S YOUR FOCUS ON LIFE THEN YOU NEED

22 SOME HELP, OKAY?  AND THAT'S WHAT IT HAD COME TO WITH HER,

23 OKAY?

24         SO, I TOLD HER I COULDN'T COME RIGHT THEN.  I

25 COULDN'T COME.  I HAD TOO MANY THINGS GOING ON.  I HAD ANOTHER

1 GUY WORKING WITH ME AT THE SHOP RIGHT THEN.

2 Q.   ARE WE TALKING ABOUT JUNE 30TH?

3 A.   YES, SIR, THAT'S JUNE 30TH.

4 Q.   WELL, LET ME BACK UP TO WHEN SHE WAS AT THE SHOP BEFORE.

5 A.   OKAY.

6 Q.   I MEAN, SHE WAS ON PROBATION, IS THAT RIGHT?

7 A.   YES, SIR.

8 Q.   DID YOU EVER MEET HER PROBATION OFFICER?

9 A.   YES, SIR.

10 Q.   DID SHE EVER TALK TO YOU ABOUT HER PROBATION OFFICER?

11 A.   OH, YEAH, WE HAD -- AND THIS WAS THE ARGUMENT THE WHOLE

12 TIME.  SHE COME BACK AND SHE WAS ONLY BACK FOR A FEW DAYS, BUT

13 THE PROBLEM WE HAD WHEN SHE'D COME TO WORK -- I'D DRIVE UP TO

14 PIKEVILLE AND PICK HER UP AT EIGHT O'CLOCK IN THE MORNING, AT

15 ONE O'CLOCK SHE'D HAVE ONE OF HER FRIENDS COME BY AND PICK HER

16 UP.  AND THEN SHE'D COME AROUND AND TOLD ME, SAID, IF MY

17 PAROLE OFFICER COMES BY JUST TELL HER I'VE GONE TO THE PARTS

18 STORE.

19           MS. WELLS:  OBJECTION TO WHAT --

20           THE COURT:  SUSTAINED.

21           MS. WELLS:  -- SHE SAID.

22           THE WITNESS:  I WAS TO COVER ANYWAY FOR HER.  I WAS

23 TO COVER AND I'M -- I WASN'T GOING TO DO THAT.

24 BY MR. STEWART:

25 Q.   DID YOU EVER COVER -- AND BY COVER, YOU MEAN LIE TO HER

1 PROBATION OFFICER?

2 A.    NO, SIR, I DID NOT.  NO, SIR.  NO, SIR.

3 Q.    DID YOU EVER MEET HER PROBATION OFFICER?

4 A.    YES, SIR.

5 Q.    WHAT WOULD YOU TELL HER PROBATION OFFICER?

6 A.    WELL, SHE ALWAYS SEEMED TO BE THERE WHEN SHE COME EXCEPT

7 ONE TIME.  ONE TIME I DID SEND HER TO GET PARTS, BUT SHE NEVER

8 CAME BACK THAT DAY.  AND ACTUALLY I TOOK HER ONE TIME TO

9 GOLDSBORO TO THE PAROLE OFFICER -- TO SEE THE PAROLE OFFICER.

10 AND, I MEAN, WE SEEMED TO GET ALONG GOOD.  NO PROBLEM.

11 Q.    YOU TALKING ABOUT YOU AND THE PAROLE OFFICER?

12 A.    YEAH, WE SEEMED TO GET ALONG.  SHE COME OUT TO THE SHOP.

13 SHE COME OUT TO THE SHOP AND WALKED AROUND AND EVERYTHING,

14 COME INSIDE THE SHOP.

15 Q.    STEPHANIE'S PAROLE OFFICER, SHE CAME TO THE SHOP?

16 A.    YEAH.  YEAH.

17 Q.    WALKED AROUND WHERE IN THE SHOP?

18 A.    WALKED AROUND INSIDE THE SHOP AND EVERYTHING.  JUST

19 LOOKED AT EVERYTHING.  JUST WALKED OUT IN THE BACKYARD SEEING

20 WHAT WE DO AND EVERYTHING.  SHOWED HER THE WHOLE SHOP.  Q.

21 WHEN WAS THIS?

22 A.    THIS WAS MAYBE TWO MONTHS BEFORE SHE COME BACK HERE --

23 BEFORE THIS RIGHT HERE HAPPENED.

24 Q.    HOW LONG DID THE PAROLE OFFICER STAY?

25 A.    SHE STAYED ONE DAY ABOUT AN HOUR WAITING ON STEPHANIE TO

1 COME BACK AND THEN FINALLY SHE SAID SHE HAD TO LEAVE.

2 Q.   BACK TO JUNE THE 30TH.

3 A.   OKAY.

4 Q.   YOU SAID THAT STEPHANIE CALLED YOU THAT MORNING?

5 A.   YES, SIR, SHE CALLED ME --

6 Q.   WHAT DID SHE WANT?

7 A.   SHE WANTED A RIDE FROM JOHNSTON COUNTY.

8 Q.   TO WHERE?

9 A.   BACK TO WILSON.  SHE WAS WONDERED IF WE COULD GO SEE THE

10 PAROLE OFFICERS, TALK TO THEM, AND I SAID THAT WOULD BE FINE.

11 I SAID I'M NOT GOING DOWN TO JOHNSTON COUNTY RIGHT NOW.  I

12 DON'T HAVE TIME TO GO.  I'VE GOT SOME THINGS I GOT TO -- I'VE

13 TO BE IN GOLDSBORO THIS MORNING TO CARRY SOME SALVAGE UP

14 THERE, YOU KNOW, AND STUFF.  I'LL CALL YOU IF I NEED TO GO

15 DOWN THERE OR WHATEVER BECAUSE I WAS STILL A LITTLE MAD OVER

16 WHAT SHE DONE BEFORE, NOT HELPING ME FINISH THE CARS LIKE I

17 NEEDED TO.

18        WELL, BY THIS TIME WADE TURNAGE CALLED ME.  OKAY, I

19 HAD MET WADE TURNAGE A FEW YEARS AGO.  HE BROUGHT A TRUCK TO

20 ME TO REBUILD THE MOTOR FOR HIS GRANDSON, OKAY?  IT WAS A 1998

21 CHEVROLET TRUCK.

22        ALL RIGHT, WADE CALLED ME AND SAID HAVE YOU GOT TWO

23 DOOR PANELS FOR A '98 CHEVROLET TRUCK, WHICH I HAD HAD THREE

24 TRUCKS I HAD JUST JUNKED OUT AND, YES, I DID HAVE DOOR PANELS.

25 I SAID I'VE GOT A SET.  AND HE SAID WHAT DO YOU TAKE FOR THEM?

1 I SAID I'LL TAKE $50 A PIECE.  HE SAID CAN YOU BRING THEM TO

2 ME?  HE SAID, I'LL PAY YOU FOR THE GAS.  I SAID YOU GOT IT.

3          I CALLED STEPHANIE UP AND TOLD HER, I SAID I'VE GOT

4 TO RUN DOWN TO FOUR OAKS, 30 MILES MAYBE, I SAID TO DROP OFF

5 SOME DOOR PANELS.  I SAID YOU WANT TO RIDE?  I'LL PICK YOU UP.

6 I SAID JUST GET SOMEBODY TO DROP YOU OFF OR WHATEVER.  I'M NOT

7 GOING OUT OF THE WAY.  I SAID IT'S ON MY WAY DOWN THERE.  SHE

8 SAID CAN YOU TAKE 42 DOWN?  I SAID YEAH.  SHE SAID I'LL MEET

9 YOU AT THE INTERSECTION THERE AT 42.  I SAID OKAY.

10          WHEN I PULLED UP TO THIS LITTLE STORE OR WHATEVER

11 HAD BEEN CLOSED UP.  I WAITED THERE MAYBE TWO MINUTES AND HERE

12 A TRUCK PULLS UP LIKE A DODGE RAM TYPE OF TRUCK OR WHATEVER,

13 AND SHE GETS OUT AND A GUY GETS OUT, SOME BALD HEADED GUY, I

14 DIDN'T KNOW HIM, AND THEY THROW THREE OR FOUR SATCHELS IN THE

15 BACK LIKE DUFFLE BAGS IN THE BACK OF THE TRUCK.

16 Q.    WELL, HOW MANY FOLKS SHOWED UP WITH STEPHANIE?

17 A.    JUST TWO OF THEM.

18 Q.    JUST HER --

19 A.    HER AND THIS GUY.  AND THEY THROW THE DUFFLE BAGS IN THE

20 BACK OF THE TRUCK AND I MADE THE COMMENT, I SAID, DO YOU NEED

21 A RIDE OR ARE YOU MOVING IN WITH ME, YOU KNOW, JUST JOKING

22 WITH HER.  AND SO SHE LAUGHED AND WE GOT IN THE TRUCK AND

23 LEFT.

24          WE DIDN'T TAKE LONG AND GOT DOWN TO WADE'S HOUSE.

25 TOOK THE DOOR PANELS OUT.  WE HAD TO CLEAN THEM UP.  THEY WERE

1 DUSTY, YOU KNOW.  AND SO WADE PAID ME MONEY FOR THE DOOR

2 PANELS AND PAID ME FOR THE GAS.  AND WE LEFT.  WE DIDN'T STAY

3 THERE.  WE WEREN'T EVEN THERE FIVE MINUTES, I GUESS.

4           WE LEFT.  WENT DOWN TO THE STORE.  I STOPPED AT THE

5 STORE.  AND I SAID, DO YOU NEED SOME CIGARETTES?  SHE SAID

6 YEAH.  I GOT OUT OF THE CAR, WALKED IN THERE -- OR OUT OF THE

7 TRUCK AND WALKED IN THE STORE AND JUST AS I WAS WALKING IN THE

8 -- JUST AS I GOT OUT OF THE TRUCK GOOD HER PHONE RANG.  I

9 HEARD IT RINGING.  BUT I WALKED AROUND THE TRUCK, I DIDN'T PAY

10 ATTENTION TO WHO SHE WAS TALKING TO.  I GO IN THE STORE AND

11 GET CIGARETTES, PAY FOR GAS.  I COME BACK OUT AND SHE'S JUST

12 HANGING UP THE PHONE.  SHE SAID I NEED TO STOP BY TERESA'S A

13 MINUTE.  I SAID STEPHANIE, I'M NOT GOING OUT OF THE WAY

14 NOWHERE.  I'VE GOT TO GO BACK -- GET UP THERE AND GO TO

15 GOLDSBORO TO THE SALVAGE YARD.  THIS WON'T TAKE BUT A MINUTE.

16 IT'S ONLY A HALF A MILE UP THE ROAD.

17           I DIDN'T WANT TO, BUT I TRIED TO DO FAVORS FOR THIS

18 GIRL.  I TRIED TO LOOK AFTER HER AND DO THE BEST I COULD,

19 OKAY?  I FELT SORRY FOR HER.  SHE JUST COULDN'T -- SHE

20 COULDN'T SEEM TO GET RIGHT.

21           SO, WE GO TO TERESA'S AND I'VE ONLY MET TERESA ONE

22 TIME WHEN SHE BROUGHT STEPHANIE BY THERE ONE DAY.  I'VE MET

23 HER ONE TIME AND TALKED TO HER ON THE PHONE MAYBE ONE TIME.

24           SO, WE PULL IN THE YARD, STEPHANIE JUMPS OUT.  I'M

25 GOING TO GET OUT JUST TO SAY HELLO, JUST TO BE SOCIABLE; HEY,

1 HOW YOU DOING?

2        WALKED IN THE HOUSE.  AS SOON AS STEPHANIE WALKED IN

3 THE HOUSE THE SHERIFF COMES ALL OUT AND THEY START PATTING ME

4 ALL DOWN AND ASKING ME HAVE I GOT DRUGS ON ME OR WHATEVER.  I

5 SAID, WHAT'S GOING ON?  WHAT HAPPENING?  THEY SAID YOU DIDN'T

6 KNOW SHE'S GOT A PROBATION VIOLATION?  I SAID I KNEW SHE HAD

7 SOME PROBLEMS, I SAID, BUT I AIN'T GOT NOTHING TO DO WITH

8 THAT.  YOU GOT ANY DRUGS WITH YOU?  AND I SAID, NO, SIR.  HE

9 SAID STEP OUTSIDE A MINUTE.  I STEP OUTSIDE.  AND HE SAID

10 THAT'S YOUR TRUCK?  I SAID IT BELONGS TO A FRIEND OF MINE.  HE

11 SAID WHOSE STUFF IS THAT IN THE BACK?  I SAID IT BELONGS TO

12 STEPHANIE.  HE SAID, DO YOU MIND IF WE SEARCH THE TRUCK?  I

13 SAID TAKE IT A PART.  I MEAN, I HAD NO PROBLEM WITH IT AT ALL.

14 I HAD NO IDEA THAT ANYTHING WAS IN THE TRUCK.  I HAD NO IDEA.

15        SO, THEY SEARCH THE TRUCK AND THEY FIND THIS AND

16 START HANDCUFFING ME.  SHE MAKES THE COMMENT, IT'S ALL MINE.

17 HE HAD --

18        MS. WELLS:  OBJECTION.

19        THE WITNESS:  -- NOTHING TO DO WITH IT.

20        THE COURT:  SUSTAINED.  SUSTAINED.

21        THE WITNESS:  OKAY.  ANYWAY, I TELL THE OFFICER I

22 HAVE NOTHING TO DO WITH IT.  THIS IS HER STUFF.  THIS IS NOT

23 MINE.  I HAVE NOT MESSED WITH NO METH.  AND HE SAID YOU KNOW

24 MORE THAN YOU'RE SAYING.  I SAID, I TELL YOU WHAT, WHY DON'T

25 YOU STOP RIGHT NOW AND GIVE ME A DRUG TEST.  GIVE ME A DRUG

1 TEST RIGHT NOW.  I HAVE NOT DONE NO DRUGS.  I'M NOT GUILTY OF

2 MESSING WITH NO DRUGS AND THAT IS NOT MY STUFF IN THE TRUCK.

3 HE SAID I'M GOING TO DO BETTER THAN THAT, I'M GOING TO LOCK

4 YOUR -- EXCUSE ME -- I'M GOING TO LOCK YOU UP AND YOU'LL TELL

5 SOMETHING THEN.  AND THAT'S WHAT HAPPENED.

6 BY MR. STEWART:

7 Q.   NOW, WERE YOU DRUNK ON LIQUOR AT THAT POINT?

8 A.   NO, SIR.

9 Q.   WERE YOU HIGH ON METH?

10 A.   NO, SIR.

11 Q.   HAD YOU BOUGHT ANY METH FROM WADE TURNAGE?

12 A.   NO, SIR.

13 Q.   WHAT ABOUT DELIVER HIM ANY PILLS?

14 A.   NO, SIR.

15        (PAUSE.)

16        BY THE WAY, WADE TURNAGE IS 300 POUNDS SITTING IN A

17 WHEELCHAIR, YOU KNOW.

18 Q.   HOW LONG HAVE YOU KNOWN WADE?

19 A.   ABOUT THREE YEARS.  LIKE I SAID, HE HAD A TRUCK BROUGHT

20 TO ME TO REBUILD AN ENGINE.

21 Q.   IS THAT THE ONLY OTHER TIME YOU'VE DONE BUSINESS OR DID

22 YOU START DOING BUSINESS WITH HIM AFTER THAT?

23 A.   NO, I WORKED ON SEVERAL VEHICLES FOR WADE.  AND ACTUALLY,

24 I'VE GOT A RACE CAR SITTING DOWN AT HIS PLACE RIGHT NOW THAT I

25 BOUGHT FROM HIM AND I HADN'T NEVER PICKED IT UP.  IT'S A 1920

1  -- I MEAN, IT'S A '28 FORD MODEL T, SOMETHING LIKE THAT.

2  Q.   NOW, YOU SAID YOU DID NOT DELIVER ANY PSEUDOEPHEDRINE

3  PILLS TO WADE, BUT HAVE YOU BOUGHT ANY PSEUDOEPHEDRINE PILLS?

4  A.   YES, SIR, I HAVE.

5  Q.   WELL, WE'VE SEEN A LARGE AMOUNT OF PURCHASES.

6  A.   I BOUGHT SOME, BUT I HAVEN'T BOUGHT THAT MANY, NO, SIR.

7  Q.   NOW, YOU'RE SAYING YOU HAVE NOT MADE 47 PURCHASES --

8  A.   NO.

9  Q.   -- IN TWO YEARS?

10  A.   NO, SIR.  NO, SIR.

11  Q.   YOUR NAME WAS ON IT, WASN'T IT?

12  A.   YES, SIR, BUT I KNOW MY NAME AND I'VE BEEN SIGNING MY

13  NAME SINCE THE DAY I COULD WRITE AND I KNOW WHAT I WRITE LIKE

14  AND WHAT I DON'T AND SOME SIGNATURES ARE NOT MINE.

15  Q.   SOME OF THEM ARE NOT YOURS?

16  A.   NO, SIR.

17  Q.   HAVE YOU BEEN IN POSSESSION OF YOUR DRIVER'S LICENSE FOR

18  THE PAST TWO YEARS?

19  A.   MY DRIVER'S LICENSE HAS BEEN STOLEN FROM MY WALLET TWICE.

20  MY WHOLE WALLET WAS GONE TWO YEARS AGO.  I WENT OVER TO --

21  STEPHANIE AND HER BOYFRIEND WERE LIVING TOGETHER, STEPHANIE

22  AND BOBBY, OKAY?  THEY LIVED UP IN FREMONT, OKAY?  I WENT OVER

23  THERE AND ACTUALLY HE HAD JUST GOT OUT OF JAIL OR SOMETHING.

24  HE HAD BEEN IN JAIL OR WHATEVER.

25          I WENT OVER THERE TO HELP HIM MOVE SOME THINGS

1  AROUND.  I HAD MY ROLLBACK AT THE TIME.  AND THEY HAD A LITTLE

2  GO CART.  AND HE SAID RIDE THIS GO CART BECAUSE I LIKE TO RIDE

3  ANYTHING THAT'S FAST.  SO, I GET IN THIS GO CART AND I GO UP

4  AND DOWN THIS PATH FOUR OR FIVE DIFFERENT TIMES, JUST HAVING A

5  GOOD TIME.

6          I GET BACK IN THE ROLLBACK AND LEAVE.  I GET ALL THE

7  WAY TO THE HOUSE AND NOTICE I AIN'T GOT MY WALLET.  SO, I CALL

8  STEPHANIE BACK UP THERE AND ASK HER IF SHE'S SEEN WALLET AND

9  SHE SAID, NO, THEY HADN'T SEEN MY WALLET.  I SAID COULD YOU

10 CHECK THAT PATH AND SEE IF IT FELL OUT OF MY POCKET WHILE I

11 WAS ON THE GO CART.  SHE SAID SHE CHECKED AND SHE DIDN'T SEE

12 IT.

13         NINE MONTHS LATER -- A GOOD NINE MONTHS LATER

14 STEPHANIE TOLD ME SHE FOUND MY DRIVER'S LICENSE, BUT SHE

15 DIDN'T FIND MY WALLET OUT THERE ON THE PATH.  SHE WAS WALKING

16 DOWN THE PATH AND HAPPENED TO FIND MY DRIVER'S LICENSE.

17 Q.   YOUR DRIVER'S LICENSE?  SHE FOUND YOUR DRIVER'S LICENSE,

18 BUT NOT YOUR WALLET?

19 A.   NOT MY WALLET.  I DIDN'T HAVE BUT $50 IN IT, BUT, I MEAN,

20 STILL IT'S $50, BUT, YOU KNOW.  ANOTHER TIME WAS --

21 Q.   NOW, WHEN SHE FOUND YOUR DRIVER'S LICENSE ON THE PATH,

22 DID YOU SEE IT ON THE PATH OR DID SHE BRING IT BACK TO YOU?

23 A.   NO, SHE TOLD ME ABOUT IT.  SHE NEVER BROUGHT IT BACK TO

24 ME.  I HAD ALREADY GOTTEN ANOTHER DRIVER'S LICENSE THEN, OKAY?

25         NOW, THE NEXT TIME IT'S MISSING, I CAN'T TELL YOU

1 HOW LONG IT'S MISSING BECAUSE I'LL TELL YOU WHY, WHEN I GOT

2 LOCKED UP IN JOHNSTON COUNTY AND BONDED OUT OF JOHNSTON

3 COUNTY, OKAY, AND I GOT MY WALLET OUT OF PROPERTY, WHEN I

4 OPENED MY WALLET UP FROM PROPERTY THE ONLY THING IN MY WALLET

5 WAS TWO CHECKS I HAD LEFT IN THERE, OKAY?  NO I.D. AT ALL.

6 NOTHING.  MY DRIVER'S LICENSE GONE.  EVERYTHING.  MY SOCIAL

7 SECURITY CARD IS THERE, BUT NO -- AS FAR AS DRIVER'S LICENSE

8 OR ANYTHING, ALL THAT'S GONE.  I DON'T KNOW HOW LONG IT'S BEEN

9 GONE.

10          BUT SEE, WHEN I WORKED ON CARS AT THE SHOP I TOOK MY

11 WALLET OUT.  THE REASON I TOOK MY WALLET OUT OF MY PANTS IS

12 BECAUSE MY WIFE HAS CHEWED ME OUT FOR YEARS BECAUSE OUR CREDIT

13 CARDS, SHE'D GO TO USE IT OUT OF MY WALLET AND COULDN'T USE

14 IT.  WHERE I LAID BACK ON THE PAVEMENT I WOULD CHAFE THAT

15 WALLET UP AND DOWN THE CONCRETE LIKE THIS SO BAD INSIDE MY

16 WALLET THAT IT WOULD JUST EAT THE NUMBERS AND STUFF OFF THE

17 CREDIT CARDS.  MY DRIVER'S LICENSE, YOU COULDN'T HARDLY SEE MY

18 PICTURE HALF THE TIME, YOU KNOW.

19          SO, I GOT IN THE HABIT OF TAKING MY WALLET OUT AND

20 PUTTING IT IN THE DESK DRAWER, YOU KNOW, SO IT'S READABLE WHEN

21 YOU OPEN IT.

22          SO, I CAN'T TELL YOU WHEN THAT DRIVER'S LICENSE WAS

23 MISSING.  I DON'T KNOW.  THAT'S THE FIRST TIME I REALIZED IT.

24 I DON'T EVER USUALLY LOOK AT IT UNTIL --

25 Q.   WERE YOU ARRESTED FOR BUYING TOO MUCH PSEUDOPHED BY NORTH

1 CAROLINA?

2 A.   NO, SIR.  NO, SIR.  NOT AT ALL.

3 Q.   IS IT FAIR TO SAY THAT YOU AND STEPHANIE SMITH HAVE A

4 CHECKERED RELATIONSHIP?

5 A.   YEAH, WE -- YEAH, IT WAS CHECKERED ALL RIGHT.

6 Q.   DO YOU KNOW WHETHER SHE'S EVER WANTED TO COOK METH AT

7 YOUR SHOP?

8 A.   OH, YEAH.

9 Q.   DID SHE ASK YOU POINT BLANK?

10 A.   OH, YEAH, SHE'S ASKED.

11 Q.   AND DID YOU SAY, SURE, GO IN THE TRAILER IN THE BACK?

12 A.   NO.

13 Q.   WHAT DID YOU SAY?

14 A.   NO, I TOLD HER I DON'T PLAY THAT GAME.  I GOT -- LET ME

15 TELL YOU, I'VE GOT CUSTOMERS COMING OUT TO THE SHOP ALL DAY

16 LONG, OKAY?  I MEAN, JUST -- ALL OVER THE PLACE.

17        THREE OF THE CARS SITTING IN MY SHOP RIGHT NOW,

18 OKAY, I HAVE ONE CAR THAT BELONGS TO A SUPREME COURT JUDGE,

19 OKAY?  I HAVE ONE CAR THAT BELONGS TO A NASHVILLE COUNTY

20 POLICE OFFICER -- CANINE POLICEMAN, OKAY?  ANOTHER ONE BELONGS

21 TO A RETIRED COLONEL, OKAY?  ALL THESE CARS ARE TO BE

22 RESTORED.  AND EACH ONE OF THESE CARS I'M TALKING ABOUT A

23 PRICE TAG OF 25, $30,000, OKAY?

24        I'M NOT GOING TO LET A BUNCH OF METH HEADS HANG

25 AROUND.  I JUST FINISHED A CAR FOR A PAROLE OFFICER FOR THE

1 STATE OF NORTH CAROLINA, MR. NORMAN RUSH, AND I WORKED ON HIS

2 CAR IN 2009, FOR A PERIOD OF FIVE MONTHS.  AT THE TIME THAT

3 DUSTIN BOYKIN SAYS HE WAS COMING DOWN TO MY SHOP EVERYDAY,

4 THIS PAROLE OFFICER WAS AT MY SHOP ALMOST EVERYDAY.

5 Q.   I WAS NEVER SURE WHEN DUSTIN SAID HE WAS AT YOUR SHOP

6 EVERYDAY.  WHAT MONTH ARE YOU TALKING ABOUT YOU WERE WORKING

7 ON THE PAROLE OFFICER'S --

8 A.   FROM THE FIRST PART OF 2009, JANUARY, TO MAYBE JUNE, I

9 WORKED ON THAT CAR.

10 Q.   THE WINTER MONTHS?

11 A.   YEAH, RIGHT AT IT.

12 Q.   BACK TO AARON SIMMONS AND HIS ANHYDROUS TANK.

13 A.   UH-HUH.

14 Q.   DID YOU TAKE HIM UP TO WADE TURNAGE'S --

15 A.   NO, SIR.  NO, SIR.

16 Q.   -- HOUSE TO SELL THAT TANK FOR $50.

17 A.   NO, SIR.  I'M NOT GOING TO RIDE DOWN I-95 DOWN THERE WITH

18 AN ANHYDROUS TANK IN THE BACK OF MY TRUCK.

19 Q.   DID YOU TELL AARON THAT HE COULD GET $1,000, $100 A

20 GALLON FOR THAT?

21 A.   I HAVE NO IDEA WHAT IT EVEN DOES, WHAT IT'S WORTH AND

22 WHAT IT DOES.  I MEAN, I JUST DON'T KNOW ABOUT WHAT IT IS.

23 I'VE HEARD YOU CAN WELD WITH IT.  I'VE HEARD YOU -- FARMERS

24 USE IT OR WHATEVER.  I DON'T KNOW WHAT IT IS.

25 Q.   WELL --

1 A.   LISTEN, I HAVE TROUBLE SPRAYING A CAR -- WELL, THE

2 CARBURETOR WITH LIGHTING FLUID -- WITH STARTING FLUID.  I'VE

3 SET MYSELF ON FIRE TWICE AND BLOWN IT OFF.  DO YOU THINK I'M

4 GOING TO MESS WITH ANHYDROUS?  I'M SCARED TO DEATH OF THAT,

5 YOU KNOW?

6 Q.   WELL, NOW, WE'VE HEARD THAT STARTER FLUID IS PART OF THE

7 METH PRODUCTION.  DID YOU HEAR THAT --

8 A.   YEAH, I HEARD IT.

9 Q.   -- DURING THE TESTIMONY?

10 A.   YEAH.  THE ONLY THING I'VE DONE, I'VE PRODUCED TWO MAJOR

11 FIRES ON A CAR WITH IT.

12 Q.   SO YOU OWN SOME?

13 A.   HUH?

14 Q.   SO YOU OWN SOME?

15 A.   OH, YEAH, I USE IT EVERYDAY.

16 Q.   THERE'S SOME IN THE SHOP?

17 A.   YEAH, I USE IT ON THE CARS ALL THE TIME.

18 Q.   WHAT DO YOU USE IT FOR?

19 A.   TO START THE CARS UP.  LIKE WHEN THE CAR WON'T START AND

20 HAS TROUBLE STARTING, SHOOT IT IN THE FIRE BODY, SHOOT IT IN

21 THE CARBURETOR.  AND IF YOU SHOOT TOO MUCH YOU BLOW SOMETHING

22 UP AND I DID A COUPLE OF TIMES.  I BURNED ALL MY HAIR OFF A

23 COUPLE OF TIMES.

24 Q.   NOW, YOU SAY YOU HAVE A LOT OF CARS IN YOUR SHOP FROM

25 PEOPLE OF AUTHORITY, IS THAT CORRECT?

1 A.   YES, SIR.

2 Q.   DID THESE PEOPLE BRING THEIR CAR TO YOUR SHOP?

3 A.   YES, SIR.

4 Q.   NOW, YOU'VE ALSO HEARD THE TESTIMONY FROM EVERYONE THAT

5 BASICALLY FROM MAYBE '08, UP UNTIL JUNE, YOU WERE HIGH

6 EVERYDAY AT THE SHOP, IS THAT CORRECT?

7 A.   NO, I DON'T THINK SO.

8 Q.   WERE YOU SNORTING COCAINE --

9 A.   I HEARD THEM, BUT, NO, SIR.

10 Q.   -- AT THE SHOP EVERYDAY?

11 A.   NO, SIR.  I COULDN'T HAVE GOT MY WORK DONE IF I WAS HIGH,

12 YOU KNOW.

13 Q.   WELL, YOU HEARD THE TESTIMONY THEY CAME -- EVERY TIME

14 THEY CAME OVER EVERYBODY GOT HIGH FOR HOURS ON END.

15 A.   WELL, I DON'T KNOW WHO THEY THINK THEY WERE GETTING HIGH

16 WITH.  I ASKED THEM -- WHEN I WAS PICKED UP BY MS. PAGE AND

17 ALL OF THEM, I TOLD THEM RIGHT THAT DAY SITTING RIGHT IN THE

18 OFFICE IN FRONT OF MS. PAGE I'D TAKE A DRUG TEST RIGHT THEN,

19 I'D TAKE A DRUG TEST RIGHT THEN.  SHE ASKED ME IF I TAKE A

20 DRUG TEST WOULD I BE CLEAN.  YES, MA'AM, I'D BE CLEAN.

21 Q.   NOW, YOU'VE TAKEN DRUG TESTS?

22 A.   YES, I HAVE.

23 Q.   YOU'VE TAKEN DRUG TESTS FOR HOW LONG NOW?

24 A.   11 YEARS.

25 Q.   DID YOU KNOW THESE DRUG TESTS WERE COMING?

1  A.   NO.  NO.

2  Q.   DID JENNIFER JONES CALL YOU AND SAY, HEY, YOU KNOW, NEXT

3  WEEK WE'RE GOING TO DRUG TEST YOU, BE READY.

4  A.   SHE'S CALLED ME AND SAID CAN YOU BE IN MY OFFICE IN 45

5  MINUTES.

6  Q.   TO TAKE A DRUG TEST?

7  A.   YES, SIR.

8  Q.   BUT YOU WERE HIGH, WEREN'T YOU?

9  A.   I DON'T THINK SO.

10 Q.   BUT YOU WENT TO HER OFFICE AND TOOK THE DRUG TEST?

11 A.   YES, SIR.  MANY TIMES I'VE TOOK DRUG TESTS.

12 Q.   HAVE YOU BEEN VIOLATED ON YOUR NORTH CAROLINA PROBATION?

13 A.   NO, SIR.  I WAS RECOMMENDED BY THREE DIFFERENT PAROLE

14 OFFICERS TO BE --

15           MS. WELLS:  OBJECTION TO ANYTHING --

16           THE COURT:  SUSTAINED.

17           MS. WELLS:  -- THAT ANYBODY ELSE SAID.

18 BY MR. STEWART:

19 Q.   JUST STATE WHAT YOU SAY --

20 A.   YES, SIR.

21 Q.   -- NOT WHAT YOU DO IN REGARDS TO THAT.  IS IT FAIR TO SAY

22 THAT YOU HAVE TRIED METH?

23 A.   YES, SIR, I'VE TRIED IT.

24 Q.   NOW, WHY -- YOU DON'T DO IT ON A DAILY BASIS?

25 A.   NO, SIR.  I'M GOING TO TELL YOU SOMETHING, I WOULDN'T

1 HAVE DONE IT THEN IF SOMEBODY TOLD ME IT HAD DRANO IN IT.  AND

2 THAT'S WHAT MY STEPDAUGHTER SAID, WHY DON'T YOU TRY THIS ONE

3 TIME AND SEE WHAT IT'S LIKE?  I SAID LET ME TASTE OF IT A

4 MINUTE.  I TASTED OF IT AND IT LIKED TO TORE ME ALL TO PIECES.

5 Q.    NOW, YOUR STEPDAUGHTER --

6 A.    VALERIE.

7 Q.    -- ASKED YOU TO TRY IT?

8 A.    THAT'S WHY ME AND MY WIFE -- I WENT AND TOLD MY WIFE THAT

9 I HAD TRIED IT RIGHT THERE AND SHE HAD A FIT WHEN I TOLD HER

10 THAT RIGHT THERE.  AND I'LL BE -- I WAS HONEST WITH HER.  I

11 AIN'T GOING TO HIDE NOTHING FROM HER AND WE GOT IN AN ARGUMENT

12 BECAUSE -- ME AND VAL GOT IN AN ARGUMENT AND WE DIDN'T TALK

13 FOR A FEW MONTHS OVER THIS RIGHT HERE BECAUSE I TOLD HER THE

14 MORNING MY STEPSON DIED I BELIEVE FOR A FACT AND I BELIEVE IT

15 RIGHT NOW UNTIL SOMEONE PROVES DIFFERENT I BELIEVE SHE GAVE

16 HIM METH THE DAY BEFORE -- THE DAY HE DIED, THE MORNING HE

17 DIED.

18         MS. WELLS:  YOUR HONOR, I'M GOING TO OBJECT AND ASK

19 THE RECORD --

20         THE COURT:  SUSTAINED.

21         MS. WELLS:  -- TO STRIKE THAT.

22         THE COURT:  OBJECTION SUSTAINED.

23         THE WITNESS:  ANYWAY, WE HAD AN ARGUMENT AND WE JUST

24 DIDN'T GET ALONG FOR QUITE AWHILE.  I HAD HARD FEELINGS.

25 BY MR. STEWART:

1 Q.   DID YOU ENJOY THE METH THAT YOU GOT?

2 A.   NO, SIR.  NO.

3 Q.   DID YOU GET ADDICTED TO IT?

4 A.   NO, SIR.  NO, SIR.

5 Q.   WHAT DID IT DO TO YOU?

6 A.   IT TASTED JUST LIKE SOMEBODY PUT BATTERY ACID IN MY

7 MOUTH.  THAT'S WHAT IT TASTED LIKE.  BUT SEE, I TALKED TO

8 SOMEBODY ABOUT THIS FOUR YEARS AGO -- YEAH, IT'S BEEN A GOOD

9 FOUR YEARS AGO.  I SPOKE TO A MR. PAUL MOATS --

10 Q.   DON'T SAY ANYTHING PAUL SAID.

11 A.   OKAY.

12 Q.   BUT YOU CAN --

13 A.   NO, I SPOKE --

14 Q.   WHAT DID YOU TELL PAUL MOATS?

15 A.   I SPOKE TO PAUL MOATS AND I TOLD PAUL MOATS, I WAS AS

16 HONEST AS I COULD BE WITH PAUL --

17 Q.   WELL, WHO IS PAUL?

18 A.   PAUL MOATS WAS A DEA DRUG AGENT OR WHATEVER IN WILSON

19 COUNTY, OKAY?  AND I SPOKE TO HIM ABOUT MY SHOP.  I SAID THAT

20 THINGS HAVE BEEN SAID AROUND BY DIFFERENT PEOPLE ABOUT MY SHOP

21 BEING, YOU KNOW, METH PEOPLE AND ALL THIS RIGHT HERE.  AND I

22 HAD GREASE ALL OVER ME, I WAS COVERED FROM ONE END TO THE

23 OTHER WITH GREASE, AND I TOLD PAUL, I SAID, PAUL, I'M GOING TO

24 TELL YOU THE GOD'S HONEST TRUTH, WHEN I WAS YOUNG, I WAS

25 FOOLISH THING, I DID A STUPID THING, GOT INVOLVED WITH

COCAINE.  I HAULED IT.  I SMUGGLED IT.  I DID WHATEVER I HAD

TO DO.  I MADE MONEY OFF OF IT.  MADE MORE MONEY PROBABLY THAN

I'LL EVER SEE AGAIN.  I DID COCAINE MORE THAN I COULD EVER

THINK ABOUT DOING.  AND THAT WAS ALL WHILE I WAS YOUNG.  BUT

LOOK AT ME NOW.

Q.   HOW YOUNG?

A.   I WAS 26, 27 YEARS OLD.

Q.   IS THIS WHEN YOU GOT IN TROUBLE?

A.   YES, SIR.  YES, SIR.

Q.   DID THAT PATTERN OF BEHAVIOR CONTINUE ON UP UNTIL YOU

WERE 59 YEARS OLD?

A.   NO.  NO, SIR.  SO, I TOLD PAUL, I SAID I WOULDN'T BE LIKE

THIS IF I WAS DEALING DRUGS.  I SAID I'M TRYING TO MAKE A

LIVING, BUT I CAN'T CONTROL WHO COMES UP HERE.  I CAN'T WEED

OUT AND SAY, EXCUSE ME, SIR, ARE YOU A DRUG DEALER?  I CAN'T

WORK ON YOUR CAR, YOU KNOW.  NO, I'M NOT GOING TO TAKE THAT

$35,000 FROM YOU BECAUSE YOU'RE A DRUG DEALER.  I CAN'T DO

THAT, YOU KNOW.

Q.   NOW, YOU DID TESTIFY THAT A LOT OF THE FOLKS THAT CAME TO

SEE YOU HAD CAR PROBLEMS --

A.   YES, SIR.

Q.   -- IS THAT CORRECT?

A.   YES, SIR, THEY DID.

Q.   ALL THESE FOLKS THAT STEPHANIE WOULD BRING UP THERE HAD

SOME SORT OF CAR PROBLEM?

1  A.   OH, YEAH.  OH, YEAH.  THAT'S HOW IT ALL STARTED.  THAT'S

2  HOW THEY ALL STARTED COMING AROUND, WORKING ON CARS, WORKING

3  ON CARS, YOU KNOW.  I MUST HAVE GIVE -- I BET YOU I GIVE AARON

4  THREE OR FOUR VEHICLES.  GIVE THEM TO HIM.

5  Q.   WHAT KIND?

6  A.   TRUCKS.

7  Q.   WHY?

8  A.   LITTLE HONDAS.  TO HELP HIM OUT JUST BECAUSE HE HAD

9  PROBLEMS AND NEEDED A CAR AND HE'D TEAR IT UP OR HE'D SELL

10  THAT ONE AND I'D GO GET HIM ANOTHER ONE.  I LOOKED AFTER HIM

11  JUST LIKE HE WAS MY SON FOR A WHILE.

12  Q.   DID ANY OF THESE YOUNG PEOPLE THAT CAME AROUND THAT

13  APPEARED TO YOU TO HAVE A PROBLEM, DID YOU EVER TRY TO GET

14  THEM TO STRAIGHTEN OUT?

15  A.   I TALKED TO AARON UNTIL I'M BLUE IN THE FACE.

16  Q.   WHAT ABOUT STEPHANIE?

17  A.   I'VE TALKED TO STEPHANIE TOO.  I JUST --

18  Q.   AND VALERIE?

19  A.   YEAH, VAL, ESPECIALLY, YOU KNOW.  VAL WAS ON IT BEFORE,

20  BUT WHEN HER BROTHER DIED SHE GOT WORSE, YOU KNOW.

21  Q.   IS IT POSSIBLE, MR. LEWIS, THAT SOME OF THESE PEOPLE,

22  AARON, KEVIN, WERE COOKING METH IN YOUR SHOP WITHOUT YOUR

23  KNOWLEDGE?

24  A.   YES, SIR, IT'S POSSIBLE.  AARON TOLD ME ONE TIME THAT HE

25  COOKED ONE TIME --

1          MS. WELLS:  OBJECTION.

2          THE WITNESS:  -- IN MY SHOP WITHOUT ME KNOWING IT.

3  WELL, I'M SORRY.

4          THE COURT:  OBJECTION IS SUSTAINED.

5          MR. STEWART:  YOUR HONOR, MAY WE APPROACH?

6          THE WITNESS:  WELL, THERE WAS EVIDENCE OF A COOK.

7          MR. STEWART:  MAY WE APPROACH?

8          THE COURT:  YES, SIR.

9          (BENCH CONFERENCE ON THE RECORD.)

10          MR. STEWART:  YOUR HONOR, AARON SPENT HOURS

11  TESTIFYING ABOUT HIS COOKS AT THE SHOP.  I THINK IT'S NOT

12  HEARSAY IF MR. LEWIS TESTIFIES AS TO --

13          THE COURT:  YOU ASKED HIM WHO TOLD HIM THAT?

14          MR. STEWART:  NO, HE WAS VOLUNTEERING THAT AARON WAS

15  ABOUT TO -- HE WAS ABOUT TO SAY SOMETHING THAT AARON HAD TOLD

16  HIM, BUT IT HAS -- IT'S TESTIFIED ABOUT.

17          THE COURT:  SUSTAINED.

18          MR. STEWART:  YES, SIR.  THANK YOU, JUDGE.

19          (BENCH CONFERENCE CONCLUDED.)

20  BY MR. STEWART:

21  Q.   SO, IS IT POSSIBLE THAT THEY WERE COOKING AT YOUR SHOP

22  WITHOUT YOUR KNOWLEDGE?

23  A.   YES, SIR.

24  Q.   AND DO YOU HAVE REASON TO BELIEVE THEY WERE COOKING AT

25  YOUR SHOP WITHOUT YOUR KNOWLEDGE?

1  A.   YES, SIR.

2  Q.   COULD THEY HAVE BEEN STEALING STUFF FROM YOUR SHOP

3  WITHOUT YOUR KNOWLEDGE?

4  A.   YES, SIR.

5  Q.   AND DO YOU HAVE REASON TO BELIEVE THEY WERE STEALING

6  STUFF AT YOUR SHOP WITHOUT YOUR KNOWLEDGE?

7  A.   YES, SIR, I DO.

8  Q.   DO YOU SPEND ANY TIME AT YOUR SHOP IN PRAYER?

9  A.   YES, SIR, I DID.

10  Q.   HOW MUCH WOULD YOU SAY YOU PRAYED?

11  A.   BEFORE EVERY MEAL I SIT DOWN AND SAY A BLESSING AND EVERY

12  NIGHT BEFORE I LAY MY HEAD DOWN I SAY A PRAYER.

13  Q.   DO YOU EVER PRAY --

14  A.   AND IT DON'T MATTER WHETHER I COME TO THE HOUSE OR NOT,

15  WHETHER I LEAVE THE HOUSE.  IF I DON'T LEAVE THE SHOP AND I

16  STAY IN THE SHOP AND WORK ALL NIGHT LONG THEN I SAY A PRAYER

17  RIGHT IN THE SHOP.

18  Q.   DID YOU EVER PRAY FOR OR WITH THESE YOUNG PEOPLE AROUND

19  YOUR SHOP?

20  A.   WELL, AARON, WE'VE PRAYED SEVERAL TIMES TOGETHER.  AARON

21  AND I PRAYED SEVERAL TIMES TOGETHER.  AND KEVIN IS NOT INTO

22  IT.  HE IS NOT INTO IT.  HE'LL TALK A GOOD GAME, BUT HE'S NOT

23  INTO IT.  I'VE TOLD STEPHANIE I'VE PRAYED FOR HER SEVERAL

24  TIMES.  SHE SAID OKAY, EVERYTHING WAS FINE.  YOU KNOW, I

25  TALKED -- SHE WENT TO CHURCH WITH US -- ACTUALLY WENT TO

1 CHURCH WITH US A COUPLE OF TIMES I BELIEVE ALTOGETHER.

2 Q.    WHO DID?

3 A.    STEPHANIE.

4 Q.    YOU TOOK HER TO CHURCH?

5 A.    YEAH, ME AND MY WIFE.  YEAH, SHE WENT TO CHURCH WITH US.

6 TOOK ABIGAIL, THE GRANDBABY, WITH US TOO, YOU KNOW.  AND WE

7 STILL -- MY WIFE STILL, YOU KNOW, WOULD GET THE BABY SOMETIMES

8 AND GO TO CHURCH AND WE'D GET HER TO GO TO CHURCH WITH US, THE

9 GRANDBABY ABIGAIL.  MY STEPSON HAD SEVEN CHILDREN ALTOGETHER.

10 Q.    I'M SORRY, WHAT'D YOU SAY?

11 A.    HE HAD SEVEN CHILDREN ALTOGETHER SO WE'D TRY TO GET THEM

12 ALTOGETHER TO GO TO CHURCH, YOU KNOW, KEEP THEM CHURCH.  AND

13 WE'VE GOT AARON'S DAUGHTER OVER THERE RIGHT NOW.  SHE'S LIVED

14 WITH US QUITE A WHILE AND SHE'S GONE TO CHURCH EVERY SUNDAY

15 WITH US AND WE HELP HER WITH HER HOMEWORK EVERY NIGHT.  SHE'S

16 IMPROVED 100 PERCENT FROM WHAT SHE WAS FROM A YEAR AGO.  HER

17 GRADES HAVE TURNED AROUND.  SHE'S DOING GOOD.

18         I HAVE A POLICE OFFICER THAT WORKED FOR ME PART

19 TIME, WE'VE GONE TO CHURCH WITH FOR TEN YEARS.

20 Q.    WHO WAS THAT?

21 A.    HIS NAME IS JAMES FRAZIER -- FAISON.  JAMES FAISON.  HE

22 WENT -- WE WENT TO CHURCH TOGETHER, ABOUT TEN YEARS

23 ALTOGETHER, AND HE COMES OVER TO THE HOUSE A LOT.

24         I HAVE, LIKE I SAID, ANOTHER POLICE OFFICER, HE'S A

25 CHURCH GOING GUY, DOUG WILLIAMS, OUT OF ROCKY MOUNT.  AND HE'S

1 WORKED OUT THERE SEVERAL TIMES WITH ME.

2        SO, I HAVE THESE PEOPLE WORK WITH ME.  I ACTUALLY

3 HAD AN ORDAINED MINISTER WORK WITH ME.  I RESTORED HIS CAR.

4 AND HE ENJOYED THE CAR SO MUCH HE WANTED TO COME OUT THERE AND

5 WORK WITH ME.  SO, HE WORKED WITH ME QUITE A WHILE.

6 Q.    WHAT'S HIS NAME?

7 A.    WILLIE COLLEY.

8 Q.    DO YOU RECALL, MR. LEWIS, EVER GIVING ANY OF THESE --

9 AARON, KEVIN, STEPHANIE, ANY MONEY TO GO BUY DRUG

10 PARAPHERNALIA WITH?

11 A.    NO, SIR.

12 Q.    WHAT ABOUT INGREDIENTS TO MANUFACTURE METHAMPHETAMINE?

13 A.    NO, BUT I KNOW I HAD ABOUT THREE OR FOUR BOXES OF

14 PSEUDOPHED STOLE OUT OF THE CABINET THAT WAS IN THE SHOP.

15 Q.    YOU KEPT SOME IN THE SHOP?

16 A.    YES, SIR.

17 Q.    WHERE IN THE SHOP?

18 A.    IN A CABINET I'VE GOT ABOVE MY DESK.

19 Q.    WHY WOULD YOU KEEP PSEUDOPHED IN YOUR SHOP?

20 A.    WHEN YOU -- IF YOU GO OUT IN MY SHOP IN THE SUMMERTIME

21 ESPECIALLY AND LOOK ON THESE CORVETTES YOU'LL SEE THEM, THEY

22 LOOK LIKE THAT SHEET OF YELLOW PAPER RIGHT THERE WITH POLLEN

23 ALL OVER TOP OF THEM A QUARTER-INCH THICK.  I'M TELLING YOU I

24 CAN'T EVEN BREATHE.  I CAN'T EVEN BREATHE.  I EAT THEM LIKE

25 CANDY.  AND MY WIFE IS -- MY WIFE HAD A PRESCRIPTION FOR THEM.

1  Q.   IS THIS RELATED TO YOUR SINUS PROBLEMS?

2  A.   YES, SIR.  YES, SIR.

3  Q.   YOUR NOSE WOULD DRIP CONSTANTLY?

4  A.   ALL THE TIME EVERY TIME.

5  Q.   NOW, YOU SAID YOU HAD THREE BOXES OF PSEUDOPHED STOLEN

6  FROM THE SHOP?

7  A.   YES, SIR.

8  Q.   DO YOU RECALL WHEN THAT HAPPENED?

9  A.   THIS WAS LAST YEAR.

10 Q.   YOU DON'T RECALL WHAT TIME LAST YEAR?

11 A.   NO, IT WAS ABOUT THE MIDDLE OF THE YEAR I BELIEVE.

12 Q.   DID YOU STOP KEEPING PSEUDOPHED OUT THERE?

13 A.   YES, SIR.  I JUST TOOK IT DOWN TO THE HOUSE.

14 Q.   DID YOU HAVE ANY REASON TO BELIEVE THAT AARON, KEVIN OR

15 STEPHANIE WOULD TAKE YOUR PSEUDOPHED?

16 A.   OH, YEAH.  OH, YEAH.  I HAD TO KEEP -- I USED TO KEEP

17 BATTERIES IN THE SHOP FOR -- IN A DESK DRAWER RIGHT THERE.

18 I'VE GOT EQUIPMENT THAT RUNS OFF OF BATTERIES, ALL MY TESTERS

19 AND STUFF RUN OFF OF BATTERIES.  I COULDN'T KEEP THE BATTERIES

20 IN THERE.  THEY GOT GONE.  EVERYTHING I PUT IN THERE GOT GONE.

21 THAT AND FLASHLIGHTS.

22 Q.   WELL, WE SAW SOME BATTERIES ON THE GOVERNMENT'S EVIDENCE.

23 YOU SAW SOME LITHIUM -- ENERGIZER LITHIUM BATTERIES.  DID YOU

24 SEE THAT ON THE SCREEN?

25 A.   YES, SIR.  I JUST BOUGHT REGULAR ONES.  I DIDN'T BUY THE

1 LITHIUMS OR ANYTHING.  I JUST BOUGHT REGULAR ONES.  THEY TOOK

2 THEM TOO.

3 Q.   WE SAW ALSO A BUNCH OF OTHER STUFF FROM THE FEBRUARY 8TH

4 METH BUST.

5 A.   YES, SIR.

6 Q.   HAD YOU SEEN ANY OF THAT STUFF --

7 A.   NO, SIR.

8 Q.   -- PRIOR TO --

9 A.   NO, SIR.

10 Q.   CAN YOU DESCRIBE WHAT YOUR SHOP LOOKED LIKE BEFORE

11 FEBRUARY THE 8TH, IN THAT BACK ROOM?

12 A.   YEAH, THIS SHELF WAS FULL OF CAR PARTS BEFORE.  THERE

13 WASN'T NOTHING IN THERE ON THAT SHELF LIKE THAT.

14 Q.   THAT WHITE TABLE, WAS IT PRISTINE AND --

15 A.   NO.  NO, THAT WHITE TABLE WASN'T EVEN ON THERE.  WHAT'S

16 UNDER THAT WHITE TABLE -- SOMEBODY EVIDENTLY PICKED THAT UP

17 AND PUT IT ON TOP OF IT.  THAT WAS AN OLD SHELF LAID OUT IN

18 THE BACK SOMEWHERE.  BUT THAT TABLE HAS ACTUALLY GOT A HOLE

19 UNDERNEATH THERE, IT'S GOT A HOLE ABOUT THIS BIG.  AND THAT

20 TABLE IS MADE FOR REBUILDING TRANSMISSIONS OR REAR-ENDS.  YOU

21 PUT THEM IN THAT HOLE AS A STAND TO HOLD IT THERE SO YOU CAN

22 REBUILD THE GEARS AND WHATEVER.  SO, SOMEBODY PUT THAT TABLE

23 ON TOP OF IT.

24 Q.   AND BEFORE FEBRUARY 8TH, OR BEGINNING -- RIGHT ABOUT THE

25 TIME MALACHI MOVED IN, YOU DIDN'T SEE ANY OF THIS STUFF BACK

1 THERE?

2 A.   NO, SIR, THERE WASN'T NOTHING LIKE THAT.

3 Q.   DID YOU EVEN GO BACK THERE?

4 A.   NO, SIR.  WELL, YEAH, I'VE BEEN BACK THERE IN THE BACK OF

5 THE SHOP.  IT WASN'T BACK THERE.  NONE OF THAT WAS BACK THERE

6 BEFORE.

7 Q.   WHEN WOULD SAY PRIOR TO THE -- FEBRUARY 8TH, WHEN WOULD

8 YOU SAY YOU WENT BACK INTO THE BACK ROOM?

9 A.   IT WAS A GOOD THREE OR FOUR DAYS BEFORE THAT.  A GOOD

10 THREE OR FOUR DAYS BEFORE BECAUSE I TOLD YOU I WENT IN THE

11 HOUSE AND I HAD BEEN LAYING DOWN A GOOD THREE OR FOUR DAYS IN

12 THERE, YOU KNOW, AND I WAS GETTING READY TO GO TO THE HOSPITAL

13 THAT MORNING.

14 Q.   FEBRUARY THE 8TH?

15 A.   YES, SIR.

16 Q.   TO THE SCOLIOSIS CENTER?

17 A.   YES, SIR.  I BELIEVE WE HAVE THE HOSPITAL RECORDS FOR IT

18 HERE.  YEAH.

19 Q.   THAT'S THE DAY WHEN YOU ACTUALLY WENT ON THE 9TH, IS THAT

20 CORRECT?

21 A.   YES, SIR.

22 Q.   IF I MAY GO BACK TO SOMETHING THAT -- DURING DUSTIN

23 BOYKIN'S TESTIMONY.  DID HE EVER INTRODUCE YOU TO PATRICK

24 JERNIGAN?

25 A.   YES, SIR.

1 Q.   WHO DID HE INTRODUCE PATRICK JERNIGAN AS?

2 A.   HE SAID IT WAS HIS UNCLE.

3 Q.   HE DIDN'T SAY IT WAS HIS BROTHER?

4 A.   HIS UNCLE.  NO.  IT WAS HIS UNCLE, THAT'S WHAT I HEARD.

5 AND I GOT INTRODUCED -- HE WAS COMING INTO TOWN AND PATRICK

6 ACTUALLY CALLED DUSTIN'S CELL PHONE AND HE EVIDENTLY WAS

7 HAVING TROUBLE WITH A SEMI-TRUCK, AN 18-WHEELER, AND HAVING

8 SOME MECHANICAL PROBLEMS WITH IT.  I THINK IT WAS FUEL -- ONE

9 OF THE FUEL BOWLS WAS STOPPED UP ON IT AND HE PULLED IN MY

10 SHOP.  AND I WAS A DIESEL MECHANIC FOR FOUR YEARS IN THE COAST

11 GUARD. A. WILLIAM PATRICK JERNIGAN PULLED IN YOUR SHOP WITH

12 CAR TROUBLE?

13 A.   YES, SIR, TRUCK TROUBLE.

14 Q.   SO, HOW MANY -- SO, OF ALL THESE PEOPLE YOU'VE BEEN

15 INTRODUCED TO ALL OF THEM HAVE HAD CAR TROUBLE?

16 A.   YES, SIR.

17          (PAUSE.)

18          MR. STEWART:  I HAVE NO FURTHER QUESTIONS AT THIS

19 TIME, YOUR HONOR.

20          THE COURT:  CROSS?

21          MS. WELLS:  THANK YOU VERY MUCH, YOUR HONOR.

22          **C R O S S - E X A M I N A T I O N**   4:10 P.M.

23 BY MS. WELLS:

24 Q.   JOHN KYLE USED TO LIVE IN BLACK CREEK, RIGHT?

25 A.   YES, MA'AM, I BELIEVE SO.

November 17, 2011

1  Q.   OKAY.  ON MINCHEW STREET?

2  A.   I'M NOT SURE WHAT STREET.  I JUST KNEW HIM WHEN HE LIVED

3  ACROSS THE STREET FROM ME.

4  Q.   WHO IS CIRO HOLLYFIELD?

5  A.   WHO?

6  Q.   MR. HOLLYFIELD.  WHO IS CIRO HOLLYFIELD?

7  A.   CIRO.  OH.  I DIDN'T RECOGNIZE THE NAME AT FIRST, I'M

8  SORRY.  HE OWNS THAT TRUCK THAT I WAS DRIVING.

9  Q.   HE OWNS THE TRUCK YOU WERE DRIVING?

10  A.   YES, SIR.

11  Q.   THE TRUCK THAT YOU WERE --

12  A.   I'M SORRY.  I MEAN, YES, MA'AM.

13  Q.   -- DRIVING ON THE DAY YOU GOT ARRESTED, RIGHT?

14  A.   YES, MA'AM.  YES, MA'AM.

15         THE COURT:  I'M SORRY, MS. WELLS, WOULD YOU SAY THE

16  NAME AGAIN, PLEASE?

17         MS. WELLS:  IT'S CIRO HOLLYFIELD, YOUR HONOR.

18         THE COURT:  ZERO?

19         MS. WELLS:  CIRO.  C-I-R-O.

20         THE COURT:  THANK YOU.

21         MS. WELLS:  HOLLYFIELD.

22         THE COURT:  THANK YOU.

23         MS. WELLS:  YES, SIR, YOUR HONOR.

24  BY MS. WELLS:

25  Q.   I'M GOING TO SHOW YOU GOVERNMENT'S EXHIBIT 63 IN JUST A

1 MOMENT.  SO, THE TRUCK YOU WERE STOPPED ON ON JULY 30TH OF

2 2011, WASN'T YOURS?

3 A.   NO, MA'AM.

4 Q.   MR. HOLLYFIELD HAD LEFT THAT TRUCK WITH YOU, IS THAT

5 CORRECT, FOR YOU TO DO SOME WORK ON?

6 A.   YES, MA'AM.

7 Q.   AND YOU HAD NOT COMPLETED THAT WORK, ISN'T THAT CORRECT?

8 A.   NO, THE TRUCK WAS GOING TO BE THERE PROBABLY ABOUT SIX TO

9 EIGHT MONTHS.

10 Q.   IF THAT TRUCK WAS GOING TO BE THERE SIX TO EIGHT MONTHS

11 IT MUST HAVE HAD SOME SERIOUS ISSUES.

12 A.   IT WAS GETTING READY TO BE BROKE DOWN AND PUT A HIGH

13 PERFORMANCE MOTOR IN IT AND EVERYTHING.  THAT'S WHAT HE WANTED

14 DONE TO IT.  CUSTOM.  ALL CUSTOMIZED.

15 Q.   SO, IT WAS -- HE WANTED A MAJOR CUSTOM JOB DONE TO THIS

16 TRUCK --

17 A.   UH-HUH.

18 Q.   -- NOT A FEW MINOR REPAIRS?

19 A.   NO.

20 Q.   OKAY.  AND --

21 A.   THE HOOD WAS COMING OFF -- THE HOOD ACTUALLY -- THE

22 WINDSHIELD WIPERS HAD BUSTED THE WINDSHIELD RIGHT THERE WHERE

23 IT HIT.  THAT'S ONE OF THE THINGS HE WANTED TO DO WAS REMOVE

24 THE HOOD AND PUT ANOTHER HOOD ON IT, BUT HE STILL WANTED A

25 CUSTOM HOOD ON IT.  HE WAS GOING TO CHANGE THESE RIMS ON IT.

1 PART OF THE INTERIOR WAS COMING OUT AND CHANGE IT.  THERE WAS

2 QUITE A BIT OF WORK TO BE DONE ON IT.

3 Q.   SO, IF HE TOLD DETECTIVE JAY CREECH THAT HE HAD DROPPED

4 IT AT YOUR PLACE FOR A FEW MINOR REPAIRS AND HAD NO IDEA WHY

5 YOU WERE DRIVING IT THAT WOULDN'T -- HE WOULD HAVE NOT BEEN --

6 THAT WOULD NOT HAVE BEEN ACCURATE, IS THAT CORRECT?

7 A.   THAT'S RIGHT.

8 Q.   NOW, YOU KNOW MR. HOLLYFIELD FROM GOLDSBORO?

9 A.   IRON METAL, YES, MA'AM.

10 Q.   IRON METAL.

11 A.   YES, MA'AM.  I'VE BEEN UP THERE -- THERE'S ANOTHER GUY UP

12 THERE, A BOY NAMED CHRIS, HE'S ONE OF THE MANAGERS ALSO.  I

13 KNOW HIM.  I WORK ON HIS CORVETTE.

14 Q.   OKAY.  AND SO, HE HAD PAID YOU FOR THIS WORK ALREADY,

15 ISN'T THAT TRUE?

16 A.   NO, NO.  HE PAID ME A DOWN PAYMENT ON IT.

17 Q.   HE PAID YOU -- AND HOW MUCH WAS THAT DOWN PAYMENT?

18 A.   $400.

19 Q.   EXCUSE ME?

20 A.   400.

21 Q.   400?

22 A.   YES, MA'AM.

23 Q.   HOW LONG HAD IT BEEN THERE?

24 A.   ABOUT TWO WEEKS.  I TOLD HIM I WAS BUSY.  IT WOULD BE A

25 WHILE BEFORE I GET TO IT.  HE SAID IT AIN'T NO PROBLEM.  I

1  TOLD HIM I WAS GOING TO DRIVE IT SOMETIME.  HE SAID IT AIN'T

2  NO PROBLEM, JUST GO AHEAD AND DRIVE IT.  HE WANTED ME TO CHECK

3  AND SEE HOW MUCH MORE POWER I COULD GET OUT OF IT, THAT

4  ENGINE'S PERFORMANCE ON IT.

5  Q.    SO, HE TOLD YOU IT WAS OKAY FOR YOU TO DRIVE IT?

6  A.    OH, YEAH.

7  Q.    OKAY.

8  A.    HE DIDN'T MIND ME DRIVING IT.

9  Q.    OKAY.

10 A.    I HAD WORKED ON CHRIS' CAR UP THERE AND HE KNEW ME.

11 Q.    NOW, YOU TALKED ABOUT JUSTIN.

12 A.    UH-HUH.

13 Q.    JUSTIN WORKED AT THE SHOP WITH YOU --

14 A.    YES, MA'AM.

15 Q.    -- CORRECT?

16 A.    YES, MA'AM.

17 Q.    AND YOU ALSO HAD SOMEBODY BY THE NAME OF, YOU TESTIFIED,

18 ABEL WORK THERE?

19 A.    YES, MA'AM.

20 Q.    AND YOU TESTIFIED THAT YOU HAD SOMEBODY BY THE NAME OF --

21 I THINK YOU JUST SAID ABEL AND JUSTIN.  I MAY BE SHORT ONE.

22 JOHN KYLE.

23 A.    RIGHT.

24 Q.    THEY ALL WORKED AT THE SHOP FOR YOU?

25 A.    YES, MA'AM.

1 Q.   AND YOU HAD LAW ENFORCEMENT OFFICERS WHO WORKED AT THE

2 SHOP FOR YOU?

3 A.   YES, MA'AM.

4 Q.   MR. WILLIAMS, MR. FAISON --

5 A.   YES, MA'AM?

6 Q.   -- RIGHT?

7 A.   YES, MA'AM.  I STILL HAVE MR. WILLIAMS' CAR AT THE

8 CORVETTE SHOP.

9 Q.   AND YOU HAD ANDY WHO WORKED THERE, RIGHT?

10 A.   YEP.

11 Q.   RIGHT?

12 A.   YES, MA'AM.

13 Q.   AND SCOOBY?

14 A.   NO, SCOOBY DIDN'T WORK WITH ME.

15 Q.   SCOOBY DIDN'T WORK WITH YOU?

16 A.   NO.  HE JUST COME AROUND SOMETIME TO SEE ME.  HE LIVED --

17 HE WAS IN LUCAMA.  HE JUST STOPPED BY.

18 Q.   HE WOULD JUST STOP BY AND COME AROUND?

19 A.   YES.

20 Q.   NONE OF THEM SLEPT AT YOUR SHOP?

21 A.   NO, ANDY ACTUALLY STAYED THERE FOR A LITTLE WHILE BECAUSE

22 ANDY DIDN'T HAVE ANY PLACE TO STAY AFTER HIS MOTHER DIED.  AND

23 ANDY ACTUALLY STAYED IN THE SHOP FOR A WHILE.  STEPHANIE

24 ACTUALLY STAYED IN THERE FOR A WHILE.

25 Q.   BECAUSE SHE HELPED YOU TOO, RIGHT?

1  A.    YEAH.

2  Q.    AND -- WELL, YOU SAY KEVIN DIDN'T HELP YOU?

3  A.    NO.

4  Q.    AND AARON HELPED YOU?

5  A.    YEARS AGO.

6  Q.    BUT DUSTIN WOULDN'T HELP?

7  A.    I DON'T THINK THERE WAS ANYTHING HE COULD HELP ME WITH.

8  Q.    SO, WHEN MALACHI POPPELL SHOWED UP AT YOUR SHOP ABOUT A

9  WEEK TO TEN DAYS PRIOR TO A METH LAB BEING DISCOVERED IN THE

10 BACK OF YOUR SHOP YOU THOUGHT IT WOULD BE A GOOD IDEA TO OFFER

11 THIS MAN THAT YOU DIDN'T KNOW A PLACE TO SLEEP SO HE COULD

12 HELP YOU IN YOUR SHOP, IS THAT RIGHT?

13 A.    STEPHANIE TOLD ME HE WAS -- THAT HIM AND PHILLIP DID A

14 LITTLE MECHANIC WORK, NOT MUCH, BUT THEY SAID THEY KNEW HOW TO

15 DO A LITTLE MECHANIC WORK.  I SAID, WELL, THE MAIN THING I

16 NEED IS I NEED SOMEBODY WHICH, LIKE I SAID, I TRIED TO GET

17 STEPHANIE TO DO AND I COULDN'T GET HER TO DO IT BECAUSE SHE'D

18 GET BORED WITH THAT JOB, IS PUTTING THINGS UP IN A PROPER

19 PLACE.  I NEEDED -- I NEEDED AN INVENTORY LAID OUT, THINGS IN

20 THE BACK ROOM SPECIALLY.  YOU SAW THE BACK ROOM.  I NEEDED

21 THINGS PUT IN CABINETS, UP ON THE SHELVES.  AND I HAD ACTUALLY

22 PAID TWO OR THREE PEOPLE TO DO THAT, BUT THEY DIDN'T WANT TO

23 WORK.

24 Q.    SO, YOU COULDN'T ASK ANDY TO DO IT?

25 A.    I NEEDED ANDY TO WORK ON CARS.  I DIDN'T NEED HIM IN THE

1 BACK PUTTING UP PARTS.

2 Q.   COULDN'T ASK JUSTIN TO DO IT?

3 A.   THESE GUYS RIGHT HERE ARE MECHANICS.  I'M CHARGING $125

4 AN HOUR.  I CAN'T PUT MY MECHANIC IN THERE PUTTING UP SPARK

5 PLUGS IN A HOLE, YOU KNOW?

6 Q.   IT SOUNDED LIKE SCOOBY NEEDED SOMETHING TO DO.  YOU

7 COULDN'T ASK SCOOBY TO DO IT?

8 A.   SCOOBY IS JUST LIKE STEPHANIE, HE COULDN'T SIT STILL.

9 Q.   SO, BUT YOU THOUGHT YOU'D RELY ON STEPHANIE FOR THESE

10 FOLKS SHE JUST BROUGHT AROUND AND TAKE HER RECOMMENDATION AS

11 TO WHO YOU SHOULD HIRE?

12 A.   WELL, THEY SEEMED LIKE PRETTY NICE GUYS.  THEY WERE CLEAN

13 CUT, DECENT PEOPLE.  SAID HE LOST HIS LIMO BUSINESS UP THERE

14 IN RALEIGH.  AND I JUST TOOK THEIR WORD FOR IT.  I TRIED THEM.

15 I'M NOT GOING TO KNOCK ANYBODY DOWN UNTIL I TRIED THEM.

16 Q.   YOU TOOK STEPHANIE'S WORD FOR IT TOO?

17 A.   YES, I DID.  EVIDENTLY, THAT WAS A MISTAKE.

18 Q.   AND DUSTIN BOYKIN.  YOU MET DUSTIN --

19 A.   UH-HUH.

20 Q.   -- THROUGH STEPHANIE?

21 A.   NO.

22 Q.   NO?  WHO'D YOU MEET DUSTIN?

23 A.   THROUGH DANIEL SHERATON.

24 Q.   OKAY.  SO, YOU MET HIM THROUGH DANIEL?

25 A.   YES, MA'AM.

1  Q.   AND HOW LONG DID YOU KNOW HIM BEFORE YOU LET HIM USE YOUR

2  TRUCK?

3  A.   I MET HIM A COUPLE OF TIMES BEFORE.  YOU KNOW, HE SEEMED

4  TO BE ALL RIGHT DANIEL.  IT WAS A YEAR -- I GUESS A GOOD YEAR.

5  Q.   WELL, YOU'D KNOWN HIM FOR A YEAR?

6  A.   IT HAD BEEN A YEAR.  BUT, I MEAN, I ONLY MET HIM A COUPLE

7  OF TIMES.  BUT LIKE I SAY, HE COME AROUND THERE AND TALKED

8  LIKE HE'D GROWN UP IN LUCAMA AND EVERYTHING ELSE AND

9  EVERYTHING LIKE THAT AND KNEW MISSY.

10 Q.   I'M SORRY, HE SAID WHAT?

11 A.   HE SAID HE'D GROWN UP IN LUCAMA AND KNEW MISSY AND ALL

12 THIS STUFF RIGHT HERE.  SO, HE COULD GET ME SOME SHINGLES NO

13 PROBLEM.  HE'D FIX ME RIGHT UP.  AND I SAID OKAY.

14 Q.   SO, HE KNEW MISSY?

15 A.   YEAH.

16 Q.   AND YOU KNEW MISSY?

17 A.   I HAD KNOWN HER FROM BEFORE, YEAH.  SHE WANTED A JOB AND

18 I WOULDN'T HIRE HER.

19 Q.   OKAY.

20 A.   I NEEDED PEOPLE TO WORK.  I DIDN'T NEED PEOPLE TO HANG

21 OUT.

22 Q.   AND YOU LET DUSTIN USE YOUR TRUCK?

23 A.   YES, MA'AM, I DID.

24 Q.   AND YOU DIDN'T TAKE HIS NUMBER?

25 A.   NO.

1  Q.   DID YOU --

2  A.   I HAD HIS BLAZER.  I DIDN'T NEED TO TAKE HIS NUMBER.  I

3  FIGURED IF I HAD HIS TRUCK, HE'D TAKE MINE AND HE'D BRING MINE

4  RIGHT BACK.

5  Q.   SO, HE TOOK YOUR TRUCK AND HE DIDN'T COME BACK FOR THREE

6  DAYS, RIGHT?

7  A.   RIGHT.

8  Q.   AND YOU CALLED THE POLICE AFTER HOW LONG?

9  A.   I DIDN'T CALL THE POLICE.

10 Q.   YOU DIDN'T CALL THE POLICE?

11 A.   NO.

12 Q.   SOMEONE HAD STOLEN YOUR TRUCK AND YOUR TRAILER.

13 A.   MA'AM, I'M GOING TO TELL YOU SOMETHING, I'VE CALLED THE

14 WILSON COUNTY SHERIFF'S DEPARTMENT TO MY BUSINESS THREE

15 DIFFERENT TIMES AND HAD PROBLEMS WITH A CUSTOMER WANTING TO

16 TAKE THEIR CAR, OKAY, BECAUSE WE'VE HAD AN ARGUMENT ABOUT THEM

17 WANTING TO PAY THEIR BILL, OKAY?

18        THREE TIMES I WAS ADVISED BY WILSON COUNTY SHERIFF

19 DEPARTMENT THE CUSTOMER CAN HAVE THE CAR BACK, LET THEM HAVE

20 IT.

21        THREE TIMES I'VE TOOK A LOSS OF THREE AND $4,000 AT

22 LEAST ON EACH CAR, OKAY?  AND WAS TOLD IT WAS MANDATORY I HAD

23 TO GIVE THEM THEIR CAR BACK, OKAY, WHEN I HAD A LEGAL SHEET OF

24 PAPER SAYING I HAD A LIEN ON THIS CAR, OKAY?

25        FINALLY, AFTER THE THIRD TIME I HAD HAD ENOUGH, I

1 CALLED A LAWYER.  MY LAWYER TOLD ME WILSON COUNTY SHERIFF

2 DEPARTMENT --

3        MS. WELLS:  OBJECTION.  THAT'S NON-RESPONSIVE AT

4 THIS POINT WHAT HIS LAWYER TOLD HIM.

5        THE WITNESS:  WELL -- OKAY, WHAT IT IS -- BOILS

6 RIGHT DOWN TO IS THEY DIDN'T HAVE THE LEGAL RIGHT TO MAKE ME

7 GIVE THAT CAR BACK THREE DIFFERENT TIMES, OKAY?

8        NO MATTER WHAT I DID, THE SHERIFF'S DEPARTMENT DID

9 NOT TAKE MY SIDE FOR IT.  DO YOU THINK I WAS GOING TO CALL THE

10 SHERIFF TO ASK THEM TO HELP ME WITH THIS?  I WAS GOING AFTER

11 MY TRUCK MYSELF AND THAT'S WHAT I DID, I WENT AFTER MY TRUCK.

12 Q.   SO, YOU DIDN'T CALL -- WHERE -- HOW DID YOU FIND OUT

13 WHERE YOUR TRUCK WAS?

14 A.   I GOT IN TOUCH WITH DANIEL SHERATON AND FINALLY HE SAID

15 HE WAS UP THERE IN KENLY, HE HEARD HE WAS UP THERE IN KENLY.

16 Q.   AND KENLY IS IN WILSON COUNTY?

17 A.   NO, KENLY IS 15 MILES.

18 Q.   KENLY IS IN JOHNSTON COUNTY, ISN'T IT?

19 A.   YES, SIR -- YES, MA'AM.

20 Q.   SO, YOU DIDN'T CALL THE JOHNSTON COUNTY --

21 A.   NO, MA'AM.

22 Q.   -- SHERIFF'S OFFICE EITHER, DID YOU?

23 A.   NO, MA'AM.

24 Q.   AND HAD THE JOHNSTON COUNTY SHERIFF'S OFFICE COME OUT AND

25 GIVEN YOU BAD ADVICE?

1 A.   NO, MA'AM, I --

2 Q.   NO.

3 A.   -- JUST WENT AFTER MY TRUCK.

4 Q.   NOW, YOU DIDN'T CALL THE POLICE --

5 A.   NO.

6 Q.   -- IN WILSON, YOU DIDN'T CALL THE POLICE IN JOHNSTON WHEN

7 YOU KNEW YOUR -- WHAT YOU THOUGHT WAS YOUR -- WHAT YOU CLAIM

8 WAS YOUR STOLEN TRUCK WAS SITTING IN JOHNSTON COUNTY.  NOW,

9 YOU FOUND A METH LAB.

10 A.   I DIDN'T SAY HE STOLE IT.  I DIDN'T SAY STOLE IT.

11 Q.   OH, HE DIDN'T, HE JUST --

12 A.   I JUST SAID HE JUST DIDN'T BRING IT BACK, OKAY?  I LET

13 HIM USE IT, BUT HE JUST DIDN'T BRING IT BACK.

14 Q.   OKAY.  NOW --

15 A.   SO, I WENT LOOKING FOR IT.

16 Q.   NOW, YOU WENT AND YOU LOCATED YOUR TRUCK AND THERE'S A

17 METH LAB IN THE BACK OF YOUR TRUCK?

18 A.   YES, MA'AM.

19 Q.   NOW, WHAT ABOUT IT MADE YOU BELIEVE THAT IT WAS A METH

20 LAB?

21 A.   I DIDN'T KNOW IT WAS A METH LAB.  THIS IS WHAT MY FRIEND

22 TOLD ME THAT WAS WITH ME.

23 Q.   AND WHO WAS THAT?

24 A.   WELL, NOT FRIEND, THE GUY THAT WORKS WITH ME.  JUSTIN.

25 Q.   JUSTIN TOLD YOU?

1 A.   YEAH.

2 Q.   OKAY.  NOW, JUSTIN TOLD YOU THERE WAS METH LAB IN IT.

3 AND AT THAT POINT, YOU HAVE A METH LAB IN YOUR TRUCK THAT'S

4 BEEN MISSING FOR THREE DAYS, RIGHT?

5 A.   UH-HUH.

6 Q.   SO, YOU CALL THE POLICE?

7 A.   NO.

8 Q.   NO.  YOU DON'T CALL THE POLICE?

9 A.   I TOLD YOU WHAT I DID.  I WAS MAD -- I WAS MAD ENOUGH

10 OVER THE TRUCK BEING GONE FOR THREE DAYS, I RUN OVER EVERY BIT

11 OF IT.

12 Q.   WHEN WAS THIS?  WHEN DID THIS HAPPEN?

13 A.   THIS WAS ABOUT 2009.  IT WAS IN 2009.

14 Q.   2009.

15 A.   FIRST PART OF 2009.

16 Q.   SO, THE BEGINNING OF 2009.  WAS IT COLD OUTSIDE?

17 A.   YES, MA'AM, IT WAS COLD.

18 Q.   COLD.

19         (PAUSE.)

20         MATTER OF FACT, DUSTIN DID -- DUSTIN DID THE SAME

21 THING ABOUT --

22 Q.   I HAVEN'T ASKED YOU ANY QUESTIONS.

23 A.   OKAY.

24 Q.   IF YOU CAN HOLD ON ONE SECOND, PLEASE.

25 A.   OKAY.

1 Q.   THANK YOU.

2          (PAUSE.)

3          SO, THIS IS IN 2009.  NOW, DID YOU SEE THE ITEMS?

4 A.   YES, MA'AM.

5 Q.   AND WHAT WERE THEY?

6 A.   I SAW THE PLASTIC BOTTLE WITH THE STRAW STICKING OUT IT.

7 Q.   UH-HUH.

8 A.   I SAW WHAT LOOKED LIKE A TWO LITER PEPSI BOTTLE THERE --

9 SITTING RIGHT THERE.  THERE WAS ALL KINDS OF THINGS THAT

10 LOOKED PACKED INTO -- IT LOOKED LIKE ONE OF THESE MOUNTAIN

11 CLIMBING PACKS.  THERE WAS TWO BARS IN IT THAT COME UP WITH

12 LIKE CAMOUFLAGE MATERIAL ON IT.  THAT'S WHAT IT WAS SITTING

13 IN.  AND THERE WAS JUST SEVERAL CONTAINERS IN THERE.

14          I HAD NO IDEA WHAT IT WAS.  I COULDN'T TELL YOU.  IT

15 LOOKED LIKE A CONTRAPTION TO ME THAT WAS JUST THROWN TOGETHER

16 OUT OF A TRASH CAN.

17 Q.   AND, AGAIN, YOU WERE TOLD THAT YOU HAD A METH LAB IN THE

18 BACK OF YOUR TRUCK THAT HAD BEEN MISSING FOR THREE DAYS AND

19 YOU --

20 A.   WELL, THAT'S --

21 Q.   -- RAN OVER IT?

22 A.   THAT'S WHAT HE SAID -- THAT'S WHAT HE SAID IT WAS AND I

23 KICKED IT OUT.

24 Q.   AND YOU RAN OVER IT?

25 A.   YES, MA'AM, 'CAUSE I DON'T PLAY THAT.

1 Q.   OKAY.  DIDN'T CALL THE POLICE?

2 A.   NO, MA'AM.

3 Q.   DIDN'T TELL ANYBODY?  JUST RAN OVER IT AND LEFT?

4 A.   THAT'S RIGHT.

5 Q.   OKAY.  NOW, YOU WERE BOOKED INTO BRUNSWICK COUNTY WHEN?

6 A.   JUNE 30TH.

7 Q.   THAT WAS BRUNSWICK COUNTY?

8 A.   NO, NOT BRUNSWICK COUNTY.  I'M SORRY.  IN BRUNSWICK

9 COUNTY, LET ME SEE.  I DON'T KNOW WHAT DATE IT WAS.  I CAN'T

10 -- I CAN'T -- TO BE HONEST WITH YOU, I DON'T KNOW.

11 Q.   OKAY.

12 A.   SOMETIME IN OCTOBER, IS THAT FAIR TO SAY?  FIRST OF

13 OCTOBER.

14 Q.   BUT PRIOR TO ALL OF THIS, JUNE 30TH, 2011, YOU GOT

15 ARRESTED?

16 A.   YES, MA'AM.

17 Q.   AND HOW LONG WERE YOU IN JOHNSTON COUNTY?

18 A.   IN THE JAIL IN JOHNSTON COUNTY?

19 Q.   UH-HUH.

20 A.   30 DAYS.

21 Q.   30 DAYS?

22 A.   YES, MA'AM.

23 Q.   AND DURING THAT 30 DAYS, AARON AND VALERIE AND MISS

24 CATHY, YOUR WIFE, WORKED TO TRY TO GET YOU OUT OF JAIL, ISN'T

25 THAT RIGHT?

1  A.   YES, MA'AM.

2  Q.   OKAY.  AND ACTUALLY, AARON AND VALERIE CAME AND BONDED

3  YOU OUT?  THEY BONDED YOU OUT?

4  A.   NO, MY -- MY WIFE AND VALERIE COME AND BONDED ME OUT.

5  Q.   NOW, YOU SAID THAT YOU SAW KEVIN'S CAR ON YOUR PROPERTY

6  NUMEROUS TIMES AFTER VALERIE MOVED BACK INTO YOUR HOUSE?

7  A.   UH-HUH.

8  Q.   IS THAT CORRECT?

9  A.   THAT'S RIGHT.

10  Q.   NOW, KEVIN WAS DATING VALERIE --

11  A.   RIGHT.

12  Q.   -- ISN'T THAT CORRECT --

13  A.   RIGHT.

14  Q.   -- DURING THAT TIME?

15  A.   RIGHT.  AND WE HAD ARGUMENTS OVER HIM KEEPING HER MESSED

16  UP ON DRUGS.  THAT'S WHAT THE ARGUMENTS ARE ABOUT MOSTLY WITH

17  HIM AND ME.

18  Q.   OKAY.  BUT HE WAS DATING HER?

19  A.   YES.

20  Q.   I WANT TO ASK YOU BRIEFLY ABOUT YOUR PRIOR CONVICTIONS.

21  YOU HAVE A PRIOR CONVICTION --

22  A.   YES, MA'AM.

23  Q.   -- FOR SECOND DEGREE MURDER, CORRECT?

24  A.   YES, MA'AM.  YES, MA'AM.

25  Q.   YOU ALSO HAVE A PRIOR CONVICTION FOR SECOND DEGREE

1 KIDNAPPING?

2 A.   YES, MA'AM.

3 Q.   EXCUSE ME.  THAT'S JUST KIDNAPPING.  THAT'S JUST FELONY

4 KIDNAPPING.

5 A.   IT'S ALL THE SAME CRIME.  IT'S ALL --

6 Q.   IT HAPPENED AT THE SAME TIME?

7 A.   YES, MA'AM.

8 Q.   BUT YOU DO HAVE THOSE TWO CONVICTIONS OUT OF THE SAME

9 EVENT?

10 A.   YES, MA'AM.  ON PAGE NINE OF THE PLEA AGREEMENT THE JUDGE

11 QUOTED, THIS IS AN ACCIDENT THAT SHOULD HAVE NEVER TAKEN

12 PLACE.

13 Q.   I'M NOT ASKING YOU WHAT THE JUDGE SAID BECAUSE I DON'T

14 THINK THAT'S ADMISSIBLE.

15 A.   OKAY.

16        MS. WELLS:  AND I'D ASK THE COURT TO RULE THAT NON-

17 RESPONSIVE.

18        THE COURT:  YOU'RE CORRECT.

19        MS. WELLS:  THANK YOU, YOUR HONOR.

20        THE WITNESS:  YES, MA'AM.

21 BY MS. WELLS:

22 Q.   BUT YOU DO HAVE THE SECOND DEGREE MURDER CONVICTION --

23 A.   YES, MA'AM.

24 Q.   -- AND THE KIDNAPPING CONVICTION?

25 A.   YES, MA'AM.

1 Q.   ALL RIGHT.

2 A.   I'M BEING HONEST WITH EVERYBODY ABOUT IT.

3 Q.   CORRECT.

4 A.   AND THAT'S 30 YEARS AGO.  AND MY WHOLE LIFE -- MY LIFE IS

5 DIFFERENT FROM WHAT IT USED TO BE THEN.

6 Q.   OKAY.  NOW, YOU SAID YOUR RELATIONSHIP WITH STEPHANIE WAS

7 CHECKERED, IS THAT CORRECT?

8 A.   YES, MA'AM.

9 Q.   IS IT FAIR TO SAY YOUR RELATIONSHIP WITH AARON WAS

10 CHECKERED?

11 A.   (WITNESS NODS HEAD.)

12 Q.   AND YOUR RELATIONSHIP WITH VALERIE WAS CHECKERED?

13 A.   YEAH.

14 Q.   AND YOUR RELATIONSHIP WITH KEVIN WAS CHECKERED?

15 A.   RIGHT.

16 Q.   SO, YOUR RELATIONSHIPS WITH ALL THOSE FOLKS ARE -- WERE

17 UP AND DOWN?

18 A.   I'VE GOT A LOW TOLERANCE FOR NON-PRODUCTIVE PEOPLE.

19 Q.   AND YOU SAID THAT YOU COUNSELED STEPHANIE?

20 A.   I TALKED TO ALL OF THEM, MA'AM, BUT I DIDN'T STAY ON THEM

21 EVERYDAY AND PREACH TO THEM.  YOU KNOW, I JUST DID THE BEST I

22 COULD WITH THEM.

23 Q.   YOU TOLD HER THAT YOU WOULD DO WHATEVER IT TOOK FOR HER

24 TO GET RIGHT?

25 A.   I WOULD HELP HER WHATEVER IT TOOK.

1 Q.   YOU WOULD HELP HER?

2 A.   YES, MA'AM.

3 Q.   YOU TOLD HER THAT YOU WOULD DO THE BEST THAT YOU COULD

4 FOR HER?

5 A.   SHE HELD HARD FEELINGS BECAUSE WE TOOK HER CHILDREN AWAY

6 FROM HER.

7 Q.   HER CHILDREN DON'T LIVE WITH YOU OR YOUR WIFE, DO THEY?

8 A.   HER CHILDREN DON'T LIVE WITH HER.

9 Q.   THEY DON'T LIVE WITH YOU, DO THEY?

10 A.   NO.  NO.

11 Q.   NO.  NOW, WHEN STEPHANIE CALLED YOU TO TAKE HER TO COURT

12 YOU WOULDN'T TAKE HER?

13 A.   SHE DIDN'T CALL ME.  I HAD PICKED HER UP TO BRING HER TO

14 THE SHOP TO WORK.  SHE WAS AT THE SHOP.

15 Q.   SHE WAS AT THE SHOP AND YOU WOULDN'T TAKE HER TO COURT?

16 A.   I WOULDN'T TAKE HER BECAUSE ALL SHE WANTED TO DO WAS SIT

17 AROUND.

18 Q.   OKAY.  AND YOU -- SHE CALLED YOU PURSUING -- YOU

19 TESTIFIED THAT SHE CALLED YOU AND SAID SHE WAS FINALLY READY

20 TO DO THE RIGHT THING AND YOU WOULDN'T GO GET HER UNLESS YOU

21 HAD TO GO TO JOHNSTON COUNTY, CORRECT?

22 A.   THAT WAS ON THE 30TH, BEFORE SHE WENT TO COURT.  THAT WAS

23 A WEEK OR TWO BEFORE.

24 Q.   THAT'S RIGHT.  TWO SEPARATE INCIDENTS.

25 A.   RIGHT.  THAT'S RIGHT.

1 Q.   SO, A WEEK BEFORE SHE NEEDED YOU TO TAKE HER TO COURT?

2 A.   YES, MA'AM.  YES, MA'AM.

3 Q.   AND YOU WOULDN'T TAKE HER?

4 A.   THAT'S RIGHT.

5 Q.   AND THEN SHE GETS AN ORDER FOR ARREST AND THEN SHE CALLS

6 YOU AND SAYS, ACCORDING TO YOU, THAT SHE SAID SHE'S FINALLY

7 READY TO DO RIGHT --

8 A.   SHE NEEDED SOME HELP.

9 Q.   -- AND WANTED TO GO SEE HER PROBATION OFFICER AND YOU

10 TOLD HER YOU WOULD COME GET HER IF YOU -- BUT YOU WEREN'T --

11 YOU TOLD HER YOU WEREN'T GOING TO COME GET HER, YOU WEREN'T

12 GOING TO MESS WITH IT.  AND THEN YOU'VE GOT TO GO TO JOHNSTON

13 COUNTY AND THEN YOU DECIDED YOU MIGHT HELP HER OUT.

14 A.   NO, I TOLD HER IF I HAD A REASON TO GO DOWN THERE I WOULD

15 CALL HER BACK BECAUSE I TRAVELLED BACK AND FORTH TO JOHNSTON

16 COUNTY A LOT OF TIMES TO GO DOWN THERE AND CARRY PARTS AND

17 STUFF DOWN THERE.  I GO TO FAYETTEVILLE A LOT OF TIMES TO

18 CARRY PARTS.

19 Q.   NOW, YOU MET HER PROBATION OFFICER?

20 A.   YES, MA'AM.

21 Q.   YOU HAVE A PROBATION OFFICER?

22 A.   YES, MA'AM.

23 Q.   YOU'RE FAMILIAR WITH HOW THE PROBATION SYSTEM WORKS?

24 A.   OH, YEAH, THAT'S RIGHT.

25 Q.   OKAY.  STEPHANIE HAS BEEN SITTING AT YOUR SHOP

1 COMPLAINING ABOUT WANTING TO GET HIGH --

2 A.   UH-HUH.

3 Q.   -- WANTING TO GET HIGH --

4 A.   UH-HUH.

5 Q.   -- AND YOU CALLED HER PROBATION OFFICER AND TOLD HER YOUR

6 CONCERNS, RIGHT?

7 A.   NO.

8 Q.   NO.  BECAUSE THAT WOULDN'T HAVE HELPED HER.  YOU DIDN'T

9 SAY -- YOU HAD AN OPPORTUNITY WHEN HER PROBATION OFFICER CAME

10 TO THE SHOP AND WAITED FOR HER FOR AN HOUR TO TALK TO HER

11 PROBATION OFFICER ABOUT YOUR CONCERNS ABOUT STEPHANIE, DIDN'T

12 YOU?

13 A.   I NEVER DISCUSSED ANY PERSONAL PROBLEMS WITH HER WITH HER

14 PROBATION OFFICER.

15 Q.   YOU DIDN'T DISCUSS --

16 A.   SHE ASKED ME HOW SHE'S WORKING.  I SAID SHE'S WORKING

17 FINE AT THE TIME.  AND THEN SHE -- I SENT HER TO GO GET PARTS

18 -- THE LAST TIME HER PROBATION WAITED ONE HOUR.  SHE LEFT.

19 MATTER OF FACT, SHE WENT TO JOHNSTON COUNTY TO PICK UP SOME

20 PARTS AND THAT'S WHERE SHE HAD GONE.  SHE DID COME BACK, BUT

21 IT WAS ABOUT 15 MINUTES AFTER THE PAROLE OFFICER LEFT.

22 Q.   OKAY.  AND WHEN SHE WAS SITTING AT YOUR SHOP COMPLAINING,

23 ACCORDING TO YOU, JUST LAYING AROUND BEING LAZY, SAYING SHE

24 JUST WANTS TO GO GET -- SHE WANTS TO GET HIGH, YOU PICK UP THE

25 PHONE AND CALLED HER PROBATION OFFICER?

1  A.   NO.

2  Q.   NO?

3  A.   (WITNESS SHAKES HEAD.)

4  Q.   OKAY.  NOW, YOU KNEW HER PROBATION OFFICER?

5  A.   RIGHT.

6  Q.   MET HER PROBATION OFFICER, DIDN'T YOU?

7  A.   I PICKED HER UP AND TOOK HER HOME.

8  Q.   EXCUSE ME?

9  A.   I PUT HER RIGHT IN MY TRUCK AND TOOK HER HOME.

10  Q.   OKAY.  TOOK HER HOME?

11  A.   UH-HUH.

12  Q.   HOW MANY TIMES HAVE YOU DONE METHAMPHETAMINE?

13  A.   I TRIED IT ONE TIME AND THAT'S IT.

14  Q.   YOU TRIED IT ONE TIME --

15  A.   YES, MA'AM.

16  Q.   -- AND THAT'S IT?

17  A.   YES, MA'AM.

18  Q.   OKAY.  DO YOU REMEMBER WHEN YOU GOT ARRESTED ON JUNE

19  30TH, 2011 --

20  A.   YES, MA'AM.  I MADE THE --

21  Q.   -- DO YOU REMEMBER SPEAKING WITH DETECTIVE JAY CREECH?

22  A.   I REMEMBER THE COMMENT I MADE.

23  Q.   DO YOU REMEMBER MR. CREECH READING YOUR MIRANDA WARNINGS?

24  A.   UH-HUH.

25  Q.   OKAY.  AND YOU TELLING HIM THAT YOU KNEW YOUR RIGHTS AND

1  YOU WANTED TO WAIVE THEM AND SPEAK TO DETECTIVE CREECH, DO YOU

2  RECALL THAT?

3  A.   OH, YEAH.

4  Q.   DO YOU RECALL TELLING DETECTIVE CREECH THAT YOU'VE BEEN A

5  USER OF METHAMPHETAMINE FOR APPROXIMATELY SIX YEARS?

6  A.   NO, MA'AM.  I TOLD HIM THAT I HAD DONE COCAINE IN THE

7  PAST, PLENTY OF COCAINE IN THE PAST, AND I DIDN'T EVEN KNOW

8  WHAT METH WAS UNTIL SIX YEARS AGO.  I DIDN'T EVEN KNOW WHAT IT

9  WAS AND I DIDN'T.  THAT'S THE GOD'S HONEST TRUTH.

10 Q.   AND YOU TOLD DETECTIVE CREECH THAT YOU HAD BEEN A USER OF

11 METHAMPHETAMINE FOR SIX YEARS, ISN'T THAT CORRECT --

12 A.   NO, MA'AM.

13 Q.   -- MR. LEWIS?

14 A.   NO, MA'AM.  BECAUSE THAT'S --

15 Q.   YOU TOLD HIM --

16 A.   HE MISUNDERSTOOD ME BECAUSE --

17 Q.   OKAY.

18 A.   -- I TOLD HIM AT THE SAME TIME, GIVE ME A DRUG TEST.

19 Q.   OKAY.  AND SO -- LET'S SEE.

20 A.   AND NO ONE'S GIVEN ME ONE YET.

21 Q.   SO, DO YOU RECALL WHEN YOU WERE ARRESTED ON YOUR FEDERAL

22 CHARGES?

23 A.   YES, MA'AM.

24 Q.   AND DO YOU RECALL SITTING DOWN ON THURSDAY, AUGUST THE

25 11TH OF 2011, WITH SPECIAL AGENT KELLY PAGE?

1  A.   I REMEMBER KELLY PAGE MAKING A COMMENT AT THE END SAYING

2  YOU'RE SAYING --

3  Q.   EXCUSE ME.  I DIDN'T ASK --

4  A.   -- NOTHING TO INCRIMINATE YOURSELF --

5  Q.   -- YOU WHAT INVESTIGATOR PAGE OR WHAT SPECIAL AGENT PAGE

6  SAID TO YOU.

7  A.   YES, MA'AM.

8  Q.   I ASKED YOU IF YOU RECALL A MEETING WITH HER.

9  A.   AS LONG AS WE CAN TELL THE TRUTH, MA'AM.

10 Q.   ALL RIGHT.

11        THE COURT:  WE'RE GOING TO STOP FOR THE DAY.  WE'LL

12 START AGAIN TOMORROW MORNING.  FOLKS, TOMORROW, IF YOU'LL BE

13 HERE AT NINE O'CLOCK, WE'LL GET A PROMPT START AS USUAL.  BUT,

14 REMEMBER, TOMORROW IS FRIDAY, WE'RE GOING TO STOP AT THREE

15 O'CLOCK.  AND WHAT WE'LL DO IS WORK TILL LUNCHTIME, THEN WE'LL

16 TAKE A BREAK FOR LUNCH, AND WE'LL COME BACK AT 1:00 AND WORK

17 TILL 3:00 AND THEN WE'LL QUIT FOR THE WEEKEND.  SO, YOU CAN

18 PLAN THAT ACCORDINGLY.

19        IF WE HAVE TO GO OVER TILL MONDAY I MAY HAVE ANOTHER

20 HEARING THAT WILL TAKE A LITTLE BIT OF TIME EARLY THAT

21 MORNING, BUT WE'LL ARRANGE FOR YOU ALL TO COME IN AROUND 12:00

22 OR SOMETHING LIKE THAT PROBABLY SO I CAN GET RID OF THAT OTHER

23 MATTER BECAUSE THAT'S BEEN SCHEDULED FOR A LONG TIME AND IT'S

24 GOT A PUBLIC NOTICE AND I'VE GOT TO HANDLE THAT.

25        BUT IN ANY EVENT, HAVE A NICE EVENING TONIGHT.

1  REMEMBER NOT TO TALK ABOUT THE CASE OR DISCUSS IT OR READ ANY

2  NEWS ACCOUNTS.  YOU CAN STEP OUT FOR YOUR EVENING RECESS.  SEE

3  YOU TOMORROW MORNING AT 9:00.  HAVE A GOOD NIGHT.

4          (OUT OF THE PRESENCE OF THE JURY AND ALTERNATES.)

5          THE COURT:  MS. WELLS.

6          MS. WELLS:  YES, SIR, YOUR HONOR.

7          THE COURT:  THE INDICTMENT -- LET ME SEE WHAT I DID

8  WITH THAT.

9          (PAUSE.)

10          THE COURT:  THE INDICTMENT ON THE CONSPIRACY IS

11  CONSPIRACY TO POSSESS WITH INTENT TO DISTRIBUTE A MIXTURE AND

12  SUBSTANCE CONTAINING A DETECTABLE AMOUNT OF METHAMPHETAMINE.

13          MS. WELLS:  YES, SIR.

14          THE COURT:  HAS ANYBODY BEEN FOUND WITH A MIXTURE OR

15  SUBSTANCE?

16          MS. WELLS:  YOUR HONOR, I THINK THAT -- I MEAN, IT'S

17  METHAMPHETAMINE OR A MIXTURE OR SUBSTANCE CONTAINING

18  METHAMPHETAMINE.

19          THERE'S CERTAINLY BEEN PLENTY OF TESTIMONY ABOUT

20  METHAMPHETAMINE, THE PRODUCTION OF METHAMPHETAMINE.  ANYTHING

21  THAT CONTAINS METHAMPHETAMINE CERTAINLY IS A MIXTURE OR

22  SUBSTANCE CONTAINING METHAMPHETAMINE JUST LIKE IN EVERY OTHER

23  METHAMPHETAMINE CASE THAT WE'VE HAD, YOUR HONOR.

24          THE COURT:  I UNDERSTAND THAT, BUT MAYBE I'M LOOKING

25  AHEAD TOWARDS SENTENCING, BUT I HAVEN'T HEARD ANYTHING ABOUT A

1  MIXTURE OR SUBSTANCE.

2       MS. WELLS:  I THINK WE'VE DEFINITELY TALKED A LOT

3  ABOUT METHAMPHETAMINE, THE AMOUNT OF METHAMPHETAMINE AND THOSE

4  THINGS.

5       THE COURT:  I UNDERSTAND THAT, MS. WELLS.  I'M

6  TRYING TO -- UNDER THE PENALTY PROVISIONS IT TALKS ABOUT A

7  SUBSTANCE OR MIXTURE.

8       MS. WELLS:  YES, SIR.

9       THE COURT:  AND I DON'T KNOW IF YOU WOULD -- ARE YOU

10  GOING TO HAVE TO RELY ON ACTUAL METHAMPHETAMINE AS OPPOSED TO

11  A MIXTURE IF YOU DON'T HAVE ANY QUESTIONS OF A MIXTURE OR

12  SUBSTANCE?

13       MS. WELLS:  WELL, YOUR HONOR, I THINK -- I MEAN, I

14  WILL SAY THIS, EVERY -- ALL THE PREVIOUS INDICTMENTS THAT

15  WE'VE HAD -- AND I KNOW -- IF WE'RE TALKING ABOUT SENTENCING,

16  IF WE'RE TALKING ABOUT SENTENCING -- NOW, IF THERE'S AN ISSUE

17  AS TO THE GUILT OR INNOCENCE PHASE, CORRECT ME IF I'M WRONG --

18       THE COURT:  WELL, I WAS JUST LOOKING AHEAD.

19       MS. WELLS:  YES, SIR.

20       THE COURT:  BUT I'D LIKE TO THINK ABOUT THAT.

21       MS. WELLS:  YOU KNOW, I'M KIND OF SUPERSTITIOUS, I

22  DON'T REALLY WANT TO LOOK AHEAD, BUT, I MEAN, I THINK THAT'S

23  -- THAT'S THE STATE COURT PROSECUTOR STILL IN ME.

24       BUT, JUDGE, YOU KNOW, A MIXTURE OR SUBSTANCE

25  CONTAINING METHAMPHETAMINE, CERTAINLY WE ALREADY HAVE LAB

1 REPORTS TALKING ABOUT METHAMPHETAMINE --

2          THE COURT:  YES.

3          MS. WELLS:  -- AND WE HAVE TESTIMONY FROM THE

4 WITNESS STAND ABOUT PRODUCTION OF METHAMPHETAMINE AND THE

5 AMOUNT OF METHAMPHETAMINE THAT WAS -- WAS PRODUCED IN THIS

6 CASE.

7          NOW, AT SENTENCING I -- AGAIN, I DON'T SEE HOW WE --

8 IF WE WERE TO REACH SENTENCING, I DON'T SEE HOW WE WOULD

9 HANDLE IT ANY DIFFERENT THAN ANY OTHER SENTENCING WHERE WE'VE

10 CHARGED -- I'VE NEVER CHARGED IT AS ACTUAL METHAMPHETAMINE IN

11 ANY INDICTMENT THAT I'VE EVER HAD.  I'VE ALWAYS CHARGED AS A

12 MIXTURE OF SUBSTANCE.

13          THE COURT:  WELL, I'M NOT SAYING YOU'RE WRONG, BUT

14 I'M JUST TELLING YOU A QUESTION THAT COMES UP IN MY MIND.

15          MS. WELLS:  AND I THINK -- AND, JUDGE, I WOULD HAVE

16 TO GO BACK AND I DON'T HAVE MY STATUTE BOOK WITH ME, BUT, I

17 GUESS, I -- AGAIN, I THINK THAT WE WOULD -- I WOULD ANTICIPATE

18 HANDLING PRODUCTION AND HANDLING AMOUNTS OF METHAMPHETAMINE IN

19 A SIMILAR MANNER TO WHICH WE'VE HANDLED THEM BEFORE IF WE WERE

20 TO REACH THE SENTENCING PHASE OF IT.

21          (COURT CONFERS WITH LAW CLERK.)  (PAUSE.)

22          MS. WELLS:  YOUR HONOR, I CAN SAY THIS, FOR 841, THE

23 UNDERLYING CHARGE, THAT THERE IS NO CHARGE -- THERE IS NO

24 DIFFERENT -- IT'S EITHER 500 GRAMS, 50 GRAMS, AND IT DOESN'T

25 -- IT'S THE GUIDELINES THAT LOOK AT ACTUAL VERSUS A MIXTURE

1 AND I DON'T THINK THAT THAT MIXTURE THAT THEY'RE DISCUSSING IS

2 THE SAME MIXTURE OR SUBSTANCE CONTAINING A DETECTABLE AMOUNT

3 OF METHAMPHETAMINE THAT CONGRESS CONTEMPLATED IN 841(a)1.

4          THE COURT:  WELL --

5          MS. WELLS:  THERE'S NO SEPARATE CHARGE FOR ACTUAL

6 METH IS WHAT I'M SAYING.

7          THE COURT:  WELL, HAVEN'T YOU GOT TO PROVE WHAT THE

8 INDICTMENT SAYS?

9          MS. WELLS:  I DO, YOUR HONOR.

10          THE COURT:  AND ISN'T QUANTITY PART OF THE

11 INDICTMENT?

12          MS. WELLS:  ABSOLUTELY, YOUR HONOR.

13          THE COURT:  AND WHAT IS THE QUANTITY OF?

14          MS. WELLS:  THE QUANTITY --

15          THE COURT:  IS OF A MIXTURE OR SUBSTANCE.

16          MS. WELLS:  YES, SIR, AND --

17          THE COURT:  WHAT KIND OF MIXTURE OR SUBSTANCE HAS

18 BEEN TESTIFIED TO IN THIS COURT?

19          MS. WELLS:  METHAMPHETAMINE.  JUDGE, I MEAN --

20          THE COURT:  YOU HAVE TO PROVE WHAT THE INDICTMENT

21 SAYS.

22          MS. WELLS:  YES, SIR, I AGREE.

23          THE COURT:  SO, IF YOU INDICTED SOMEBODY FOR KILLING

24 HOGS AND THEY'RE KILLING DEER, YOU COULD STILL GET THEM FOR

25 KILLING BOVINES, IS THAT RIGHT?

1        MS. WELLS:  JUDGE, THIS INDICTMENT DOES NOT SAY

2  MARIJUANA, IT SAYS METHAMPHETAMINE.

3        THE COURT:  YOUR INDICTMENT -- LISTEN, I'LL READ YOU

4  YOUR INDICTMENT, IF YOU WANT ME TO READ IT.  YOU'RE FAMILIAR

5  WITH IT.

6        MS. WELLS:  I'M FAMILIAR WITH IT.

7        THE COURT:  BUT YOU'VE GOT -- YOU'VE CHARGED A

8  QUANTITY OF A MIXTURE OR SUBSTANCE.

9        MS. WELLS:  YES, SIR.

10        THE COURT:  NOW, IF YOU CHARGE ONE THING YOU'VE GOT

11  TO PROVE THAT.

12        MS. WELLS:  YES, SIR, I AGREE.

13        THE COURT:  WELL, YOU TELL ME WHERE THE SUBSTANCE

14  AND MIXTURE IS.

15        MS. WELLS:  WELL, JUDGE --

16        THE COURT:  WELL, JUST THINK ABOUT IT.  I'M NOT --

17        MS. WELLS:  I THINK I AM EVIDENTLY MISSING YOUR

18  POINT BECAUSE -- AND IF I COULD HAVE AN OPPORTUNITY TO GO BACK

19  AND LOOK AT -- I MEAN, I'VE GOT BOOKS UNDER THE TABLE I COULD

20  CERTAINLY LOOK AT THAT MIGHT HELP ME ANSWER YOUR QUESTION A

21  LITTLE BIT MORE CLEARLY.

22        THE COURT:  WELL, YOU'VE GOT A QUANTITY OF

23  SOMETHING.

24        MS. WELLS:  YES, SIR.

25        THE COURT:  WHAT HAVE YOU PRODUCED A QUANTITY OF?

1 METHAMPHETAMINE OR A MIXTURE AND SUBSTANCE?

2          MS. WELLS:  YOUR HONOR, I DON'T THINK -- I THINK

3 THAT IT'S -- AS FAR AS I'M CONCERNED AND AWARE, IT'S THE SAME.

4          THE COURT:  WELL, IT MAY BE, BUT I'LL LET YOU

5 CONSIDER IT.  WE'LL TALK ABOUT IT FURTHER.

6          MS. WELLS:  YES, SIR, YOUR HONOR.

7          THE COURT:  WE'LL TAKE A RECESS TILL TOMORROW

8 MORNING AT NINE O'CLOCK.  REMEMBER WE'RE GOING TO STOP

9 TOMORROW AT THREE O'CLOCK.

10          MS. WELLS:  YES, SIR.

11          (WHEREUPON, THESE PROCEEDINGS RECESSED AT 4:42 P.M.,

12 TO RECONVENE AT 9:00 A.M., ON NOVEMBER 18, 2011.)

          I CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE
TRANSCRIPT OF SAID PROCEEDINGS.

/s/ STACY SCHWINN                                   5/29/12
STACY SCHWINN, CCR, CVR                             DATE

November 17, 2011